UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____

TYLON C. OUTLAW                    )

            VS                     )   CASE NO: 3_07-CV-01769

TROY GORDON & MICHAEL ALLEN    )

_____)CROSS EXAMINATION & RE-DIRECT
                                 EXAMINATION OF TYLON C. OUTLAW
                                     AT TRIAL BY JURY


BEFORE:   HONORABLE GEOFFREY W. CRAWFORD
          DISTRICT JUDGE


APPEARANCES:  ANTHONY P. DiCROSTA, ESQUIRE
                   Mirto, Ketaineck & DiCrosta
                   P.O. Box 428
                   West Haven, Connecticut   06516
                   Representing The Plaintiff

              RAYMOND J. RIGAT, ESQUIRE
                   Gilbride & Rigat
                   23 E. Main Street
                   Clinton, Connecticut   06413
                   Representing The Plaintiff


                   (Appearances Continued:)


DATE:         January 5, 2016


         TRANSCRIBED BY:  Anne Marie Henry, RPR
                          Official Court Reporter
                          P.O. Box 1932
                          Brattleboro, Vermont   05302

2

1

2                        APPEARANCES CONTINUED:

3

4       NATHALIE FEOLA-GUERRIERI, ESQUIRE
               City of Hartford
5              Office of Corporation Counsel
               550 Main Street
6              Hartford, Connecticut   06013
               Representing the Defendants
7

8

9       WILLIAM J. MELLEY, III, ESQUIRE
               Law Offices of William J. Melley, III
10             250 Hudson Street
               Hartford, Connecticut  06106
11             Representing the Defendants

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1             CROSS EXAMINATION BY MR. MELLEY:

 2             THE COURT:  Mr. Melley, it's your turn.

 3             MR. MELLEY:  Thank you, Your Honor.

 4             CROSS EXAMINATION BY MR. MELLEY:

 5   Q.   Good morning, Mr. Outlaw.

 6   A.   Good morning.

 7   Q.   You described for the jury your past history as a

 8   football player.  Do you recall that?

 9   A.   Yes.

10   Q.   And is it fair to say that primarily you played defense

11   as a free safety?

12   A.   I played both sides.

13   Q.   Okay.  When you were with Missouri Valley, did you play

14   as a free safety the whole time?

15   A.   Yes.

16   Q.   All right.  And Missouri Valley, was that the

17   professional, semi-pro professional arena football?

18   A.   No.

19   Q.   What was that?

20   A.   That was college.

21   Q.   College.  Okay.  You played a lot of defense in

22   football in high school, is that right?

23   A.   Yes.

24   Q.   And as a matter of fact, you did well playing football

25   on defense, is that a fair statement?
```

1  A.    Yes.

2  Q.    As a matter of fact, did you get a chance to make a

3  record for interceptions in high school that still has a

4  place in the records today?

5  A.    Yes.

6  Q.    And when we're talking about making an interception, as

7  a defensive football player, that involves being aware of 21

8  football players on the field and making a judgment where

9  you can have a direct impact on the flow of the game, is

10  that fair?

11  A.    Twenty-two, yes.

12  Q.    Well, you would be the 22nd?

13  A.    Right.

14  Q.    So you're aware of 21 others?

15  A.    Right.   Yes.

16  Q.    And that involves being very aggressive in terms of

17  establishing your position and being able to foresee a ball,

18  a carrier, an intended pass receiver coming at you, is that

19  fair?

20  A.    I would call it eye, hand coordination.

21  Q.    Okay.   And the eye is, again, being observant of your

22  entire surroundings, is that fair?

23  A.    That's correct.

24  Q.    So 2004, when this incident occurs, you've had, you had

25  stopped playing in 2002?

1   A.    Yes.

2   Q.    So up until 2002 you had what, a solid 10 years of

3   playing fairly competitive football?

4   A.    Yes.

5   Q.    And fairly competitive football also includes a fair

6   amount of contact, is that right?

7   A.    Yes.

8   Q.    And part of what happens in football is that if you get

9   hit you got to carry on, is that right?

10  A.    Possibly, yes.

11  Q.    One of the reasons you wanted to stop playing football,

12  as I understand your testimony, is that you wanted to avoid

13  getting hurt, is that right?

14  A.    That's correct.

15  Q.    But along the way you certainly had your share of bumps

16  and bruises, is that right?

17  A.    Yes.

18  Q.    And, as a matter of fact, when this incident occurred,

19  do you recall me asking you if you were knocked unconscious?

20  A.    Yes.

21  Q.    And do you recall telling me that based upon your

22  football experience you are very hard to knock unconscious?

23  A.    Yes.

24  Q.    And that's because during your football career you got

25  hit a lot, including in the head, and you were able to

```
 1   withstand it?
 2   A.   Yes.
 3   Q.   And in the football career, even though you're getting
 4   hit in the head, you had the wherewithal to be able to carry
 5   on and continue in a game, is that fair?
 6   A.   It all depends.  If you have a concussion you can't
 7   carry on.
 8   Q.   Well, did you ever leave the game with a concussion?
 9   A.   Yes, in high school.
10   Q.   Okay.  But not in college and or in arena football?
11   A.   No.
12   Q.   And just so we're clear on that, when we talk about
13   arena football, it's the same type of football that the NFL
14   has except it's in an arena as opposed to an outdoor
15   football field, is that right?
16   A.   It's indoor football, yes.
17   Q.   All right.  But you have the full pads, full contact
18   and it's a very physical game?
19   A.   That's correct.
20   Q.   And on this day, December 17th, you were healthy, is
21   that right?
22   A.   Yes.
23   Q.   Now, at some point in high school, or whatever, you did
24   injure your left knee where you had a PCL tear?
25   A.   Yes.
```

```
1    Q.   And the PCL is the posterior cruciate ligament?
2    A.   Yes, it is.
3    Q.   We hear a lot about ACL's or anterior, that's in the
4    front.  The PCL is towards the rear, right?
5    A.   Yes, it's in the back.
6    Q.   And that will have an effect on your overall stability
7    unless you can work it up?
8    A.   I don't understand your question.
9    Q.   With regard to the knee, you had to build that knee up
10   because of the PCL?
11   A.   Umhum.
12   Q.   Is that right?
13   A.   Yes.
14   Q.   All right.  And, likewise, did you develop a problem
15   with the right knee with the PCL?
16   A.   Are you asking me I have a hurt left knee?
17   Q.   Yup.  Did you also have a deficiency in the right knee
18   with the PCL?
19   A.   Not before this incident.
20   Q.   You were never operated on, is that right?
21   A.   Right.
22   Q.   But you had a strain in that right knee as well?
23   A.   No.
24   Q.   All right.  Let's back up to the night of December 17.
25   As I understand it you worked all day and you went home, is
```

