UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____

TYLON C. OUTLAW                    )

           VS                      )   CASE NO: 3:07-CV-01769

TROY GORDON & MICHAEL ALLEN    )

_____)   WITNESS TESTIMONY DAY 1
                                         TRIAL BY JURY

BEFORE:    HONORABLE GEOFFREY W. CRAWFORD
           DISTRICT JUDGE

APPEARANCES:   ANTHONY P. DiCROSTA, ESQUIRE
                    Mirto, Ketaineck & DiCrosta
                    P.O. Box 428
                    West Haven, Connecticut   06515
                    Representing The Plaintiff

               RAYMOND J. RIGAT, ESQUIRE
                    Gilbride & Rigat
                    23 E. Main Street
                    Clinton, Connecticut   06413
                    Representing The Plaintiff

               (Appearances Continued:)

DATE:      January 4, 2016

           TRANSCRIBED BY:  Anne Marie Henry, RPR
                    Official Court Reporter
                    P.O. Box 1932
                    Brattleboro, Vermont   05302

1              APPEARANCES CONTINUED:

2

3        NATHALIE FEOLA-GUERRIERI, ESQUIRE
              City of Hartford
4              Office of Corporation Counsel
              250 Hudson Street
5              Hartford, Connecticut   06013

6

7        WILLIAM J. MELLEY, III, ESQUIRE
              Law Offices of William J. Melley, III
8              250 Hudson Street
              Hartford, Connecticut   06106
9              Representing the Defendants

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

WITNESSES:                                          PAGE:

TYLON C. OUTLAW

Direct Examination by Mr. DiCrosta                    5


EXHIBITS:                                          SHOWN:

1 - Photo Union Place                                 13

2 - Photo Union Place                        14, 18, 21

3 - Photo Union Place                            14, 18

4 - Photo Union Place                    15, 24, 54, 59

5 - Photo Union Place                        15, 19, 23

6 - Photo Union Place                        16, 21, 39

7 - Enlarged Photo Left Eyebrow                  71, 73

8 - Photo Head Left Side                         71, 72

9 - Photo Head Right Side                    71, 73, 79

10 - Photo Back of the Head                      71, 74

11 - Photo Back of Head Enlarged                 71, 74

12 - Photo Back of Head Further Enlarged         71, 75

13 - Photo Hospital Bed Left Side                71, 76

14 - Photo Hospital Bed Right Side               72, 76

15 - Photo Hospital Bed Enlarged                 72, 76

16 - Photo Bloodstain                                 57

17 - Photo Bloodstain                                 57

18 - Photo Bloodstain on Curb                         57

19 - Photo Bloodstain with Ruler                      57

1          INDEX CONTINUED:

2     EXHIBIT:                                    SHOWN:

3     20 - Photo Bloodstain Closeup              57

4     21 - Vest                                  62

5     22 - Shirt                                 62

6     23 - Cargo Pants                           62

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The Jury returned at 1:44 p.m.)

2          THE COURT:  We'll start in with the plaintiff's

3    case.  We'll go to 4:30, take a break about halfway between

4    now and then just for planning purposes, for 10 minutes, so

5    everybody can stretch.   I'll turn to the plaintiffs to

6    start with your testimony.

7          MR. RIGAT:  Thank you, Your Honor.

8          MR. DiCROSTA:  Your Honor, I'd like to call Tylon

9    Outlaw to the stand.

10          T Y L O N   C.   O U T L A W,  The Witness, after

11    being duly sworn, was examined and testified as follows:

12          DIRECT EXAMINATION BY MR. DiCROSTA:

13    Q.    Good afternoon, Mr. Outlaw.

14    A.    Good afternoon.

15    Q.    Mr. Outlaw, what is your marital status?

16    A.    Married for 11 years.

17    Q.    And children?

18    A.    I have two boys.

19    Q.    Ages?

20    A.    Nine and 20.

21    Q.    And where were you born and raised?

22    A.    Born and raised in East Hartford, Connecticut.

23    Q.    You go to all East Hartford schools?

24    A.    Mostly.  I did go to pre-school in Hartford.

25    Q.    And high school?

```
1    A.    High school East Hartford.

2    Q.    Play any sports?

3    A.    I played football, basketball and baseball.

4    Q.    Any accolades in any of your sport activities?

5    A.    I was All Conference, All State.

6    Q.    Post high school, did you attend college?

7    A.    I attended college.  I went to Missouri Valley.

8    Q.    And you play any sports there or play any ball there?

9    A.    I played football.

10   Q.    Any accolades and distinguished distinctions?

11   A.    I was All Conference, All American, Defensive Player of

12   the Year.

13   Q.    And what did you do after college?

14   A.    I played arena football.

15   Q.    Where did you do that?

16   A.    I played for Madison, Wisconsin.  And I played two

17   years for Ohio Valley Greyhounds.

18   Q.    Any accolades in your pro arena football?

19   A.    We were 2002 national champions.

20   Q.    And how did you end your football career?

21   A.    On a high note.  We won a national championship.

22   Q.    And is there any reason why you stopped playing ball?

23   A.    I stopped playing ball to save my body, go out on a

24   high note while I'm not injured and enjoy life.

25   Q.    Did you have any opportunities to continue ball beyond
```

1  the arena football?

2  A.    Yes.  I was offered to go play for Foxwoods,

3  Connecticut.  I was offered to go play in Canada.

4  Q.    Is that the Canadian Football League?

5  A.    Yes, sir.

6  Q.    And can you tell us a little bit about your employment?

7  I assume you started working after football?

8  A.    Yes.  I worked for Mount Saint Johns before they closed

9  for 11 years.  It's a homing school for boys.

10  Q.    What were your duties there?

11  A.    I was in the -- I was the supervisor, lead counselor.

12  Um, I would mentor these young boys.  Um, teach them

13  different things, help them with their homework, those type

14  things.

15  Q.    How about did you have any disciplinary duties?  What,

16  if any, disciplinary duties did you have at Mount Saint

17  Johns?

18  A.    Yes, I was supervisor so I would, you know, take care

19  of any discipline issues if there were any of the day.  I

20  would what's called charge staff, so if something was to

21  happen I would call, I believe it was Troop F., so the

22  troopers would come.  And if a kid got out of the hand they

23  would arrest them and take them away.

24  Q.    And so you indicated for about 11 years, you worked at

25  Mount Saint Johns for about 11 years?

1  A.    Yes.

2  Q.    So that would be somewhere between -- is it fair to say

3  sometime between 2000-2012?

4  A.    Yes.

5  Q.    Did you work anywhere else during that time period?

6  A.    I worked at East Hartford Middle School.

7  Q.    In what capacity did you work at East Hartford Middle

8  School?

9  A.    I was in charge of in-school suspension and support

10 center where I ran the discipline for East Hartford Middle

11 School.  And we ended up being middle school of the year.

12 Q.    Okay.  And did you work anywhere else during that time

13 period?

14 A.    I worked at community residence for a brief time around

15 that time in 2004.

16 Q.    Did there come a time when you started a program?

17 A.    Yes.

18 Q.    A program to help -- tell me what program you started?

19 A.    I started a program called Goal Line.  It's a mentoring

20 program where we would, I would get contracts from Catholic

21 Charities and we would -- I would go to JRB Meetings,

22 Juvenile Review Board Meetings.

23 Q.    What was the name of the program?  Let me back you up.

24 A.    It's for first time offenders for the youth.

25 Q.    First time offenders in the criminal system?

A.    Yes.

          THE COURT:  Mr. DiCrosta, can you speak up just a little bit?

Q.    First time offenders in the criminal system?

A.    Yes, sir.

Q.    And what was the aim of the program?

A.    To get young boys off the streets and um, keep them out of jail, keep them in -- keep them doing something back in their communities.

Q.    And how would you do that?

A.    We would team up with Catholics Charities, team up with the Hartford Police Department and myself.

Q.    And do you remember what years -- can you tell us what years you continued that program?

A.    Um, roughly 2006, somewhere around there, 2007 to 2011.

Q.    Okay.  And how are you currently employed?

A.    Through Bloomfield High School.

Q.    And what is your position there?

A.    I run the discipline program for Bloomfield High School.  I'm in charge of in-school suspension, the support center and --

Q.    What does the support center entail?

A.    Support center is like if you are having trouble in a class or let's say you didn't do your homework or you need help in a certain area you can come to the support center

1   and get help.  And then you can get your grade up.  Or you

2   can get some help to, to get a A. on a test or a B. on a

3   test, that type thing.

4   Q.   You run that alone?

5   A.   I have two assistants.

6   Q.   Okay.  And do you do anything else for Bloomfield High

7   School?  You are a coach there as well?

8   A.   Yes, sir.  I'm the head football coach.

9   Q.   When did you start coaching at Bloomfield High School?

10  A.   2009.

11  Q.   And how did this season go?

12  A.   We won the state championship.

13  Q.   And actually nominated for the Walter Camp Coach of the

14  Year, is that correct?

15  A.   Yes, sir.

16  Q.   When is that going to announce?

17  A.   January 17th.

18  Q.   I want to draw your attention to December 17, 2004.

19          Can you tell us, I think you testified you were

20  working at East Hartford Middle School?

21  A.   East Hartford Middle School, yes.

22  Q.   Do you recall the events of the workday?  Can you tell

23  us a little bit about your workday?

24  A.   Just a normal day at work.  I went to work.  I came

25  home from work.  I turned on the TV when I got home.

Q.    What time did you get home?

A.    I got out of work probably around after 2:30.  So I

probably got home before 3 o'clock.

Q.    And what did you proceed to do?

A.    I laid down, take my shoes off, take a rest.

Q.    And did you have dinner?

A.    Yes, I did.

Q.    What were your intentions for the evening?

A.    Stay home, maybe watch a movie with the wife.

Q.    And what did you do that evening?

A.    I received a phone-call around 6:30'ish from Nick

Sackandy, a good friend of mine.

Q.    And how do you know Nick?

A.    We went to -- I went to elementary school together,

middle school and high school.

Q.    Do you consider him a good friend?

A.    Yes.  One of my best friends.

Q.    All right.  And, I'm sorry, you started to say you

received a phone-call?

A.    Yes.  I received a phone-call from Nick.  It was about

6:30.  And he was saying that, you know, he had talked to a

certain person about this business we were talking about

opening, could I meet him later.

Q.    Okay.  And what transpired next in the phone-call?  How

did you end the phone-call?

1    A.    I end the phone-call, I said, okay, yeah, I'll meet

2    you.  Um, what time?

3    Q.    And where did he want to meet?

4    A.    At Bourbon Street.

5    Q.    Did he tell you about what that time?

6    A.    He said about 10 o'clock.

7    Q.    Okay.  And what did you do next?

8    A.    I continued to lay down and watch TV, Sports Center.  I

9    like Judge Judy.

10   Q.    At about, and about, did you eventually leave the

11   house?

12   A.    Yes.  I left the house sometime after 9:30, 9:45.

13   Q.    And where did you proceed?

14   A.    I was proceeding to Bourbon Street.

15   Q.    Can you tell us how you got to Bourbon Street?

16   A.    I drove there from my residence in Weathersfield.  I

17   went downtown.  I tried to find street parking so I wouldn't

18   have to pay for parking.  And so I looked, I went around

19   probably a couple times.  And then I just decided to pay for

20   parking in the back of the Holiday Inn.

21   Q.    Now, where is the Holiday Inn located?

22   A.    The Holiday Inn is on a corner.  I believe that's Union

23   Street.

24   Q.    Union Place?

25   A.    Union Place.

Q.    How far is it from your destination of Bourbon -- what

is Bourbon Street?  You referred to Bourbon Street.  What is

that?

A.    It's a restaurant.

Q.    It's Bourbon Street Restaurant, is that what it's

called?

A.    Yeah.

Q.    Okay.  And how far is the Holiday Inn parking lot from

the Bourbon Street Restaurant?

A.    It's about two blocks, maybe three.

            MR. DiCROSTA:  May I approach the witness, Your

Honor?

            THE COURT:  Sure.

            MR. DiCROSTA:  Perhaps I should mark this for

identification, Your Honor.

            THE COURT:  Yes, get it marked.