```
1    that right?
2    A.   That's correct.
3    Q.   And at some point you got a call from your friend and
4    you go downtown to meet him, is that right?
5    A.   Yes.
6    Q.   And the place you were intending to go, this Bourbon
7    Street, we saw a picture of it, that's a place you had been
8    before, is that right?
9    A.   Yes.
10   Q.   And I think you described for us, but I want to be
11   clear, when you got to Hartford you decided you wanted to
12   try to park on the street to save a couple of bucks, is that
13   right?
14   A.   That's correct.
15   Q.   So you went around the block several times without
16   success in finding a parking space, is that right?
17   A.   That's correct.
18   Q.   And so we're clear on this, where Bourbon Street is is
19   also the location of a number of bars that cater, for lack
20   of a better word, people in their younger years, their 20's
21   or their 30's, is that fair?
22   A.   I think anybody could go down there.  I was 30 at the
23   time.  I don't know.  I never was looking at ages.  I seen
24   all ages there.
25   Q.   Okay.  Would you agree it's generally a younger crowd
```

1   in 20's and 30's as opposed to --

2   A.   I actually thought Bourbon Street was for the older

3   crowd.

4   Q.   All right.  Because right around the corner you have

5   what, Coach's?

6   A.   Yes.

7   Q.   All right.  And that was, was that originally Jim

8   Calhoun's Place and then he sold it off?

9   A.   I believe so.

10  Q.   And then across the street is Up On The Rocks?

11  A.   I believe so.

12  Q.   And Federal Hill?

13  A.   I never heard of it.

14  Q.   Or the Federal Cafe?

15  A.   I never heard of it, but --

16  Q.   Okay.  But is it fair to say there's what, four, five,

17  six establishments within an area of a block or two?

18  A.   Yes.  There's a lot of different places.

19  Q.   All right.  And people generally go to these places

20  later at night, is that right?

21  A.   That's correct.

22  Q.   So 10 o'clock is actually kind of on the early side?

23  A.   That's correct.

24  Q.   The place will get busier as we get to midnight and

25  then beyond, is that right?

A.    Yes.

Q.    But when you go at this, leaving your house at 9:30 from Weathersfield to go to this area you have to circle a number of times to find a spot because it's starting to get crowded then, is that right?

A.    Well, you just never know.  You could find a spot in Hartford.

Q.    Okay.  You said you left at 9:30.  And your residence to this place, what are we talking, four or five miles tops?

A.    Somewhere around there.  That's about it --

Q.    So on a -- I'm sorry?

A.    I said it kind of depends.

Q.    Okay.  But, in any event, it would be about a 10 minute ride?

A.    With no traffic.

Q.    With -- well, is there traffic on Saturday night from Weathersfield before you get to Union Place?

A.    Yeah, on a Friday night.  I live on the Berlin Turnpike area so there's always traffic.

        THE COURT:  Why don't you try to pushing that miche away back from you?

        THE WITNESS:  Is that better?  Yup.

        THE COURT:  There you go.

Q.    So when you get down to Union Place, you can't find a spot after going around a couple of times, so you end up

1    parking.  And I was confused by what you said.  Did you park

2    in the Holiday Inn or the Coach's parking lot?

3    A.    I guess it is Coach's parking lot and Holiday Inn.

4    Q.    Okay.  And do you recall when you go into Bourbon

5    Street are there a fair amount of people on the street?

6    A.    You mean walking?

7    Q.    Yeah.

8    A.    Not really.

9    Q.    Okay.  This is a week before Christmas Eve exactly,

10   right?

11   A.    Yes.

12   Q.    And do you recall seeing a lot of younger people

13   starting to come home from college for the holiday season?

14   A.    Um, really I wasn't paying attention to it.

15   Q.    Okay.  In any event, is it fair to say if you left your

16   house at 9:30 you are inside Bourbon Street by 10, is that

17   right?

18   A.    Well, I left my house after 9:30.  I'm not sure of the

19   exact time I left my house.

20   Q.    But you're in Bourbon Street by 10?

21   A.    Somewhere 10, 10:15.

22   Q.    All right.  Now, this incident that brings us together,

23   what time did it happen?

24   A.    Um, the report it said, I think it said 11:54 or

25   something like that.

1    Q.    And do you agree or disagree?

2    A.    Of that exact time?  Agree or disagree to what?

3    Q.    That it occurred at 11:54?

4    A.    That it started at 11:54 or ended at 11:54?

5    Q.    The incident that happened with Detective Gordon --

6    A.    Yes.

7    Q.    -- is it fair to say that it happened at 6 minutes

8    approximately before midnight?

9    A.    Did it start -- I'm asking, are you asking did it start

10   at 11:54 or ended at 11:54?

11   Q.    Well, let's go at it another way.  How long were you in

12   Bourbon Street?

13   A.    Somewhere around an hour.

14   Q.    An hour.  So if you arrived at 10 o'clock that would

15   mean you left at 11, is that right?

16   A.    Yes, that's what it would mean.

17   Q.    Okay.  So that would mean that once you left Bourbon

18   Street, 54 minutes, if we believe the police report, occur

19   before the incident happens, is that right?

20   A.    If that was the exact time, yes.

21   Q.    Okay.  So let's back up.  When you leave Bourbon Street

22   you say your intention is to go right to your car to go

23   home, is that right?

24   A.    Yes.

25   Q.    And to do that you would walk along the east sidewalk

1    of Union Place, cross Allen Street, into the parking lot and

2    leave?

3    A.    Yes.

4    Q.    And that distance is maybe what, a hundred and 50 yards

5    total?

6    A.    Hundred 50, 200 yards, yes.

7    Q.    So that's something that would take two minutes?

8    A.    It would take --

9    Q.    All right.  And once you left Bourbon Street I think

10   you said that you walked down and you got to a point where

11   you were by Papa's Pizza, is that right?

12   A.    Yes.

13   Q.    And Papa's Pizza, if we're looking at Bourbon Street,

14   would be to the right as we're going towards the Coach's

15   parking lot?

16   A.    Yes.

17   Q.    And Papa's Pizza, have you been there before?

18   A.    I've been there before, yes.

19   Q.    It's closed now, but did you go there in the day back

20   when it was open?

21   A.    I've been there before, yes.

22   Q.    All right.  It's, it was open 24 hours a day and a lot

23   of people went late at night after 10, 11, 12, 4 in the

24   morning?

25   A.    I've been there during the day, yes.

1    Q.    Do you remember there being a lot of people at Papa's?

2    A.    Not really during the day.

3    Q.    This night?

4    A.    No, I don't think there was a lot of people --

5    Q.    Okay.  So --

6    A.    -- yet anyway.  It was early.

7    Q.    Excuse me?

8    A.    It was early.  So there wasn't a lot of people out.

9    Q.    Okay.  In other words, you would expect more people at

10   Papa's as we get closer to midnight, 1 and 2 o'clock when

11   the bars are going to close?

12   A.    Maybe when everything closes, yes.

13   Q.    Okay.  So, in any event, as you are walking towards

14   Papa's from Bourbon Street what's that take, 30 seconds, 10

15   seconds?

16   A.    From, from Bourbon to Papa's you said?

17   Q.    Yes.

18   A.    Yes, just a few seconds.

19   Q.    Okay.  So if that's at 11, 11:02, whatever time it is,

20   if we believe the 11:54, from the time that you got the word

21   from Anthony Carroll you're saying that you were there for

22   50 odd minutes before the incident happens?  5-0?

23   A.    5-0?  Um, I'm saying that I was in Bourbon Street about

24   an hour.  I could have got there at 10:15, 10:20, somewhere

25   around there.  And I stayed about an hour.

1   Q.   Do you remember me asking you in your deposition when

2   it was that you arrived at Bourbon Street?

3   A.   Yes, I do.

4   Q.   All right.  And what did you tell me?

5   A.   I really couldn't remember the time.  And I still

6   can't.

7          MR. MELLEY:  Your Honor, may I approach?

8          THE COURT:  Sure.  It will pick you up fine.  You

9   don't have to lean forward.

10         THE WITNESS:  Okay.

11         MR. MELLEY:  Let's, if I may approach?

12         THE COURT:  Sure.

13  Q.   I hand you this, sir.

14  A.   Umhum.

15  Q.   Do you remember coming to my office back in, what is

16  it, it's on the front page, December 2nd, 2008, so that's

17  eight years ago?

18  A.   Yes.

19  Q.   And eight years ago was a lot closer to the event than

20  we are today, is that fair?

21  A.   Yes.

22  Q.   And the deposition was at my office a couple blocks

23  from here?

24  A.   Yes.

25  Q.   A small brick building, third floor, you had to walk

1   up?

2   A.    Yup.

3   Q.    And you were there with your two attorneys?

4   A.    Yes, I was.

5   Q.    And do you recall me asking you a series of questions?

6   A.    Yes, I do.

7   Q.    And you answered those questions to the best of your

8   ability, is that fair?

9   A.    Yes.

10  Q.    And then at the end of the deposition your attorney

11  asked you some series of questions covering multiple pages,

12  is that fair?

13  A.    Yes.

14  Q.    And the idea was that to the extent there was issues

15  that I created your attorney asked you follow-up questions,

16  is that right?

17  A.    I know he asked me some questions at the end of the

18  interview.  Yes.

19  Q.    Okay.  And then as a follow-up to the deposition you

20  had, and it's attached there in the beginning, an errata

21  sheet.  Do you recall that?  Where you could make

22  corrections or fix anything in the whole deposition if there

23  was something off?

24  A.    I don't know what an errata sheet is.  I'm sorry.

25  Q.    If you open up that package I just gave you, right in

1    the front, if you open it, do you see it?

2    A.    Yes.

3    Q.    And do you see you signed the page?

4    A.    Okay.

5    Q.    Is that your signature?

6    A.    Yes, it is.

7    Q.    And there are what, four little corrections there to

8    different parts of the transcript?

9    A.    Yes.

10   Q.    Okay.  So now, if you could, if you could go to Page 80

11   of that deposition, please?  And if you can direct your

12   attention to line 17 where I asked you, that I was trying to

13   figure out exactly when it was that you arrived at Bourbon

14   Street.  And I specifically asked you, when was that in

15   relation to 9:30.  Do you see that?

16   A.    Yes.

17   Q.    All right.  And can you look at your response there?

18   All right.  Does that refresh your recollection as to what

19   you told me that day?

20   A.    I think that's what I just said.

21   Q.    You arrived at 10, right?

22   A.    No.  It's, it was after 9:30 when I left the house.

23   Q.    I understand that.  And then you said, I probably

24   arrived at Bourbon Street just around 10 o'clock, is that

25   right?

1   A.   Yeah, around.  I'm not pinpointing the times.  I'm
2   really not sure.
3   Q.   Okay.  I'm trying to establish when you arrived so we
4   can figure out when you left.
5   A.   Right.
6   Q.   You said you were at Bourbon Street just an hour?
7   A.   Yes.
8   Q.   So if you arrived at 10 --
9   A.   I'm sorry, around an hour.
10  Q.   Around an hour?
11  A.   Around an hour.  So it could have been an hour, an hour
12  10 minutes, an hour and 15 minutes, but around an hour.
13  Q.   So you are at Bourbon Street, if you arrived at 10, and
14  the incident happens at 11:54, at least an hour and a half,
15  maybe an hour and 45 minutes, maybe more?
16  A.   Okay.
17  Q.   You have any problem with that?
18  A.   I don't think it's accurate, but okay.
19  Q.   Well, I wasn't at Bourbon Street.  And I didn't have my
20  watch.  So we can only use your words.  Does that sound
21  right to you, based upon what you said, that you arrived at
22  10?
23  A.   Arrived after 10, around 10.
24  Q.   Okay.
25  A.   I'm not sure.