            (Exhibits Handed to the defense)

            MR. MELLEY:  I don't have problems with the photos

per se.  I'm not sure how they are going to be identified.

            MR. DiCROSTA:  They've just been marked for

identification, Your Honor.

            THE COURT:  That's fine.

            MR. DiCROSTA:  Can I approach the witness?

Q.    Mr. Outlaw, I'll show you what's been marked as

Plaintiff's Exhibit 1.  Can you tell me that's shown in the

1   photograph?

2   A.   The back of Holiday Inn where I parked my car.

3   Q.   Is this what you recognize?  Is this a fair and

4   accurate representation of the area of Union Place where you

5   parked your car on the day of your, on December 17 of 2004?

6   A.   Yes, sir.

7   Q.   And can you identify what's been marked as Plaintiff's

8   Exhibit 2?

9   A.   That's the restaurant, Bourbon Street.

10  Q.   And is this a fair and accurate representation of what

11  Bourbon Street appeared on the December 17, 2004?

12  A.   Yes, sir.

13  Q.   And I show you what's been marked as Plaintiff's

14  Exhibit 3.

15          MR. MELLEY:  Your Honor, if I may just see -- I'm

16  trying to --

17          THE COURT:  Of course.  Sure.  That will be fine.

18          MR. MELLEY:  I didn't mark my exhibits.

19          THE COURT:  Sure.

20  Q.   Can you tell me what -- do you recognize what's

21  depicted in this photograph?

22  A.   Yes, I do.

23  Q.   And can you tell me what that is?

24  A.   Um, that's -- this is the street.  And this is the

25  indent where the taxicab was.

1   Q.   Is that a view of the Holiday Inn parking lot which you

2   parked your vehicle in?

3   A.   Yes, it is.

4   Q.   Is it a fair and accurate representation?

5   A.   Yes, sir.

6   Q.   And I show you what's been marked as Plaintiff's

7   Exhibit 4.  Can you tell me what you're looking at in this

8   photograph?

9   A.   The same street.  You can see um, the restaurant,

10   Bourbon Street.  You can see the Holiday Inn parking lot.

11   And you can see where the cab was.

12   Q.   Where is this photograph being taken from?

13   A.   The north side of Union Place.

14   Q.   I show you what's been marked as Plaintiff's Exhibit 5.

15   Can you tell me what's depicted, I'm sorry, with regard to

16   photograph four, is that a fair and accurate representation

17   of what that scene looked like on December 4th, December 17,

18   2004?

19   A.   Yes, sir.  It is.

20   Q.   And with regard to what's been marked as Plaintiff's

21   Exhibit 5, can you tell me what's depicted in the

22   photograph?

23   A.   It's the picture of Union Place, the Holiday Inn and

24   Bourbon Street.

25   Q.   And it's a different vantage point, but is it the same

1    fair -- is it a fair and accurate representation?

2    A.   Yes, it is.

3    Q.   Of how it appeared on December 17?

4           Lastly, can you tell me what's depicted in that

5    photograph?  And that one's been marked as Plaintiff's

6    Exhibit 6.

7    A.   It's a picture of the outside of Bourbon Street, the

8    street.  And you can see across the street, the train

9    station and parks, and cars parked along the road.

10   Q.   Is that a fair and accurate represention of what's

11   depicted in the photograph on December 4th, December 17,

12   forgive me, 2004?

13   A.   Yes, sir.

14           THE COURT:  Are they offered?

15           MR. DiCROSTA:  They are being offered.

16           THE COURT:  Any objection?

17           MR. MELLEY:  If I may inquire?

18           THE COURT:  Of course.

19           VOIR DIRE BY MR. MELLEY:

20   Q.   Mr. Outlaw, do you know, from your own personal

21   knowledge, when those photographs were actually taken?

22   A.   Yes, I do.

23   Q.   Were you present?

24   A.   No, I wasn't.

25   Q.   So somebody told you that they took the photos?

A.    I asked for photos when I was in the hospital.

Q.    Do you know if they were taken on the 18th or the 19th
or the 20th of December of 2004?

A.    These photos, no, I don't know the exact date they were
taken.

Q.    So in response to your question, would it be a fair
representation of the scene at or about December 17th, is
that fair?

A.    Yes.

         MR. MELLEY:  No objection.

         THE COURT:  1 through 6 are admitted.

         MR. DiCROSTA:  May I publish them to the jury,
Your Honor?

         THE COURT:  Sure.

         MR. DiCROSTA:  If I may, Your Honor, if I could
have him describe the scenes.

         THE COURT:  What's that?

         MR. DiCROSTA:  If I can have him describe exactly
what he's looking at?  Perhaps we can put them on the Elmo.

         THE COURT:  Sure.  That would be fine.

         MR. DiCROSTA:  Could I have my son --

Q.    Mr. Outlaw, I'm going to stand behind you because I
can't sit, I'm sorry, I'll stand right there.

         Mr. Outlaw, can you tell me what -- you indicated
this is Allyn Street, I mean, we're looking down Bourbon

1   Street?

2   A.   Um, this is Union Place.

3   Q.   Union Place.  My apologies.  And is that the Holiday

4   Inn parking lot you testified you parked at?

5   A.   Yes, sir.  It is.

6   Q.   Okay.  And that appears to be on the corner of Union

7   and Allyn, is that fair?

8   A.   Correct.

9   Q.   And you see the Capital Building in the back.  And what

10  vantage point is this being taken from?

11  A.   Um, --

12  Q.   If you can tell?

13  A.   I would say northbound looking at Allyn Street.

14  Q.   So you're looking down Allyn Street, I mean, looking

15  somewhere on Union Place looking down toward Allyn Street?

16  A.   Yes.

17  Q.   And I show you what's been marked as Exhibit 2,

18  Plaintiff's Exhibit 2.  Is this the Bourbon Street Cafe?

19  A.   Yes, it is.

20  Q.   And that's what it looked like on the night you

21  entered?

22  A.   Yes.

23  Q.   When the Red Socks had won the championship.

24       And showing you Plaintiff's Exhibit 3.  Please

25  describe to me what's being offered, shown in those

1   photographs?

2   A.   That's a picture of the end of the street on Union

3   Place.

4   Q.   Okay.  And, again, this is from Union Place, from the

5   north side of Union Place looking down towards Allyn Street?

6   A.   Correct.

7   Q.   And showing you -- with respect to what's been marked

8   as Plaintiff's Exhibit 4, is this the same depiction, just

9   from a slightly different vantage point --

10  A.   Yes, it is.

11  Q.   -- of Union, looking down Union Place toward Allyn

12  Street?  Just further -- fair to say, it's just further

13  back -- the photograph shows it from a bit further back on

14  Union?

15  A.   Yes, just further back.

16  Q.   I show you what's been marked as Plaintiff's Exhibit 5.

17  The same vantage point that we've been describing on Union

18  Place?

19  A.   Yes.

20  Q.   And can you tell me, you parked at the Holiday Inn.

21  Can you tell me, in relation to this photograph, where you,

22  what direction you would take to get to Union Place?  I

23  mean, would you come up the street?

24  A.   Are you saying from my car?

25  Q.   Yeah.  From where you parked.

1    A.    From where I parked?

2    Q.    Where did you park?  Let's start there.

3    A.    I parked at the back of Holiday Inn, that parking lot.

4    Q.    How did you get to Bourbon Street from there?

5    A.    I took the street right across, what is that Allyn

6    Street, I crossed that street and proceeded through that

7    sidewalk.

8    Q.    Okay.  And is that the sidewalk nearest to the green

9    awning in this photograph?

10   A.    Yes.

11   Q.    And then what did you do?

12   A.    And I proceeded to walk into Bourbon Street.

13   Q.    You actually walked by those green awnings?

14   A.    Yes.

15   Q.    And I see the canopy, zooming in on it.  Is that the --

16   can you tell us where the entrance to Bourbon Street is in

17   this photograph?

18   A.    Yes.  Um, it is right where apartments, it says

19   apartments right there.  You took a right.  It's where that

20   white car is parked.

21   Q.    It's somewhere between the banner that says apartments

22   and the light post?

23   A.    Right.

24   Q.    What appears to be a light post?

25   A.    Yes.

Q.    And then can you explain now what's been marked as
Plaintiff's Exhibit 6?  Can you tell me what that photograph
depicts?  Is that the entrance to Bourbon Street?

A.    Yes.  That's the entrance.

Q.    With the awning, I believe it interprets, Let The Good
Times Role, is scrolled across the bottom of it?

A.    Yes.

Q.    And when you arrived at Bourbon Street, and meeting
Nick, do you arrive before or after Nick?

A.    I arrive before Nick.

Q.    Okay.  And do you recall how much sooner than Nick
or --

A.    About 10, 15 minutes.

Q.    What did you do?

A.    I grabbed a table near the window.

Q.    And explain what's been marked as Plaintiff's Exhibit
2?  Can you tell us if you recall -- can you show us where
in relation to the photograph on Bourbon Street is depicted,
can you tell us exactly where or which window, if you
recall?

A.    On the left side at the Boston Red Socks sign.

Q.    Right in here somewhere?

A.    Yes.  Yes.

Q.    Okay.  All right.  What happens next?

A.    Nick comes in.  And he has a few friends with him.

Q.   You engage in conversation or --

A.   He comes in.  Um, the first thing we did is we order drinks.  And --

Q.   Who buys?

A.   Nick buys for everyone.  He came with, I don't know, three other guys or something like that.

Q.   Can you tell us what you had to drink?

A.   I had a Corona.

Q.   And what happens?

A.   I was there to talk about the business we were going to open.  And it didn't seem like we were going to talk so I wanted to leave early.  So I drank three quarters of that Corona and I bought the others a round and left.

Q.   Okay.  What time do you leave?

A.   I left roughly 11, somewhere around 11:15.

Q.   You say you bought the others a round.  What do you mean by that?  Did you sit around and have the round with them?

A.   No.  I paid the waitress.  And I told her to buy them what they want and she can keep the change.

Q.   Okay.  And do you exit out through the front doors or how do you exit Bourbon Street?

A.   I exit right out these front doors here.

Q.   And where did you go from there?

A.   I took a left towards my car.

Q.    And what happens?

A.    I see a cab double parked.  And I was walking down the street.  And I heard my name called.  And it happened to be a friend of mine.  I know he drives cabs because he's been driving them since we were in high school.  So I started to cross the street.

Q.    Well, whose the -- whose in the cab?

A.    A friend of mine, Anthony Carroll.  I played sports with him.

Q.    And how do you know Anthony?

A.    I known him since I moved to East Hartford.  We've known each other since we were seven.

Q.    Is that someone you had been seeing regularly back then?

A.    We don't see each other regularly, but we've been friends for a long time.

Q.    How about in 2004?

A.    In 2004 I see him so often here and there.

Q.    Okay.  Not as much as Nick?

A.    No, not as much as Nick.

Q.    All right.  And so you indicate that -- on display is Plaintiff's Exhibit Number 5.  You indicate you come up -- you indicated you came out the front door, took a left, you crossed the street.  Can you indicate whereabouts, in relation to the photograph, where you crossed the street?

1        Well, let me rephrase that.  In relation to this

2  photograph, where was your friend Anthony Carroll parked?

3  A.   He was parked where that car is kitty cornered across

4  the street, like in front of that car.  Yes, around that

5  area.

6  Q.   Around in here?

7  A.   Yes.

8  Q.   This is Plaintiff's Exhibit 4.  You exit here?

9  A.   Yes.

10  Q.   Is that accurate?

11  A.   Yes, it is.

12  Q.   And the double parked car is, in relation to this

13  photograph -- Anthony Carroll was driving -- you said he was

14  a cab driver.  What was he driving?

15  A.   He was driving a Honda Civic.

16  Q.   And it was a Yellow Cab?

17  A.   A Yellow Cab, yes.

18  Q.   Does it have a taxi light on top of it or what does it

19  look like?

20  A.   I believe it has a taxi light on top.

21  Q.   And in relation to the -- in relation to where he's

22  parked, with respect to Plaintiff's Exhibit 4, can you tell

23  me where the -- you indicate he was double parked?

24  A.   Umhum.

25  Q.   And can you point out the vehicle, approximately where

1    he's double parked?