```
1    Q.    So when you leave and you go outside and you walk to
2    Papa's you hear from Mr. Carroll, and at that point you
3    cross the street?
4    A.    Correct.
5    Q.    And when you first crossed the street and you go to the
6    cab, how long are you there before you encounter Detective
7    Gordon?
8    A.    The encounter with Detective Gordon was before I
9    reached the cab.
10   Q.    Okay.  When you say the encounter, you're talking about
11   the first --
12   A.    The first words spoken.
13   Q.    First words.  All right.  So let's back up then.  From
14   the time of the first word from Detective Gordon to you,
15   until the incident happens, how much time passed?
16   A.    Um, maybe a minute.
17   Q.    Okay.  Do you recall me asking you that in the
18   deposition?
19   A.    May have.
20   Q.    So, on page 89?
21   A.    Okay.  You want me to go to it?
22   Q.    Sure.
23   A.    Okay.
24   Q.    And how long did you say?  Page 89, lines 1 through
25   three?
```

```
1   A.    I said maybe three minutes.
2   Q.    Okay.  So let's back up.  You leave Bourbon Street, you
3   walk the 20 odd yards to Papa's, you cross the street, and
4   about three minutes later we have this actual incident that
5   you talked about, right?
6   A.    Yes.
7   Q.    So if we do the clock backwards, and we start at 11:54,
8   that would mean that you left Bourbon Street around 11:50,
9   is that right?
10  A.    If I was at Bourbon Street at 10 o'clock on the dot,
11  yes.
12  Q.    And that would mean you were there an hour and 50
13  minutes, is that right?
14  A.    Yes.
15  Q.    So I was somewhat confused and I want to back up.  When
16  you first see Detective Gordon he's in this Taurus and I
17  think you said, correct me if I'm wrong, that you saw him to
18  the south side of Allen Street, is that right?
19  A.    Yes.
20  Q.    Okay.  So if we get our directions, and maybe if I can
21  get one of the photographs.
22            MR. MELLEY:  Your Honor, may I use the --
23            THE COURT:  Projector.  Absolutely.
24            MR. MELLEY:  -- projector?
25            THE COURT:  You can use the young man too if you
```

1    need some help.

2             MR. MELLEY:  I know.  So there it is.

3             THE COURT:  What exhibit is this?

4             MR. MELLEY:  This is Exhibit 1, Your Honor.

5             THE COURT:  Thank you.

6    Q.   So, Mr. Outlaw, if I understand your testimony, we're

7    looking at this photograph.  And just to orientate ourselves

8    that's the state capital to the right, is that right?

9    A.   Yes.

10   Q.   And then to the left is the Holiday Inn Express?

11   A.   Yes.

12   Q.   And then in between Allen Street and the Holiday Inn

13   Express is the parking lot for Coach's and the Holiday Inn

14   Express?

15   A.   Yes.

16   Q.   And Coach's would be just to our left outside this

17   picture, is that right?

18   A.   Yes.

19   Q.   And as I understand what you said, when you first saw

20   Detective Gordon he is stopped on the right-hand side of

21   Union Place heading north, and where would you put him in

22   relation to that do not enter sign which is right in the

23   middle there?

24   A.   I would put him just ahead of the van.

25   Q.   Okay.  So he's back on Allen Street, excuse me, back on

1    Union Place?

2    A.    Right.

3    Q.    Okay.  And is he on the side of the road parked?

4    A.    No.  He's in the middle.

5    Q.    He's in the road?

6    A.    He's in the middle of the road.

7    Q.    All right.  And is his vehicle moving?

8    A.    No.  He's at a stop at this time.

9    Q.    Okay.  And so can you help us out?  Are you saying he's

10   stopped in the travel portion of Union Place?

11   A.    Yeah.

12   Q.    Is there any vehicle in front of him?

13   A.    No.

14   Q.    Does he have his lights on?

15   A.    Regular car lights, yes.

16   Q.    Okay.  But he's just stopped there?

17   A.    Yes.

18   Q.    Okay.  At that point in time can you see anybody in the

19   vehicle?

20   A.    Yes.

21   Q.    And you see an individual in the vehicle?

22   A.    I see a car.  And somebody's in the vehicle, yes.

23   Q.    Okay.  So can you discern from this -- well, you said

24   before it's about a hundred and 50 to 200 yards from Bourbon

25   Street to the parking lot.  And he's close to where your car

```
 1   is.  So he's about 150 yards from you?
 2   A.   No.
 3   Q.   How far is he from you?
 4   A.   He's about 30 feet from me.
 5   Q.   When he's in the car in that spot on Union Place --
 6   A.   Yes.
 7   Q.   -- on the other side of Allen Street, he's 30 feet from
 8   you?
 9   A.   Yeah.  I said 150 feet from the parking area where the
10   Holiday Inn is.  That's 200 yards or a hundred and 50 yards
11   I said.
12   Q.   Maybe I confused the matter.  Let me back up.
13            Did you say from Bourbon Street to where your
14   parked, is that 150 yards or feet?
15   A.   Yards.
16   Q.   Okay.  So a football field and a half?
17   A.   Right.
18   Q.   All right.  So when you first see Detective Gordon's
19   Taurus he's parked near the lot where you are parked, is
20   that right?
21   A.   No.  He's right where this mini-van is, just ahead of
22   this mini-van to the right.
23   Q.   Well, are you talking about the mini-van to the right
24   front of the photo?
25   A.   Yes.
```

```
 1    Q.   I thought before you said, and that's why I asked, when
 2    you first saw his vehicle was he on the far side or the
 3    opposite side of the fire hydrant?
 4    A.   This is the first I heard of a fire hydrant.  I was
 5    saying -- I thought you said the mini-van.  I said the
 6    mini-van.
 7    Q.   You did.  And --
 8              DiCROSTA:  Objection, Your Honor.  He's
 9    characterizing evidence.  Maybe he can just repeat it.
10              THE COURT:  What's that?
11              DiCROSTA:  He's characterizing the evidence.
12              THE COURT:  I'll allow the questioning.  I think
13    they got it a little mixed up and they can start over.
14              THE WITNESS:  He confused me.  I'm sorry.
15              MR. MELLEY:  So please bare with me.
16              THE WITNESS:  Okay.
17    Q.   When you first see Detective Gordon's Taurus, yesterday
18    did you tell us it was on the other side of Allen Street?
19    A.   I believe I'm -- what I'm saying this car is parked
20    where this mini-van is, around this mini-van.
21    Q.   And I see the mini-van is this side of Allen Street.
22    But yesterday did you say it was on the far side?
23    A.   No.  No.  Not the far side.
24    Q.   Maybe I mis-heard it.
25    A.   No.
```

```
 1   Q.   Okay.  All right.  So you're saying when you first see
 2   the -- when you first see the Taurus, if I, maybe if I can
 3   do this, how about there, is it in between those two
 4   vehicles?
 5   A.   Yes.  It's around there.  Around there.
 6           THE COURT:  You can kind of pinch the thing and it
 7   will work.
 8           MR. MELLEY:  Right.  But I wanted to get the two
 9   cars.
10   Q.   So he's somewhere between those two cars.
11   A.   Yes.
12   Q.   And he is stopped?
13   A.   Yes.
14   Q.   And is there any vehicle between his vehicle and you?
15   A.   No.
16   Q.   Okay.  So you see this vehicle when you are crossing
17   from Papa's to the cab?
18   A.   Yes.
19   Q.   And when do you first hear anything being said from the
20   individual in the car, in the Taurus?
21   A.   When I get into the street --
22   Q.   Okay.
23   A.   -- and I'm crossing, that's when the vehicle moves,
24   moves up.
25   Q.   Okay.  So as you start to cross the street the vehicle
```

1   is stopped?

2   A.   Yes.

3   Q.   And then as you walk across the street, originally to

4   the passenger's side of this cab, the vehicle starts moving?

5   A.   Yes.

6   Q.   Okay.  And how does it start moving, slow, fast?

7   A.   Very slow.

8   Q.   Very slow.  Okay.

9          So you get to the cab side, the passenger's side

10  of the cab.  Does he say anything before you get there?

11  A.   Yes.

12  Q.   Before you get to your destination, while you are still

13  walking, you're saying he said something to you?

14  A.   Yes.

15  Q.   Okay.  And at that point what do you hear?

16  A.   I hear, hey mother fucker.

17  Q.   Okay.  And did you recognize him at all?

18  A.   No.

19  Q.   Had you ever, in hindsight in your life, had you ever

20  had an encounter with Officer Detective Sergeant Gordon?

21  A.   No.

22  Q.   This is the only time you ran into him in your life,

23  right?

24  A.   Yes.

25  Q.   And when you saw the vehicle and you heard this how did

1   he say this?  Did he lean out the window?

2   A.    Yes.

3   Q.    So could you see his face at that time?

4   A.    Not really.  Barely.

5   Q.    Okay.  And what kind of tone was it?

6   A.    It wasn't an aggressive tone at the time.

7   Q.    Okay.  Now, did it sound at all authoritative?

8   A.    No.

9   Q.    You know what that is, right?

10  A.    Yes.

11  Q.    Do you recall saying it sounded like somebody from the

12  inner city?

13  A.    Yeah.

14  Q.    Okay.

15  A.    Okay.

16  Q.    So what do you do when he yells at you?

17  A.    I mimmick what he says.

18  Q.    Excuse me?

19  A.    I mimmick what he says.

20  Q.    While you are walking?

21  A.    While I'm walking, yes.

22  Q.    So this whole conversation occurs while you are

23  crossing from the Papa's side to the other side?

24  A.    That's correct.

25  Q.    Okay.  And do you mimmick back to him before you get to

1    the passenger's side of the cab?

2    A.   Yes.

3    Q.   So you haven't even made it across when you are done

4    with your first interaction, is that fair?

5    A.   Yes.

6    Q.   And how long does that take?

7    A.   Seconds.

8    Q.   Okay.  So when you get to the cab passenger's side do

9    you stop and talk inside the cab?

10   A.   I shake hands.

11   Q.   And you shake hands with?

12   A.   The passenger.

13   Q.   The passenger who is, what's his name, Martin?

14   A.   Foster.

15   Q.   Martin Foster?

16   A.   Michael Foster.

17   Q.   Michael Foster, okay.

18            Do you know where Michael Foster is today?

19   A.   No.

20   Q.   And did you know Michael Foster before?

21   A.   Um, I knew that was Anthony Carroll's uncle.

22   Q.   Okay.  And Anthony Carroll is the driver?

23   A.   Right.

24   Q.   Do you lean through to Anthony?

25   A.   No.

```
1    Q.    Okay.  When was the last time you had seen Anthony?

2    A.    At that time maybe months before.

3    Q.    Okay.  And when did you realize you knew the people in

4    the back seat of the cab?