2    A.    He would be right next to the Caravan.

3    Q.    Right here?

4    A.    Yes.

5          MR. MELLEY:  Your Honor, I think the witness

6    should post as opposed to counsel if we're going to have the

7    use of the diagram.  He says right here.  I think the

8    witness should say this is where it was.

9          MR. DiCROSTA:  He indicated next to the Caravan.

10         MR. MELLEY:  It's leading so I'll object.

11         THE COURT:  So it's my first time in this

12   courtroom.  If you touch your finger on it what happens?

13         MR. DiCROSTA:  Nothing.

14         THE COURT:  So you have to come up and go if you

15   would join Mr. DiCrosta there.

16         MR. DiCROSTA:  For these purposes, come on up.

17   Q.    Mr. Outlaw, if you could identify on the photograph

18   marked Plaintiff's Exhibit 4 where the taxi was double

19   parked?

20   A.    The taxi was right in front of this car here.

21   Q.    Okay.  And as you are crossing the street can you tell

22   me, are you encountered or what happens as you are crossing

23   the street?

24   A.    I see, I see a car parked where Allyn Street is.  Not

25   moving.  And while I was crossing the street a man is, yells

1   out his window.

2   Q.   Where is he -- in that photograph, where is he coming

3   from?

4   A.   He's right here. (So indicated)

5   Q.   Well, that's on the photograph.  I can get into a

6   broader overview.  Can you tell me where the -- a man you

7   said?  Can you describe what you see?

8   A.   There's a black man.  He's in a regular street car.

9   And he is parked right there at the corner where Allyn

10  Street is, but in the middle of the street.

11  Q.   And when do you first notice?

12  A.   When he yells out the window.

13  Q.   Okay.  And can you tell us, as you are crossing the

14  street, where is the vehicle?  Can you describe the vehicle?

15  A.   The vehicle was a Ford, Ford Taurus.

16  Q.   Okay.  You believed it to be a Ford Taurus?

17  A.   I believe so.

18  Q.   Okay.  And how far is that vehicle from you as you

19  began to cross the street?

20  A.   Somewhere around 30 feet.

21  Q.   And by the time you are in middle of the street how far

22  is the vehicle from you?

23  A.   Well, once he sees me he starts inching up.  And he's

24  saying something out his window.

25  Q.   Can you point out on Exhibit 4 where you first notice

1  him and how he inched -- the manner in which he proceeded in

2  which you describe as inching up?

3  A.   Once he, once he seen me crossing the street he yelled

4  out his window.  And he said, hey, mother fucker.

5  Q.   At what point is that where he says this?

6  A.   He's still at Allyn Street, but he's inching up.

7  Q.   And he yells out what?

8  A.   He yells out, hey, mother fucker.  Sorry, Judge.

9         THE COURT:  That's okay.

10 Q.   I know it's not nice language, but can you tell me what

11 path you take, indicating on that photograph what path you

12 take to the double parked vehicle?

13 A.   Um, I come to the front of the vehicle, around the

14 front.  So I stopped at the passenger's side and say, hello.

15 And I walk around the front side.

16 Q.   Let me back you up.  Why don't you take the stand again

17 if you would, please?

18         Is there anyone else in the vehicle?  You said you

19 recognized it to be a black man.  Was there anyone else in

20 the vehicle with him?

21 A.   No.

22 Q.   Are there any markings on it that would indicate it's

23 law enforcement?

24 A.   No.

25 Q.   You indicated he shouted something out to you in

1    profanities.  How did this person -- what did his
2    demeanor -- what did his tone seem like to you?
3    A.    Originally I thought he was kidding.
4    Q.    And how did you respond?
5    A.    I repeated what he said.
6    Q.    Okay.  What was your tone in repeating it?
7    A.    He said, hey, mother fucker.  I said, hey, mother
8    fucker.  Sorry, Judge.
9    Q.    What did you think he was trying to -- did you think he
10   was trying to entice you or what were you thinking was
11   happening?
12            MR. MELLEY:  Objection to the call of speculation.
13            THE COURT:  I'll sustain the objection and let you
14   frame a new question, okay?
15   Q.    What was, what did you think he was trying to
16   accomplish when he asked you the question?  What was in your
17   mind as to what he was trying to do by asking you, by
18   saying, hey, blaw, blaw, blaw?
19   A.    Well, originally I thought it was maybe one of my crazy
20   college friends or something like that.
21   Q.    Okay.  Does he identify himself in any way?
22   A.    No, he doesn't.
23   Q.    Okay.  Does he hold up a badge?
24   A.    No, he doesn't.
25   Q.    Is there any type of police display?

A.     No, he doesn't.

Q.     Anything indicating he's law enforcement?

A.     No.

Q.     Does he motion you in any way?  Does he --

A.     No.

Q.     Okay.  What happens next?

A.     Well, it seemed like he got a little excited.  So he started -- he told me to come over to the car.

Q.     Where are you at this point with respect to crossing the street?

A.     Going towards the front of the cab.

Q.     You got to the front of the cab?

A.     Yes, I did.

Q.     Did you go directly -- as you are crossing the street did you go to the cab?

A.     As I'm crossing the street I go to the cab.  I go to the passenger's side window.  And I shook hands.  And then I proceed to the driver's side window.

Q.     Shake hands with?

A.     With Anthony Carroll's uncle.

Q.     Okay.  You know him to be his uncle?

A.     Yes, I do.

Q.     Okay.  And what does the -- what does the -- what you described as the Ford Taurus, what does that -- where is the Ford Taurus at this point?

A. At this point the Ford Taurus is inching up. Um, he's,
he still stays within the 30, 30 feet mark.

Q. Okay. Is he, is it a slow roll or can you describe how
he's inching up?

A. He's stopping and then he's going. So he stops and
then he goes. He's inching up.

Q. Okay. And at some point is there any -- does he say
anything else?

A. Yeah. I mean, he's saying, while I'm talking to the
cab, and I ended up knowing everyone in the cab from high
school, and I'm talking to the cab, and he's just yelling
different profanity things.

Q. You say you're talking to the cab, you're talking to
people in the cab?

A. People in the cab, yes.

Q. After you say hello to Mr. Foster, you indicated -- did
you go around and talk to Mr. Carroll?

A. Then I went around and talked to Mr. Carroll.

Q. You went around to talk to Mr. Carroll. How did you
get to Mr. Carroll?

A. I walked around the front of the vehicle.

Q. Away from the direct --

A. Away from the Ford Taurus.

Q. And what, if anything, did you say to Mr. Carroll?

A. Well, we were just saying hello, happy holidays. It

was around Christmastime.  And um, you know, what have you been up to, those type things, pleasantries.

Q.    Okay.  So there wasn't anybody else in the cab at this point?

A.    Yes.  Um, it was Richard Rakus and Rachel Killian.

Q.    And you know them?

A.    Yes, I do.

Q.    How do you know them?

A.    I went to school with them all.

Q.    Okay.  Did you have any discussions or any -- with Rachel and Richard?

A.    Yes.  We were doing the same thing.  We were saying happy holidays, what have you been up to.  You know, we haven't seen each other in a while.  Where you working at, that type of thing.

Q.    And where is the Ford Taurus at this point?

A.    At this point the Ford Taurus is pulling up.  It's like at the back of the Civic's trunk.

Q.    The Civic being the taxicab?

A.    The taxicab, yes.

Q.    All right.  Anything else said at this point?

A.    Then he says um, come over here you mother fucker, come over here, or something something.

Q.    Is he gesturing in any way?

A.    He's waiving at me to come over here.

1  Q.   All right.  He's waiving to you in a manner?

2  A.   Like he's hanging out the window saying, come over

3  here.  Come over here.

4  Q.   What, if anything, do you do?

5  A.   I waive it off.  I waive him off.  And I said, like

6  this, and I keep talking.

7  Q.   Okay.  Do you say anything?

8  A.   Well, I'm talking to the cab.  And he's talking to me.

9  And I'm at the window.  So I just, I waive him off like

10 this.  And that's when, I don't know.

11 Q.   What happens next?  Does he, does he continue inching

12 up?

13 A.   Well, then he pulls all the way forward.  He never, he

14 never gets like parallel with the cab.  He goes past the

15 cab.  So once he goes past the cab I'm thinking that he's

16 leaving.  And he stops.

17 Q.   Okay.  So he's in the back of the -- you are testifying

18 that -- you testified that his vehicle is in the back of the

19 cab, he says something else to you.  We don't have to repeat

20 it again.  He drives past the cab.  How much further past

21 the cab?

22 A.   Probably about two or three car lengths, 30 feet,

23 somewhere around there.

24 Q.   Beyond the front of the cab?

25 A.   Yes.  Beyond the front of the cab.

1    Q.    At any point does he ever identify himself, from the

2    point that you saw him, when you first noticed him, when you

3    first said anything or exchanged the MF to when he pulls up

4    into the front of the cab, does he identify himself in any

5    way?

6    A.    No, sir.  Never.

7    Q.    Okay.  Does he display any type of law enforcement --

8    A.    No.

9    Q.    -- identification?  All right.

10          Is the -- do you notice any identification in the

11   vehicle, any law enforcement, anything that would identify

12   it as a law enforcement vehicle?

13   A.    No.

14   Q.    Do you recall what color it was?

15   A.    What color of what?

16   Q.    The Ford Taurus.

17   A.    Tan.

18   Q.    Tan?

19   A.    Tan.

20   Q.    Tan.  All right.

21          What happens?  What happens next?

22   A.    Um, then he jumps out the Ford Taurus.

23   Q.    And it was a couple car lengths ahead, I think you said

24   20, 30 feet.  I don't want to put words in your mouth.

25   A.    Right.

| | | |
|---|---|---|
| 1 | Q. | And he stops the cab? |
| 2 | A. | The cab, the cab was never driving.  He stops his car. |
| 3 | Q. | Right.  In front of the taxi?  I'm sorry. |
| 4 | A. | In front of the taxi, yes. |
| 5 | Q. | My apologies.  The Ford Taurus comes to a stop? |
| 6 | A. | Right. |
| 7 | Q. | And can you tell me what happens next? |
| 8 | A. | He jumps out the car. |
| 9 | Q. | Okay.  And this is the black individual you described? |
| 10 | A. | Yes, it is. |
| 11 | Q. | How is he dressed? |
| 12 | A. | He was dressed in regular street clothes. |
| 13 | Q. | Can you describe his clothing? |
| 14 | A. | It was -- |
| 15 | Q. | Any more than -- |
| 16 | A. | He had dark, dark clothing, dark top. |
| 17 | Q. | And where is he headed? |
| 18 | A. | He's headed towards me. |
| 19 | Q. | What do you do? |
| 20 | A. | Um, I seen something in his hand. |
| 21 | Q. | What did you think it was? |
| 22 | A. | I thought it was a gun. |
| 23 | Q. | What's going through your mind? |
| 24 | A. | Well, I'm telling the people in the cab that this guy's |
| 25 | | getting out the car.  And he's coming.  Then he um, he got |

1  something in his hand.

2  Q.    Okay.

3  A.    So when he clears the cab --

4  Q.    Explain to me how he clears the cab.

5  A.    Well, after he got out he's coming aggressively, he's

6  coming fast.  He didn't have a slow pace.  I was thinking

7  that, you know, he would stop or, you know, or say

8  something.  But at this point he didn't say anything.

9  Q.    Where are you when he exits the vehicle?  Where are you

10  when the black man exits the Ford Taurus?

11  A.    I'm on the driver's side of the taxi.

12  Q.    When he's approaching, what path does he take to --

13  does he come toward you?

14  A.    He comes around the front of the taxi.

15  Q.    All right.  What are you doing at this point?  What are

16  you physically doing at this point?

17  A.    I, I was talking to them, but I, I froze.  And I was

18  standing there.  And so he kicked me.

19  Q.    Okay.  So he had something in his hand.  What is it he

20  has -- can you describe what he has in his hand?