5    A.    Once I got to the driver's side of the cab.

6    Q.    Okay.  So while you were talking to Michael Foster were

7    they in the back of the cab, these other two?

8    A.    When I shook hands with Michael Foster and I walked

9    around to the driver's side the cab.

10   Q.    My question is, when you shook hands with Michael

11   Foster did you look in and see the two in the back seat?

12   A.    No.

13   Q.    Okay.  So how long are you recall shaking hands with

14   Michael Foster?

15   A.    As long as it takes to shake someone's hands.

16   Q.    I mean, you're talking what, five seconds, three, 30

17   seconds?

18   A.    Two seconds.

19   Q.    Two seconds?

20   A.    It was quick.  Three seconds.

21   Q.    Okay.  So then where do you go from there?

22   A.    To the driver's side of the cab.

23   Q.    Okay.  So is it your testimony that at no time did you

24   linger on the passenger's side other than this two second

25   handshake with Michael Foster?
```

1   A.    That's correct.

2   Q.    Okay.  And you then walk around the front of the cab

3   and then you go to the driver's side of the cab?

4   A.    Yes.

5   Q.    And how long does that take?

6   A.    How long does what take?

7   Q.    For you to finish shaking hands, the two seconds, and

8   then you walk around to the driver's side?

9   A.    A few seconds.

10  Q.    Okay.  So then where is the Taurus as you go around to

11  the cab?

12  A.    It starts to inch up.

13  Q.    Okay.  And when you say inch up, is it just moving

14  very, very slowly?

15  A.    Yes.

16  Q.    And as it's inching up, is this individual saying

17  anything to you?

18  A.    Yes.

19  Q.    So once you get over to where Anthony Carroll is, until

20  Detective Gordon gets out of the car, let's break it down,

21  how many things are coming out of his mouth?  How many

22  sentences?

23  A.    Um, I'm engaged in another conversation.  So I could

24  hear him, but I'm not paying attention to him.

25  Q.    Okay.  So this individual that you just had an exchange

1  with is saying something, but you are not paying attention

2  to him at all?

3  A.   Right.

4  Q.   So as far as those exchanges go is it fair to say you

5  don't know what this individual is saying to you?

6  A.   I know certain things that he said, but he said a lot

7  more.  I don't know what all that he said.

8  Q.   How much time is he talking to you before he ultimately

9  brings the vehicle to a stop?

10 A.   Um, maybe two minutes, a minute and a half.  I'm not

11 sure.

12 Q.   And how long -- how far does he travel in that time

13 period?

14 A.   Probably 20 yards, somewhere around there.

15 Q.   So he's 20 yards in two minutes, is that what you're

16 saying?

17 A.   Twenty yards in two minutes?

18 Q.   Right.

19 A.   He was inching up, yes.

20 Q.   Excuse me?

21 A.   Yes.

22 Q.   So he's going very slow, is that right?

23 A.   Yes.  Well, he's stopping and going.

24 Q.   I'm sorry?

25 A.   He stops and then goes.  He was stopping and going.

```
1    Q.    And from the time you got to Anthony Carroll's

2    passenger -- driver's side door, how many times do you say

3    something back to him?

4    A.    That one time.

5    Q.    Just once?

6    A.    Yes.

7    Q.    You indicated to us that when you first heard him say

8    something, when he's down by this mini-van, you repeated the

9    exact same words he said to you?

10   A.    Umhum.

11   Q.    Is that right?

12   A.    Yes.

13   Q.    So what do you say next to him?

14   A.    What do I say back to him?

15   Q.    Yeah.

16   A.    I mimmick what he says.

17   Q.    Again, you mimmick what he says?

18   A.    No, the first time.

19   Q.    I understand that.

20   A.    Okay.

21   Q.    I'm talking about the next time.

22   A.    Okay.

23   Q.    What do you say?

24   A.    What do I say?

25   Q.    Yeah.
```

1   A.   I don't say anything.  I brush him off with my hand.  I

2   waive him off.

3   Q.   All right.  So is it after that he stops the car and

4   gets out?

5   A.   Yes.

6   Q.   All right.  So I want to be clear on this.  Is it your

7   testimony that the only thing you said to him was mimicking

8   his first remark to you when you were some distance apart?

9   A.   That I can recall, yes.

10  Q.   That you can recall?

11  A.   Yes.

12  Q.   So do you recall ever swearing at him?

13  A.   I said, hey, mother fucker.  Yes.

14  Q.   Okay.  Do you recall him telling you to get out of the

15  roadway?

16  A.   Never.

17  Q.   Do you recall telling him, why don't you try to make

18  me?

19  A.   Never.

20  Q.   Do you recall telling him, if you do get out I'll kick

21  your ass or something along that line?

22  A.   No.

23  Q.   So as I understand what you're saying, you mimmicked

24  this one conversation and then you gave him a hand gesture

25  of some sort, and based upon that that prompts him to get

```
1   out of the car, is that what you're saying?
2   A.   Yes.
3   Q.   You did nothing else?
4   A.   No.
5   Q.   When, when you saw the vehicle put, come to a stop, do
6   you recall how far it was from you?
7   A.   It was a couple car lengths.
8   Q.   Twenty feet?
9   A.   Twenty, 30 feet, yes.
10  Q.   Okay.  So do you recall seeing the brake lights, the
11  car being put into park?
12  A.   Um, I was engaged in a conversation.  So when I, when I
13  looked up the car was stopped and he was almost out of the
14  car.
15  Q.   Okay.  So when you saw the vehicle stopped and you saw
16  the, you saw the door opening?
17  A.   Yes.
18  Q.   Is that right?
19  A.   Right.
20  Q.   What's going through your mind at that time?
21  A.   Well, immediately I see something in his hand so --
22  Q.   All right.  Before you see anything in his hand, you
23  see the car stopped, you see the individual starting to get
24  out of the car, what's going through your mind?
25  A.   I tell the people in the cab, I said, this guy's
```

1    getting out of the car.  Look at him.

2    Q.    Was there any doubt in your mind that he was getting

3    out of the car because of you?

4    A.    Well, yeah.  Now I knew -- he said something passing by

5    when he passed the cab.

6    Q.    And did you respond to him?

7    A.    That's when I waived him off.

8    Q.    Okay.  So when the door opens is it in your mind that

9    he's stopping because of you?

10   A.    Yes.

11   Q.    All right.  So there's no question in your mind that

12   this individual, you don't know who it is, who said these

13   things, and you don't know what he said because you're

14   engaged in conversation, stops his vehicle and gets out

15   because of you?

16   A.    Right.

17   Q.    And at that time is it fair to say that you feel he's

18   probably not going to invite you to a Christmas party, it's

19   because of what you said or what he said?

20   A.    Yes.

21   Q.    So, in other words, you know right at that point this

22   is not necessarily a friendly encounter?

23   A.    Right.

24   Q.    And you see something in his hand, which you don't

25   identify as a radio, is that right?

1    A.    It was a black object.  I didn't know it was a radio.

2    Q.    Is there any doubt in your mind today that it was a

3    radio?

4    A.    I've never seen it to this day.

5    Q.    Okay.  So the individual gets out, has the object in

6    his hand.  Do you recall him going to his chest to pull out

7    a chain?

8    A.    Never.

9    Q.    So the individual gets out of the car and what does he

10   do?  Does he start to move to you?

11   A.    He walks to me aggressively.

12   Q.    So he's walking, is that right?

13   A.    Like speed walking, yes.

14   Q.    Okay.  And what do you do?

15   A.    Well, I was at the cab.  And when I see him coming I'm

16   looking at his hand.

17   Q.    Okay.  And what do you do?

18   A.    I froze.

19   Q.    You froze?

20   A.    I thought he had a gun.

21   Q.    Okay.  So at that moment in time do you survey your

22   surroundings, find out where you are?

23   A.    No.

24   Q.    All right.  I mean, you had been down Union Place many

25   times before, right?

```
 1   A.    I've been down there before.  I know where I am.
 2   Q.    You would go down how often, once a month, more
 3   frequently, Union Place?
 4   A.    No.  Union Place?
 5   Q.    Yeah.
 6   A.    Um, maybe once a month or once every two months,
 7   something like that.
 8   Q.    Okay.  So if you're going down once a month or once
 9   every two months, you have a fair knowledge of what's there,
10   is that a fair statement?
11   A.    Yes.
12   Q.    And one of the things that is there is a constant
13   police presence, isn't that fair?
14   A.    Yes.
15   Q.    And that's because there are so many incidents in the
16   general area where the police are constantly going through,
17   is that a fair statement?
18   A.    I wouldn't know.  I don't think so.
19   Q.    Well, do you ever look around your surroundings as this
20   individual is getting out of the car just to say to yourself
21   what's going on?
22   A.    No.
23   Q.    Do you think it was a case of mistaken identity?
24   A.    Most likely.
25   Q.    Okay.  So if it's not you, and it's supposed to be
```

```
 1   somebody else, do you start looking around to see what else
 2   is around you?
 3   A.    No.
 4   Q.    So it's fair for us to assume you never saw Officer
 5   Allen in a cruiser directly behind Detective Gordon, isn't
 6   that true?
 7   A.    No.
 8   Q.    I'm correct, you never saw the cruiser?
 9   A.    I never saw the cruiser.
10   Q.    All right.  Do you doubt that he was in a cruiser?
11   A.    I don't doubt he was in a cruiser.
12   Q.    Okay.  But you never registered to look to your right
13   to see what else is going on in this neighborhood?  This
14   guy's getting out of a car, he's coming at me, is there a
15   cop around, what's going on?  You never do that?
16   A.    It happened so fast.
17   Q.    Okay.  And as Detective Gordon is coming at you, as I
18   understand your testimony, he suddenly kicks at you, is that
19   fair?
20   A.    Yes.  Yes.
21   Q.    And he catches you in the stomach, is that right?
22   A.    Yes.
23   Q.    And just so we're clear on your testimony on this part,
24   is it fair to say that there's no mark on your stomach as a
25   result of this alleged contact?
```