21  A.    It was a black object in his hand.

22  Q.    Okay.  Can you describe how big it is?

23  A.    Slightly bigger than his hand.

24  Q.    Does he say anything when he exits the vehicle?

25  A.    No.

Q.   Does he display any type of identification?

A.   No.

Q.   You indicated he kicks you.  Can you describe how he kicks you?

A.   He kicked me in the stomach like he was kicking down a door.

Q.   Did he stop?  Is it a karate style kick?  Can you describe the style of the kick?

A.   Well, he had something in his left hand.  So I'm looking at his left hand.  And next thing I know I have his boot in my stomach.  And then right from there another kick comes.  I was able to block that kick.

Q.   What happens -- where are you when -- in relation to the first kick, where are you in relation to the cab?

A.   Well, I have to -- after I stepped away from the driver's area when I was kicked and I stumbled back to the trunk area.

Q.   Okay.  Did you ever proceed forward toward the path this black man is exiting the Ford Taurus?

A.   No.

Q.   Okay.  After the first kick you indicated you stumbled back?

A.   Yes.

Q.   Where did the first kick land or where did the first kick land?

A.    The first kick landed in my stomach.

Q.    Okay.  Is that what forced you back?

A.    That's what forced me back, yes.

Q.    Did you fall?

A.    Not off of the first kick, no.

Q.    Okay.  What happens next?  What does this black man do next?

A.    Then he -- there's another kick coming.  And he kicks me in the same area.  And at the same time I was hit with a bat-like object.

Q.    You were hit.  How were you hit?

A.    I was hit in the back of my head here with what I now know was probably a baton.

Q.    You say at the same time.  Explain.  Prior to getting hit, does anyone scream?  Does anybody say anything?  Do you hear anybody say anything?

A.    No, no one says anything.

Q.    Anybody identifying themselves as a police officer?

A.    No, sir.

Q.    Can you describe -- what was -- what type of footwear was this man kicking you wearing?

A.    Black boots, black sole.

Q.    What happens when you -- after you get hit with the baton after the second kick?  How much time between -- let me strike that.  I'm sorry.

1    How much time between the second kick and getting

2  hit in the back of the head?

3  A.    It was almost simultaneously.  The same time.

4  Q.    What happens next?

5  A.    Then I'm getting kicked and punched and hit with the

6  baton, the bat-like object for a number of times.

7  Q.    Okay.  Prior to what you're describing right now,

8  between the two kicks and the time the man exited the

9  vehicle, two kicks, you get hit, did you resist?  Did you

10  fight them back at any point in time?

11  A.    No.  I never had a chance to do anything.

12  Q.    When the black man exited the vehicle did you actually

13  find out his identity?

14  A.    Yes.

15  Q.    And who was that?

16  A.    That was Officer Troy Gordon.

17  Q.    Troy Gordon?

18  A.    Troy Gordon.

19  Q.    And I believe it is Sergeant Gordon now.  If you can

20  refer to him as Sergeant Gordon, if you would.

21    Did you ever at any point raise a hand?

22  A.    No.

23  Q.    Kick out at him?

24  A.    No.

25  Q.    From the point that he leaves his vehicle, did you ever

1   have an opportunity to -- did you say anything?  Strike

2   that.

3           Did you say anything to him from the time you are

4   on the ground -- from the point he leaves the vehicle to the

5   time you are on the ground did you say anything to him?

6   A.    No.

7   Q.    You've indicated you fell to the ground.  Can you

8   describe to me how you fell to the ground?

9   A.    After I was hit with the first blow to the head I fell

10  on my left side.  And I grabbed the back of my head with

11  both hands.

12  Q.    Okay.  You say you fell on the left side.  Would you

13  mind terribly identifying where in this photograph, and if

14  you would come up here Mr. Outlaw, can you identify the --

15  I'm showing you what's been marked as Plaintiff's Exhibit 6.

16  Show where your body hits, lays on the ground or lands on

17  the ground?

18  A.    Yes.  Where this indent is.  There was a space between

19  these cars right here.  There's a little indent right there.

20  That's where I was.

21  Q.    So where is your head?

22  A.    My head is --

23  Q.    Where is your head facing?

24  A.    My head is facing the train station.  My feet are

25  towards the cab.

1  Q.   Can you show where your feet would be?

2  A.   Right here.  (So indicated)

3  Q.   And where would your head come to rest?

4  A.   Right here.  Somewhere around here.  (So indicated)

5  Q.   That would be perpendicular to the curb?

6  A.   Yes.

7  Q.   And which way are you facing when you land, when you

8  hit the ground?

9  A.   Well, I --

10  Q.   When you come to rest on the ground where are you

11  facing?

12  A.   Well, my head is facing towards the train station.  And

13  I'm in a fetal position.  I'm on my back.

14  Q.   What happens next?

15  A.   Well, I'm taking, taking the kicks and punches and --

16  Q.   All in a row?

17  A.   Yes.

18  Q.   Can you circle -- point to the area?  Where is the cab?

19  Can you indicate where the cab is parked?

20  A.   I can't really see because of this car, but it would be

21  on the side right here.

22       MR. MELLEY:  Your Honor, the witness' voice is

23  dropping.  I'm having a hard time.

24       THE COURT:  Yes, if you could move a little bit

25  away so everybody can hear.

         MR. DiCROSTA:  Can we indulge perhaps get a miche?

Q.   Can you tell me -- you indicated you were lying on
your, I'm sorry, can you repeat where you are facing when
you hit the ground?

A.   My feet are -- there was a space where this indent is.
And the cab was parked right in front of this car here.

Q.   Can you mark, put a F. where your feet would be or
where your feet came to rest?

A.   (So indicated)

Q.   And your head?

A.   (So indicated)

Q.   Please?  And what direction are you -- and you say you
are facing straight up.  What are you looking at at that
point?  Are you facing the sky or are you facing --

A.   Well, I'm on my left side.  I'm on my back, but I'm
leaning toward my left side.  And I'm holding my head.  And
I'm facing, I'm facing up, but I'm on my left side.  So I'm
facing, I guess you could say, north.

Q.   Okay.  Go sit down, again.

         While you're laying there tell me, your head hit
the ground.  Tell me what happens?

A.   I put myself in a fetal position.  And I just --

Q.   Where are your hands?

A.   My hands are covering my head for a while.  My hands
are going where ever I'm hit really.

```
1    Q.    Okay.  Where are your hands first?
2    A.    In the back of my head.
3    Q.    You hit the ground, you're holding your head?
4    A.    Right.
5    Q.    Are you in pain?
6    A.    Excruciating pain.
7    Q.    Are you kicking?
8    A.    No, sir.  I'm not kicking.
9    Q.    Are you trying to defend yourself in any way?
10   A.    No.
11   Q.    What happens next?
12   A.    I'm being hit all over.
13   Q.    After you get hit in the head, where do you get hit
14   next?
15   A.    I get kicked in the face.  And then um, I took a hard
16   blow to the knee.
17   Q.    Do you know -- how did you get kicked in the face?
18   A.    I was laying to my left and I was holding my, the back
19   of my head.  So I took a shot to the face.  And then --
20   Q.    Do you know who kicked you in the face?
21   A.    Officer Gordon kicked me in the face.
22   Q.    How do you know that?
23   A.    It was the same boot.  I'm looking almost directly in
24   his direction.
25   Q.    What was the color of his boot?
```

1    A.    It was black.

2    Q.    What color sole?

3    A.    Black.

4    Q.    Same black boot, same black sole that just kicked you

5    in the stomach?

6    A.    Yes.

7    Q.    So what happens after the kick to the face?  What do

8    you do?

9    A.    I try to cover my face and my head.  And then I'm hit

10   in the kneecap.

11   Q.    Do you kick out at any point?

12   A.    No.

13   Q.    Do you punch out?

14   A.    No.

15   Q.    Do you try and defend yourself other than covering up

16   in any manner?

17   A.    No, sir.

18   Q.    What happens after the blow to the head?  I mean, the

19   kick to the face?

20   A.    I get a blow to the knee.

21   Q.    Can you please describe the blow to the knee?  What do

22   you mean by, blow to the knee?

23   A.    A bat-like object hits me in the knee because it gave

24   me the most pain I've ever had.

25   Q.    Okay.  What happens to your knee or what happens to

1  your leg upon being struck with the bat-like object?

2  A.   My leg goes dead.  It's just laying there.  So I can't,

3  I can't move.  I'm laying on my left side and my leg is just

4  dragging.  I can't, I can't pull it to my chest because I'm

5  trying to stay in a fetal position to take all these blows,

6  but now it's just laying there.

7  Q.   Okay.  Do you know who hit you with the bat-like object

8  in the knee?

9  A.   Michael Allen.

10  Q.   Okay.  You learned the individual's, the defendant

11  Michael Allen?

12  A.   Yes.

13  Q.   Do you hear anyone say anything?  Does anyone identify

14  himself as a police officer at this point or law enforcement

15  at this point?

16  A.   No.

17  Q.   Has anyone screamed stop, freeze, anything of that

18  nature?

19  A.   No, but people on the street were yelling.

20  Q.   What's going on in the street?

21  A.   They were saying that's messed up, that's police

22  brutality.

23          MR. MELLEY:  Objection.  Move to strike.  I don't

24  know who these people are.  It sounds like hearsay.

25          MR. DiCROSTA:  It's present sense, Your Honor.

He's describing what's going on around him.

        THE COURT:  I'll sustain the objection and strike the comments from people that we don't know.

Q.   Tell me what people are saying?  Do you hear anything? What do you hear at this point in time?

A.   I --

        MR. MELLEY:  Objection as to from whom?

        MR. DiCROSTA:  I'm not asking him to state that. I'm asking what he's hearing at this point in time.

Q.   Are you hearing voices?

A.   I'm yelling, I'm yelling for help.  I'm hearing basically myself and around me.

Q.   Anybody yelling back?

A.   I don't know.  People were around.  I could hear people around.  But I'm the one that's yelling for help.

Q.   Do you hear other people other than the two officers?

A.   I do.

Q.   Did you hear anything from the two, Troy Gordon or Michael Allen?

A.   No.

Q.   You hearing other voices?  Are you hearing other voices?

A.   I hear other voices from people around.

Q.   Tell me what -- okay.

        Does it appear a crowd is starting to form?

1    A.    Yes.

2    Q.    Okay.  And you indicated it was a -- what happens after

3    the two kicks?  The baton that drives you to the ground, the

4    kick in the face, you get hit in the knee, what happens

5    next?

6    A.    I'm laying on the ground.  And um, I felt a knee into

7    my back.  And I'm turned and I --

8    Q.    Are you kicked -- let me back you up a little bit.

9          Are you kicked -- you testified that you were

10   kicked again.  And you described a series of events, two

11   kicks to the stomach, the baton to the back of the head, the

12   baton being a police baton, is that what you are describing?

13   A.    Yes.

14   Q.    Went to the ground, hit to the face, baton to the knee.

15   Are you hit again?

16   A.    I'm hit on the top of the head several times.

17   Q.    Are you hit anywhere else?

18   A.    I'm kicked in my back.  Kicked in the stomach.  I'm hit

19   all over.

20   Q.    Can you tell whose kicking you while you were on the

21   ground?

22   A.    I could see Officer Gordon or Sergeant Gordon get a few

23   kicks in.  But I have a -- it happened so fast I don't know

24   everyone that was there, no.

25   Q.    You say everyone.  Is it -- what's your impression of

1    the number of people kicking you or striking you?

2    A.    I would say others.

3    Q.    In addition to Officer Allen and --

4    A.    Yes.

5    Q.    -- Sergeant Gordon?  All right.

6            Tell me what happens next, please?

7    A.    Then I'm laying face down on the cement.  And I felt

8    myself being cuffed, turned over and cuffed.

9    Q.    Okay.  Do you know who cuffs you?

10    A.    Officer Allen.

11    Q.    Okay.  Anyone -- when did you first learn it was

12    Officer Allen cuffing you?

13    A.    Well, he -- from this point on he had me by the collar.

14    Q.    Let me back you up just a little bit.

15            You indicate someone was on your back.  Could you

16    describe how he was on your back?

17    A.    Say again?

18    Q.    You described someone being on your back prior to being

19    cuffed?

20    A.    Umhum.

21    Q.    Can you describe the cuffing for me?

22    A.    It was the face down on the cement.  Somebody pushed my

23    face down into the cement and put their knee in my back and

24    brought my arms around and cuffed me.