```
 1   A.    Yes.
 2   Q.    I'm correct?
 3   A.    Correct.
 4   Q.    All right.  And at no time did you ever complain to
 5   anybody at the hospital, I got kicked in the stomach?
 6   A.    That's correct.
 7   Q.    Is that right?
 8   A.    Yes.
 9   Q.    So your testimony is that the kick pushed you back, is
10   that right?
11   A.    Yes.
12   Q.    And this whole time you're just standing there?
13   A.    Well, I got pushed back.  So I'm stumbling back.
14   Q.    You're standing there until you get kicked?
15   A.    Yes.
16   Q.    And then you get pushed back?
17   A.    Right.
18   Q.    And you described for us the kick yesterday as a kick
19   similar to breaking down a door, is that right?
20   A.    Yes.
21   Q.    And do you recall saying you had never seen such a kick
22   before?
23   A.    Yes.
24   Q.    And why do you say that you had never seen such a kick
25   before?
```

```
 1    A.    It's all -- it's almost like he knew that I was going
 2    to get hit with a baton in the head.
 3    Q.    Oh, all right.  How would he know?  Do you have any
 4    idea what he was thinking?
 5    A.    No.
 6    Q.    All right.  Was it a funny move on his part, this kick?
 7    A.    It was a different type.  It wasn't a karate kick.  It
 8    was just a front kick.
 9    Q.    Okay.  Do recall if it was a sweep of some kind?  Was
10    he going for your legs?
11    A.    No.  Front kick into the stomach, mid-section.
12    Q.    I'm sorry?
13    A.    Mid-section.
14    Q.    Okay.  And as a result of this, it's fair to say that
15    you weren't hurt at all, right?
16    A.    Not off of that, no.
17    Q.    All right.  Now, do you recall me asking you what type
18    of kick it was specifically?
19    A.    During the deposition?
20    Q.    Yeah.
21    A.    Yes, I believe so.
22    Q.    Okay.  And do you recall telling me in your mind it was
23    the type of kick somebody would do to protect themselves?
24    A.    Yes.
25    Q.    So, in other words, as you're standing there doing
```

1    nothing this individual comes walking aggressively towards

2    you and suddenly, and for no apparent reason in your mind,

3    kicks you to protect himself, is that right?

4    A.    Yeah.  Yes.

5    Q.    And the reason he had to protect himself from you was

6    because you were coming at him, isn't that true?

7    A.    That's not true.

8    Q.    Isn't it true that you approached him as soon as he got

9    out of the vehicle in order to engage him in some sort of

10   physical contact?

11   A.    Negative.  That's not true.

12   Q.    Let's back up to your football career.  If you see

13   somebody coming at you in an aggressive manner are you going

14   to stand there and watch or are you going to act?

15   A.    I don't understand the question.

16   Q.    If you're playing football and somebody's coming to you

17   and they have the ball or they are intending to block you,

18   isn't it true that you are going to approach them and

19   attempt to get the advantage?

20   A.    Well, you drop down low.

21   Q.    All right.  And on this occasion you acknowledge that

22   Detective Gordon is acting to protect himself when this kick

23   comes at you, is that right?

24   A.    Because batons are swinging.

25   Q.    Baton hasn't swung yet sir, isn't that right?

```
1    A.    No.

2    Q.    First kick, there's no baton?

3    A.    First kick, no baton.

4    Q.    So the only thing he's got to protect himself from is

5    you, isn't that true?

6    A.    I didn't never swing.

7    Q.    You are approaching him, isn't that right?

8    A.    No.

9    Q.    Don't you go to grab him?

10   A.    Never.

11   Q.    Don't you go to swing at him?

12   A.    Never.

13   Q.    So you deny doing any of that?

14   A.    Yes.

15   Q.    You're just standing there?

16   A.    I never touched him.

17   Q.    So just help us understand that, why is Detective

18   Gordon going to kick to protect himself if not from a

19   aggressive physical move from you?

20   A.    I think they were looking for somebody.

21   Q.    How do you know that?

22   A.    Just the way they all came.

23   Q.    Once Detective Gordon gets out of the car does he ever

24   talk to you again?

25   A.    No.
```

 1    Q.    So you don't know what he's thinking or what's in his

 2    mind, isn't that fair?

 3    A.    That's fair.

 4    Q.    But from his body language at the moment that brings

 5    you two together, you come to the realization he's got to

 6    protect himself?

 7    A.    I don't know if he's an officer at this point.  And he

 8    has something in his hand.  I think I'm going to get shot.

 9    Q.    So do you aggressively go at him?

10    A.    I'm not going to go aggressively to someone who has a

11    gun.

12    Q.    Do you try to shorten the distance between you and him?

13    A.    I froze.  I stood there.

14    Q.    Okay.

15          THE COURT:  Why don't we take 15 minutes off.  And

16    get together at quarter of 11.  Give everybody a chance to

17    stretch.

18          (The Court recessed at 10:25 p.m. and resumed at

19    10:45 a.m. without the jury present)

20          THE COURT:  Why don't we bring the jury in and

21    we'll continue.

22          MR. MELLEY:  Is Your Honors intention to stop at

23    noon?

24          THE COURT:  Stop at noon and start again at 1.

25          MR. MELLEY:  I will likely be done at some point

```
 1   before that.
 2            THE COURT:  Okay.  We'll take it as it comes.
 3   Twelve to 1 is sort of the normal.
 4            And we'll make time later in the day for a charge
 5   conference.  I have a second draft out.  But you guys have
 6   been busy.  And if you can read it over tonight we can talk
 7   about it tomorrow.
 8            MR. RIGAT:  I did get it on my email late last
 9   night.
10            THE COURT:  No.  No.  We'll talk about it
11   tomorrow.
12            MR. RIGAT:  It looked good.
13            (The jury returned at 11:46 a.m.)
14            MR. MELLEY:  If I may continue, Your Honor?
15            THE COURT:  Please.
16            EXAMINATION CONTINUED BY MR. MELLEY:
17   Q.   So, after that first kick you say Detective Gordon goes
18   to kick you a second time, is that right?
19   A.   Yes.
20   Q.   And the second kick you catch?
21   A.   I don't catch it, but I block my stomach.
22   Q.   You block.  So the second kick does not make contact
23   with you?
24   A.   Well, it hits my hands.  Yes.
25   Q.   Okay.  And it was right after that that you were struck
```

1   with the baton?

2   A.   It was almost at the same time.

3   Q.   Okay.  But in terms of a sequence we have the kick and

4   then we have the baton?

5   A.   Right.

6   Q.   Now, yesterday you told us, the ladies and gentlemen of

7   the jury and the Court, that Detective Gordon later kicked

8   you, is that right?

9   A.   Yes.

10   Q.   And you said he kicked you a couple of times in the

11   face?

12   A.   Yes.

13   Q.   And you said you saw the black soles and heals of his

14   boot?

15   A.   Black soles, yes.

16   Q.   Do you recall me asking you in the deposition eight

17   years ago, after that second kick, did Detective Gordon ever

18   touch you again?  Do you recall me asking you that?

19   A.   Um, it's been a while, but --

20   Q.   Let's go to page 109.  And beginning on line 13, I'll

21   wait until you get there, please.

22   A.   I got it.

23   Q.   Okay.  And the question was, do you know, from your

24   personal observations, if Detective Gordon kicked, punched

25   or did anything else to you after that second kick that you

```
 1   just described to us?  That's what the question was, right?
 2   A.   This was a confusing question.  I asked you to repeat
 3   the question.  On line --
 4   Q.   You asked me to repeat it beginning --
 5   A.   On line 13 it says, all right, so let me ask the same
 6   question another way.
 7   Q.   All right.  And that's because you did have a problem
 8   with my prior question.  So I restated the question to you
 9   at your request and asked you again.
10          And the question that I asked was, after the
11   second kick that you described, which is similar to what
12   you've done today, the first one made contact with your
13   stomach, the second one did not, after that second kick,
14   from your own personal observations, did Detective Gordon
15   kick, punch or do anything else to you?  Right?  That was
16   the question?
17   A.   Right.
18   Q.   Okay.  And your answer to that question was, no?  Isn't
19   that right?
20   A.   Right.
21   Q.   So eight years later your memory is better and all of a
22   sudden we have Detective Gordon now kicking you a couple of
23   times in the face, is that right?
24   A.   No.  I know on page 111 we go back to it and I tell you
25   that I'm hit multiple times.
```

1    Q.    No.  My question was, did Detective Gordon, from your

2    own personal observations, did he ever do anything?  And you

3    said, no.  Isn't that right?

4    A.    Yes.

5    Q.    And yesterday you said he did, is that right?

6    A.    Yes.

7    Q.    All right.  And you were under oath at this time just

8    like you are under oath today, is that right?

9    A.    Yes.

10   Q.    So when you were covering up how did you cover up?

11   A.    Um, when I was on the ground are you asking?

12   Q.    Yeah.  That's when you say you were kicked in the face?

13   A.    Yes.

14   Q.    How did you cover up?

15   A.    Well, after the blow to the back of the head I tried to

16   get both of my hands protecting my head.  And I was laying

17   on my left side.

18   Q.    And were your hands, your elbows, your forearms, were

19   they covering the side of your head?

20   A.    They were like this.  (So indicated)  I was like this

21   laying here.

22   Q.    Okay.  And you're making a motion where you are

23   interlacing both hands behind your head?

24   A.    Well, I probably didn't have both of my finger locked,

25   but I was trying to.

1   Q.   And was your face protected or exposed when you covered

2   your head?

3   A.   Um, I was trying to protect it, but some of it was

4   exposed.

5   Q.   Okay.  And you're saying that you got kicked in the

6   face, is that right?

7   A.   Yes.

8   Q.   All right.  Did you ever get treated for a broken nose?

9   A.   No.

10  Q.   Did you ever get treated for any chipped teeth, knocked

11  out teeth?

12  A.   No.

13  Q.   Did you ever get treated for a broken lip?

14  A.   No.

15  Q.   Did you ever have black eyes?

16  A.   Um, --

17  Q.   Swollen eyes?

18  A.   My eyebrow was a little swollen, yes.

19  Q.   Okay.

20         MR. MELLEY:  Your Honor, may I approach?

21         THE COURT:  Sure.

22         MR. MELLEY:  I didn't clarify this with the clerk.

23  I've got it marked with stickers, but I didn't put down -- I

24  don't know if I'm dealing with numbers or letters.

25         THE COURT:  Letters.