25    Q.    Did Officer Allen say anything while he was cuffing

```
 1   you?
 2   A.    No.
 3   Q.    Did he identify himself as a police officer?
 4   A.    No.
 5   Q.    Can you tell me what happens next?
 6   A.    Then I'm dragged in between two cars.
 7   Q.    How were you dragged?
 8   A.    By my collar.
 9   Q.    Who drags you?
10   A.    Officer Allen.
11   Q.    How does he drag you?  I know you said by your collar,
12   describe how by the collar?
13   A.    He grabs me by the back of the collar.  Um, lifts like
14   my arm and drags me just like a, like a dog.
15   Q.    Where are your legs?
16   A.    My left leg is -- it's dead.  It's, I have a broken
17   kneecap so --
18   Q.    You said left leg?
19   A.    I mean my right kneecap.
20   Q.    Are you hit in your left leg as well?
21   A.    Yes.
22   Q.    Where else are you hit?
23   A.    I'm hit on my legs, my upper body, my face and the back
24   of my head.
25   Q.    You indicate you're dragged.  Where are you facing or
```

1  how -- are you walking?  How were you dragged?

2  A.   Like this. (So indicated)  So he has me by my collar.

3  Has one hand underneath me and was just bringing me where

4  ever he wanted me to go.

5  Q.   Right.  And where does he take you?  Where does he drag

6  you to?

7  A.   He drags me in between two cars next to a parking

8  meter.

9  Q.   And what, what happens next?

10  A.   Then I, I sit there.  And um, he starts arguing with

11  another police officer.

12  Q.   Okay.  Does he drop you on the ground?  What does he do

13  with you?

14  A.   No.  He throws me in between the cars.

15  Q.   Okay.  How do you land from the dragging?  Does he put

16  you down on your face?  Does he seat you?

17  A.   He didn't lay me down nicely.  He just throws me into

18  the cars.  So I land on, I tried not to land on my face but,

19  you know, my face still hits because my arms are behind my

20  back.

21  Q.   Did you land on your face, your butt, what?

22  A.   I land on my face.

23        MR. DiCROSTA:  Your Honor, I have a series of

24  exhibits.

25        THE COURT:  Why don't we give everybody 10 minutes

1  off.  Take a break now.

2          MR. DiCROSTA:  So I can mark them?

3          THE COURT:  Sure.  We'll catch you guys at five

4  after three.

5          (The Court recessed at 2:54 p.m. and resumed

6  without the jury present at 3:05 p.m.)

7          THE COURT:  What's the scoop on the exhibits?

8          MR. DiCROSTA:  Your Honor, I'm just not sure I

9  have to identify it without introducing it as an exhibit.

10  If the Court wants to hear --

11          THE COURT:  Is it going to get introduced later

12  on?

13          MR. DiCROSTA:  No, I want to introduce it now, but

14  I want to give Mr. Melley an opportunity to voir dire on the

15  clothing.  If I bring it out the horse is out of the barn,

16  so to speak.

17          THE COURT:  I don't get it.  This is Mr. Outlaw's

18  clothing he was wearing at the time?

19          MR. DiCROSTA:  Correct.

20          THE COURT:  So any reason why it shouldn't come

21  into evidence?

22          MR. MELLEY:  No.

23          MR. DiCROSTA:  I could have introduced the

24  photograph for identification.  So if there's no objection

25  it makes it easier.

1          MR. MELLEY:  As to the clothing?

2          THE COURT:  Yes.

3          MR. DiCROSTA:  As to the clothing.

4          MR. MELLEY:  We're going to get to the photographs

5   of the blood.  And I think before the jury comes there

6   should be a foundation because it's, it's blood.

7          THE COURT:  Yeah.  Jury's usually hear

8   foundational testimony.  That's how they know what weight to

9   give it, a little or a lot.  But you want to do it first

10  without them?

11         MR. MELLEY:  I just want to have some sort of

12  offer of proof.  I know the statement is it's his blood, but

13  how do you show that?

14         THE COURT:  Right.  The clothing, you're just

15  going to show it to him and then offer it into evidence,

16  right?

17         MR. DiCROSTA:  Correct.  And I'd ask him if it's

18  his blood, if the clothing has blood on it.

19         THE COURT:  Yeah, I figured something like that.

20  Right.

21         MR. DiCROSTA:  And I would ask him if that's his

22  blood.  I think that's a fair question.  I know the jury can

23  draw its own inference.

24         THE COURT:  Mr. Melley is not giving you a fight

25  about that.

1        MR. DiCROSTA:  I can lay a foundation as to the

2  photographs how he knows it's his blood.

3        THE COURT:  What's the proffer?  How's it going to

4  work?

5        MR. DiCROSTA:  I'm going to ask him, did he

6  actually see the blood drip from his head.  And he'll say,

7  yes.

8        THE COURT:  Onto?

9        MR. DiCROSTA:  The pavement.

10        THE COURT:  On the pavement.  Okay.

11        MR. DiCROSTA:  And he was in a position to see.

12  And he knows he was thrown up against the meter and there's

13  a meter in the background.  So I would want him to identify

14  the meter as well.

15        THE COURT:  Okay.  And can I see the photo before

16  we get too far down the road?

17        MR. MELLEY:  It's been marked for ID.

18        MR. DiCROSTA:  You want to see the blood on these

19  as well?

20        MR. MELLEY:  No.

21        THE COURT:  All right.  So he's going to say he

22  was hit on the head, he saw blood dripping off his head, he

23  was in this location and it was on the pavement.  What's not

24  to like about that?  I mean for evidentiary purposes what

25  would be wrong with that?  It's foundation.

1          MR. MELLEY:  I think in the general realm of

2   everyday experience people know blood dries.  That is not

3   dried blood.  This happened at midnight.  When was it taken?

4   All these cars and nobody has driven over any of the blood.

5   I mean, there's no chain, so to speak, of the custody of the

6   blood.  How do we know it's his blood?  Beyond the general

7   description, yeah, I was in this area, yeah, I was bleeding.

8   I know that.

9          THE COURT:  Right.

10         MR. MELLEY:  But to say that's my blood, how do

11  we?

12         THE COURT:  I think that's your cross or your, I

13  think it's your cross.  They are all good points, but I

14  don't think they amount to an evidentiary reason not to let

15  the stuff in.  Either it has credibility or not.

16         MR. MELLEY:  You didn't, I was just suggesting

17  there's a foundational issue.

18         THE COURT:  Yeah, no, I hear you.  No, I

19  appreciate it.

20         MR. DiCROSTA:  The photographer of the blood is

21  here.

22         THE COURT:  All right.  Quit while you are ahead.

23  Let's get the jury back in so we can get started.

24         (The jury returned at 3:10 p.m.)

25         THE COURT:  All right.  Mr. Outlaw, you want to

1 come back up to continue your testimony?

2         EXAMINATION CONTINUED BY MR. DiCROSTA:

3 Q.  Mr. Outlaw, if you could please join me at the table?

4         I'm showing you what is Plaintiff's Exhibit 4.

5 Can you mark -- can you show me where the taxicab was double

6 parked with a large X. showing the space where the taxicab

7 was double parked?

8 A.  (So indicated)

9 Q.  Okay.  And I think you had indicated next to the

10 Caravan.  So the car to the right of your X., is that what

11 you described as the Caravan?

12 A.  Yes.  That's correct.

13 Q.  Okay.  And can you please describe to me what direction

14 Sergeant Gordon was traveling?  I mean, can you describe to

15 me where you first encountered with a circle, a small

16 circle?

17 A.  (So indicated)

18 Q.  And this is when you expressed words, pleasantries,

19 hey, mother fucker, hey, mother fucker?

20 A.  Yes.

21 Q.  My apologies to the Court.

22         And where is the vehicle -- you indicated he --

23 does he yell out to you again as you are crossing the street

24 or once you, I'm sorry, you indicated that he yelled out to

25 you again.  Can you indicate to me where he's in his vehicle

1  at that point in time?

2  A.   Yes.   He's at the trunk of the taxicab.   He yells out

3  and he says, come over here and I'll fuck you up.

4  Q.   Can you put a circle there?

5  A.   Around here.   (So indicated)

6  Q.   Okay.   And does he yell out again at any point in time?

7  A.   He says something while driving by.

8  Q.   Okay.   And this is a photograph depicting the entire

9  scene.   Can you show me where the Ford Taurus with the large

10  X., where he brings his vehicle -- where Sergeant Gordon

11  brings his vehicle to rest?

12  A.   He comes up around this area.   (So indicated)

13  Q.   Okay.   And can you point to me where you are when he

14  exits his vehicle or can you show it on Exhibit 4 where you

15  are located when he exits his vehicle?

16  A.   Somewhere right around here.   (So indicated)

17  Q.   Okay.   And is there anything in front of the -- let me

18  ask you, is there anything, my apologies, Your Honor.   Is

19  there anything in front of the -- is there another car in

20  front of the taxicab?

21  A.   No.   There's no car in front of the taxicab.

22  Q.   How does he approach, if you can show me from the X.

23  where you indicate where the Ford Taurus came to rest and

24  where the taxicab is, what direction?

25  A.   It comes out of here over here.   (So indicated)

1  Q.   Okay.  All right.  Thank you.  You can please take the

2  stand again.

3          Let me draw your attention -- why don't we stick

4  with 4.  My apologies.  Plaintiff's Exhibit 4, you see

5  before you, once you were hit, you indicated you were

6  dragged.  Can you tell me what direction you were dragged in

7  in relation to this photograph?

8  A.   Yes.  I was -- I would be dragged beyond this first car

9  um, where the indent is.

10 Q.   Okay.  To the right or the left of the car?

11 A.   To the left of the car.

12 Q.   On the street side versus the curbing side?

13 A.   Correct.

14 Q.   And do you know how far you were dragged?

15 A.   Sixty-two feet.

16 Q.   How do you know that?

17 A.   I measured it myself.

18 Q.   And you were dragged, you described, down the street

19 side.  And you testified that you were thrown between a

20 couple of cabs or a couple of parked cars that happened to

21 be there?

22 A.   Yes.

23 Q.   And can you describe that to me?  Can you describe that

24 more fully for me?

25 A.   Yes.  He dragged me 62 feet and put me in front of two

1    parked cars.  And then he grabbed me by the collar, took my

2    arm and flipped me over.  And I just sat there.  And I was

3    dripping blood onto the street.

4    Q.   I'll show you what's been marked as Plaintiff's

5    Exhibits 16, 17, 18, 19 and 20.

6         Do you recognize these photographs?  Take your

7    time and look through them.

8    A.   Yes, I do.

9    Q.   Is that a fair and accurate depiction, first, of where

10   you were seated or where you landed or were thrown on the

11   ground or, my apologies, is that where you ended up?

12   A.   Yes, that's where I was.

13   Q.   Okay.  And is that a fair and accurate depiction of the

14   blood that dripped -- that you had the blood dripping -- was

15   there blood dripping from your face?

16   A.   Yes.

17   Q.   From anywhere else?

18   A.   From my head.

19   Q.   Okay.  Is that a fair and accurate depiction of the

20   blood -- were you able to see the blood on the ground?

21   A.   Yes.

22   Q.   Is that a fair and accurate depiction of the blood?

23   A.   Yes, it is.

24   Q.   In all these exhibits?

25   A.   Yes.

Q.   16, 17?

A.   17, 18, 19 and 20.

          MR. DiCROSTA:  Your Honor, I'd offer them as a full exhibit.

          MR. MELLEY:  May I inquire, Your Honor?  I would actually like to see them as well.

          THE COURT:  Of course.

          MR. MELLEY:  If I may approach?

          MR. DiCROSTA:  I'm sorry, I thought we provided you copies.

          VOIR DIRE BY MR. MELLEY:

Q.   If I may inquire?  Mr. Outlaw, of your own personal knowledge, do you know when those photographs were taken?

A.   Um, the day after.

Q.   Of your own personal knowledge?  Were you there when they were taken?

A.   No.

Q.   You were still in the hospital, is that right?

A.   That's correct.

Q.   So you were not present at the scene to say that's where my blood was, is that correct?

A.   No, not at this time.

Q.   You indicated earlier that there were cars parked along that general area where those blood spots are, is that right?