```
1              MR. MELLEY:  Letters.  So we'll make that A..

2              THE COURT:  A..

3              MR. MELLEY:  If I may approach?

4              THE COURT:  Yeah, thanks.

5    Q.    I'm going to give you, sir, what was marked as

6    Defendant's Exhibit A..  And do you recall that as the

7    police photos when you were formally charged?

8    A.    First time I've seen it.

9    Q.    Excuse me?

10   A.    It's the first time I've seen the picture, but, yes.

11   Q.    Okay.  Is that you?

12   A.    Yes.

13   Q.    And it says, date 12-20.  So this is -- if this

14   happened right at midnight on the 18th, 17th, or whatever

15   we're, what, 48 hours to 72 hours later?

16   A.    Okay.

17   Q.    Is that right?

18   A.    Yes.

19   Q.    And is this an accurate photo of how you looked that

20   day?

21   A.    Yes.

22   Q.    Okay.  I'd offer it.

23              DiCROSTA:  No objection, Your Honor.

24              THE COURT:  A. is admitted.

25              MR. MELLEY:  And may I publish it, Your Honor?
```

```
 1                  THE COURT:  Sure.

 2                  MR. MELLEY:  May I approach, Your Honor?

 3                  THE COURT:  Yes.

 4                  MR. MELLEY:  Thank you.

 5     Q.   Let's see, now, we have the screen that just shows the

 6     two photos, a frontal and then the side.  And then below it

 7     is the writing, is that right?

 8     A.   Yes.

 9     Q.   Okay.  So just directing your attention to the

10     photograph.  Sir, we see the mark above the left eye.

11     That's where you had some stitches, right?

12     A.   No.  Yes.  It was above the left eye.  Not in the same

13     area, but by the scar right there.

14     Q.   Above the left eye?

15     A.   Right.

16     Q.   That's where the stitches are.  All right.

17                  Can you point to any other part of those, that

18     series of two photos, that shows us the signs of you being

19     kicked in the face a couple of times by Detective Gordon or

20     by anybody else?

21     A.   Can I show you --

22     Q.   Is there any swelling?  Is there any discoloration?

23     A.   No.

24     Q.   In the course of the time period where this second kick

25     happens, and then suddenly you feel the baton, okay, I want
```

```
 1   to focus on that part.  Is it fair to say that at that
 2   moment it's an dynamic situation?  In other words, you're
 3   moving and he's moving?
 4   A.   Whose moving?
 5   Q.   Detective Gordon, he's coming at you with a kick?
 6   A.   Right.
 7   Q.   And are you moving?
 8   A.   Backwards, yes.
 9   Q.   All right.  So are you doing anything with your hands
10   other than trying to catch the kick?
11   A.   Yeah.
12   Q.   Are you moving to defend yourself?
13   A.   Well, I'm stumbling back.  And then the next one comes
14   back and I get my hands up.
15   Q.   Okay.  Do you recall at that point ever making any
16   offensive move towards Detective Gordon?
17   A.   No.
18   Q.   Do you identify the radio at this time?
19   A.   No.
20   Q.   Are you looking at it?
21   A.   No.
22   Q.   Why aren't you looking at the radio?
23   A.   I was originally looking at the radio.  And then I got
24   kicked.  And I'm stumbling back.  And I see the next kick
25   coming so I get my hands up.
```

1   Q.    You originally said you thought it might be a gun?

2   A.    Right.

3   Q.    But after that first kick you're pretty close to

4   Detective Gordon at that time, right?

5   A.    In kicking distance.

6   Q.    Well, three feet?

7   A.    Four or five feet, yeah.  Three feet.

8   Q.    This is a well lit area, right?

9   A.    Yes.

10  Q.    I mean, with the street lights and the stores it's

11  pretty well set out for everything, is that right?

12  A.    Yes.

13  Q.    And is there any doubt in your mind that after that

14  first kick whatever he has in his hand is not a gun?

15  A.    No.  I mean, it happened so fast I wasn't -- I didn't

16  have a chance to react.  But I was looking at it as a gun,

17  yes.

18  Q.    So this whole time you're just in a back peddling mode,

19  you are not in any sort of offensive mood?

20  A.    Well, on that whole time it took three seconds.

21  Q.    Okay.  So do you recall when you get struck by the

22  baton?

23  A.    Yes.

24  Q.    Do you recall yourself being in motion before -- at

25  that moment, just that instant before the baton strikes?

1    A.    Yes.

2    Q.    And where are you going?

3    A.    I'm stumbling backwards.

4    Q.    Okay.  So you deny at any time you ever make any

5    forward move towards Detective Gordon?

6    A.    That is correct.

7    Q.    Okay.  And then when the strike comes and you are hit,

8    you know you are hit, is it fair to say that you go down at

9    that time?

10   A.    Yes.

11   Q.    Okay.  And when you go down do you go down hard?

12   A.    It hurt.

13   Q.    All right.  Is it fair to say that you went down

14   because of the strike, not because you tripped or anything

15   like that?

16   A.    Right.

17   Q.    All right.  And as I understand your testimony, you

18   certainly weren't expecting it, is that right?

19   A.    Correct.

20   Q.    Because you had never looked to see a cruiser with

21   strobe lights or an officer in a uniform coming towards the

22   scene, is that right?

23   A.    I never seen strobe lights, no.

24   Q.    Nor the cruiser?

25   A.    Nor the cruiser.

```
1    Q.    So when the hit comes it's fair to say you hit the
2    asphalt hard?
3    A.    Um, I hit it hard, yes.
4    Q.    Now, after this is all done, and you're handcuffed, and
5    you say you're dragged, I think we heard it three times,
6    62 feet, does that sound right?
7    A.    Yes.
8    Q.    All right.  And you said that Officer Allen had you by
9    the collar of your vest which is marked as an exhibit?
10   A.    Yes.
11   Q.    All right.  I was confused.  Maybe you can help us.
12   How did he drag you?  Were your feet up?  Were you on your
13   heals or your toes or were you walking at all?
14   A.    They were dragging.
15   Q.    What was dragging?
16   A.    My toes.
17   Q.    Your toes were dragging.  And were your legs extended
18   at all?
19   A.    Yes.
20   Q.    Okay.  And during that time period did you ever have
21   your knees hit the ground?
22   A.    Did they hit the ground?
23   Q.    Yes.  As he's dragging you by the color 62 feet and
24   your toes, I'm assuming that you're being dragged forward,
25   is that right?
```

1    A.    Right.

2    Q.    Do you ever hit the ground?

3    A.    Yes.

4    Q.    All right.  Do the knees of the pants get scuffed as

5    you're dragged along the ground?

6    A.    My knees are not touching the ground, but they hit the

7    ground, yes.

8    Q.    As you're dragged, other than your toes, what other

9    part of your clothing comes into contact with the asphalt?

10   A.    What he does is he drops me in front of the car.  So in

11   between the cars the whole front part of my body was on the

12   ground.

13   Q.    But for the 62 feet, was any part of your body, other

14   than your toes, touching the asphalt?

15   A.    No.

16   Q.    So were you walking along with him?

17   A.    No.

18   Q.    No?

19   A.    No.

20   Q.    So were your shoes dragged over this distance?

21   A.    Yes.

22   Q.    I know we have the clothing.  Where are the shoes?

23   A.    Um, they are not here.

24   Q.    Excuse me?

25   A.    I think I walked home with those.

```
 1    Q.    Okay.  Well, did they show the effects of this drag?

 2    A.    You want to know the effects of the drag?

 3    Q.    Yeah, on the shoes.

 4    A.    On the shoes?

 5    Q.    I mean, we have all the clothing?

 6    A.    Umhum.

 7    Q.    Was the front of the tow of the shoe --

 8    A.    Scuffed?

 9    Q.    Scuffed?

10    A.    Yes.

11    Q.    Where are they?

12    A.    I think I have them at home though if you want me to

13    bring them in.

14    Q.    And you've been wearing them since, right?

15    A.    Yes.

16    Q.    But these clothes you didn't wear?

17    A.    No.

18    Q.    All right.

19    A.    I would like to wear them.

20    Q.    Excuse me?

21    A.    If I take them home I will wear them again.  Yeah.

22    It's an nice vest.

23    Q.    Okay.  Isn't it true that an ambulance was there almost

24    immediately?