1  A.    Right.

2  Q.    Do you see any indication that any tire marks went

3  through what you describe as your blood earlier the day

4  before?

5  A.    Can you repeat the question?

6  Q.    In the photographs, between when this event happened

7  and when those photographs were actually taken, whatever

8  that time length was, is it fair to say that there were many

9  cars in the area?

10  A.    There was cars in the area, yes.

11  Q.    And those cars would come and go, is that right?

12  A.    Yes.

13  Q.    And do you see any tire marks through those blood marks

14  that you pointed out to us?

15  A.    No.

16  Q.    On the screen we have, I believe it's Plaintiff's

17  Exhibit 4, is that right?

18  A.    Yes, it is.

19  Q.    And in front of the car to the right there's a big

20  puddle, is that right?

21  A.    Yes, it is.

22  Q.    And the photographs that you have with this alleged

23  blood, is in blazing sunlight, is that right?

24  A.    Yes.

25  Q.    And do you know which ones were taken first, of your

1  own personal knowledge?

2  A.    No.

3              MR. MELLEY:  I would object.  Lack of foundation.

4              THE COURT:  All right.  You guys want to come up?

5              (Bench Conference held:)

6              THE COURT:  You are the photographer, right?

7              MR. DiCROSTA:  Yes.

8              THE COURT:  It was somebody?

9              MR. DiCROSTA:  He was there.  Someone was there.

10             THE COURT:  So you have the photographer?

11             MR. DiCROSTA:  I can put it on.

12             THE COURT:  So we can defer this ruling until

13  after the photographer testifies?

14             MR. DiCROSTA:  Yes.

15             THE COURT:  Why don't we do that.

16             MR. MELLEY:  It would have been nice to know the

17  identity before now.

18             THE COURT:  Who is it?

19             MR. MELLEY:  It was in the interrogatories that

20  were eight years ago, nine years ago.

21             MR. DiCROSTA:  I don't recall being asked who the

22  photographer was.

23             THE COURT:  He's the brother?

24             MR. DiCROSTA:  The brother-in-law.

25             THE COURT:  All right.  So I'll wait until all the

foundational testimony is completed, which you're telling me

the photographer's testimony, that he was there the next day

and took the photos?

MR. DiCROSTA:  Within six hours, seven hours.

THE COURT:  All right.  Good enough.  Just for my

own information where do the puddle photos come from?

That's a whole other time?

MR. DiCROSTA:  The puddle photos?

THE COURT:  The ones you've been mostly using that

show the wet, is that from another visit?

MR. DiCROSTA:  No, that's next which --

MR. RIGAT:  No, did you notice?

THE COURT:  1 through 6?

MR. RIGAT:  The first it was a wet day.

MR. DiCROSTA:  It was the very next day.

THE COURT:  All right.  Thanks.

(Bench Conference concluded)

Q.   Keep the photos on the stool there.  We'll get back to

that.  Okay.

Mr. Outlaw, do you recall what you were wearing

that evening?

A.   Yes.

Q.   What were you wearing?

A.   Cargo pants, very nice shirt and a vest.

(Counsel conferring)

1          MR. MELLEY:  If he identifies them I have no

2    objection to them going in.

3          THE COURT:  Okay.

4    Q.   Is this the vest you were wearing, Mr. Outlaw?

5    A.   Yes, sir.

6    Q.   Let's get the exhibit on the record.  It's a gray gap

7    vest?

8    A.   Yes.

9          THE COURT:  What exhibit number is that?

10         MR. DiCROSTA:  Oh, I'm sorry.  It may come in as

11   Exhibit 21, Your Honor.

12   Q.   And I show you Exhibit 23 is the cargo pants --

13   A.   Yes.

14   Q.   -- you were wearing?

15         And Exhibits, I show you what's been marked as

16   Plaintiff's Exhibit 22.  You recognize this as the shirt you

17   were wearing?

18   A.   Yes.

19         MR. DiCROSTA:  And, Your Honor, I offer those as a

20   full exhibit.

21         MR. MELLEY:  No objection.

22         THE COURT:  21, 22, 23 all admitted.

23   Q.   Mr. Outlaw, you are now between the two parked cars

24   thrown down.  They flipped you around I believe you

25   testified to.  What happens next?

A.   Um, he sits me down, he sets me down on my butt.   And I
just start -- I'm dripping blood.   And I'm waiting for, to
get in the ambulance.   I think the ambulance is there now.

Q.   You're handcuffed?

A.   I'm handcuffed.

Q.   Your hands behind your back?

A.   My hands behind my back.

Q.   Okay.   Is anything said to you?

A.   No.

Q.   Anybody identify themselves?

A.   No.

Q.   How was Mr. Allen -- Officer Allen dressed?

A.   Um, he was in uniform.

Q.   Police uniform?

A.   Police uniform.

Q.   By the way, the vest, do you know how you were wearing
that?

A.   I had the vest zipped all the way up to the top.

Q.   And what occurs next?   You are on your buttocks?

A.   Yup.   And they were arguing if I'm going to be put in a
police car or sent on an ambulance.

Q.   Whose they?

A.   Officer Allen and another officer.

Q.   And what was Mr. Allen indicating or Officer Allen
indicating?   What was he saying in this discussion?

```
1   A.    He was saying that I'm going in the police car.

2   Q.    And what was the -- who was he arguing with?

3   A.    Another officer.  Not Sergeant Troy Gordon.

4   Q.    And can you tell me what transpires next?

5   A.    Um, eventually I'm grabbed by the collar, picked up and

6   the ambulance guys come over and put me on a, the wood

7   stretcher.

8   Q.    Who grabs you by the collar and picks you up?

9   A.    Officer Allen.

10  Q.    And does what?  Picks you up and --

11  A.    Picks me up again by the collar.

12  Q.    For what purpose?  To bring you to the ambulance?

13  A.    Yeah.

14  Q.    I'm a little confused.  Okay.

15        And where, where is the ambulance?

16  A.    It's right there in the road.

17  Q.    Where in relation to where you are between the parked

18  cars?

19  A.    Right where the meter is.  Right in front of that

20  meter.

21  Q.    As you sit here, is it directly in front of you?  Are

22  you seated facing the roadway or facing the building behind

23  you?

24  A.    I'm sitting facing the roadway.

25  Q.    Where is the ambulance in relation to your direct sight
```

1   of view between the two parked cars?

2   A.   To my left side.

3   Q.   A little further up?

4   A.   A little further up, yes.

5   Q.   Up Union Place?

6   A.   Yes.

7   Q.   And what transpires after that?

8   A.   They put me in an ambulance and --

9   Q.   How are you put in the ambulance?

10   A.   On the stretcher.

11   Q.   The stretcher, I assume, comes out the back of the

12   ambulance?

13   A.   Right.

14   Q.   You laid in the stretcher, you're put in the ambulance

15   then what transpires?

16   A.   Then we're on our way to Hartford Hospital.

17   Q.   Can you tell the ladies and gentlemen of the jury what

18   -- tell me what happens in the ambulance as you're traveling

19   in the ambulance?  Are you by yourself?

20   A.   There's the ambulance people inside and there's one

21   officer with me.

22   Q.   Do you know the identity of that officer?

23   A.   No, I don't.

24   Q.   Does any conversation take place in the ambulance?

25   A.   He's in my ear and said --

1          MR. MELLEY:  Objection, Your Honor, to the hearsay

2    coming from this other officer.

3          MR. DiCROSTA:  It's a verbal act, Your Honor.

4          THE COURT:  What's the, the question was whether

5    there was any conversation, yes or no.  Was that the answer,

6    yes, there was conversation?

7          THE WITNESS:  Yes.

8          THE COURT:  And what would be the --

9          MR. DiCROSTA:  The follow-up would be what was

10   that conversation.  Mr. Malley's anticipating --

11         MR. MELLEY:  And the question calls for a one word

12   response.

13         THE COURT:  Why don't you come up and we'll talk a

14   minute without the jury.

15         (Bench Conference held:)

16         THE COURT:  Where are we going with this?

17         MR. DiCROSTA:  They are starting to whisper in his

18   ear, starting to give him a hard time about any cops, the

19   verbal act.

20         THE COURT:  They are what?

21         MR. DiCROSTA:  Whisper, the cops, they started

22   harassing him.

23         THE COURT:  I thought your case was over at this

24   point?

25         MR. DiCROSTA:  With respect to the city.  I'm

1    sorry, the case is over in terms of?

2          THE COURT:  Well, the excessive force case is

3    completed, right?  Is there more?

4          MR. DiCROSTA:  There's more.

5          THE COURT:  More tortious conduct?

6          MR. DiCROSTA:  Not more tortious conduct, but they

7    are circumstances that aggravate the situation certainly.

8          THE COURT:  But this guy isn't an agent or

9    anything, right?  What is he, he's just another --

10          MR. DiCROSTA:  Another officer.

11          THE COURT:  So it's a kind of a, so what.

12          MR. DiCROSTA:  Well, they continue at the hospital

13    right up until the time they discharge, they book him, they

14    keep him in leg irons and cuffs.

15          MR. RIGAT:  Part of the story, Your Honor, is that

16    they are responding to what they believe is an off duty

17    officer who gets punched in the face, which is why they are

18    all converging at this point on Union Place.  So what that

19    kind of testimony demonstrates, the whispering, the

20    threating, the harassment is that the cops, all of the

21    participants are very angry because they think Ty is one of

22    the guys that did this.  I think that's the point Tony is

23    trying to make.

24          THE COURT:  There has been a different unrelated

25    incident?

1     MR. RIGAT:  Right.  But that's what draws them to

2 it.

3     THE COURT:  Yeah.  Yeah.  Yeah.

4     MR. MELLEY:  It's still a hearsay statement.  We

5 don't know who it is.

6     MR. DiCROSTA:  I'm not trying to prove --

7     MR. RIGAT:  It's a verbal act.

8     THE COURT:  Every statement is a verbal act, but

9 normally we think of them, like I'll sell you a marked car

10 for a hundred dollars, that's a verbal act.

11     MR. RIGAT:  Right.

12     THE COURT:  I'm trying to understand what it has

13 to do with the case.  Give it to me in small bites.

14     MR. RIGAT:  Sure.  Everybody is converging on the

15 scene because they believe an off duty officer has been

16 attacked by a group of kids and hanging out at some of these

17 bars.  Part of the theory here is that Gordon and Allen

18 don't know at that point that he's not one of these guys.

19 And so all the cops that are coming there are thinking that

20 he is.  And so he gets no peace in the ambulance ride.  He's

21 being told by this cop, the cops in the hospital, he likes

22 to beat up cops.

23    So that seems to be relevant to what was the

24 reason for the beating to begin with.  So this isn't just,

25 you know, --

1    MR. DiCROSTA:  They had the wrong guy.

2    MR. RIGAT:  Right.

3    MR. MELLEY:  There's no testimony that ties it

4  into my two guys.

5    THE COURT:  That's what I was thinking.  I'll

6  exclude it.

7    MR. RIGAT:  Exclude it, all right.

8    THE COURT:  It's going to lead you, the day may

9  come when you thank me for that ruling.

10    MR. RIGAT:  Thanks, Judge.

11    (Bench Conference concluded)

12  Q.   Mr. Outlaw, we'll continue in the ambulance.  And then

13  you proceed to which hospital?  Where do you proceed to?

14  A.   We go to Hartford Hospital.

15  Q.   Okay.  And when you are in the ambulance, are you in

16  handcuffs?

17  A.   Um, I'm cuffed to their bed thing, rail.

18  Q.   The railing?

19  A.   The railing.

20  Q.   Okay.  And where in the hospital are you brought to?

21  A.   Emergency room.

22  Q.   And what type of room is it?

23  A.   They put me in a private room.

24  Q.   And who, who, if anyone, is in the room with you?

25  A.   Um, officer, Officer Allen is in the room and Sergeant

Troy Gordon is in the room. And there's others in the room.

Q. Is there -- is it a type of a room that there's a door

that you enter or leave from or is it a curtain type thing?