25    A.    After everything was done?
```

1   Q.    Yeah.

2   A.    I believe so.

3   Q.    I mean, after you were handcuffed isn't it true that

4   the ambulance was there?

5   A.    Um, no.  We waited for a little bit.

6   Q.    A minute, two?

7   A.    I sat on the curb for about two minutes I believe.

8   Somewhere around there.  Shorter, longer, I'm not sure.

9   Q.    And did anybody explain to you that the police

10  procedure is if you're in their custody and you're at a

11  hospital you're going to get handcuffed?

12  A.    No one explained anything to me, no.

13  Q.    Okay.  And I think, I'm not sure I asked you this,

14  Officer Allen, as far as you recall, he never said anything

15  to you, is that right?

16  A.    No.  He never said anything to me.  That's correct.

17  Q.    You don't recall him shouting out to you before you

18  were struck?

19  A.    No.

20  Q.    You don't recall him saying anything to you after that

21  first strike?

22  A.    No.

23  Q.    And you don't recall him saying anything at any point

24  after that?

25  A.    Right.

1   Q.   And is it fair to say he was at the hospital until 5

2   a.m.?

3   A.   That's correct.

4   Q.   Okay.  And was it after that that you got the doctor to

5   go get the camera to get the photos taken?

6   A.   It was before that.

7   Q.   All right.  So I read you that note.  And I think it's

8   in evidence.  I mean, do you doubt that it was at 6 o'clock

9   where you said you didn't want anybody taking care of your

10  facial wounds until the camera was there?

11  A.   What note was that?

12          MR. MELLEY:  May I have a moment?

13          THE COURT:  Of course.

14          MR. MELLEY:  Perhaps counsel has it.  May I just

15  have a moment?

16          THE COURT:  Sure.

17          (Attorneys conferring off the record)

18          MR. MELLEY:  Pardon my back, Your Honor.  Your

19  Honor, this is about 10 pages in of Exhibit 24.

20          THE COURT:  Yes, I understand.

21  Q.   And if I can orientate us.  If we look at the top,

22  12-18-04.  And we have the right-hand column.  I'm going to

23  assessments evaluations.  And then at 6 o'clock.  Do you see

24  that Mr. Allen?

25  A.   See what?

1   Q.    Six a.m. on the right-hand side?  I just pointed it to

2   you.

3   A.    Yes.  Yup.

4   Q.    Okay.  And it says, patient requesting photos taken of

5   lacerations prior to suturing.  Patient's family brought

6   camera.  Photos taken by MD.  Do you see that?

7   A.    Umhum.  Yup.

8   Q.    So do you recall asking the staff at Hartford Hospital

9   not to treat your sutures, the cuts, the wounds that you

10  had, until you could get the camera?

11  A.    That's correct.

12  Q.    Okay.  And that's at 6 o'clock, is that right?

13  A.    No.  That's not correct.

14  Q.    So whoever wrote this down wrote it down wrong?

15  A.    Maybe that was -- I believe I had surgery before

16  6 o'clock.

17  Q.    You didn't have surgery until the following morning

18  later.  We can get that time.  I think it's like 9 o'clock

19  with Dr. Lena.

20  A.    Um, I believe it was a couple hours after I got to the

21  hospital.

22  Q.    What?

23  A.    That the pictures were taken.

24  Q.    Okay.  So you think that this part of the chart,

25  whoever wrote that, got it wrong?

1    A.    I believe it was that night.  Maybe it was the end of

2    their shift they are putting 6 o'clock they put the photos

3    in.

4    Q.    Well, let me ask you this.  Were any photos taken while

5    Officer Allen was there?

6    A.    Yes.

7    Q.    Okay.  Speaking of the caring of the wounds, so until

8    those photos were taken, is it fair to say that you were

9    just in that bed that we have without anything being cleaned

10   up?

11   A.    Yes.

12   Q.    Okay.  And then once you were sutured and stitched your

13   next treatment for that was with the bone doctor, is that

14   right?

15   A.    You talking for the knee?

16   Q.    No, for the head.

17   A.    Oh, for the head.

18   Q.    He removed the stitches?

19   A.    Right.

20   Q.    And the staples?

21   A.    And the staples, yes.

22   Q.    So you never saw anybody for the head wound, the wound

23   after that initial fix up, other than Dr. Lena's staff?  I

24   don't know if he did it or his P. A..  Do you know?

25   A.    I'm not sure.

1   Q.   But one of them did it?

2   A.   Right.

3   Q.   Right.  And speaking of that, I heard you say

4   yesterday, and then I'm not sure I heard today, but are you

5   saying it was six months before you were full weightbearing?

6   A.   Full weightbearing?

7   Q.   Yeah.

8   A.   On both legs?

9   Q.   Yeah.

10  A.   Yeah.  If not longer.

11  Q.   Okay.  So if Dr. Lena says by the beginning of March,

12  two months, you are full weightbearing, you would disagree

13  with him?

14  A.   No.  He says according to my own pain or something like

15  that.

16  Q.   Excuse me?

17  A.   He says according to my own pain.

18          MR. MELLEY:  Your Honor I need a moment, please?

19          THE COURT:  Take your time.  Always.

20          MR. MELLEY:  All right.  I know it If I may have a

21  moment with counsel?

22          (Attorneys conferring off the record)

23          MR. MELLEY:  I have an ID exhibit they would like

24  to converse about, Your Honor.

25          THE COURT:  All right.

```
 1              (Bench conference held:)

 2          MR. MELLEY:  This proposed ID exhibit, I don't

 3   intend to offer, but an ID exhibit is from Hartford four

 4   days later, but he's not quoting.

 5          THE COURT:  One at a time.  Yeah.

 6          MR. MELLEY:  And in the article it quotes a

 7   witness describing what Mr. Outlaw thought or said.

 8          THE COURT:  Right.

 9          MR. MELLEY:  And my intent is to ask did he

10   express that thought or intent as to what he was thinking

11   when this happened to the witness.  So it, I would offer it

12   as his words.

13          THE COURT:  You want to ask him if he said these

14   things?

15          MR. MELLEY:  Yeah.  I'm not asking what he said.

16   I would show it to him and say is that what Mr. Rakus said,

17   is that an accurate representation of what you said to him.

18          THE COURT:  Who is Mr. Rakus?

19          MR. MELLEY:  He's a witness.

20          DiCROSTA:  First of all, it's a misrepresentation.

21   It says if he knew he was an officer he would have said, he

22   didn't say Tylon said to me.

23          MR. MELLEY:  Correct.

24          DiCROSTA:  That's Rakus' opinion.

25          THE COURT:  There's no statement here.  There's no
```

1   statement here from Mr. Outlaw?

2           DiCROSTA:  Correct.

3           MR. MELLEY:  No.

4           THE COURT:  There's only a sort of an opinion from

5   Mr. Rakus about what is, he thinks his friend would have

6   done?

7           MR. MELLEY:  Correct.

8           DiCROSTA:  Had he knew.

9           MR. MELLEY:  I understand that, but then he says,

10  but he thought he was some average guy.  So my question to

11  Mr. Outlaw would be, did you convey that thought which is

12  attributed to you.  I'm not going to ask him what it is.  If

13  he says yes then I would offer it.  If he says no, it's not

14  accurate, I never said that to him, that's the end of it.

15          THE COURT:  This is what he's -- it's in testimony

16  today already that he thought the man was, as you said, an

17  inner city person calling him a mother fucker assuming he's

18  not an officer, right?

19          MR. MELLEY:  Right.  Right.

20          THE COURT:  So this is what he is saying again.

21  So your question is, you want to ask whether he told Mr.

22  Rakus that?

23          DiCROSTA:  He will say he thought he was an

24  average guy.

25          THE COURT:  Go for it.  I mean, you wouldn't

1  object to that, right?  It's your theory of the case?

2          MR. MELLEY:  Right.

3          MR. RIGAT:  Okay.

4          DiCROSTA:  When do you think he had the

5  opportunity to say this though?  This is dated December 19.

6  He's been in custody.

7          MR. MELLEY:  I don't know.  The question is, did

8  he say it.  I don't know.

9          THE COURT:  Sure.  You can ask him if he made the

10 statement.  You don't care, right?

11         MR. RIGAT:  I don't think we do care actually.

12 Because it actually supports Rakus.

13         THE COURT:  Consistent.

14         MR. RIGAT:  I guess that's right.  Fair enough.

15         DiCROSTA:  Okay.

16         (Bench conference concluded.

17         MR. MELLEY:  If I may approach?

18         THE COURT:  Sure.

19 Q.   If I may, Mr. Outlaw, I direct your attention to what

20 has been marked as Defendant's Exhibit B. for identification

21 only.  Okay.

22         And by way of a very simple background, there's a

23 lot of stuff in there that has nothing to do with my

24 question, but I did highlight in yellow some comments by an

25 individual, Richard Rakus.  And you know Mr. Rakus, right?

```
 1    A.    Yes, sir.

 2    Q.    And he was there that night, is that right?

 3    A.    Yes.

 4    Q.    Okay.  And following the incident, is it fair to say

 5    you had several opportunities to talk to him?

 6    A.    No.

 7    Q.    Have you talked to him at all?

 8    A.    Actually, I ran into him in the mall for the first time

 9    this past Christmas.

10           THE COURT:  Has somebody got a miche on on

11    their -- okay.  Okay.  Sure.

12    Q.    So --

13    A.    I'm sorry, no, we, we were high school friends and

14    childhood friends, but we didn't even have each other's

15    number.

16    Q.    Okay.  I'd ask you to direct your attention to what I

17    highlighted in yellow, to read it to yourself and answer us

18    yes or no, is what is in yellow from Mr. Rakus' mouth an

19    accurate description of what you would have said at that

20    time?

21    A.    Yes.

22    Q.    Okay.  I would offer it, just that quote.

23           THE COURT:  What?  All right.  Any objection to

24    that excerpt?