A. No, there's a door.

Q. Okay. So it has walls around it, in other words?

A. Yes.

Q. Okay. And are you seen by anyone from the hospital?

Any hospital personnel -- who, if anyone, from the hospital

personnel did attend to you?

A. Yes. I was seen by a nurse originally, Dr. Pachucki

and her assistant.

Q. Okay. And did there come a point in time where, where

there were some photographs taken?

A. Yes.

Q. Of you?

A. Yes.

Q. Tell me how that came about?

A. I told Dr. Pachucki before she cleans me up that I know

my family's here. I can hear them. And I want my, my wife

and my father to go get a disposable camera.

Q. And did they?

A. Yes, they did.

Q. And what, if anything, was done with the disposable

camera?

A. Her and her assistant started taking pictures of me

1    after they got the disposable camera.

2    Q.    Whose her?

3    A.    Dr. Pachucki.

4    Q.    Okay.  I show you what's been marked as Plaintiff's

5    Exhibit Number 7 through 15.  Is that you?

6    A.    Yes, it is.

7    Q.    Can you go through them all, please?  7 through 13.  My

8    apologies, Your Honor.

9          Do you know approximately what time you arrived at

10   the hospital?

11   A.    Sometime before or around, sometime around 12 o'clock.

12   Q.    Do you know what time photographs were taken,

13   approximately what time the photographs were taken in the,

14   while you were in the emergency room?

15   A.    Yeah.  It was sometime around 12:30.

16   Q.    So this would be 12, into December 18, 2004?

17   A.    That's correct.

18   Q.    Are these photographs a fair and accurate depiction of,

19   photograph number 7, that's been marked as Plaintiff's

20   Exhibits 7, 8, 9, is that a fair depiction of your forehead?

21   A.    Yes, it is.

22   Q.    And showing you what's been marked as Plaintiff's

23   Exhibits 10, 11, 12, 13, is that a fair depiction of the

24   back of your head?

25   A.    Yes, it is.

Q.    Let me show you what's been marked as Exhibits 14 and
15.    Is that a fair and accurate depiction of your body,
torso, in particular, your leg?

A.    Yes, it is.

          MR. DiCROSTA:  We would offer these.  If Mr.
Melley would like to voir dire.

          THE COURT:  They are offered.  Any objection?

          MR. MELLEY:  If I may just inquire?

          THE COURT:  Of course.

          VOIR DIRE BY MR. MELLEY:

Q.    Mr. Outlaw, your recollection is that these were taken
at 12:30?

A.    Yes, somewhere around that time.

Q.    So if the hospital record says they were taken about
6:30, and you would refuse medical attention until then,
would you agree with that or disagree?

A.    Disagree.

Q.    Okay.  Your recollection is that they were taken within
a half an hour of you showing up?

A.    Um, somewhere around that time.  I'm not sure of the
exact time.

          MR. MELLEY:  That's it.  No objection.

          THE COURT:  All right.  7 through 15 are admitted.

          MR. DiCROSTA:  And may be marked as full exhibits,
Your Honor?

```
1              THE COURT:  What's that?

2              MR. DiCROSTA:  And may be marked as full exhibits?

3              THE COURT:  Yes.

4    Q.   Just a housekeeping matter.  Madame Clerk indicated it

5    might be easier to change the markings afterwards.

6              So, Mr. Outlaw, explain what's been marked as

7    Exhibit 9?  What is that?

8    A.   That's me in the hospital room.

9    Q.   And what does that show?

10   A.   That's me bleeding from my face, from my eyebrow.  And

11   it's going down.  I needed stitches.

12   Q.   Did you get stitches?

13   A.   Yes, I did.

14   Q.   And showing you Plaintiff's Exhibit 10, explain,

15   forgive me, explain Plaintiff's Exhibit 7?  That's the same

16   eye from a different view?

17   A.   Yes, it is.  The same, the same eye, different view.

18   Q.   And Plaintiff's Exhibit 8, the same thing?

19   A.   Yes, the same thing.

20   Q.   Okay.  What happens -- you received stitches.  Is there

21   a scar?

22   A.   Yes, it is a scar.

23   Q.   You mind lifting your glasses and showing the ladies

24   and the gentlemen of the jury?

25   A.   It's there.  (So indicated)
```

Q.    And by the way, is that scar noticeable -- do you feel

that scar is noticeable?

A.    Yes.

Q.    Do you notice it?

A.    I notice it every day.

Q.    When you look in the mirror, I assume?

A.    Yes, sir.

Q.    Showing you what's been marked as Plaintiff's Exhibit

10, can you tell me what that, what this photograph shows?

A.    That's the picture of the back of my head after, after

being hit.  The scars -- when I was hit or being kicked,

it's the first blow.

Q.    You believe that to be the result of the first blow?

A.    Yes.

Q.    That's the first blow by?

A.    By a baton.

Q.    By a baton by Officer Allen?

A.    Right.

Q.    Can you tell me what's depicted in what's been marked

as Plaintiff's Exhibit 11?  Can you pan out first or pan in

so we can see the exhibit number, please?

        Can you tell me what's demonstrated in what's been

marked as Plaintiff's Exhibit 11?

A.    Um, you still could see the first blow on the bottom.

And then you could see on top where I also needed staples.

1  Q.   Is that how they treated both these, both these

2  abrasions, cuts?

3  A.   Yes.  I had staples in three different areas.

4  Q.   Okay.  Showing you what's been marked as Plaintiff's

5  Exhibit 11 or 12.  Can you tell me what's depicted in this

6  photograph or this Exhibit 12?

7  A.   You can see from a different angle I was hit on the

8  bottom and on top of the head.

9  Q.   You say three different areas?

10 A.   There's two on top.  And there's one on the bottom.

11 Q.   Okay.  And that resulted in scarring?

12 A.   Yes.

13 Q.   How were they treated?

14 A.   They were all treated with staples.

15 Q.   Okay.  And is that -- what, if any, -- are you aware of

16 scars on your head, the back of your head?

17 A.   Yes, I am.  I cut my own hair so --

18       MR. DiCROSTA:  Your Honor, I'd ask the witness if

19 he could possibly show the jury, as best he can, the

20 scarring?

21 A.   This is the bottom.  This is the bottom scar here.

22 This is the top one that goes like this.  And then there's

23 one here that you can see.

24 Q.   Does that affect you in any way, the scars itself?

25 A.   Yes.

1   Q.   I see a laceration on the bottom.  I see the laceration

2   on the left side.  Is the other laceration you're referring

3   to on the top, the crown itself?

4   A.   No.  It's, it's also on the left side.

5   Q.   Okay.  And how do you get those lacerations?

6   A.   With a bat-like object.

7   Q.   All three of them?

8   A.   All three of them.

9   Q.   Okay.  I'm showing you what's been marked as Exhibit

10  13.  That's you?

11  A.   Yes, that is me.

12  Q.   Showing you, we're showing Exhibit 14.  Is that you?

13  A.   Yes.

14  Q.   What is that to your, on your left arm or left hand?

15  Perhaps I can show you.  Are you handcuffed to the bed?

16  A.   Those are handcuffs.  I'm handcuffed to the rail.

17  Q.   Okay.  By your left hand?

18  A.   Yes.

19  Q.   All right.  And, lastly, showing you what's been marked

20  Plaintiff's Exhibit 15.  Is that -- can you tell me what's

21  depicted in this photograph?

22  A.   A picture of my left hand handcuffed to the rail with

23  my right leg and a full cast like.

24  Q.   You testified that Officer Allen and Officer Gordon

25  were also in the emergency room?

1    A.    Yes.

2    Q.    What were they doing?

3    A.    They were discussing their report.

4    Q.    Had you been receiving visitors?

5    A.    No, I'm not allowed phone-calls or to see anyone.

6    Q.    Are you in custody?

7    A.    Yes, I'm in custody.

8    Q.    Did you consider yourself to have been in custody?

9    A.    Well, I can't make a phone-call.  So I'm in custody.

10   Q.    All right.  An officer is stationed outside the door?

11   A.    Yes, sir.

12   Q.    Is there a -- you indicated Officer Allen and Officer

13   Gordon discussing the police report?

14   A.    Yes.

15   Q.    Do you know what they were saying?

16   A.    They were going over times and stuff like that.  And I

17   was um, talking to Dr. Pachucki and her assistant.

18   Q.    When the doctor came in, what happened -- what did the

19   officers do?

20   A.    They would leave the room or they would stay close to

21   the door area.

22   Q.    Okay.  And there's an officer outside --

23   A.    Yes.

24   Q.    -- as well?

25         He's not coming in and out the room is he?

```
1    A.    No.

2    Q.    And he's there sitting guard or sitting century?

3    A.    Yes.

4    Q.    Okay.  Are any of these officers -- you said there were

5    a number of officers in the room.  Anybody say anything to

6    you?

7          MR. MELLEY:  Objection to anybody other than the

8    officers.

9          THE COURT:  Why don't you narrow it down?

10   Q.    Officer Allen, did Officer Allen say anything to you

11   while you were in the emergency room?

12   A.    No.

13   Q.    Officer Gordon?

14   A.    No.

15   Q.    Any other officers, did they say anything to you?

16         MR. MELLEY:  Objection.

17         THE COURT:  Yes or no.

18         THE WITNESS:  Yes.

19         MR. DiCROSTA:  Your Honor, I offer as the present

20   test, the state of mind.  Let me lay -- I'll withdraw the

21   question.

22   Q.    What was their tone?

23         MR. MELLEY:  Objection, relevance.  The tone of

24   this other officer that maybe said something?

25         THE COURT:  All right.  We'll do our little huddle
```

1   again.

2           (Bench Conference held:)

3           MR. RIGAT:  Let it go.

4           MR. DiCROSTA:  I'm sorry?

5           MR. RIGAT:  No, that's okay.

6           THE COURT:  It's only going to get you in trouble

7   or get me in trouble.  I don't mind if it gets you in

8   trouble, but I'm not going to get in trouble over this.  So

9   the question is withdrawn?

10          MR. DiCROSTA:  Withdrawn.

11          THE COURT:  Move to a new area.

12          (The Bench Conference concluded)

13  Q.    Mr. Outlaw, I'm trying to shuffle away from the -- I'll

14  show you what's been marked Plaintiff's Exhibit 9, the kick

15  to the eye.  Do you know how you got that injury or the

16  injury being displayed?

17  A.    Yes, by Sergeant Gordon.

18  Q.    How?

19  A.    He kicked me in the face.

20  Q.    Is that the black boot?

21  A.    That's the black boot.

22  Q.    With the black sole?

23  A.    Yes.

24  Q.    From the black guy who got out of the Ford Taurus?

25  A.    Yes, it is.

Q.    Okay.  We finished leading off, you indicated they

sutured your head, the lacerations to your face and head?

A.    Yes.

Q.    And what was the result of -- what was going on with

your knees?

A.    I had a broken kneecap.

Q.    In your right leg?

A.    My right leg.

Q.    All right.  And what, if any, procedures take place to

address your broken right leg or broken right knee?

A.    I had, I had screws put in my knee.

Q.    And when you say screws, is that a medical procedure?

What type of medical procedure is that?

A.    I had actual screws put in, two screws going on the

side of the knee.  A metal strip across the kneecap.

Q.    Is that surgery?

A.    In surgery, yes.

Q.    All right.  General anesthesia?

A.    Yes.

Q.    You're out?

A.    Out cold.

Q.    Okay.  And you were wheeled to the operating room?

A.    Yes.

Q.    Were you still in custody?

A.    Yes, I am.

Q.   And do you know who performed the surgery?

A.   Yes, Dr. Lena.

Q.   And what was the result of that surgery?

A.   Um, I need another surgery to get the screws out after healing.  And then I'll have another orthoscopic surgery, a laser surgery to clean it up.

Q.   You said you had to get the screws out.  You mean the hardware that they --

A.   That was put in my knee to stabilize the kneecap.

Q.   And why was that necessary?

     MR. MELLEY:  Objection.  Calls for a medical conclusion.  We're going to have the doctor anyways.

     MR. DiCROSTA:  Let me rephrase the question.  I'll move on.