25           MR. RIGAT:  No.  No objection, Your Honor.
```

 1            THE COURT:  So that portion which is highlighted
 2  is admitted without objection.
 3            MR. MELLEY:  Okay.  May I publish it, the
 4  highlighted?
 5            THE COURT:  I don't see how you're going to do it
 6  because it has --
 7            MR. MELLEY:  I'm not going to put it there.  I'm
 8  going to read it.
 9            THE COURT:  Oh, sure.  Yeah.
10  Q.   That kind of publication.
11            This is from Richard Rakus, if Tylon knew he was a
12  police officer he would have said, okay, sir.  But he
13  thought he was some average guy who was telling him what to
14  do.
15            And your testimony is that that's a fair statement
16  as to what you were thinking?
17  A.   Yes.
18  Q.   So, in other words, if it's an officer you would have
19  acted in a certain way, is that right?
20  A.   Yes, sir.
21  Q.   All right.  If it's just another guy on the street you
22  would have acted the way you did, is that right?
23  A.   Yes.
24  Q.   So, in other words, if somebody on the street just
25  happened to say something to you, and you just think it's

1    another civilian, you are not going to say yes, sir, you're

2    going to react, is that fair?

3    A.    No.

4    Q.    All right.  Well, with regard to this individual, your

5    own testimony, you thought when you heard some sort of

6    instruction from him you thought the appropriate response

7    was to quote him verbatim back in a joking manner, is that

8    right?

9    A.    No.

10   Q.    Didn't you say that's what you did?

11   A.    I didn't hear an instruction.  I said he said, hey

12   mother fucker.  That's not an instruction.

13   Q.    So that's all you heard him say?

14   A.    And he also said, come here, he said I'll fuck you up.

15   Q.    Did you ever hear him say, get out of the street, you

16   are blocking traffic, or anything along that line?

17   A.    Never.  I wasn't in the street.

18   Q.    Okay.  So if another individual is to give you some

19   sort of words of any kind you're just apt to give him a

20   gesture, is that your testimony?

21   A.    No.

22   Q.    Well, that's what you did here, right?  You gave him a

23   gesture when he's crossing by the cab?

24   A.    Well, originally I thought it might have been one of my

25   friends playing a joke.

1    Q.    You didn't recognize who it was, right?

2    A.    Not at the time, no.

3    Q.    And just backing up for a moment, when this car is

4    coming towards you and the lights are on, you have no idea

5    whose behind the wheel?

6    A.    His head is out the window.

7    Q.    Okay.  All right.

8              MR. MELLEY:  If I may have a moment?

9    Q.    You said that this individual tried to talk, made some

10   sort of reference to you at least three times?

11   A.    What individual?

12   Q.    Detective Gordon.

13   A.    Yes.  I heard him twice.

14   Q.    Twice or three times?

15   A.    He was saying different things.  I heard him, I heard

16   him the whole time, but I wasn't paying attention to him the

17   whole time.

18   Q.    Let's be clear, how many times do you recall him

19   addressing you?

20   A.    He was addressing me throughout the time.  I heard

21   three different things.

22   Q.    Okay.  So on three different occasions he started to

23   say something to you, right?

24   A.    Right.

25   Q.    All right.  And you knew he was talking to you?

```
1    A.    Yes.

2    Q.    And you knew he was trying to get your attention?

3    A.    Yes.

4    Q.    So, in other words, he had some sort of problem?

5    A.    Yes.

6              MR. MELLEY:  May I have a moment?  Nothing

7    further.

8              THE COURT:  Any re-direct?

9              DiCROSTA:  Yes, Your Honor.

10             MR. MELLEY:  Your Honor, May I?

11             THE COURT:  Yes.

12             FURTHER EXAMINATION BY MR. DiCROSTA:

13   Q.    Mr. Outlaw, there's been a lot of talk about things

14   that Mr. Gordon said as you crossed the street.  You

15   indicated there was a number of -- he was talking and you,

16   you weren't paying attention to everything he was saying,

17   but some things you could make out?

18   A.    That's correct.

19   Q.    What could you clearly make out?

20   A.    Hey mother fucker.

21   Q.    And when was that said?

22   A.    That was the first time.

23   Q.    Okay.  And --

24   A.    And then he said um, come over here I'll fuck you up.

25   Q.    When was that?
```

```
1    A.    I was --

2    Q.    At what point in his, in this ordeal was that said?

3    A.    Um, as he was inching up towards the taxi.

4    Q.    There was some talk about your football days.  When you

5    are being approached by Mr. Gordon, do you think you were

6    playing football?

7    A.    No.

8    Q.    Okay.  And there was some talk about your deposition.

9    You recall some talk about you describing at the time of

10   your deposition on December 7, 2008 you described as the

11   first kick or the kicks?

12   A.    Yes.

13   Q.    Were they both similar in nature?

14   A.    Yes, they were.

15   Q.    Okay.  You indicated he was trying to protect himself?

16   A.    Yes.

17   Q.    Is that what you thought at the time of the incident?

18   A.    No.  At the time of the incident I thought he was

19   coming to shoot me.

20   Q.    Okay.

21   A.    Later down the road, years down the road when we were

22   in Mr. Melley's office I noticed that he was throwing those

23   kicks to not really engage and to -- I think he knew that I

24   was going to be hit in the back of the head.

25              MR. MELLEY:  Your Honor, the witness' voice is
```

1    dropping off.

2             THE WITNESS:  Oh, I'm sorry.  I'll speak up.

3             THE COURT:  Just speak up please, but raise your

4    tone a little bit.

5             THE WITNESS:  Okay.

6             DiCROSTA:  May I approach, Your Honor?

7    Q.   You were asked to read an excerpt from your deposition

8    transcript, which I just handed to you.

9    A.   Yes.

10   Q.   Okay.  The miche picks up the shuffling of pages much

11   better than it picks up my voice.

12            I direct your attention to page 111.  Starting at

13   line 10 the question is asked, by Mr. Melley, I asked you

14   before how many times you got hit in the head, you said

15   three or four.  What was your answer at line 12?

16   A.   Three or four, somewhere around there.

17   Q.   And then you just said you got head in the head five

18   times?  And your answer, line 15, please?

19   A.   Three or four, four or five.  I mean, I just tried to

20   cover up.

21   Q.   Can you continue?

22            MR. MELLEY:  Your Honor, I'm going to object to

23   this.  And perhaps we can have a side bar on it.

24            THE COURT:  Sure.

25            (Bench conference held:)

1          MR. MELLEY:  I know he's going, if we can just

2    continue this, the next question, this is from me, whose the

3    they?  Well, it's Gordon and initiated from Gordon.  I just

4    assumed he was getting some licks in.  You didn't see that?

5    No.  No, I didn't see that.  So he's making the assumption.

6    It's not personal observation.  I object to this type of

7    attempt of rehabilitation that creates something that

8    doesn't exist.  He made an assumption of what Gordon may or

9    may not have done.  He has no personal knowledge.

10          DiCROSTA:  He testified he did have personal

11   knowledge.  It was a black boot to a black shoe.

12          THE COURT:  What is the black boot to the black

13   shoe?

14          DiCROSTA:  He's indicating it's Gordon behind him.

15   He said he knows where Gordon is and he's assuming it's

16   Gordon kicking him and getting his licks in.

17          MR. MELLEY:  He didn't see that.  No.  I

18   specifically was wired for that.  It's not there.

19          THE COURT:  All right.  Well, he can't testify

20   about things he didn't see.

21          DiCROSTA:  I'll ask him about a black boot.

22          THE COURT:  Okay.

23          (Bench conference concluded)

24   Q.  Do you recall testifying yesterday about the shoe that

25   Mr. Gordon was wearing?

1    A.    Yes.

2    Q.    And as you sit here now do you recall -- do you recall

3    testifying that it was a black boot, black sole?

4    A.    Yes.

5    Q.    Do you recall you testified that that shoe hit you

6    where?

7    A.    The stomach and the face.

8    Q.    Is there any doubt in your mind that the shoe connected

9    with your face?

10   A.    No, I know it did.

11   Q.    Okay.  When you say face, what generally -- what do you

12   mean by face?

13   A.    In the eye area.

14   Q.    Is it the entire face?

15   A.    It probably covered some where like here. (So

16   indicated)

17   Q.    And where did that black boot with the black sole hit

18   you?

19   A.    Where did it hit me?

20   Q.    Where did it hit you in the face?

21   A.    It hit me over here.  (So indicated)

22          DiCROSTA:  One moment, Your Honor?  Nothing

23   further, Your Honor.

24          THE COURT:  All right.  Thanks.

25          MR. MELLEY:  Briefly?

```
 1              THE COURT:  Sure.
 2              FURTHER EXAMINATION BY MR. MELLEY:
 3   Q.   In response to a question that was just given to you,
 4   you indicated that Detective Gordon said something along the
 5   lines of, the second time, I'll fuck you up.  Do you recall
 6   just saying that?
 7   A.   Yes.
 8   Q.   And earlier I thought you said you didn't hear what he
 9   was saying because you weren't paying attention?
10   A.   I heard certain parts.  He said a lot of profanity.
11   The second time I heard, the third time I heard, but he was,
12   he was constantly talking.  Then he drove up.  He still was
13   saying something.
14   Q.   And in response to these profanities, which are
15   specifically directed to you, you still think this person is
16   joking?
17   A.   No, I don't think he's joking.
18   Q.   Okay.
19   A.   I don't talk to him any more.  I noticed I didn't know
20   him.
21   Q.   Okay.  But you do at this time give him some sort of
22   gesture by your admission?  No words, just a gesture?
23   A.   Yes.
24              MR. MELLEY:  Thank you.  Nothing further.
25              DiCROSTA:  Nothing further Your Honor.
```

1          THE COURT:  All right.  Mr. Outlaw you may step

2    down.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  C E R T I F I C A T E

 2

 3          I, Anne Marie Henry, Official Court Reporter for

 4     the United States District Court, for the District of

 5     Vermont, do hereby certify that the foregoing pages are a

 6     true and accurate transcription of my shorthand notes taken

 7     in the aforementioned matter to the best of my skill and

 8     ability.

 9

10     _____

11                  Anne Marie Henry, RPR
                    Official Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```