Q.   When you -- after surgery were you brought to recovery?

A.   Yes.

Q.   And I assume the surgery took place -- where did the surgery take place?

A.   At Hartford Hospital.

Q.   Okay.  And recovery is at Hartford Hospital as well, I assume?

A.   Yes.

Q.   And you come out of, you are under anesthesia, you come out of anesthesia, what happens next?

A.   Um, I'm getting medication in and out.  I wake up.

1    Sometimes I thought it was a bad dream.  Um --

2    Q.   Are you in handcuffs?

3    A.   When I get out um, they keep switching officers.  So

4    there was another officer on duty.  By the time I got out of

5    surgery it was a different officer.  This officer wasn't as

6    nice as the last officer.  So instead of having me cuffed to

7    the bed he cuffed my legs, around the leg.

8              MR. MELLEY:  Objection, relevance.  I'm not sure

9    --

10             MR. DiCROSTA:  It was part of his treatment, Your

11   Honor.

12             THE COURT:  I'll allow it.  Let's move on.

13   Q.   And are you eventually discharged from the hospital?

14   A.   Yes.

15   Q.   Do you know when?

16   A.   Um, it was three or four days later.

17   Q.   And what happens upon discharge?

18   A.   I'm escorted to the Hartford Police Department.  And

19   I'm picked up by my wife.

20   Q.   Who were you escorted by?

21   A.   Escorted by a police officer.

22   Q.   And in what type of vehicle?

23   A.   A van.

24   Q.   Were you charged with any -- what happens when you get

25   -- I assume they are taking you to the police department?

```
1    A.    Yes.

2    Q.    And what happens there?

3    A.    I get fingerprinted.  I get my picture taken.  They

4    asked me who did this to me.

5    Q.    Do you recall the charges they charged you with?

6    A.    They said breach of peace, intoxicated, in the road.

7    Q.    Threatening?

8    A.    Threatening a police officer.  And assault to a police

9    officer.

10   Q.    When you discharged was your leg in a cast or were you

11   immobilized in any way?

12   A.    I'm in a full length cast from the top of my leg to the

13   bottom of my leg.

14   Q.    And can you describe your recovery or your

15   rehabilitation?  Who do you continue -- do you continue

16   treatment for that?

17   A.    I continue treatment with Dr. Lena.  My most recent

18   surgery, I had orthoscopic surgery, laser surgery.

19   Q.    Let me back you up a little bit though.  When you see

20   Dr. Lena after your discharge, when do you see him next?

21   A.    Um, a few months later when I could actually get

22   around.  I couldn't walk for a good while.

23   Q.    Can you ambulate on the leg upon your discharge?

24   A.    I'm on crutches.

25   Q.    How long are you on crutches for?
```

A.    Six months.

Q.    And you indicate there's a subsequent surgery?

A.    Yes.

Q.    And when was that?

A.    At Dr. Lena's.  He had another office in Rocky Hill.

Q.    And was -- did you have to get an MRI or was any
diagnostic testing done?

A.    X-rays, yes.

        MR. DiCROSTA:  Your Honor, at this time I would
like to introduce the medical reports.  They are marked.
One moment, Your Honor?

        THE COURT:  Absolutely.

        MR. DiCROSTA:  Your Honor, may we approach for a
side bar?

        THE COURT:  Sure.

        (Bench Conference held:)

        MR. RIGAT:  It may make better sense for us to
take a break now so we can get it pre-marked and you can
review them and if you have objections --

        THE COURT:  That's fine.

        MR. MELLEY:  I likely, will not have any
objection, but the housekeeping is going to take a while.

        THE COURT:  I know.  We'll get the jury out of
here and then we'll discuss it, okay?

        MR. RIGAT:  Thank you, Judge.

1          (Bench Conference concluded)

2          THE COURT:  I'll remind you again don't chat with

3  folks at home.  Obviously, you can tell them where you were,

4  but really don't go into it.  It's important that you keep

5  an open mind.  Listen to both sides before you reach a

6  conclusion and do so as a group of eight.

7          And you can go on the internet all you like except

8  not regarding this case.  All right.  Thank you.  See you

9  bright and early.

10          (The jury was excused at 4:15 p.m.)

11          THE COURT:  Have a seat.  Let's get some homework

12  done.

13          MR. DiCROSTA:  May Mr. Outlaw step down?

14          THE COURT:  Yes, Mr. Outlaw.  Sorry.  I didn't

15  mean to forget you.

16          Medical records are stipulated except for those

17  two that we've been fussing about a little bit?

18          MR. MELLEY:  Zimmerman and Ranade-Kapur.  I think

19  everything else relates to ambulance, Hartford Hospital and

20  Dr. Lena.

21          THE COURT:  Okay.  So do you have a medical binder

22  or how are you going to offer them?

23          MR. DiCROSTA:  We haven't separated the folders,

24  but we can mark them all.  We have copies for all parties.

25          THE COURT:  Okay.

1      MR. DiCROSTA:  So we can mark them for

2 identification and tomorrow just introduce them as a group.

3 I can briefly run through the -- there's a convalescing from

4 the hospital and whatever else.  And that's pretty much --

5      THE COURT:  Yeah.  Yeah.  It's all the normal

6 stuff.

7      MR. DiCROSTA:  Yeah, normal stuff.  I can do it

8 now or then, but I thought it would be helpful to bring the

9 medical reports now.

10      THE COURT:  All right.  Did you plan to question

11 him about them or just put them in?

12      MR. DiCROSTA:  Not other than he's been through

13 all these different facilities.

14      THE COURT:  All right.  So we can finish that up

15 tomorrow.  And are the bills stipulated to as well with the

16 exception of Zimmerman and Ranade-Kapur?

17      MR. MELLEY:  I believe so, Your Honor.  I don't

18 expect a problem.  And I just want to throw out that I'm

19 agreeing with Hartford Hospital, Dr. Lena, etcetera, based

20 upon his anticipated testimony in a couple hours.

21      THE COURT:  Yeah.  Right.  Right.  Right.  If it's

22 something, it turns out to be something totally different

23 then we'll deal with it then.

24      MR. MELLEY:  Yes.  But on that premise I expect,

25 as we go through these probably with the clerk, that there

1    will not be any objection to the bills or the reports.

2            THE COURT:  Okay.  And then I want to put on the

3    record while we're all here some of the things that we

4    talked about off the record early this morning.

5            And the first one relates to the bills.  There's a

6    collateral source issue because medical insurance has paid

7    for pretty much all the bills, right?

8            MR. DiCROSTA:  Correct.  We'll have a breakdown

9    for you by the morning.  I think we have a breakdown.

10           THE COURT:  All right.  And as I understand the

11   common plan it is that you are going to reach a stipulation

12   about the amounts actually paid by the medical insurer?

13           MR. DiCROSTA:  The insurance carrier.

14           THE COURT:  And that will be the number that will

15   go to the jury?

16           MR. DiCROSTA:  Yes.

17           THE COURT:  And how is that going to show up on,

18   they are going to get copies of the bills, right?

19           MR. MELLEY:  Counsel had a worksheet.

20           MR. DiCROSTA:  Yeah, we can provide them with a

21   summary which we'll provide to --

22           MR. MELLEY:  Between now and then we should be

23   able to figure that out.

24           THE COURT:  Are we going provide the gross amount

25   to the jury and then have me reduce it pursuant to a

1  stipulation?

2      MR. RIGAT:  I would like it, if we could do it

3  that way, Your Honor, because I think they should know what

4  the costs of this were.  And then you can make the

5  appropriate reduction through collateral source.

6      THE COURT:  All right.

7      MR. RIGAT:  Because I don't want them thinking

8  that his surgeries are $5,000 when, you know, we're looking

9  at right now 52,748.74 plus whatever this new procedure may

10  cost.

11      And so if we just give them his out of pockets as

12  five grand and not explain that it could, it doesn't look

13  like it's a serious or as serious an injury as it really is.

14      THE COURT:  All right.  So you're going to offer,

15  that work for you Mr. Melley?  They are going to put the

16  face of the bills as they appear?

17      MR. MELLEY:  Yes.

18      THE COURT:  And then you are going to enter into a

19  written stipulation that the Court will reduce the amount to

20  the amounts actually paid --

21      MR. MELLEY:  Yes.

22      THE COURT:  -- by the insurer?

23      MR. RIGAT:  Yes, that's fair.  Yes, sir.  Yes,

24  sir.

25      THE COURT:  All right.  And if the amount of the

1    medical bills are awarded by the jury is less than the

2    amount that you put in what number am I going to use?

3           MR. RIGAT:  I haven't thought about it that far.

4           THE COURT:  I don't want to get in a box.  So why

5    don't you talk it over tonight.

6           MR. RIGAT:  Okay.

7           THE COURT:  It's not a huge sum either way, but

8    I'll be happier and you'll be happier if you reduce it to a

9    written stipulation that goes in the file and never gets,

10   becomes the subject of some sort of an evidentiary hearing

11   about what were we thinking because that's unhelpful.

12          MR. MELLEY:  If I may inquire, just looking

13   through this, I'm missing the ambulance, is that missing?

14   There may be a couple items, but for the most part I think

15   we're fine here.

16          THE COURT:  Okay.  Can we get over the course of

17   the evening a witness list, I'm sorry, an exhibit list from

18   each side?  And the exhibits marked in advance so it will

19   save, as you saw, a lot of time.

20          MR. MELLEY:  I think so.

21          MR. RIGAT:  What exhibit number are we at now,

22   20?  Oh, because of the clothing.

23          THE COURT:  Yeah.  Yeah.  23, right.  And

24   everything has been used between 1 and 23.

25          MR. RIGAT:  Right.  Your Honor, I thought, as we

1    broke it down by folder, some of those documents are

2    multiple pages, but I'd like to enter them as one exhibit.

3    Did you want every page with like a sub-number?

4           THE COURT:  No.  No.  You can, you can group these

5    in any way that's convenient for you.

6           MR. RIGAT:  All right.  We can talk to Mr. Melley.

7           MR. MELLEY:  Yeah, I think it's very simple.  Dr.

8    Lena covers a lot.  Hartford Hospital does what it does.

9    And then there's a couple others.

10          THE COURT:  Okay.

11          MR. RIGAT:  We can figure that out, Jay.

12          THE COURT:  And you'll give some thought tonight

13    to Zimmerman and the other one.  Maybe I'll have to make a

14    ruling after I look at the exhibit, but I haven't seen the

15    records and it's a little hard.

16          While we have a record, the other thing we talked

17    about this morning was how to handle the qualified immunity

18    question.  And I think I heard agreement that you would like

19    the Judge not to submit that question factually to the jury,

20    but to, in the course of hearing the case, make an

21    independent determination, both of whether there's a factual

22    predicate for qualified immunity and whether, as a legal

23    ruling, it should bar recovery, rather than submit piecemeal

24    the fact part to the jury and the law part for the Court?

25          MR. RIGAT:  That's correct, Your Honor.  I think

1  that makes best sense and it's the fairest way to go for

2  both parties.

3          THE COURT:  Does that work for the defense?

4          MR. MELLEY:  It does, Your Honor.  Your Honor

5  indicated that you, through your assistant, had sent the

6  proposed verdict form, which I have not seen.

7          THE COURT:  Right.

8          MR. MELLEY:  And that ties into that.  But based

9  upon our general discussions I think I'm on board at this

10  point.

11         THE COURT:  That's a good way to go for you?

12         MR. MELLEY:  Yes.

13         THE COURT:  Okay.  What else do we need to cover?

14  Let me just think through what we talked about this morning.

15  We got a minute to -- those were the, those were the things.

16  Yes.  All right.

17         I'll get out of your hair and let you do some

18  homework and get ready to get south to Glastonbury.  We'll

19  see you in the morning a little before 9.

20         MR. DiCROSTA:  Thank you, Your Honor.

21         MR. MELLEY:  Thank you, Your Honor.

22         (The Court recessed at 4:25 p.m.)

23

24

25

1                    C E R T I F I C A T E

2

3          I, Anne Marie Henry, Official Court Reporter for

4     the United States District Court, for the District of

5     Vermont, do hereby certify that the foregoing pages are a

6     true and accurate transcription of my shorthand notes taken

7     in the aforementioned matter to the best of my skill and

8     ability.

9

10     _____

11                    Anne Marie Henry, RPR
                      Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25