UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

_____

TYLON C. OUTLAW                    )

            VS                     )   CASE NO: 3:07-CV-01769

TROY GORDON & MICHAEL ALLEN    )

_____)   DAY 2 - TRIAL BY JURY




BEFORE:   HONORABLE GEOFFREY W. CRAWFORD
          DISTRICT JUDGE



APPEARANCES:  ANTHONY P. DiCROSTA, ESQUIRE
                     Mirto, Ketaineck & DiCrosta
                     P.O. Box 428
                     West Haven, Connecticut   06516
                     Representing The Plaintiff


                  RAYMOND J. RIGAT, ESQUIRE
                     Gilbride & Rigat
                     23 E. Main Street
                     Clinton, Connecticut   06413
                     Representing The Plaintiff

                     (Appearances Continued:)


DATE:        January 5, 2016


          TRANSCRIBED BY:  Anne Marie Henry, RPR
                     Official Court Reporter
                     P.O. Box 1932
                     Brattleboro, Vermont   05302

1                    APPEARANCES CONTINUED:

2


3          NATHALIE FEOLA-GUERRIERI, ESQUIRE
               City of Hartford
4              Office of Corporation Counsel
               550 Main Street
5              Hartford, Connecticut 06013

6


7          WILLIAM J. MELLEY, III, ESQUIRE
               Law Offices of William J. Melley, III
8              250 Hudson Street
               Hartford, Connecticut    06106
9              Representing the Defendants

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
            INDEX

WITNESS:                                        PAGE:

TYLON OUTLAW
Direct Examination Continued by Mr. DiCrosta      14
Cross Examination by Mr. Melley                   26
Further Examination by Mr. DiCrosta               92
Further Examination by Mr. Melley                 97


RACHEL KILLIAN-LALLIER
Direct Examination by Mr. Rigat                   98
Cross Examination by Mr. Melley                  106


NICK SACKANDY
Direct Examination by Mr. Rigat                  120
Cross Examination by Mr. Melley                  129


JONATHAN STENGAL
Direct Examination by Mr. Rigat                  169
Cross Examination by Mr. Melley                  173
Further Examination by Mr. Rigat                 176
Further Examination by Mr. Melley                176


LEWIS CALHOUN
Direct Examination by Mr. DiCrosta               184

DR. CHRISTOPHER LENA'S VIDEO DEPOSITION PLAYED    214


PLAINTIFF EXHIBITS:                             SHOWN:

1 - Photo Union Place                      108, 191

16 - Photo Bloodstain with Meter           185, 199

17 - Photo Bloodstain with Papa's Pizza    185, 199

18 - Photo Bloodstain and Curb             185, 199
```

```
 1                    INDEX CONTINUED:

 2   PLAINTIFF EXHIBITS:                           SHOWN:

 3   19 - Photo Bloodstain and Ruler            185, 199

 4   20 - Photo Bloodstain and Dollar Bill      187, 199

 5   24 - Hartford Hospital Records                    8

 6   25 - Jefferson Radiology Records                  8

 7   26 - Orthopedic Associates of Hartford Records    8

 8   27 - Dr. Ranade-Kapur Records                     8

 9   28 - Ambulance Billing                            9

10   29 - Hartford Hospital Billing                    9

11   30 - Hartford Anesthesia Billing                  9

12   31 - Orthopedic Associates Billing               9

13   32 - CVS Billing                                 9

14   33 - Durant Physical Therapy Billing             9

15   34 - Dr. Zimmerman Billing                        9

16   35 - Ambulance Report                            9

17   36 - Billing Summary                            12

18   37 - Video Deposition Dr. Lena                  214

19

20

21

22

23

24

25
```

1          (The Court opened without the jury present at 9:00

2    a.m.)

3          THE CLERK:  This is the matter of Tylon Outlaw

4    versus Troy Gordon and Michael Allen.  Case number

5    3:07-CV-1769.

6          THE COURT:  All right.  Good morning.  Nice to see

7    everybody.  Did you have an okay time last night with the

8    doctor?

9          MR. DiCROSTA:  Yes.

10         THE COURT:  It went fine, good.  A little

11   housekeeping.  Miss Henry, our court reporter, has asked

12   that you both use the podium more because she's had a little

13   trouble catching track of hearing everybody as they wander

14   around.  I won't put tape on the floor.  It's not a fixed

15   rule, but if you use the podium it will ease things a lot.

16         And we had two motions that we're just closing

17   out, 151 and 152.  I just wanted to get it on the record.

18   What numbers?  150 and 152.  They were the motions that

19   related to the City of Hartford.

20         I'll just mark those as denied as mute because

21   Hartford is not a party, just for the sake of the record, so

22   they have a home in the docket report.

23         All right.  We ready to proceed?  Anything else we

24   need to take up?

25         MR. RIGAT:  Your Honor, if I may, I just finished

marking the exhibits.  And I condensed some of the files

given Jay's suggestion.  Can I just share these with him to

make sure that he is --

      THE COURT:  Sure.

      MR. RIGAT:  Thank you.

      (Attorneys conferring off the record)

      MR. MELLEY:  Your Honor, while he's getting that

stuff together can I just ask maybe through the clerk,

procedurally in terms of using a deposition that would be

marked for ID for purposes of impeachment in terms of Your

Honor's pleasure?  I mean, I have my own ideas to how to do

it.

      THE COURT:  Why don't you tell us what you want to

do and it will probably be fine.

      MR. MELLEY:  All right.  But then the question is

whether it gets marked as an exhibit if the Court allows it

or, you know, gets displayed.  You want to deal with that as

we go along?

      THE COURT:  You mean you want to impeach somebody

with a prior deposition testimony?

      MR. MELLEY:  Right.  Right.

      THE COURT:  I mean, normally I've always just had

lawyers give chapter and verse, you know, at page 17, Line

33, did I ask you this, did you say that.

      MR. MELLEY:  Okay.

1          THE COURT:  And he says yes or no.

2          MR. MELLEY:  That's one way to do it.

3          THE COURT:  But we don't put it up on the screen.

4    I mean, it's not like an exhibit that goes into the jury

5    room or gets displayed.

6          MR. MELLEY:  Okay.

7          THE COURT:  Is that satisfactory?

8          MR. MELLEY:  Yes.  I can work with that.  Thank

9    you.

10         THE COURT:  Okay.

11         (Attorneys Conferring)

12         MS. FEOLA-GUERRIERI:  And, Your Honor, if I may?

13         THE COURT:  Of course.

14         MS. FEOLA-GUERRIERI:  This morning was the morning

15   that I had another matter in the next courtroom over with

16   Judge Bryant.

17         THE COURT:  No problem.

18         MS. FEOLA-GUERRIERI:  It starts at 9:30.  So if

19   we're in the middle of it I'm going to try to be as discreet

20   as possible.

21         THE COURT:  I'll be fine.  Thank you.  I totally

22   understand.

23         (Attorneys conferring off the record)

24         MR. MELLEY:  Your Honor, maybe I can simplify.

25   They've given me a bunch of material, a majority of which I

do not have a problem other than that which I identified in

my prior motions dealing with --

THE COURT: Zimmerman and the other one?

MR. MELLEY: Yes, Your Honor. So, if you want I

can go through on the record and then we can have the clerk

take care of it.

THE COURT: Sure.

MR. MELLEY: In terms of numbers.

THE COURT: Sure.

MR. MELLEY: So 24 is Hartford Hospital.

MR. DiCROSTA: Actually, we have them written down

for you.

MR. MELLEY: But I'd like to go through it. I

want to look at it to make sure the numbers correspond.

THE COURT: Okay. So these are exhibits that

plaintiff is offering?

MR. DiCROSTA: Correct, Your Honor. It's all the

medicals and the, that we had agreed on in terms of

authentication. And then --

THE COURT: So for the sake of the record why

don't you just give us the exhibit number, tell us what it

is, offer it, I'll admit it and we're there.

MR. MELLEY: So 24 is the Hartford Hospital

record. 25 is Jefferson Radiology MRI. 26 is Orthopedic

Associates, primarily Dr. Lena. 27 is Dr. Ranade to which I

1    do have an objection.

2              THE COURT:  Yup.

3              MR. MELLEY:  So I don't agree to that.

4              THE COURT:  Can you spell the last name?

5              MR. MELLEY:  R-A-N-A-D-E-K-A-P-U-R, MD.

6              THE COURT:  That's Exhibit 27?

7              MR. MELLEY:  Correct, Your Honor.  28 is the

8    ambulance bill.  No objection.  29 is Hartford Hospital

9    billing.  No objection.  30 is Hartford Anesthesiology bill.

10   No objection.  I'm noting that the outside files have a

11   different number than the sticker.

12             MR. DiCROSTA:  Why don't we just fix them?

13             MR. MELLEY:  So I think the sticker controls.

14             MR. DiCROSTA:  Why don't we just fix the file.

15   Which number is this one?  It's easy enough, right?

16             MR. MELLEY:  The number I'm giving you is correct.

17             THE CLERK:  That's fine, okay.

18             MR. MELLEY:  31 is the billing from Dr. Lena.  32

19   is the billing from CVS, the prescriptions from Dr. Lena.

20   33 is the billing from physical therapy as ordered by Dr.

21   Lena.  34 is billing from Dr. Zimmerman to which there is an

22   objection.

23             THE CLERK:  There is?

24             MR. MELLEY:  There is.  And then 35 is the

25   ambulance report to which there is no objection.

1          MR. DiCROSTA:  Did we have -- I just want to make

2     sure we skipped over none.

3          THE COURT:  Okay.  So 24 through 26 are admitted

4     without objection.  27 there is an objection.  I'll have a

5     look at the exhibit and make a ruling.  28 through 33 are

6     admitted without objection.  34, concerning Dr. Zimmerman's

7     treatment, there was an objection.  I'll have a look at

8     these in a minute and make a ruling.  35 is admitted.

9          MR. DiCROSTA:  You want the file covers?

10         MR. MELLEY:  No.  No.  I don't --

11         THE COURT:  And have you got an exhibit list

12    there?

13         MR. DiCROSTA:  We have the list here.

14         THE COURT:  Excellent.  So we'll make copies at

15    the break and pass it around.

16         MR. RIGAT:  Which we already took care of that,

17    Judge.

18         THE COURT:  You've done that.  Great.  Can I have

19    one?

20         MR. MELLEY:  Do you have an extra one?  Why don't

21    --

22         THE COURT:  What's that?

23         MR. RIGAT:  -- you keep mine.

24         THE COURT:  Perfect.

25         MR. RIGAT:  That's if you can read my handwriting.

1          THE COURT:  I'm sure it's fine.  You got one too.

2     Good.  We both have one.  And are you going to do a billing

3     summary or --

4          MR. RIGAT:  We have one.

5          THE COURT:  You got one.  You're way ahead.

6          MR. DiCROSTA:  The only thing it doesn't reflect

7     Zimmerman so depending on your ruling.

8          THE COURT:  I see.  So we'll, and I got an exhibit

9     number and we'll -- usually we put in a billing summary just

10    so the jury doesn't have to kind of poor, it's usually

11    stipulated.

12         MR. MELLEY:  No.  That's fine.  This summary

13    includes Dr. Zimmerman.

14         THE COURT:  So it will have to be --

15         MR. RIGAT:  We can redact it if that's --

16         THE COURT:  Redact it if necessary.  So we won't

17    admit it at this point.  I just wanted to make sure there

18    was one in the works.

19         MR. MELLEY:  Do you want to have this marked for

20    ID and then based upon what the Court does we can substitute

21    or file another exhibit?

22         THE COURT:  It will come in in some form.  It's

23    just whether we take a line out, right?

24         MR. MELLEY:  Yes.

25         THE COURT:  Right.  So let's mark that.  Is that

```
 1   the next one, 36 or do you have more to mark?
 2              MR. RIGAT:  I think that's it.
 3              THE COURT:  That's it.  So 36 is the billing
 4   summary.  If I can get 34 and 27 I'll look at them up here
 5   while we all talk.  Those are the two in dispute, right?
 6              MR. DiCROSTA:  34 and --
 7              THE COURT:  27.  Dr. Zimmerman and Dr. Kapur.
 8              MR. DiCROSTA:  The only reason for the folders,
 9   Your Honor, is we have them fastened together.
10              THE COURT:  That's fine.
11              MR. DiCROSTA:  So it keeps them together.
12              THE COURT:  All right.  Totally fine.  All right.
13              Ready for the jury?
14              MR. DiCROSTA:  Let me just get these up to Madame
15   Clerk.
16              THE COURT:  Mr. Outlaw, you can come on up and
17   take the stand and I'll remind you that you're still under
18   oath.
19              THE WITNESS:  Okay.
20              MR. DiCROSTA:  Your Honor, the reports that I will
21   offer them in the presence of the jury or is that something
22   you want to take up afterwards on motion?
23              THE COURT:  The medical bills and records?
24              MR. DiCROSTA:  The Zimmerman bill and the Kapur
25   billing.
```

1    THE COURT:  Let's take it up when the jury's not

2  here so we can talk about it freely.  I'll have a look at

3  them in the next hour while the testimony unfolds.

4    MR. DiCROSTA:  No.  In other words, they are

5  admitted now?

6    THE COURT:  Right.

7    MR. DiCROSTA:  Those, all of them are in evidence

8  except for the two marked for identification, Zimmerman and

9  Kapur.  And you'll rule on those --

10    THE COURT:  34.

11    MR. DiCROSTA:  -- outside the presence of the

12  jury?

13    THE COURT:  Yes.  That way we can talk about them.

14  But everything else of a medical nature is admitted without

15  objection.

16    (The jury returned at 9:20 a.m.)

17    MR. DiCROSTA:  Your Honor, I was going to ask Mr.

18  Outlaw, have him show them his knee.

19    THE COURT:  What's that?

20    All right.  Have a seat please.  Good morning.

21  Nice to see everybody.  We're getting off to 20 minute late

22  start.  We've actually all been in here working.  And in

23  your absence the lawyers and I have admitted the medical

24  records and the medical bills in the case.  So that you'll

25  see them at the end of the case, but those records related

1    to Mr. Outlaw's treatment have come into evidence.   And

2    we've been going through them to make sure everybody

3    understands what they are and that they are in the right

4    spot.

5            So we'll continue Mr. Outlaw's direct testimony.

6    And I'll turn it over to you Mr. DiCrosta.

7            MR. DiCROSTA:   Thank you very much, Your Honor.

8            DIRECT EXAMINATION CONTINUED BY MR. DiCROSTA:

9    Q.   Good morning, Mr. Outlaw.

10   A.   Good morning.

11   Q.   Mr. Outlaw, yesterday we discussed the charges that

12   were brought against you.   Can you tell us what happened

13   with those charges?

14   A.   Yes.   The charge reduced the charges down to

15   infraction.   And I accepted it.

16   Q.   Was it a misdemeanor?

17   A.   Yes, it was.

18   Q.   Do you know what misdemeanor charge you accepted?

19   A.   Um, creating a public disturbance.

20   Q.   You were actually -- that was considered a plea, right,

21   a guilty plea?

22   A.   Yes.

23   Q.   And why did you accept that plea?

24           MR. MELLEY:   Objection, relevance.

25           THE COURT:   What's the relevance?

1          MR. DiCROSTA:  The relevance goes to -- I'll

2     withdraw the question, Your Honor.

3          THE COURT:  Okay.

4     Q.   Mr. Outlaw, you were speaking about -- when we finished

5     off we were speaking about your injuries and your

6     convalescing from those injuries.

7          Drawing your attention to that, starting with the

8     -- we discussed the first operation.  And it was a period of

9     convalescent.  Can you tell us a little bit about that?  I

10    think when we left off you were just on your way out of the

11    hospital on your way home.

12    A.   Yes.  I had the surgery.  Um, I was in a full cast

13    throughout the surgery for six months almost that I cut up

14    the cast after --

15    Q.   What do you mean by, you cut the cast?

16    A.   It was like a big brace.  And it was from the top of my

17    leg to my ankles.  So I cut half of it so I could move

18    around a little bit better.  Um, the doctor said, um --

19         MR. MELLEY:  Objection to what the doctor said.

20    Q.   Tell me why you cut the cast without telling me what

21    the doctor said?

22    A.   Oh, just to move around better just so I could get

23    around.  I was laid up for two months.

24    Q.   When you say laid up, is that non-weightbearing?

25    A.   Yeah.  I couldn't um, I couldn't put any pressure on

1    my, on my knee.  So I had to go around with crutches and so

2    I really couldn't move around.

3    Q.    Okay.  And what happened, just quickly, with two months

4    of crutches, full cast and then what then?

5    A.    Yeah, then a cane.  Then I used the cane to get around.

6    Q.    And how long did you -- did you go to one crutch first

7    and then a cane?

8    A.    I had two crutches and then I --

9    Q.    Can you just give us a little bit of detail?

10   A.    After two months I went to one crutch.  After another

11   month and half or so I went to the cane.

12   Q.    Okay.  And what about after that six month period you

13   just described, can you tell us a little bit about your

14   convalescing?

15   A.    I would get around by physically grabbing my

16   sweatpants, or whatever I had on, and carrying my right leg

17   to get around.

18   Q.    Okay.  Did there ever come a time where you went to a

19   brace rather than the cast?

20   A.    Yes.  That was down the road when I was able to bend

21   the knee a little bit.

22   Q.    Can you describe the cast?  Is it a plaster cast or can

23   you describe the material of the cast?

24   A.    Well, it was a big black brace, about this big.  And it

25   had like --

Q.    That's what you mean by cast?

A.    That's what I mean by cast.  It wasn't the white cast on an arm.

Q.    Was it something you could take on and off or was it a permanent fixture?

A.    It was something I could take on and off.

Q.    Okay.  And did that surgery result in a scar?

A.    Yes.

Q.    All right.

        MR. DiCROSTA:  Your Honor, I'd ask that he show the ladies and gentlemen of the jury the scar to his right knee?

        THE COURT:  Sure.

        MR. DiCROSTA:  May he step down, Your Honor?

        THE COURT:  Yes, absolutely.

        MR. DiCROSTA:  To the side bar?

        (So showing the jury)

        THE COURT:  Thank you.

        THE WITNESS:  Thanks.

Q.    All right.  So what happens, can you tell us a little bit more about your future surgeries or --

A.    Um, eventually I started trying to exercise and going through therapy.  And the screws that was in my knee and I had a metal strip over the kneecap.

Q.    When did you go to therapy after the -- what period of

1  time in relation to the first operation?

2  A.   Maybe a year and a half later.  Once I got some

3  strength in the knee maybe a year later.  Um, --

4  Q.   Was that prescribed?

5  A.   Yes.

6  Q.   Okay.  By Dr. Lena?

7  A.   Yes.

8  Q.   All right.  How did that go?

9  A.   It went okay.  It didn't help too much.

10  Q.   The knee starts to feel a little better?

11  A.   I'm moving around, walking.

12  Q.   You're moving around, walking?

13  A.   Yeah.

14  Q.   All right.  Then?

15  A.   Then when it gets cold out, like it is now, the rubbing

16  and the screws that's inside the knee really bother me.

17  Q.   When is this approximately time-wise?

18  A.   This was a couple years later.

19  Q.   Okay.  I don't mean to hurry you along, but tell us

20  what happens, the screws are bothering you and then what do

21  you do about that?

22  A.   I go see Dr. Lena and I get the hardware removed.

23  Q.   Okay.  What do you mean, you get the hardware removed?

24  A.   The screws.

25  Q.   You undergo a procedure?

A.    A metal strip taken out, yes.  So they open the knee

back up and take the screws and the metal strip out the

knee.

Q.    Okay.  Is there a convalescing period after that or do

you find --

A.    Yeah.  It took a while because I opened that scar back

up so it didn't close right away.  And then it took, it took

a while for it to close back.  So I kind of was um, put

behind the schedule again.

Q.    So they cut right through the first scar?

A.    Right.

Q.    They opened it up and took the hardware out.  And you

had a period of convalescing from that?

A.    Yes.

Q.    And can you tell us just a little bit about that?

A.    Well, like, again, I couldn't move around for probably

another six months 'cause um, the scar wouldn't close after

it was re-opened.

Q.    Are you on crutches?  You have trouble ambulating?

A.    Yeah.  I'm, I have crutches.  I hate the crutches.  So

I get around with the crutches for, you know, a few weeks.

And then when I'm able to move a little bit I just put the

pressure on my left knee and get around and drag the right

leg, so to speak.

Q.    Okay.  And then did you start feeling better, moving

1    around better?

2    A.    Yes.

3    Q.    And then what happens?

4    A.    Then the scar eventually closes.  Um, I start, I start

5    trying to do things again, moving around, walking around,

6    exercising.  And then eventually um, I to go see Dr. Lena

7    and I tell him, you know, my knee is swelling up every time

8    I start doing anything.  And he prescribes me different

9    medications.

10   Q.    You tried, without telling us what Dr. Lena said to

11   you, he prescribed some medications.  Were there any other

12   procedures or any other -- did he do anything else?

13   A.    Yes.  Eventually I have um, I talked to Dr. Lena and

14   he, he um, he advised me to get the knee cleaned up and --

15   Q.    Before we get to that, did you do anything prior to

16   getting your knee cleaned up to try to withstand the pain?

17   Is there anything short of the surgery you are describing

18   now?

19   A.    Um, I went through a lot of different medications.

20   Q.    Okay.  Anti-inflammatories?

21   A.    Anti-inflammatories, yes.

22   Q.    Did they try draining the knee at all?

23   A.    No.

24   Q.    And then, I'm sorry, I interrupted you, you were about

25   to say you had another operation to clean up?

A.    Yes.  A orthoscopic surgery, laser surgery.

Q.    Can you tell me what you mean by that?

A.    Um, I go through, they go through the knee and it's three, three holes.  And it's laser surgery so they don't cut you open.  But it helps clean up the knee and get the swelling out.  Well, that's what it was supposed to do.

Q.    Okay.  And how did that work out?

A.    That didn't work out like we planned.

Q.    When was that, by the way?  I'm sorry.

A.    That was actually this past August.

Q.    Okay.  And can you tell me why you say that's not working out?

A.    Um, I have some inflammation under the kneecap, some scarring.  The doctor probably can explain it better, but the procedure really didn't do anything.

        MR. DiCROSTA:  Could I have just one second?

Q.    Now you, these operations were at different surgical centers and the medicals are in Jefferson Radiology, radiology centers that were utilized?

A.    Yes.

Q.    Did you ever, and of course you had an MRI along the way?

A.    Yes.

Q.    Okay.  And did you ever see anyone in the psychiatric field?

A.    Yes.

Q.    Can you -- who did you see first, if anyone?

A.    I seen Dr. Zimmerman.

          MR. MELLEY:  Objection, Your Honor.  There needs to be some foundation for this, not just that he went.  I filed on this.

          THE COURT:  Let's talk for a second.

          (Bench Conference held:)

          THE COURT:  The question is, did he go to see somebody?

          MR. MELLEY:  What's the difference?

          MR. DiCROSTA:  I want the reports and we haven't talked about them.  We never talked about the reports.  They have to get in.

          THE COURT:  The reports are --

          MR. DiCROSTA:  These two reports.

          THE COURT:  You just going to ask him?

          MR. DiCROSTA:  Had he seen him and that's it.  I'm not going to ask for opinions.

          MR. MELLEY:  What's the relevance if it's not coming in?  I mean, how does it have a connection to anything?

          THE COURT:  Well, you could back up and provide a little foundation.  For example, did you go to see him for issues related to --

          MR. MELLEY:  How do we know, Your Honor, if we
don't have the records?  If the records aren't coming in why
should any testimony regarding seeing the doctor -- it's
very prejudicial because there's no foundation for it.  I
mean, you have medical records from a providing physician,
that if it doesn't come in it doesn't come in it's not part
of the case.

          THE COURT:  Right.

          MR. DiCROSTA:  Well, I don't want the records to
go in without -- I don't want just psychiatric records to
show up in the jury room if you rule in our favor.

          MR. RIGAT:  Well, Your Honor, there is value to, I
had a, I had psychological trauma that I did go see a
psychologist.

          MR. DiCROSTA:  Related to the accident.  It's not,
I don't think his objection is the foundation.  He doesn't
want them in if you are ruling --

          THE COURT:  Right.  That's a --

          MR. DiCROSTA:  I think he's saying putting the
cart before the horse, but --

          THE COURT:  Clearly the guy can testify that this
upset him.

          MR. MELLEY:  Sure.

          THE COURT:  Clearly he can testify that it upset
him enough to go see someone.

1          MR. DiCROSTA:  Without naming who the person is.

2          THE COURT:  No, we can say who he is.  I don't

3     think you're going, you haven't pleaded your case.  It

4     doesn't look like the records are in or the bills are in for

5     the treatment, but I think he can say that he was upset and

6     that he sought --

7          MR. DiCROSTA:  I'll leave it at that.

8          THE COURT:  -- professional assistance.

9          MR. DiCROSTA:  Then it makes sense if you rule in

10    our favor.

11         THE COURT:  Then we'll deal with whether the

12    reports come in or not.

13         MR. DiCROSTA:  Right.  But that would make sense

14    to the reports with regard to a psychiatrist.

15         MR. MELLEY:  Then they are going to wonder why

16    they are not in.  That's the whole thing about opening up

17    the door where the information will not be provided.  It's

18    like a non sequitur.  It doesn't tie in.

19         THE COURT:  Either side, if they think that the

20    record is incomplete, can offer more information about it.

21         MR. RIGAT:  Right.

22         THE COURT:  If they have a hole in their case they

23    have a hole in their case if you think that the psychiatrist

24    really dealt with different psychological problems.

25         MR. MELLEY:  I don't know because I can't read

1  them.  That's my problem.

2          MR. RIGAT:  Dr. Ranade's report, which isn't a

3  business report, and is probably not going to come in for

4  that reason, it's a report to an attorney.

5          MR. MELLEY:  Right.

6          THE COURT:  But there's no doubt what Dr. Ranade

7  was treating him for.  As to Dr. Zimmerman I haven't seen,

8  all I've seen is the bill.  I haven't seen Dr. Zimmerman's

9  ledger, I mean a record of --

10          MR. RIGAT:  The billing.

11          THE COURT:  -- of the treatment.  But what I'm

12  saying is do it this way, he can testify that he was upset

13  or he can testify that he was upset enough to go and seek

14  professional assistance.

15          MR. DiCROSTA:  I'll leave it at that.

16          THE COURT:  And you'll leave it at that.

17          MR. DiCROSTA:  Thank you.

18          (Bench Conference concluded)

19  Q.  Just one last question, Mr. Outlaw.  I know you've been

20  up there for a while.  Was this -- this incident, was it, I

21  assume, was upsetting to you?

22  A.    Yes.

23  Q.    All right.

24  A.    Very.

25  Q.    Was it upsetting where you might have -- did you see

anyone or was it upsetting enough to see anyone for mental

healthcare?

A.    Yes.

Q.    Okay.

        MR. DiCROSTA:  I have no further questions, Your

Honor.

        THE COURT:  Mr. Melley, it's your turn.

        MR. MELLEY:  Thank you, Your Honor.

        CROSS EXAMINATION BY MR. MELLEY:

Q.    Good morning, Mr. Outlaw.

A.    Good morning.

Q.    You described for the jury your past history as a

football player.  Do you recall that?

A.    Yes.

Q.    And is it fair to say that primarily you played defense

as a free safety?

A.    I played both sides.

Q.    Okay.  When you were with Missouri Valley, did you play

as a free safety the whole time?

A.    Yes.

Q.    All right.  And Missouri Valley, was that the

professional, semi-pro professional arena football?

A.    No.

Q.    What was that?

A.    That was college.

1  Q.    College.   Okay.   You played a lot of defense in
2  football in high school, is that right?
3  A.    Yes.
4  Q.    And as a matter of fact, you did well playing football
5  on defense, is that a fair statement?
6  A.    Yes.
7  Q.    As a matter of fact, did you get a chance to make a
8  record for interceptions in high school that still has a
9  place in the records today?
10 A.    Yes.
11 Q.    And when we're talking about making an interception, as
12 a defensive football player, that involves being aware of 21
13 football players on the field and making a judgment where
14 you can have a direct impact on the flow of the game, is
15 that fair?
16 A.    Twenty-two, yes.
17 Q.    Well, you would be the 22nd?
18 A.    Right.
19 Q.    So you're aware of 21 others?
20 A.    Right.   Yes.
21 Q.    And that involves being very aggressive in terms of
22 establishing your position and being able to foresee a ball,
23 a carrier, an intended pass receiver coming at you, is that
24 fair?
25 A.    I would call it eye, hand coordination.

Q.   Okay.  And the eye is, again, being observant of your
entire surroundings, is that fair?

A.   That's correct.

Q.   So 2004, when this incident occurs, you've had, you had
stopped playing in 2002?

A.   Yes.

Q.   So up until 2002 you had what, a solid 10 years of
playing fairly competitive football?

A.   Yes.

Q.   And fairly competitive football also includes a fair
amount of contact, is that right?

A.   Yes.

Q.   And part of what happens in football is that if you get
hit you got to carry on, is that right?

A.   Possibly, yes.

Q.   One of the reasons you wanted to stop playing football,
as I understand your testimony, is that you wanted to avoid
getting hurt, is that right?

A.   That's correct.

Q.   But along the way you certainly had your share of bumps
and bruises, is that right?

A.   Yes.

Q.   And, as a matter of fact, when this incident occurred,
do you recall me asking you if you were knocked unconscious?

A.   Yes.

```
 1   Q.   And do you recall telling me that based upon your
 2   football experience you are very hard to knock unconscious?
 3   A.   Yes.
 4   Q.   And that's because during your football career you got
 5   hit a lot, including in the head, and you were able to
 6   withstand it?
 7   A.   Yes.
 8   Q.   And in the football career, even though you're getting
 9   hit in the head, you had the wherewithal to be able to carry
10   on and continue in a game, is that fair?
11   A.   It all depends.  If you have a concussion you can't
12   carry on.
13   Q.   Well, did you ever leave the game with a concussion?
14   A.   Yes, in high school.
15   Q.   Okay.  But not in college and or in arena football?
16   A.   No.
17   Q.   And just so we're clear on that, when we talk about
18   arena football, it's the same type of football that the NFL
19   has except it's in an arena as opposed to an outdoor
20   football field, is that right?
21   A.   It's indoor football, yes.
22   Q.   All right.  But you have the full pads, full contact
23   and it's a very physical game?
24   A.   That's correct.
25   Q.   And on this day, December 17th, you were healthy, is
```

1  that right?

2  A.   Yes.

3  Q.   Now, at some point in high school, or whatever, you did

4  injure your left knee where you had a PCL tear?

5  A.   Yes.

6  Q.   And the PCL is the posterior cruciate ligament?

7  A.   Yes, it is.

8  Q.   We hear a lot about ACL's or anterior, that's in the

9  front.  The PCL is towards the rear, right?

10  A.   Yes, it's in the back.

11  Q.   And that will have an effect on your overall stability

12  unless you can work it up?

13  A.   I don't understand your question.

14  Q.   With regard to the knee, you had to build that knee up

15  because of the PCL?

16  A.   Umhum.

17  Q.   Is that right?

18  A.   Yes.

19  Q.   All right.  And, likewise, did you develop a problem

20  with the right knee with the PCL?

21  A.   Are you asking me I have a hurt left knee?

22  Q.   Yup.  Did you also have a deficiency in the right knee

23  with the PCL?

24  A.   Not before this incident.

25  Q.   You were never operated on, is that right?

1  A.    Right.

2  Q.    But you had a strain in that right knee as well?

3  A.    No.

4  Q.    All right.  Let's back up to the night of December 17.

5  As I understand it you worked all day and you went home, is

6  that right?

7  A.    That's correct.

8  Q.    And at some point you got a call from your friend and

9  you go downtown to meet him, is that right?

10  A.    Yes.

11  Q.    And the place you were intending to go, this Bourbon

12  Street, we saw a picture of it, that's a place you had been

13  before, is that right?

14  A.    Yes.

15  Q.    And I think you described for us, but I want to be

16  clear, when you got to Hartford you decided you wanted to

17  try to park on the street to save a couple of bucks, is that

18  right?

19  A.    That's correct.

20  Q.    So you went around the block several times without

21  success in finding a parking space, is that right?

22  A.    That's correct.

23  Q.    And so we're clear on this, where Bourbon Street is is

24  also the location of a number of bars that cater, for lack

25  of a better word, people in their younger years, their 20's

1    or their 30's, is that fair?

2    A.    I think anybody could go down there.  I was 30 at the

3    time.  I don't know.  I never was looking at ages.  I seen

4    all ages there.

5    Q.    Okay.  Would you agree it's generally a younger crowd

6    in 20's and 30's as opposed to --

7    A.    I actually thought Bourbon Street was for the older

8    crowd.

9    Q.    All right.  Because right around the corner you have

10   what, Coach's?

11   A.    Yes.

12   Q.    All right.  And that was, was that originally Jim

13   Calhoun's Place and then he sold it off?

14   A.    I believe so.

15   Q.    And then across the street is Up On The Rocks?

16   A.    I believe so.

17   Q.    And Federal Hill?

18   A.    I never heard of it.

19   Q.    Or the Federal Cafe?

20   A.    I never heard of it, but --

21   Q.    Okay.  But is it fair to say there's what, four, five,

22   six establishments within an area of a block or two?

23   A.    Yes.  There's a lot of different places.

24   Q.    All right.  And people generally go to these places

25   later at night, is that right?

```
1    A.    That's correct.

2    Q.    So 10 o'clock is actually kind of on the early side?

3    A.    That's correct.

4    Q.    The place will get busier as we get to midnight and

5    then beyond, is that right?

6    A.    Yes.

7    Q.    But when you go at this, leaving your house at 9:30

8    from Weathersfield to go to this area you have to circle a

9    number of times to find a spot because it's starting to get

10   crowded then, is that right?

11   A.    Well, you just never know.  You could find a spot in

12   Hartford.

13   Q.    Okay.  You said you left at 9:30.  And your residence

14   to this place, what are we talking, four or five miles tops?

15   A.    Somewhere around there.  That's about it --

16   Q.    So on a -- I'm sorry?

17   A.    I said it kind of depends.

18   Q.    Okay.  But, in any event, it would be about a 10 minute

19   ride?

20   A.    With no traffic.

21   Q.    With -- well, is there traffic on Saturday night from

22   Weathersfield before you get to Union Place?

23   A.    Yeah, on a Friday night.  I live on the Berlin Turnpike

24   area so there's always traffic.

25             THE COURT:  Why don't you try to pushing that
```

1    miche away back from you?

2              THE WITNESS:  Is that better?  Yup.

3              THE COURT:  There you go.

4    Q.    So when you get down to Union Place, you can't find a

5    spot after going around a couple of times, so you end up

6    parking.  And I was confused by what you said.  Did you park

7    in the Holiday Inn or the Coach's parking lot?

8    A.    I guess it is Coach's parking lot and Holiday Inn.

9    Q.    Okay.  And do you recall when you go into Bourbon

10   Street are there a fair amount of people on the street?

11   A.    You mean walking?

12   Q.    Yeah.

13   A.    Not really.

14   Q.    Okay.  This is a week before Christmas Eve exactly,

15   right?

16   A.    Yes.

17   Q.    And do you recall seeing a lot of younger people

18   starting to come home from college for the holiday season?

19   A.    Um, really I wasn't paying attention to it.

20   Q.    Okay.  In any event, is it fair to say if you left your

21   house at 9:30 you are inside Bourbon Street by 10, is that

22   right?

23   A.    Well, I left my house after 9:30.  I'm not sure of the

24   exact time I left my house.

25   Q.    But you're in Bourbon Street by 10?

A.    Somewhere 10, 10:15.

Q.    All right.  Now, this incident that brings us together,
what time did it happen?

A.    Um, the report it said, I think it said 11:54 or
something like that.

Q.    And do you agree or disagree?

A.    Of that exact time?  Agree or disagree to what?

Q.    That it occurred at 11:54?

A.    That it started at 11:54 or ended at 11:54?

Q.    The incident that happened with Detective Gordon --

A.    Yes.

Q.    -- is it fair to say that it happened at 6 minutes
approximately before midnight?

A.    Did it start -- I'm asking, are you asking did it start
at 11:54 or ended at 11:54?

Q.    Well, let's go at it another way.  How long were you in
Bourbon Street?

A.    Somewhere around an hour.

Q.    An hour.  So if you arrived at 10 o'clock that would
mean you left at 11, is that right?

A.    Yes, that's what it would mean.

Q.    Okay.  So that would mean that once you left Bourbon
Street, 54 minutes, if we believe the police report, occur
before the incident happens, is that right?

A.    If that was the exact time, yes.

1   Q.   Okay.  So let's back up.  When you leave Bourbon Street
2   you say your intention is to go right to your car to go
3   home, is that right?
4   A.   Yes.
5   Q.   And to do that you would walk along the east sidewalk
6   of Union Place, cross Allyn Street, into the parking lot and
7   leave?
8   A.   Yes.
9   Q.   And that distance is maybe what, a hundred and 50 yards
10  total?
11  A.   Hundred 50, 200 yards, yes.
12  Q.   So that's something that would take two minutes?
13  A.   It would take --
14  Q.   All right.  And once you left Bourbon Street I think
15  you said that you walked down and you got to a point where
16  you were by Papa's Pizza, is that right?
17  A.   Yes.
18  Q.   And Papa's Pizza, if we're looking at Bourbon Street,
19  would be to the right as we're going towards the Coach's
20  parking lot?
21  A.   Yes.
22  Q.   And Papa's Pizza, have you been there before?
23  A.   I've been there before, yes.
24  Q.   It's closed now, but did you go there in the day back
25  when it was open?

A.    I've been there before, yes.

Q.    All right.  It's, it was open 24 hours a day and a lot
of people went late at night after 10, 11, 12, 4 in the
morning?

A.    I've been there during the day, yes.

Q.    Do you remember there being a lot of people at Papa's?

A.    Not really during the day.

Q.    This night?

A.    No, I don't think there was a lot of people --

Q.    Okay.  So --

A.    -- yet anyway.  It was early.

Q.    Excuse me?

A.    It was early.  So there wasn't a lot of people out.

Q.    Okay.  In other words, you would expect more people at
Papa's as we get closer to midnight, 1 and 2 o'clock when
the bars are going to close?

A.    Maybe when everything closes, yes.

Q.    Okay.  So, in any event, as you are walking towards
Papa's from Bourbon Street what's that take, 30 seconds, 10
seconds?

A.    From, from Bourbon to Papa's you said?

Q.    Yes.

A.    Yes, just a few seconds.

Q.    Okay.  So if that's at 11, 11:02, whatever time it is,
if we believe the 11:54, from the time that you got the word

1    from Anthony Carroll you're saying that you were there for

2    50 odd minutes before the incident happens?  5-0?

3    A.    5-0?  Um, I'm saying that I was in Bourbon Street about

4    an hour.  I could have got there at 10:15, 10:20, somewhere

5    around there.  And I stayed about an hour.

6    Q.    Do you remember me asking you in your deposition when

7    it was that you arrived at Bourbon Street?

8    A.    Yes, I do.

9    Q.    All right.  And what did you tell me?

10   A.    I really couldn't remember the time.  And I still

11   can't.

12           MR. MELLEY:  Your Honor, may I approach?

13           THE COURT:  Sure.  It will pick you up fine.  You

14   don't have to lean forward.

15           THE WITNESS:  Okay.

16           MR. MELLEY:  Let's, if I may approach?

17           THE COURT:  Sure.

18   Q.    I hand you this, sir.

19   A.    Umhum.

20   Q.    Do you remember coming to my office back in, what is

21   it, it's on the front page, December 2nd, 2008, so that's

22   eight years ago?

23   A.    Yes.

24   Q.    And eight years ago was a lot closer to the event than

25   we are today, is that fair?

```
1    A.    Yes.
2    Q.    And the deposition was at my office a couple blocks
3    from here?
4    A.    Yes.
5    Q.    A small brick building, third floor, you had to walk
6    up?
7    A.    Yup.
8    Q.    And you were there with your two attorneys?
9    A.    Yes, I was.
10   Q.    And do you recall me asking you a series of questions?
11   A.    Yes, I do.
12   Q.    And you answered those questions to the best of your
13   ability, is that fair?
14   A.    Yes.
15   Q.    And then at the end of the deposition your attorney
16   asked you some series of questions covering multiple pages,
17   is that fair?
18   A.    Yes.
19   Q.    And the idea was that to the extent there was issues
20   that I created your attorney asked you follow-up questions,
21   is that right?
22   A.    I know he asked me some questions at the end of the
23   interview.  Yes.
24   Q.    Okay.  And then as a follow-up to the deposition you
25   had, and it's attached there in the beginning, an errata
```

1    sheet.  Do you recall that?  Where you could make

2    corrections or fix anything in the whole deposition if there

3    was something off?

4    A.    I don't know what an errata sheet is.  I'm sorry.

5    Q.    If you open up that package I just gave you, right in

6    the front, if you open it, do you see it?

7    A.    Yes.

8    Q.    And do you see you signed the page?

9    A.    Okay.

10   Q.    Is that your signature?

11   A.    Yes, it is.

12   Q.    And there are what, four little corrections there to

13   different parts of the transcript?

14   A.    Yes.

15   Q.    Okay.  So now, if you could, if you could go to Page 80

16   of that deposition, please?  And if you can direct your

17   attention to line 17 where I asked you, that I was trying to

18   figure out exactly when it was that you arrived at Bourbon

19   Street.  And I specifically asked you, when was that in

20   relation to 9:30.  Do you see that?

21   A.    Yes.

22   Q.    All right.  And can you look at your response there?

23   All right.  Does that refresh your recollection as to what

24   you told me that day?

25   A.    I think that's what I just said.

Q.    You arrived at 10, right?

A.    No.  It's, it was after 9:30 when I left the house.

Q.    I understand that.  And then you said, I probably

arrived at Bourbon Street just around 10 o'clock, is that

right?

A.    Yeah, around.  I'm not pinpointing the times.  I'm

really not sure.

Q.    Okay.  I'm trying to establish when you arrived so we

can figure out when you left.

A.    Right.

Q.    You said you were at Bourbon Street just an hour?

A.    Yes.

Q.    So if you arrived at 10 --

A.    I'm sorry, around an hour.

Q.    Around an hour?

A.    Around an hour.  So it could have been an hour, an hour

10 minutes, an hour and 15 minutes, but around an hour.

Q.    So you are at Bourbon Street, if you arrived at 10, and

the incident happens at 11:54, at least an hour and a half,

maybe an hour and 45 minutes, maybe more?

A.    Okay.

Q.    You have any problem with that?

A.    I don't think it's accurate, but okay.

Q.    Well, I wasn't at Bourbon Street.  And I didn't have my

watch.  So we can only use your words.  Does that sound

1    right to you, based upon what you said, that you arrived at

2    10?

3    A.    Arrived after 10, around 10.

4    Q.    Okay.

5    A.    I'm not sure.

6    Q.    So when you leave and you go outside and you walk to

7    Papa's you hear from Mr. Carroll, and at that point you

8    cross the street?

9    A.    Correct.

10   Q.    And when you first crossed the street and you go to the

11   cab, how long are you there before you encounter Detective

12   Gordon?

13   A.    The encounter with Detective Gordon was before I

14   reached the cab.

15   Q.    Okay.  When you say the encounter, you're talking about

16   the first --

17   A.    The first words spoken.

18   Q.    First words.  All right.  So let's back up then.  From

19   the time of the first word from Detective Gordon to you,

20   until the incident happens, how much time passed?

21   A.    Um, maybe a minute.

22   Q.    Okay.  Do you recall me asking you that in the

23   deposition?

24   A.    May have.

25   Q.    So, on page 89?

1    A.    Okay.  You want me to go to it?

2    Q.    Sure.

3    A.    Okay.

4    Q.    And how long did you say?  Page 89, lines 1 through

5    three?

6    A.    I said maybe three minutes.

7    Q.    Okay.  So let's back up.  You leave Bourbon Street, you

8    walk the 20 odd yards to Papa's, you cross the street, and

9    about three minutes later we have this actual incident that

10    you talked about, right?

11    A.    Yes.

12    Q.    So if we do the clock backwards, and we start at 11:54,

13    that would mean that you left Bourbon Street around 11:50,

14    is that right?

15    A.    If I was at Bourbon Street at 10 o'clock on the dot,

16    yes.

17    Q.    And that would mean you were there an hour and 50

18    minutes, is that right?

19    A.    Yes.

20    Q.    So I was somewhat confused and I want to back up.  When

21    you first see Detective Gordon he's in this Taurus and I

22    think you said, correct me if I'm wrong, that you saw him to

23    the south side of Allyn Street, is that right?

24    A.    Yes.

25    Q.    Okay.  So if we get our directions, and maybe if I can

get one of the photographs.

        MR. MELLEY:  Your Honor, may I use the --

        THE COURT:  Projector.  Absolutely.

        MR. MELLEY:  -- projector?

        THE COURT:  You can use the young man too if you need some help.

        MR. MELLEY:  I know.  So there it is.

        THE COURT:  What exhibit is this?

        MR. MELLEY:  This is Exhibit 1, Your Honor.

        THE COURT:  Thank you.

Q.    So, Mr. Outlaw, if I understand your testimony, we're looking at this photograph.  And just to orientate ourselves that's the state capital to the right, is that right?

A.    Yes.

Q.    And then to the left is the Holiday Inn Express?

A.    Yes.

Q.    And then in between Allyn Street and the Holiday Inn Express is the parking lot for Coach's and the Holiday Inn Express?

A.    Yes.

Q.    And Coach's would be just to our left outside this picture, is that right?

A.    Yes.

Q.    And as I understand what you said, when you first saw Detective Gordon he is stopped on the right-hand side of

1  Union Place heading north, and where would you put him in

2  relation to that do not enter sign which is right in the

3  middle there?

4  A.    I would put him just ahead of the van.

5  Q.    Okay.  So he's back on Allyn Street, excuse me, back on

6  Union Place?

7  A.    Right.

8  Q.    Okay.  And is he on the side of the road parked?

9  A.    No.  He's in the middle.

10  Q.    He's in the road?

11  A.    He's in the middle of the road.

12  Q.    All right.  And is his vehicle moving?

13  A.    No.  He's at a stop at this time.

14  Q.    Okay.  And so can you help us out?  Are you saying he's

15  stopped in the travel portion of Union Place?

16  A.    Yeah.

17  Q.    Is there any vehicle in front of him?

18  A.    No.

19  Q.    Does he have his lights on?

20  A.    Regular car lights, yes.

21  Q.    Okay.  But he's just stopped there?

22  A.    Yes.

23  Q.    Okay.  At that point in time can you see anybody in the

24  vehicle?

25  A.    Yes.

Q.    And you see an individual in the vehicle?

A.    I see a car.  And somebody's in the vehicle, yes.

Q.    Okay.  So can you discern from this -- well, you said before it's about a hundred and 50 to 200 yards from Bourbon Street to the parking lot.  And he's close to where your car is.  So he's about 150 yards from you?

A.    No.

Q.    How far is he from you?

A.    He's about 30 feet from me.

Q.    When he's in the car in that spot on Union Place --

A.    Yes.

Q.    -- on the other side of Allyn Street, he's 30 feet from you?

A.    Yeah.  I said 150 feet from the parking area where the Holiday Inn is.  That's 200 yards or a hundred and 50 yards I said.

Q.    Maybe I confused the matter.  Let me back up.

      Did you say from Bourbon Street to where your parked, is that 150 yards or feet?

A.    Yards.

Q.    Okay.  So a football field and a half?

A.    Right.

Q.    All right.  So when you first see Detective Gordon's Taurus he's parked near the lot where you are parked, is that right?

A.    No.  He's right where this mini-van is, just ahead of
this mini-van to the right.

Q.    Well, are you talking about the mini-van to the right
front of the photo?

A.    Yes.

Q.    I thought before you said, and that's why I asked, when
you first saw his vehicle was he on the far side or the
opposite side of the fire hydrant?

A.    This is the first I heard of a fire hydrant.  I was
saying -- I thought you said the mini-van.  I said the
mini-van.

Q.    You did.  And --

        MR. DiCROSTA:  Objection, Your Honor.  He's
characterizing evidence.  Maybe he can just repeat it.

        THE COURT:  What's that?

        MR. DiCROSTA:  He's characterizing the evidence.

        THE COURT:  I'll allow the questioning.  I think
they got it a little mixed up and they can start over.

        THE WITNESS:  He confused me.  I'm sorry.

        MR. MELLEY:  So please bare with me.

        THE WITNESS:  Okay.

Q.    When you first see Detective Gordon's Taurus, yesterday
did you tell us it was on the other side of Allyn Street?

A.    I believe I'm -- what I'm saying this car is parked
where this mini-van is, around this mini-van.

1   Q.   And I see the mini-van is this side of Allyn Street.

2   But yesterday did you say it was on the far side?

3   A.   No.  No.  Not the far side.

4   Q.   Maybe I mis-heard it.

5   A.   No.

6   Q.   Okay.  All right.  So you're saying when you first see

7   the -- when you first see the Taurus, if I, maybe if I can

8   do this, how about there, is it in between those two

9   vehicles?

10  A.   Yes.  It's around there.  Around there.

11          THE COURT:  You can kind of pinch the thing and it

12  will work.

13          MR. MELLEY:  Right.  But I wanted to get the two

14  cars.

15  Q.   So he's somewhere between those two cars.

16  A.   Yes.

17  Q.   And he is stopped?

18  A.   Yes.

19  Q.   And is there any vehicle between his vehicle and you?

20  A.   No.

21  Q.   Okay.  So you see this vehicle when you are crossing

22  from Papa's to the cab?

23  A.   Yes.

24  Q.   And when do you first hear anything being said from the

25  individual in the car, in the Taurus?

1  A.    When I get into the street --

2  Q.    Okay.

3  A.    -- and I'm crossing, that's when the vehicle moves,

4  moves up.

5  Q.    Okay.  So as you start to cross the street the vehicle

6  is stopped?

7  A.    Yes.

8  Q.    And then as you walk across the street, originally to

9  the passenger's side of this cab, the vehicle starts moving?

10 A.    Yes.

11 Q.    Okay.  And how does it start moving, slow, fast?

12 A.    Very slow.

13 Q.    Very slow.  Okay.

14        So you get to the cab side, the passenger's side

15 of the cab.  Does he say anything before you get there?

16 A.    Yes.

17 Q.    Before you get to your destination, while you are still

18 walking, you're saying he said something to you?

19 A.    Yes.

20 Q.    Okay.  And at that point what do you hear?

21 A.    I hear, hey mother fucker.

22 Q.    Okay.  And did you recognize him at all?

23 A.    No.

24 Q.    Had you ever, in hindsight in your life, had you ever

25 had an encounter with Officer Detective Sergeant Gordon?

1    A.    No.

2    Q.    This is the only time you ran into him in your life,

3    right?

4    A.    Yes.

5    Q.    And when you saw the vehicle and you heard this how did

6    he say this?  Did he lean out the window?

7    A.    Yes.

8    Q.    So could you see his face at that time?

9    A.    Not really.  Barely.

10   Q.    Okay.  And what kind of tone was it?

11   A.    It wasn't an aggressive tone at the time.

12   Q.    Okay.  Now, did it sound at all authoritative?

13   A.    No.

14   Q.    You know what that is, right?

15   A.    Yes.

16   Q.    Do you recall saying it sounded like somebody from the

17   inner city?

18   A.    Yeah.

19   Q.    Okay.

20   A.    Okay.

21   Q.    So what do you do when he yells at you?

22   A.    I mimmick what he says.

23   Q.    Excuse me?

24   A.    I mimmick what he says.

25   Q.    While you are walking?

1   A.    While I'm walking, yes.

2   Q.    So this whole conversation occurs while you are

3   crossing from the Papa's side to the other side?

4   A.    That's correct.

5   Q.    Okay.  And do you mimmick back to him before you get to

6   the passenger's side of the cab?

7   A.    Yes.

8   Q.    So you haven't even made it across when you are done

9   with your first interaction, is that fair?

10  A.    Yes.

11  Q.    And how long does that take?

12  A.    Seconds.

13  Q.    Okay.  So when you get to the cab passenger's side do

14  you stop and talk inside the cab?

15  A.    I shake hands.

16  Q.    And you shake hands with?

17  A.    The passenger.

18  Q.    The passenger who is, what's his name, Martin?

19  A.    Foster.

20  Q.    Martin Foster?

21  A.    Michael Foster.

22  Q.    Michael Foster, okay.

23        Do you know where Michael Foster is today?

24  A.    No.

25  Q.    And did you know Michael Foster before?

1   A.    Um, I knew that was Anthony Carroll's uncle.

2   Q.    Okay.  And Anthony Carroll is the driver?

3   A.    Right.

4   Q.    Do you lean through to Anthony?

5   A.    No.

6   Q.    Okay.  When was the last time you had seen Anthony?

7   A.    At that time maybe months before.

8   Q.    Okay.  And when did you realize you knew the people in

9 the back seat of the cab?

10  A.    Once I got to the driver's side of the cab.

11  Q.    Okay.  So while you were talking to Michael Foster were

12 they in the back of the cab, these other two?

13  A.    When I shook hands with Michael Foster and I walked

14 around to the driver's side of the cab.

15  Q.    My question is, when you shook hands with Michael

16 Foster did you look in and see the two in the back seat?

17  A.    No.

18  Q.    Okay.  So how long are you recall shaking hands with

19 Michael Foster?

20  A.    As long as it takes to shake someone's hands.

21  Q.    I mean, you're talking what, five seconds, three, 30

22 seconds?

23  A.    Two seconds.

24  Q.    Two seconds?

25  A.    It was quick.  Three seconds.

1  Q.    Okay.  So then where do you go from there?

2  A.    To the driver's side of the cab.

3  Q.    Okay.  So is it your testimony that at no time did you

4  linger on the passenger's side other than this two second

5  handshake with Michael Foster?

6  A.    That's correct.

7  Q.    Okay.  And you then walk around the front of the cab

8  and then you go to the driver's side of the cab?

9  A.    Yes.

10  Q.    And how long does that take?

11  A.    How long does what take?

12  Q.    For you to finish shaking hands, the two seconds, and

13  then you walk around to the driver's side?

14  A.    A few seconds.

15  Q.    Okay.  So then where is the Taurus as you go around to

16  the cab?

17  A.    It starts to inch up.

18  Q.    Okay.  And when you say inch up, is it just moving

19  very, very slowly?

20  A.    Yes.

21  Q.    And as it's inching up, is this individual saying

22  anything to you?

23  A.    Yes.

24  Q.    So once you get over to where Anthony Carroll is, until

25  Detective Gordon gets out of the car, let's break it down,

1  how many things are coming out of his mouth?  How many
2  sentences?
3  A.    Um, I'm engaged in another conversation.  So I could
4  hear him, but I'm not paying attention to him.
5  Q.    Okay.  So this individual that you just had an exchange
6  with is saying something, but you are not paying attention
7  to him at all?
8  A.    Right.
9  Q.    So as far as those exchanges go is it fair to say you
10 don't know what this individual is saying to you?
11 A.    I know certain things that he said, but he said a lot
12 more.  I don't know what all that he said.
13 Q.    How much time is he talking to you before he ultimately
14 brings the vehicle to a stop?
15 A.    Um, maybe two minutes, a minute and a half.  I'm not
16 sure.
17 Q.    And how long -- how far does he travel in that time
18 period?
19 A.    Probably 20 yards, somewhere around there.
20 Q.    So he's 20 yards in two minutes, is that what you're
21 saying?
22 A.    Twenty yards in two minutes?
23 Q.    Right.
24 A.    He was inching up, yes.
25 Q.    Excuse me?

| | |
|---|---|
| 1 | A.    Yes. |
| 2 | Q.    So he's going very slow, is that right? |
| 3 | A.    Yes.  Well, he's stopping and going. |
| 4 | Q.    I'm sorry? |
| 5 | A.    He stops and then goes.  He was stopping and going. |
| 6 | Q.    And from the time you got to Anthony Carroll's |
| 7 | passenger -- driver's side door, how many times do you say |
| 8 | something back to him? |
| 9 | A.    That one time. |
| 10 | Q.    Just once? |
| 11 | A.    Yes. |
| 12 | Q.    You indicated to us that when you first heard him say |
| 13 | something, when he's down by this mini-van, you repeated the |
| 14 | exact same words he said to you? |
| 15 | A.    Umhum. |
| 16 | Q.    Is that right? |
| 17 | A.    Yes. |
| 18 | Q.    So what do you say next to him? |
| 19 | A.    What do I say back to him? |
| 20 | Q.    Yeah. |
| 21 | A.    I mimmick what he says. |
| 22 | Q.    Again, you mimmick what he says? |
| 23 | A.    No, the first time. |
| 24 | Q.    I understand that. |
| 25 | A.    Okay. |

1    Q.    I'm talking about the next time.

2    A.    Okay.

3    Q.    What do you say?

4    A.    What do I say?

5    Q.    Yeah.

6    A.    I don't say anything.  I brush him off with my hand.  I

7    waive him off.

8    Q.    All right.  So is it after that he stops the car and

9    gets out?

10   A.    Yes.

11   Q.    All right.  So I want to be clear on this.  Is it your

12   testimony that the only thing you said to him was mimicking

13   his first remark to you when you were some distance apart?

14   A.    That I can recall, yes.

15   Q.    That you can recall?

16   A.    Yes.

17   Q.    So do you recall ever swearing at him?

18   A.    I said, hey, mother fucker.  Yes.

19   Q.    Okay.  Do you recall him telling you to get out of the

20   roadway?

21   A.    Never.

22   Q.    Do you recall telling him, why don't you try to make

23   me?

24   A.    Never.

25   Q.    Do you recall telling him, if you do get out I'll kick

1   your ass or something along that line?

2   A.   No.

3   Q.   So as I understand what you're saying, you mimmicked

4   this one conversation and then you gave him a hand gesture

5   of some sort, and based upon that that prompts him to get

6   out of the car, is that what you're saying?

7   A.   Yes.

8   Q.   You did nothing else?

9   A.   No.

10   Q.   When, when you saw the vehicle put, come to a stop, do

11   you recall how far it was from you?

12   A.   It was a couple car lengths.

13   Q.   Twenty feet?

14   A.   Twenty, 30 feet, yes.

15   Q.   Okay.  So do you recall seeing the brake lights, the

16   car being put into park?

17   A.   Um, I was engaged in a conversation.  So when I, when I

18   looked up the car was stopped and he was almost out of the

19   car.

20   Q.   Okay.  So when you saw the vehicle stopped and you saw

21   the, you saw the door opening?

22   A.   Yes.

23   Q.   Is that right?

24   A.   Right.

25   Q.   What's going through your mind at that time?

1    A.    Well, immediately I see something in his hand so --

2    Q.    All right.  Before you see anything in his hand, you

3    see the car stopped, you see the individual starting to get

4    out of the car, what's going through your mind?

5    A.    I tell the people in the cab, I said, this guy's

6    getting out of the car.  Look at him.

7    Q.    Was there any doubt in your mind that he was getting

8    out of the car because of you?

9    A.    Well, yeah.  Now I knew -- he said something passing by

10   when he passed the cab.

11   Q.    And did you respond to him?

12   A.    That's when I waived him off.

13   Q.    Okay.  So when the door opens is it in your mind that

14   he's stopping because of you?

15   A.    Yes.

16   Q.    All right.  So there's no question in your mind that

17   this individual, you don't know who it is, who said these

18   things, and you don't know what he said because you're

19   engaged in conversation, stops his vehicle and gets out

20   because of you?

21   A.    Right.

22   Q.    And at that time is it fair to say that you feel he's

23   probably not going to invite you to a Christmas party, it's

24   because of what you said or what he said?

25   A.    Yes.

1  Q.   So, in other words, you know right at that point this

2  is not necessarily a friendly encounter?

3  A.   Right.

4  Q.   And you see something in his hand, which you don't

5  identify as a radio, is that right?

6  A.   It was a black object.  I didn't know it was a radio.

7  Q.   Is there any doubt in your mind today that it was a

8  radio?

9  A.   I've never seen it to this day.

10  Q.   Okay.  So the individual gets out, has the object in

11  his hand.  Do you recall him going to his chest to pull out

12  a chain?

13  A.   Never.

14  Q.   So the individual gets out of the car and what does he

15  do?  Does he start to move to you?

16  A.   He walks to me aggressively.

17  Q.   So he's walking, is that right?

18  A.   Like speed walking, yes.

19  Q.   Okay.  And what do you do?

20  A.   Well, I was at the cab.  And when I see him coming I'm

21  looking at his hand.

22  Q.   Okay.  And what do you do?

23  A.   I froze.

24  Q.   You froze?

25  A.   I thought he had a gun.

1  Q.   Okay.  So at that moment in time do you survey your

2  surroundings, find out where you are?

3  A.   No.

4  Q.   All right.  I mean, you had been down Union Place many

5  times before, right?

6  A.   I've been down there before.  I know where I am.

7  Q.   You would go down how often, once a month, more

8  frequently, Union Place?

9  A.   No.  Union Place?

10  Q.   Yeah.

11  A.   Um, maybe once a month or once every two months,

12  something like that.

13  Q.   Okay.  So if you're going down once a month or once

14  every two months, you have a fair knowledge of what's there,

15  is that a fair statement?

16  A.   Yes.

17  Q.   And one of the things that is there is a constant

18  police presence, isn't that fair?

19  A.   Yes.

20  Q.   And that's because there are so many incidents in the

21  general area where the police are constantly going through,

22  is that a fair statement?

23  A.   I wouldn't know.  I don't think so.

24  Q.   Well, do you ever look around your surroundings as this

25  individual is getting out of the car just to say to yourself

1   what's going on?

2   A.   No.

3   Q.   Do you think it was a case of mistaken identity?

4   A.   Most likely.

5   Q.   Okay.  So if it's not you, and it's supposed to be

6   somebody else, do you start looking around to see what else

7   is around you?

8   A.   No.

9   Q.   So it's fair for us to assume you never saw Officer

10   Allen in a cruiser directly behind Detective Gordon, isn't

11   that true?

12   A.   No.

13   Q.   I'm correct, you never saw the cruiser?

14   A.   I never saw the cruiser.

15   Q.   All right.  Do you doubt that he was in a cruiser?

16   A.   I don't doubt he was in a cruiser.

17   Q.   Okay.  But you never registered to look to your right

18   to see what else is going on in this neighborhood?  This

19   guy's getting out of a car, he's coming at me, is there a

20   cop around, what's going on?  You never do that?

21   A.   It happened so fast.

22   Q.   Okay.  And as Detective Gordon is coming at you, as I

23   understand your testimony, he suddenly kicks at you, is that

24   fair?

25   A.   Yes.  Yes.

1     Q.    And he catches you in the stomach, is that right?

2     A.    Yes.

3     Q.    And just so we're clear on your testimony on this part,

4   is it fair to say that there's no mark on your stomach as a

5   result of this alleged contact?

6     A.    Yes.

7     Q.    I'm correct?

8     A.    Correct.

9     Q.    All right. And at no time did you ever complain to

10   anybody at the hospital, I got kicked in the stomach?

11     A.    That's correct.

12     Q.    Is that right?

13     A.    Yes.

14     Q.    So your testimony is that the kick pushed you back, is

15   that right?

16     A.    Yes.

17     Q.    And this whole time you're just standing there?

18     A.    Well, I got pushed back. So I'm stumbling back.

19     Q.    You're standing there until you get kicked?

20     A.    Yes.

21     Q.    And then you get pushed back?

22     A.    Right.

23     Q.    And you described for us the kick yesterday as a kick

24   similar to breaking down a door, is that right?

25     A.    Yes.

| | |
|---|---|
| 1 | Q.    And do you recall saying you had never seen such a kick |
| 2 | before? |
| 3 | A.    Yes. |
| 4 | Q.    And why do you say that you had never seen such a kick |
| 5 | before? |
| 6 | A.    It's all -- it's almost like he knew that I was going |
| 7 | to get hit with a baton in the head. |
| 8 | Q.    Oh, all right.  How would he know?  Do you have any |
| 9 | idea what he was thinking? |
| 10 | A.    No. |
| 11 | Q.    All right.  Was it a funny move on his part, this kick? |
| 12 | A.    It was a different type.  It wasn't a karate kick.  It |
| 13 | was just a front kick. |
| 14 | Q.    Okay.  Do recall if it was a sweep of some kind?  Was |
| 15 | he going for your legs? |
| 16 | A.    No.  Front kick into the stomach, mid-section. |
| 17 | Q.    I'm sorry? |
| 18 | A.    Mid-section. |
| 19 | Q.    Okay.  And as a result of this, it's fair to say that |
| 20 | you weren't hurt at all, right? |
| 21 | A.    Not off of that, no. |
| 22 | Q.    All right.  Now, do you recall me asking you what type |
| 23 | of kick it was specifically? |
| 24 | A.    During the deposition? |
| 25 | Q.    Yeah. |

1  A.   Yes, I believe so.

2  Q.   Okay.  And do you recall telling me in your mind it was

3  the type of kick somebody would do to protect themselves?

4  A.   Yes.

5  Q.   So, in other words, as you're standing there doing

6  nothing this individual comes walking aggressively towards

7  you and suddenly, and for no apparent reason in your mind,

8  kicks you to protect himself, is that right?

9  A.   Yeah.  Yes.

10  Q.   And the reason he had to protect himself from you was

11  because you were coming at him, isn't that true?

12  A.   That's not true.

13  Q.   Isn't it true that you approached him as soon as he got

14  out of the vehicle in order to engage him in some sort of

15  physical contact?

16  A.   Negative.  That's not true.

17  Q.   Let's back up to your football career.  If you see

18  somebody coming at you in an aggressive manner are you going

19  to stand there and watch or are you going to act?

20  A.   I don't understand the question.

21  Q.   If you're playing football and somebody's coming to you

22  and they have the ball or they are intending to block you,

23  isn't it true that you are going to approach them and

24  attempt to get the advantage?

25  A.   Well, you drop down low.

Q.    All right.  And on this occasion you acknowledge that Detective Gordon is acting to protect himself when this kick comes at you, is that right?

A.    Because batons are swinging.

Q.    Baton hasn't swung yet sir, isn't that right?

A.    No.

Q.    First kick, there's no baton?

A.    First kick, no baton.

Q.    So the only thing he's got to protect himself from is you, isn't that true?

A.    I didn't never swing.

Q.    You are approaching him, isn't that right?

A.    No.

Q.    Don't you go to grab him?

A.    Never.

Q.    Don't you go to swing at him?

A.    Never.

Q.    So you deny doing any of that?

A.    Yes.

Q.    You're just standing there?

A.    I never touched him.

Q.    So just help us understand that, why is Detective Gordon going to kick to protect himself if not from a aggressive physical move from you?

A.    I think they were looking for somebody.

1   Q.    How do you know that?

2   A.    Just the way they all came.

3   Q.    Once Detective Gordon gets out of the car does he ever

4   talk to you again?

5   A.    No.

6   Q.    So you don't know what he's thinking or what's in his

7   mind, isn't that fair?

8   A.    That's fair.

9   Q.    But from his body language at the moment that brings

10  you two together, you come to the realization he's got to

11  protect himself?

12  A.    I don't know if he's an officer at this point.  And he

13  has something in his hand.  I think I'm going to get shot.

14  Q.    So do you aggressively go at him?

15  A.    I'm not going to go aggressively to someone who has a

16  gun.

17  Q.    Do you try to shorten the distance between you and him?

18  A.    I froze.  I stood there.

19  Q.    Okay.

20          THE COURT:  Why don't we take 15 minutes off.  And

21  get together at quarter of 11.  Give everybody a chance to

22  stretch.

23          (The Court recessed at 10:25 p.m. and resumed at

24  10:45 a.m. without the jury present)

25          THE COURT:  Why don't we bring the jury in and

1   we'll continue.

2          MR. MELLEY:  Is Your Honor's intention to stop at

3   noon?

4          THE COURT:  Stop at noon and start again at 1.

5          MR. MELLEY:  I will likely be done at some point

6   before that.

7          THE COURT:  Okay.  We'll take it as it comes.

8   Twelve to 1 is sort of the normal.

9          And we'll make time later in the day for a charge

10  conference.  I have a second draft out.  But you guys have

11  been busy.  And if you can read it over tonight we can talk

12  about it tomorrow.

13         MR. RIGAT:  I did get it on my email late last

14  night.

15         THE COURT:  No.  No.  We'll talk about it

16  tomorrow.

17         MR. RIGAT:  It looked good.

18         (The jury returned at 11:46 a.m.)

19         MR. MELLEY:  If I may continue, Your Honor?

20         THE COURT:  Please.

21         EXAMINATION CONTINUED BY MR. MELLEY:

22  Q.   So, after that first kick you say Detective Gordon goes

23  to kick you a second time, is that right?

24  A.   Yes.

25  Q.   And the second kick you catch?

1   A.    I don't catch it, but I block my stomach.

2   Q.    You block.  So the second kick does not make contact

3   with you?

4   A.    Well, it hits my hands.  Yes.

5   Q.    Okay.  And it was right after that that you were struck

6   with the baton?

7   A.    It was almost at the same time.

8   Q.    Okay.  But in terms of a sequence we have the kick and

9   then we have the baton?

10  A.    Right.

11  Q.    Now, yesterday you told us, the ladies and gentlemen of

12  the jury and the Court, that Detective Gordon later kicked

13  you, is that right?

14  A.    Yes.

15  Q.    And you said he kicked you a couple of times in the

16  face?

17  A.    Yes.

18  Q.    And you said you saw the black soles and heals of his

19  boot?

20  A.    Black soles, yes.

21  Q.    Do you recall me asking you in the deposition eight

22  years ago, after that second kick, did Detective Gordon ever

23  touch you again?  Do you recall me asking you that?

24  A.    Um, it's been a while, but --

25  Q.    Let's go to page 109.  And beginning on line 13, I'll

1    wait until you get there, please.

2    A.    I got it.

3    Q.    Okay.  And the question was, do you know, from your

4    personal observations, if Detective Gordon kicked, punched

5    or did anything else to you after that second kick that you

6    just described to us?  That's what the question was, right?

7    A.    This was a confusing question.  I asked you to repeat

8    the question.  On line --

9    Q.    You asked me to repeat it beginning --

10   A.    On line 13 it says, all right, so let me ask the same

11   question another way.

12   Q.    All right.  And that's because you did have a problem

13   with my prior question.  So I restated the question to you

14   at your request and asked you again.

15         And the question that I asked was, after the

16   second kick that you described, which is similar to what

17   you've done today, the first one made contact with your

18   stomach, the second one did not, after that second kick,

19   from your own personal observations, did Detective Gordon

20   kick, punch or do anything else to you?  Right?  That was

21   the question?

22   A.    Right.

23   Q.    Okay.  And your answer to that question was, no?  Isn't

24   that right?

25   A.    Right.

Q.    So eight years later your memory is better and all of a
sudden we have Detective Gordon now kicking you a couple of
times in the face, is that right?

A.    No.  I know on page 111 we go back to it and I tell you
that I'm hit multiple times.

Q.    No.  My question was, did Detective Gordon, from your
own personal observations, did he ever do anything?  And you
said, no.  Isn't that right?

A.    Yes.

Q.    And yesterday you said he did, is that right?

A.    Yes.

Q.    All right.  And you were under oath at this time just
like you are under oath today, is that right?

A.    Yes.

Q.    So when you were covering up how did you cover up?

A.    Um, when I was on the ground are you asking?

Q.    Yeah.  That's when you say you were kicked in the face?

A.    Yes.

Q.    How did you cover up?

A.    Well, after the blow to the back of the head I tried to
get both of my hands protecting my head.  And I was laying
on my left side.

Q.    And were your hands, your elbows, your forearms, were
they covering the side of your head?

A.    They were like this.  (So indicated)  I was like this

1  laying here.

2  Q.   Okay.  And you're making a motion where you are

3  interlacing both hands behind your head?

4  A.   Well, I probably didn't have both of my finger locked,

5  but I was trying to.

6  Q.   And was your face protected or exposed when you covered

7  your head?

8  A.   Um, I was trying to protect it, but some of it was

9  exposed.

10  Q.   Okay.  And you're saying that you got kicked in the

11  face, is that right?

12  A.   Yes.

13  Q.   All right.  Did you ever get treated for a broken nose?

14  A.   No.

15  Q.   Did you ever get treated for any chipped teeth, knocked

16  out teeth?

17  A.   No.

18  Q.   Did you ever get treated for a broken lip?

19  A.   No.

20  Q.   Did you ever have black eyes?

21  A.   Um, --

22  Q.   Swollen eyes?

23  A.   My eyebrow was a little swollen, yes.

24  Q.   Okay.

25          MR. MELLEY:  Your Honor, may I approach?

1          THE COURT:  Sure.

2          MR. MELLEY:  I didn't clarify this with the clerk.

3    I've got it marked with stickers, but I didn't put down -- I

4    don't know if I'm dealing with numbers or letters.

5          THE COURT:  Letters.

6          MR. MELLEY:  Letters.  So we'll make that A..

7          THE COURT:  A..

8          MR. MELLEY:  If I may approach?

9          THE COURT:  Yeah, thanks.

10   Q.   I'm going to give you, sir, what was marked as

11   Defendant's Exhibit A..  And do you recall that as the

12   police photos when you were formally charged?

13   A.   First time I've seen it.

14   Q.   Excuse me?

15   A.   It's the first time I've seen the picture, but, yes.

16   Q.   Okay.  Is that you?

17   A.   Yes.

18   Q.   And it says, date 12-20.  So this is -- if this

19   happened right at midnight on the 18th, 17th, or whatever

20   we're, what, 48 hours to 72 hours later?

21   A.   Okay.

22   Q.   Is that right?

23   A.   Yes.

24   Q.   And is this an accurate photo of how you looked that

25   day?

```
1    A.    Yes.
2    Q.    Okay.  I'd offer it.
3            MR. DiCROSTA:  No objection, Your Honor.
4            THE COURT:  A. is admitted.
5            MR. MELLEY:  And may I publish it, Your Honor?
6            THE COURT:  Sure.
7            MR. MELLEY:  May I approach, Your Honor?
8            THE COURT:  Yes.
9            MR. MELLEY:  Thank you.
10   Q.    Let's see, now, we have the screen that just shows the
11   two photos, a frontal and then the side.  And then below it
12   is the writing, is that right?
13   A.    Yes.
14   Q.    Okay.  So just directing your attention to the
15   photograph.  Sir, we see the mark above the left eye.
16   That's where you had some stitches, right?
17   A.    No.  Yes.  It was above the left eye.  Not in the same
18   area, but by the scar right there.
19   Q.    Above the left eye?
20   A.    Right.
21   Q.    That's where the stitches are.  All right.
22            Can you point to any other part of those, that
23   series of two photos, that shows us the signs of you being
24   kicked in the face a couple of times by Detective Gordon or
25   by anybody else?
```

A.    Can I show you --

Q.    Is there any swelling?  Is there any discoloration?

A.    No.

Q.    In the course of the time period where this second kick happens, and then suddenly you feel the baton, okay, I want to focus on that part.  Is it fair to say that at that moment it's an dynamic situation?  In other words, you're moving and he's moving?

A.    Whose moving?

Q.    Detective Gordon, he's coming at you with a kick?

A.    Right.

Q.    And are you moving?

A.    Backwards, yes.

Q.    All right.  So are you doing anything with your hands other than trying to catch the kick?

A.    Yeah.

Q.    Are you moving to defend yourself?

A.    Well, I'm stumbling back.  And then the next one comes back and I get my hands up.

Q.    Okay.  Do you recall at that point ever making any offensive move towards Detective Gordon?

A.    No.

Q.    Do you identify the radio at this time?

A.    No.

Q.    Are you looking at it?

```
1   A.   No.
2   Q.   Why aren't you looking at the radio?
3   A.   I was originally looking at the radio.  And then I got
4   kicked.  And I'm stumbling back.  And I see the next kick
5   coming so I get my hands up.
6   Q.   You originally said you thought it might be a gun?
7   A.   Right.
8   Q.   But after that first kick you're pretty close to
9   Detective Gordon at that time, right?
10  A.   In kicking distance.
11  Q.   Well, three feet?
12  A.   Four or five feet, yeah.  Three feet.
13  Q.   This is a well lit area, right?
14  A.   Yes.
15  Q.   I mean, with the street lights and the stores it's
16  pretty well set out for everything, is that right?
17  A.   Yes.
18  Q.   And is there any doubt in your mind that after that
19  first kick whatever he has in his hand is not a gun?
20  A.   No.  I mean, it happened so fast I wasn't -- I didn't
21  have a chance to react.  But I was looking at it as a gun,
22  yes.
23  Q.   So this whole time you're just in a back peddling mode,
24  you are not in any sort of offensive mood?
25  A.   Well, on that whole time it took three seconds.
```

1    Q.    Okay.  So do you recall when you get struck by the

2    baton?

3    A.    Yes.

4    Q.    Do you recall yourself being in motion before -- at

5    that moment, just that instant before the baton strikes?

6    A.    Yes.

7    Q.    And where are you going?

8    A.    I'm stumbling backwards.

9    Q.    Okay.  So you deny at any time you ever make any

10   forward move towards Detective Gordon?

11   A.    That is correct.

12   Q.    Okay.  And then when the strike comes and you are hit,

13   you know you are hit, is it fair to say that you go down at

14   that time?

15   A.    Yes.

16   Q.    Okay.  And when you go down do you go down hard?

17   A.    It hurt.

18   Q.    All right.  Is it fair to say that you went down

19   because of the strike, not because you tripped or anything

20   like that?

21   A.    Right.

22   Q.    All right.  And as I understand your testimony, you

23   certainly weren't expecting it, is that right?

24   A.    Correct.

25   Q.    Because you had never looked to see a cruiser with

1  strobe lights or an officer in a uniform coming towards the

2  scene, is that right?

3  A.   I never seen strobe lights, no.

4  Q.   Nor the cruiser?

5  A.   Nor the cruiser.

6  Q.   So when the hit comes it's fair to say you hit the

7  asphalt hard?

8  A.   Um, I hit it hard, yes.

9  Q.   Now, after this is all done, and you're handcuffed, and

10 you say you're dragged, I think we heard it three times,

11 62 feet, does that sound right?

12 A.   Yes.

13 Q.   All right.  And you said that Officer Allen had you by

14 the collar of your vest which is marked as an exhibit?

15 A.   Yes.

16 Q.   All right.  I was confused.  Maybe you can help us.

17 How did he drag you?  Were your feet up?  Were you on your

18 heals or your toes or were you walking at all?

19 A.   They were dragging.

20 Q.   What was dragging?

21 A.   My toes.

22 Q.   Your toes were dragging.  And were your legs extended

23 at all?

24 A.   Yes.

25 Q.   Okay.  And during that time period did you ever have

1  your knees hit the ground?

2  A.   Did they hit the ground?

3  Q.   Yes.  As he's dragging you by the color 62 feet and

4  your toes, I'm assuming that you're being dragged forward,

5  is that right?

6  A.   Right.

7  Q.   Do you ever hit the ground?

8  A.   Yes.

9  Q.   All right.  Do the knees of the pants get scuffed as

10 you're dragged along the ground?

11 A.   My knees are not touching the ground, but they hit the

12 ground, yes.

13 Q.   As you're dragged, other than your toes, what other

14 part of your clothing comes into contact with the asphalt?

15 A.   What he does is he drops me in front of the car.  So in

16 between the cars the whole front part of my body was on the

17 ground.

18 Q.   But for the 62 feet, was any part of your body, other

19 than your toes, touching the asphalt?

20 A.   No.

21 Q.   So were you walking along with him?

22 A.   No.

23 Q.   No?

24 A.   No.

25 Q.   So were your shoes dragged over this distance?

1   A.   Yes.

2   Q.   I know we have the clothing.  Where are the shoes?

3   A.   Um, they are not here.

4   Q.   Excuse me?

5   A.   I think I walked home with those.

6   Q.   Okay.  Well, did they show the effects of this drag?

7   A.   You want to know the effects of the drag?

8   Q.   Yeah, on the shoes.

9   A.   On the shoes?

10  Q.   I mean, we have all the clothing?

11  A.   Umhum.

12  Q.   Was the front of the tow of the shoe --

13  A.   Scuffed?

14  Q.   Scuffed?

15  A.   Yes.

16  Q.   Where are they?

17  A.   I think I have them at home though if you want me to

18  bring them in.

19  Q.   And you've been wearing them since, right?

20  A.   Yes.

21  Q.   But these clothes you didn't wear?

22  A.   No.

23  Q.   All right.

24  A.   I would like to wear them.

25  Q.   Excuse me?

A.    If I take them home I will wear them again.  Yeah.

It's an nice vest.

Q.    Okay.  Isn't it true that an ambulance was there almost

immediately?

A.    After everything was done?

Q.    Yeah.

A.    I believe so.

Q.    I mean, after you were handcuffed isn't it true that

the ambulance was there?

A.    Um, no.  We waited for a little bit.

Q.    A minute, two?

A.    I sat on the curb for about two minutes I believe.

Somewhere around there.  Shorter, longer, I'm not sure.

Q.    And did anybody explain to you that the police

procedure is if you're in their custody and you're at a

hospital you're going to get handcuffed?

A.    No one explained anything to me, no.

Q.    Okay.  And I think, I'm not sure I asked you this,

Officer Allen, as far as you recall, he never said anything

to you, is that right?

A.    No.  He never said anything to me.  That's correct.

Q.    You don't recall him shouting out to you before you

were struck?

A.    No.

Q.    You don't recall him saying anything to you after that

```
 1  first strike?
 2  A.    No.
 3  Q.    And you don't recall him saying anything at any point
 4  after that?
 5  A.    Right.
 6  Q.    And is it fair to say he was at the hospital until 5
 7  a.m.?
 8  A.    That's correct.
 9  Q.    Okay.  And was it after that that you got the doctor to
10  go get the camera to get the photos taken?
11  A.    It was before that.
12  Q.    All right.  So I read you that note.  And I think it's
13  in evidence.  I mean, do you doubt that it was at 6 o'clock
14  where you said you didn't want anybody taking care of your
15  facial wounds until the camera was there?
16  A.    What note was that?
17             MR. MELLEY:  May I have a moment?
18             THE COURT:  Of course.
19             MR. MELLEY:  Perhaps counsel has it.  May I just
20  have a moment?
21             THE COURT:  Sure.
22             (Attorneys conferring off the record)
23             MR. MELLEY:  Pardon my back, Your Honor.  Your
24  Honor, this is about 10 pages in of Exhibit 24.
25             THE COURT:  Yes, I understand.
```

1  Q.   And if I can orientate us.  If we look at the top,

2  12-18-04.  And we have the right-hand column.  I'm going to

3  assessments evaluations.  And then at 6 o'clock.  Do you see

4  that Mr. Allen?

5  A.   See what?

6  Q.   Six a.m. on the right-hand side?  I just pointed it to

7  you.

8  A.   Yes.  Yup.

9  Q.   Okay.  And it says, patient requesting photos taken of

10  lacerations prior to suturing.  Patient's family brought

11  camera.  Photos taken by MD.  Do you see that?

12  A.   Umhum.  Yup.

13  Q.   So do you recall asking the staff at Hartford Hospital

14  not to treat your sutures, the cuts, the wounds that you

15  had, until you could get the camera?

16  A.   That's correct.

17  Q.   Okay.  And that's at 6 o'clock, is that right?

18  A.   No.  That's not correct.

19  Q.   So whoever wrote this down wrote it down wrong?

20  A.   Maybe that was -- I believe I had surgery before

21  6 o'clock.

22  Q.   You didn't have surgery until the following morning

23  later.  We can get that time.  I think it's like 9 o'clock

24  with Dr. Lena.

25  A.   Um, I believe it was a couple hours after I got to the

1    hospital.

2    Q.    What?

3    A.    That the pictures were taken.

4    Q.    Okay.  So you think that this part of the chart,

5    whoever wrote that, got it wrong?

6    A.    I believe it was that night.  Maybe it was the end of

7    their shift they are putting 6 o'clock they put the photos

8    in.

9    Q.    Well, let me ask you this.  Were any photos taken while

10   Officer Allen was there?

11   A.    Yes.

12   Q.    Okay.  Speaking of the caring of the wounds, so until

13   those photos were taken, is it fair to say that you were

14   just in that bed that we have without anything being cleaned

15   up?

16   A.    Yes.

17   Q.    Okay.  And then once you were sutured and stitched your

18   next treatment for that was with the bone doctor, is that

19   right?

20   A.    You talking for the knee?

21   Q.    No, for the head.

22   A.    Oh, for the head.

23   Q.    He removed the stitches?

24   A.    Right.

25   Q.    And the staples?

A.    And the staples, yes.

Q.    So you never saw anybody for the head wound, the wound after that initial fix up, other than Dr. Lena's staff?  I don't know if he did it or his P. A..  Do you know?

A.    I'm not sure.

Q.    But one of them did it?

A.    Right.

Q.    Right.  And speaking of that, I heard you say yesterday, and then I'm not sure I heard today, but are you saying it was six months before you were full weightbearing?

A.    Full weightbearing?

Q.    Yeah.

A.    On both legs?

Q.    Yeah.

A.    Yeah.  If not longer.

Q.    Okay.  So if Dr. Lena says by the beginning of March, two months, you are full weightbearing, you would disagree with him?

A.    No.  He says according to my own pain or something like that.

Q.    Excuse me?

A.    He says according to my own pain.

        MR. MELLEY:  Your Honor I need a moment, please?

        THE COURT:  Take your time.  Always.

        MR. MELLEY:  All right.  I know it If I may have a

1  moment with counsel?

2           (Attorneys conferring off the record)

3           MR. MELLEY:  I have an ID exhibit they would like

4  to converse about, Your Honor.

5           THE COURT:  All right.

6           (Bench conference held:)

7           MR. MELLEY:  This proposed ID exhibit, I don't

8  intend to offer, but an ID exhibit is from Hartford four

9  days later, but he's not quoting.

10          THE COURT:  One at a time.  Yeah.

11          MR. MELLEY:  And in the article it quotes a

12  witness describing what Mr. Outlaw thought or said.

13          THE COURT:  Right.

14          MR. MELLEY:  And my intent is to ask did he

15  express that thought or intent as to what he was thinking

16  when this happened to the witness.  So it, I would offer it

17  as his words.

18          THE COURT:  You want to ask him if he said these

19  things?

20          MR. MELLEY:  Yeah.  I'm not asking what he said.

21  I would show it to him and say is that what Mr. Rakus said,

22  is that an accurate representation of what you said to him.

23          THE COURT:  Who is Mr. Rakus?

24          MR. MELLEY:  He's a witness.

25          MR. DiCROSTA:  First of all, it's a

1    misrepresentation.  It says if he knew he was an officer he

2    would have said, he didn't say Tylon said to me.

3              MR. MELLEY:  Correct.

4              MR. DiCROSTA:  That's Rakus' opinion.

5              THE COURT:  There's no statement here.  There's no

6    statement here from Mr. Outlaw?

7              MR. DiCROSTA:  Correct.

8              MR. MELLEY:  No.

9              THE COURT:  There's only a sort of an opinion from

10   Mr. Rakus about what is, he thinks his friend would have

11   done?

12             MR. MELLEY:  Correct.

13             MR. DiCROSTA:  Had he knew.

14             MR. MELLEY:  I understand that, but then he says,

15   but he thought he was some average guy.  So my question to

16   Mr. Outlaw would be, did you convey that thought which is

17   attributed to you.  I'm not going to ask him what it is.  If

18   he says yes then I would offer it.  If he says no, it's not

19   accurate, I never said that to him, that's the end of it.

20             THE COURT:  This is what he's -- it's in testimony

21   today already that he thought the man was, as you said, an

22   inner city person calling him a mother fucker assuming he's

23   not an officer, right?

24             MR. MELLEY:  Right.  Right.

25             THE COURT:  So this is what he is saying again.

1  So your question is, you want to ask whether he told Mr.

2  Rakus that?

3          MR. DiCROSTA:  He will say he thought he was an

4  average guy.

5          THE COURT:  Go for it.  I mean, you wouldn't

6  object to that, right?  It's your theory of the case?

7          MR. MELLEY:  Right.

8          MR. RIGAT:  Okay.

9          MR. DiCROSTA:  When do you think he had the

10  opportunity to say this though?  This is dated December 19.

11  He's been in custody.

12          MR. MELLEY:  I don't know.  The question is, did

13  he say it.  I don't know.

14          THE COURT:  Sure.  You can ask him if he made the

15  statement.  You don't care, right?

16          MR. RIGAT:  I don't think we do care actually.

17  Because it actually supports Rakus.

18          THE COURT:  Consistent.

19          MR. RIGAT:  I guess that's right.  Fair enough.

20          MR. DiCROSTA:  Okay.

21          (Bench conference concluded.

22          MR. MELLEY:  If I may approach?

23          THE COURT:  Sure.

24  Q.  If I may, Mr. Outlaw, I direct your attention to what

25  has been marked as Defendant's Exhibit B. for identification

1    only.  Okay.

2              And by way of a very simple background, there's a

3    lot of stuff in there that has nothing to do with my

4    question, but I did highlight in yellow some comments by an

5    individual, Richard Rakus.  And you know Mr. Rakus, right?

6    A.   Yes, sir.

7    Q.   And he was there that night, is that right?

8    A.   Yes.

9    Q.   Okay.  And following the incident, is it fair to say

10   you had several opportunities to talk to him?

11   A.   No.

12   Q.   Have you talked to him at all?

13   A.   Actually, I ran into him in the mall for the first time

14   this past Christmas.

15             THE COURT:  Has somebody got a miche on on

16   their -- okay.  Okay.  Sure.

17   Q.   So --

18   A.   I'm sorry, no, we, we were high school friends and

19   childhood friends, but we didn't even have each other's

20   number.

21   Q.   Okay.  I'd ask you to direct your attention to what I

22   highlighted in yellow, to read it to yourself and answer us

23   yes or no, is what is in yellow from Mr. Rakus' mouth an

24   accurate description of what you would have said at that

25   time?

A.    Yes.

Q.    Okay.  I would offer it, just that quote.

THE COURT:  What?  All right.  Any objection to that excerpt?

MR. RIGAT:  No.  No objection, Your Honor.

THE COURT:  So that portion which is highlighted is admitted without objection.

MR. MELLEY:  Okay.  May I publish it, the highlighted?

THE COURT:  I don't see how you're going to do it because it has --

MR. MELLEY:  I'm not going to put it there.  I'm going to read it.

THE COURT:  Oh, sure.  Yeah.

Q.    That kind of publication.

This is from Richard Rakus, if Tylon knew he was a police officer he would have said, okay, sir.  But he thought he was some average guy who was telling him what to do.

And your testimony is that that's a fair statement as to what you were thinking?

A.    Yes.

Q.    So, in other words, if it's an officer you would have acted in a certain way, is that right?

A.    Yes, sir.

1  Q.   All right.  If it's just another guy on the street you

2  would have acted the way you did, is that right?

3  A.   Yes.

4  Q.   So, in other words, if somebody on the street just

5  happened to say something to you, and you just think it's

6  another civilian, you are not going to say yes, sir, you're

7  going to react, is that fair?

8  A.   No.

9  Q.   All right.  Well, with regard to this individual, your

10  own testimony, you thought when you heard some sort of

11  instruction from him you thought the appropriate response

12  was to quote him verbatim back in a joking manner, is that

13  right?

14  A.   No.

15  Q.   Didn't you say that's what you did?

16  A.   I didn't hear an instruction.  I said he said, hey

17  mother fucker.  That's not an instruction.

18  Q.   So that's all you heard him say?

19  A.   And he also said, come here, he said I'll fuck you up.

20  Q.   Did you ever hear him say, get out of the street, you

21  are blocking traffic, or anything along that line?

22  A.   Never.  I wasn't in the street.

23  Q.   Okay.  So if another individual is to give you some

24  sort of words of any kind you're just apt to give him a

25  gesture, is that your testimony?

A.    No.

Q.    Well, that's what you did here, right?  You gave him a
gesture when he's crossing by the cab?

A.    Well, originally I thought it might have been one of my
friends playing a joke.

Q.    You didn't recognize who it was, right?

A.    Not at the time, no.

Q.    And just backing up for a moment, when this car is
coming towards you and the lights are on, you have no idea
whose behind the wheel?

A.    His head is out the window.

Q.    Okay.  All right.

        MR. MELLEY:  If I may have a moment?

Q.    You said that this individual tried to talk, made some
sort of reference to you at least three times?

A.    What individual?

Q.    Detective Gordon.

A.    Yes.  I heard him twice.

Q.    Twice or three times?

A.    He was saying different things.  I heard him, I heard
him the whole time, but I wasn't paying attention to him the
whole time.

Q.    Let's be clear, how many times do you recall him
addressing you?

A.    He was addressing me throughout the time.  I heard

1 three different things.

2 Q.   Okay.  So on three different occasions he started to

3 say something to you, right?

4 A.   Right.

5 Q.   All right.  And you knew he was talking to you?

6 A.   Yes.

7 Q.   And you knew he was trying to get your attention?

8 A.   Yes.

9 Q.   So, in other words, he had some sort of problem?

10 A.   Yes.

11       MR. MELLEY:  May I have a moment?  Nothing

12 further.

13       THE COURT:  Any re-direct?

14       MR. DiCROSTA:  Yes, Your Honor.

15       MR. MELLEY:  Your Honor, May I?

16       THE COURT:  Yes.

17       FURTHER EXAMINATION BY MR. DiCROSTA:

18 Q.   Mr. Outlaw, there's been a lot of talk about things

19 that Mr. Gordon said as you crossed the street.  You

20 indicated there was a number of -- he was talking and you,

21 you weren't paying attention to everything he was saying,

22 but some things you could make out?

23 A.   That's correct.

24 Q.   What could you clearly make out?

25 A.   Hey mother fucker.

1  Q.    And when was that said?

2  A.    That was the first time.

3  Q.    Okay.  And --

4  A.    And then he said um, come over here I'll fuck you up.

5  Q.    When was that?

6  A.    I was --

7  Q.    At what point in his, in this ordeal was that said?

8  A.    Um, as he was inching up towards the taxi.

9  Q.    There was some talk about your football days.  When you

10  are being approached by Mr. Gordon, do you think you were

11  playing football?

12  A.    No.

13  Q.    Okay.  And there was some talk about your deposition.

14  You recall some talk about you describing at the time of

15  your deposition on December 7, 2008 you described as the

16  first kick or the kicks?

17  A.    Yes.

18  Q.    Were they both similar in nature?

19  A.    Yes, they were.

20  Q.    Okay.  You indicated he was trying to protect himself?

21  A.    Yes.

22  Q.    Is that what you thought at the time of the incident?

23  A.    No.  At the time of the incident I thought he was

24  coming to shoot me.

25  Q.    Okay.

A.   Later down the road, years down the road when we were in Mr. Melley's office I noticed that he was throwing those kicks to not really engage and to -- I think he knew that I was going to be hit in the back of the head.

MR. MELLEY:  Your Honor, the witness' voice is dropping off.

THE WITNESS:  Oh, I'm sorry.  I'll speak up.

THE COURT:  Just speak up please, but raise your tone a little bit.

THE WITNESS:  Okay.

MR. DiCROSTA:  May I approach, Your Honor?

Q.   You were asked to read an excerpt from your deposition transcript, which I just handed to you.

A.   Yes.

Q.   Okay.  The miche picks up the shuffling of pages much better than it picks up my voice.

I direct your attention to page 111.  Starting at line 10 the question is asked, by Mr. Melley, I asked you before how many times you got hit in the head, you said three or four.  What was your answer at line 12?

A.   Three or four, somewhere around there.

Q.   And then you just said you got head in the head five times?  And your answer, line 15, please?

A.   Three or four, four or five.  I mean, I just tried to cover up.

1  Q.    Can you continue?

2              MR. MELLEY:  Your Honor, I'm going to object to

3  this.  And perhaps we can have a side bar on it.

4              THE COURT:  Sure.

5              (Bench conference held:)

6              MR. MELLEY:  I know he's going, if we can just

7  continue this, the next question, this is from me, whose the

8  they?  Well, it's Gordon and initiated from Gordon.  I just

9  assumed he was getting some licks in.  You didn't see that?

10  No.  No, I didn't see that.  So he's making the assumption.

11  It's not personal observation.  I object to this type of

12  attempt of rehabilitation that creates something that

13  doesn't exist.  He made an assumption of what Gordon may or

14  may not have done.  He has no personal knowledge.

15             MR. DiCROSTA:  He testified he did have personal

16  knowledge.  It was a black boot to a black shoe.

17             THE COURT:  What is the black boot to the black

18  shoe?

19             MR. DiCROSTA:  He's indicating it's Gordon behind

20  him.  He said he knows where Gordon is and he's assuming

21  it's Gordon kicking him and getting his licks in.

22             MR. MELLEY:  He didn't see that.  No.  I

23  specifically was wired for that.  It's not there.

24             THE COURT:  All right.  Well, he can't testify

25  about things he didn't see.

1    MR. DiCROSTA:  I'll ask him about a black boot.

2    THE COURT:  Okay.

3    (Bench conference concluded)

4    Q.   Do you recall testifying yesterday about the shoe that

5    Mr. Gordon was wearing?

6    A.   Yes.

7    Q.   And as you sit here now do you recall -- do you recall

8    testifying that it was a black boot, black sole?

9    A.   Yes.

10    Q.   Do you recall you testified that that shoe hit you

11    where?

12    A.   The stomach and the face.

13    Q.   Is there any doubt in your mind that the shoe connected

14    with your face?

15    A.   No, I know it did.

16    Q.   Okay.  When you say face, what generally -- what do you

17    mean by face?

18    A.   In the eye area.

19    Q.   Is it the entire face?

20    A.   It probably covered some where like here. (So

21    indicated)

22    Q.   And where did that black boot with the black sole hit

23    you?

24    A.   Where did it hit me?

25    Q.   Where did it hit you in the face?

1  A.   It hit me over here.  (So indicated)

2         MR. DiCROSTA:  One moment, Your Honor?  Nothing

3  further, Your Honor.

4         THE COURT:  All right.  Thanks.

5         MR. MELLEY:  Briefly?

6         THE COURT:  Sure.

7         FURTHER EXAMINATION BY MR. MELLEY:

8  Q.   In response to a question that was just given to you,

9  you indicated that Detective Gordon said something along the

10  lines of, the second time, I'll fuck you up.  Do you recall

11  just saying that?

12  A.   Yes.

13  Q.   And earlier I thought you said you didn't hear what he

14  was saying because you weren't paying attention?

15  A.   I heard certain parts.  He said a lot of profanity.

16  The second time I heard, the third time I heard, but he was,

17  he was constantly talking.  Then he drove up.  He still was

18  saying something.

19  Q.   And in response to these profanities, which are

20  specifically directed to you, you still think this person is

21  joking?

22  A.   No, I don't think he's joking.

23  Q.   Okay.

24  A.   I don't talk to him any more.  I noticed I didn't know

25  him.

Q.    Okay.  But you do at this time give him some sort of

gesture by your admission?  No words, just a gesture?

A.    Yes.

            MR. MELLEY:  Thank you.  Nothing further.

            MR. DiCROSTA:  Nothing further Your Honor.

            THE COURT:  All right.  Mr. Outlaw you may step

down.

            MR. RIGAT:  Your Honor, the plaintiff calls Rachel

Killian.  Rachel Killian-Lallier now.

            THE COURT:  Why don't you come on up.

            THE WITNESS:  Oh, I'm sorry.

            R A C H E L   K I L L I A N - L A L L I E R,  The

Witness, after being duly sworn, was examined and testified

as follows:

            THE COURT:  Good morning.  Thank you for waiting

for us.

            THE WITNESS:  Good morning.

            DIRECT EXAMINATION BY MR. RIGAT:

Q.    Good morning, Miss Killian.

A.    Good morning.

Q.    I want to ask you some background questions, okay?

We'll try to move through these as quickly as possible.  Now

you're married?

A.    I am.

Q.    And how long have you been married?

```
1    A.    Five years.

2    Q.    And do you have children?

3    A.    I do.

4    Q.    How many?

5    A.    Four.

6    Q.    Are you currently employed?

7    A.    I am.

8    Q.    What do you do?

9    A.    I work for the East Hartford Chamber of Commerce.

10   Q.    What do you do there?

11   A.    I'm the administrative manager.

12   Q.    All right.  Now, you are a graduate of the Moore School

13   of Business?

14   A.    I am.

15   Q.    That was right after high school?

16   A.    That was.

17   Q.    All right.  And do you known Tylon Outlaw?

18   A.    Yes.

19   Q.    How do you know Tylon?

20   A.    We went to grade school together.

21   Q.    Okay.  You might want to step back a bit.  Yeah, it's

22   going to echo.  All right.

23           Now, I'm going to take you back a few years now,

24   okay.  So we're going to go back to December 17, 2004.  Were

25   you employed?
```

A.    I was.

Q.    What were you doing?

A.    I was working for The Hartford as an underwriting assistant.

Q.    Now, December 17, 2004, do you recall that being a Friday?

A.    I do.

Q.    All right.  And did you have -- or, you know what, did you, did you go to Union Place?

A.    I did.

Q.    That evening?

A.    Yes, I did.

Q.    Okay.  Were you with anyone?

A.    I was.  I was with my boyfriend at the time, Rich Rakus, and my best friend Tracy.

Q.    Okay.  And about what time did you arrive?

A.    Approximately 7'ish.

Q.    Okay.  Where did you go?

A.    We went to Hot Tomatoes for dinner.

Q.    That's a restaurant?

A.    A restaurant down there, yes.

Q.    You drove?

A.    We did.

Q.    Was it your car?

A.    It was my car.

1   Q.   Okay.  And did, did you, let's fast forward.  You left

2   the restaurant?

3   A.   We left the restaurant.

4   Q.   Okay.  Did somebody take the car?

5   A.   Um, my friend Tracy was feeling ill from dinner so she

6   took my car and went home.  And Rich and I stayed downtown.

7   Q.   Okay.  And did you have occasion to go to Papa's Pizza?

8   A.   We did.

9   Q.   And that was towards the end of the evening?

10  A.   That was the end of the evening.

11  Q.   And why did you go to Papa's?

12  A.   To call a cab to come pick us up.

13  Q.   And did you call the cab?

14  A.   Rich did.

15  Q.   All right.  So then what happens?

16  A.   Um, a few moments later a cab pulled up and Rich and I

17  went out and got into the cab.  And it was friends of ours.

18  Q.   When you say friend of yours, you mean the driver?

19  A.   The driver.

20  Q.   Was there anyone else in the cab?

21  A.   Yes.  His uncle.

22  Q.   All right.  So the four of you were in the cab.  Where

23  are you seated?

24  A.   Behind the driver.  Behind Anthony.

25  Q.   Behind Mr. Carroll?

1   A.   Yes.  And Rich is to my right.

2   Q.   All right.  Then what happens?

3   A.   Then Ty um, made his way over to the cab.  I'm not sure

4   where he came from.  But um, Ty's uncle flagged him down to

5   say hi.  And he came over to the car.  And we were all --

6   Q.   So he's over at the car?

7   A.   Yeah.

8   Q.   What side of the car is he on?

9   A.   He's on the driver's side.

10  Q.   Okay.  And what happens then or next?

11  A.   We were all just talking and catching up and saying hi

12  and just talking.

13  Q.   All right.  Okay.  And at the point in time did you

14  notice anything unusual?

15  A.   No.

16  Q.   All right.  All right.  Then what happens?

17  A.   Then um, a dark car pulled -- we were double parked in

18  Union Station where the cab was.  And then a dark car came

19  up and parked a car's length away from us.  And I noticed --

20  Q.   Let me stop you for a moment.

21  A.   Okay.

22  Q.   When you say, a car length away from you, do you mean

23  to the right as you're sitting?

24  A.   Yes.

25  Q.   Let me do it this way.  To the right where you are

1   sitting or do you mean in front?

2   A.   To the right where I'm sitting.

3   Q.   Okay.  All right.  And then what happened?

4   A.   And then someone got out of the vehicle um, in dark

5   clothing and made his way in front of the cab walking very

6   aggressively towards Ty.

7   Q.   Okay.  Now, was that individual in any kind of police

8   uniform?

9   A.   No.

10  Q.   Do you recollect, if you have a recollection did he

11  have a badge displayed?

12  A.   Not that I saw.

13  Q.   Did you hear him indicate to anyone that he's a police

14  officer?

15  A.   No, never.

16  Q.   Okay.  What happens next?

17  A.   Um, he walked in front of the car like he was on a

18  mission.  And he kicked Ty, which looked to me like it was

19  in the abdomen, but I believe Ty blocked it.

20  Q.   Okay.

21  A.   Um, there was another kick which brought Ty further

22  back down the sidewalk.

23  Q.   Okay.  Stop for a moment.  So as this individual is

24  kicking Ty, he's wearing dark clothes?

25  A.   Umhum.

Q.   And does he have a badge displayed at all at that time?

A.   I never saw a badge.

Q.   And did you hear him at that moment indicate, I'm a police officer?

A.   Never.

Q.   Did you hear him indicate in any polite fashion to anyone, please move the cab?

A.   No.

Q.   Did you hear him say, you're blocking traffic, please move the cab?

        MR. MELLEY:  Your Honor, leading.  It's his witness.

        THE COURT:  Fair enough.

        MR. RIGAT:  I'm sorry, Your Honor.

        THE COURT:  I'll sustain the objection.

Q.   Okay.  So you see this incident, he's kicking at Mr. Outlaw?

A.   Umhum.

Q.   What's the next thing that you see?

A.   Um, --

Q.   If anything?

A.   At that point um, I just see police officers and people just coming and fighting and to the, you know, to the back right of the, on the sidewalk.

Q.   Okay.  When you say you see police officers and people

coming and fighting, could you be a little more descriptive?

A.   I don't know where everybody came from.  It was, it just happened so fast.  Um, I don't know where the people came from.  I just know that Ty was on the bottom of all of it.

Q.   And did you see what, if anything, was Ty doing while he's on the bottom of all of it?

A.   I don't recall.

Q.   Okay.  What's your next recollection?

A.   Um, I remember, you know, people just kind of peeling off and seeing Ty laying there with blood coming out of his head.

Q.   Did you hear any -- what, if anything, did you hear anyone say at that moment?

A.   I don't recall.

Q.   Did you hear anyone identify as police?

A.   No.

Q.   Okay.  So the pile is piled off of Ty?

A.   Umhum.

Q.   What happens next?

A.   An ambulance came and took Ty away in the ambulance.

Q.   What, if any, restraints was Ty in?

A.   I didn't -- I didn't see him restrained.

Q.   That's fair enough.  Okay.  Then what happened?

A.   Um, we left and went home.

1   Q.    Okay.  When you say we?

2   A.    Oh, Rich and I.

3   Q.    All right.  In the cab?

4   A.    In the cab.

5   Q.    All right.  To your best recollection did anyone

6   approach the cab before you left?

7   A.    Um, no.  But I know that Rich tried to make a

8   statement, but they wouldn't take his statement.

9   Q.    Thank you.  I have no further questions.  But please

10  remain seated.  Attorney Melley, who represents the two

11  officers, gets to question you now.

12  A.    Okay.

13          MR. RIGAT:  Thank you.

14          CROSS EXAMINATION BY MR. MELLEY:

15  Q.    Good morning.

16  A.    Good morning.

17  Q.    Do you remember meeting me?

18  A.    I do.

19  Q.    And you gave a deposition?

20  A.    I did.

21  Q.    And have you had an opportunity to review it?

22  A.    Um, I read through it.

23  Q.    When did you read through it?

24  A.    Last week.

25  Q.    And where did you get it from?

1    A.    Um, Ty's attorney.

2    Q.    Did you meet with him?

3    A.    I did.

4    Q.    Okay.  And do you have a copy with you?

5    A.    Not with me.

6    Q.    Okay.  And reading it did that refresh your

7    recollection about some of the events?

8    A.    It refreshed it.  And it also brought me back again to

9    that night.

10   Q.    Okay.  So at the time Richard Rakus was your boyfriend?

11   A.    Umhum.

12   Q.    Yes?

13   A.    Yes.

14   Q.    Do you have children?

15   A.    We do.

16   Q.    Two by him?

17   A.    Two by him.

18   Q.    And how long -- were you married at this time?

19   A.    We were never married.

20   Q.    Oh, you were never married?

21   A.    No, never married.

22   Q.    You said you were married five years?

23   A.    Oh, to my current husband.

24   Q.    To your current husband.  Okay.

25         And is it fair to say this was a big night out for

1   you?

2   A.    Not a big night.

3   Q.    Before Christmas?

4   A.    Not a big night out, no.  It was just friends getting

5   together and going to dinner and shooting pool.

6   Q.    So your mom had the kids so you were free for the

7   night?

8   A.    I was.

9   Q.    You got to grab those when you can, right?

10  A.    Yeah.

11  Q.    So you went to, if I can just use, this is Plaintiff's

12  Exhibit 1.  If you can just take a look at that.  You

13  recognize that?

14  A.    Yeah, Union Station.

15  Q.    Okay.  And then just to orientate ourselves, the

16  Capital is straight ahead, Holiday Inn Express to the left.

17  And as we're looking in this direction towards the Capital,

18  on the right-hand side of that brownstone building, is where

19  the Hot Tomatoes is, is that right?

20  A.    Yes.  On the right.

21  Q.    Okay.  And that's where you said you went to dinner?

22  A.    It is.

23  Q.    Okay.  And the Hot Tomatoes is one of a number of

24  different places down Union Station that bring in a lot of

25  people, is that fair?

A.    Very fair.

Q.    Because you have the restaurant itself and then you have a bar area at the Hot Tomatoes?

A.    Umhum.

Q.    Yes?

A.    Yes.  Sorry.

Q.    That's okay.  And you sat down for dinner?

A.    We did.

Q.    And I think you said you arrived about 7, is that right?

A.    Correct.

Q.    And this happened about midnight.  Does that sound right, about five hours later?

A.    Yeah.

Q.    So it was a pretty long time in this area?

A.    Yeah.  I would say we called the cab around 11'ish.

Q.    Okay.  So after Hot Tomatoes do you recall going to Bourbon Street?

A.    I do.

Q.    And you were there for a while?

A.    Yeah, a couple hours.

Q.    Where did you play pool?

A.    At Bourbon Street.

Q.    And where was that, first level, second level?

A.    First level to the right.

1    Q.    Okay.  And at some -- did you ever see Tylon Outlaw at

2    Bourbon Street this evening?

3    A.    No.

4    Q.    Okay.  But you left Bourbon Street and went, if we look

5    at this, the opposite direction, to The Federal Cafe?

6    A.    No.  I, we just went to Papa's.

7    Q.    Do you recall telling me you went to The Federal?

8    A.    I do, but I don't remember going to The Federal.

9    Q.    You did testify to that though?

10   A.    I did.

11   Q.    Okay.  And I forget when you and I met, but it was

12   sometime around 2009?

13   A.    Yeah.

14   Q.    So almost seven years ago?

15   A.    Right.

16   Q.    So if you told me then you went to The Federal --

17   A.    I don't -- when I think back at the night and I have,

18   you know, vivid memories of that night, and I'm sure I was

19   quite intimidated at that point about everything that was

20   going on.  Um, but when I think, when I replay that night in

21   my head I don't remember going to The Federal at all.

22   Q.    Okay.

23   A.    And I apologize for that.

24   Q.    Please don't apologize.  But there are a number of bars

25   along the way, right?

1   A.   There are.

2   Q.   So at some point you end up at Papa's?

3   A.   Umhum.

4   Q.   And you order a pizza or do you?

5   A.   No, because at that point Rich was working there.  We

6   only went there so he could call --

7   Q.   Okay.

8   A.   -- a cab.

9   Q.   Now, had you had anything to drink of an alcoholic

10  nature that night?

11  A.   I had a couple of Coronas.

12  Q.   And how about Richard?

13  A.   The same.

14  Q.   So eventually you make the call and the cab comes, and

15  small world, it's Anthony Carroll?

16  A.   Yeah.

17  Q.   Who you've known for a long time?

18  A.   Yeah.

19  Q.   Right?

20  A.   Yes.

21  Q.   And you're seated, I think you said behind the driver?

22  A.   Yeah.  I'm behind Anthony.  And Rich is to my right.

23  Q.   Okay.  And how long after you are in the cab does Mr.

24  Outlaw show up?

25  A.   I would say five minutes, but it was very quickly.

Q.    Okay.

A.    We weren't sitting in the cab that long.

Q.    Were you sitting in the cab at all before he appeared
or was it like you get in the cab and he shows up?

A.    That's what it felt like.  We were in the cab.  Um, and
we started talking.  And then I believe Anthony's uncle saw
Ty coming down and called him over to say hi.

Q.    Okay.  And so as you're seated there where does Mr.
Outlaw come from?

A.    I don't know.

Q.    Okay.  Do you ever see him by Anthony's uncle?

A.    I don't recall.

Q.    Okay.  So you don't recall him being in the street at
all?

A.    I don't recall him being in the street.  I just
remember him on the left side of the car.

Q.    Okay.  So in terms of how he got there or what he was
doing before he got there you don't know because you didn't
have any personal observation of that?

A.    No.

Q.    And suddenly are you aware that an individual is in a
car approaching the cab?

A.    I, I witnessed the car pulling up in front of us.  And
witnessed somebody coming out.

Q.    Okay.  And do you recall this individual saying

1    anything that was in this car?

2    A.    I don't.

3    Q.    Okay.  And do you recall Ty saying anything back?

4    A.    I don't.

5    Q.    Do you remember reading your deposition?

6    A.    I do.  But I know that words were exchanged, but I

7    don't know what the words were.

8    Q.    Okay.  Forget what the words were.  Do you recall that

9    the individual in the car was saying something?

10   A.    He seemed very angry.

11   Q.    Okay.  And do you recall Mr. Outlaw responding to him

12   verbally?

13   A.    I don't.

14   Q.    Okay.  Do you remember the deposition where you, where

15   you were asked that?

16   A.    I read it, but I don't recall Ty --

17   Q.    Okay.  Do you recall saying that words were exchanged?

18   A.    Words were exchanged.

19   Q.    Yeah.  Is that, is that a fair statement?

20   A.    It's a fair statement.  I just don't know what they

21   were.

22   Q.    Oh, I understand that.

23   A.    Ty wasn't -- I don't think anybody knew that he was --

24   that it was directed at Ty.  I think that the person coming

25   towards him, I think Ty was more in like shock I feel like.

1  Q.   We're going to get to that.

2  A.   Oh, okay.

3  Q.   But before that, when you said words were exchanged, to

4  me, correct me if I'm wrong, that means that this individual

5  is saying something and Mr. Outlaw is saying something back,

6  is that a fair characterization?

7  A.   It's fair, but the person that -- the aggressor -- Ty

8  wasn't aggressive at all.

9  Q.   We're going to get to that.  But I'm just talking

10  first, was there an exchange of words?

11  A.   Yes.

12  Q.   Okay.  And so when you say, an exchange of words,

13  correct me if I'm wrong, I imply, you tell me, that that

14  means Mr. Outlaw is saying something back to this

15  individual?

16  A.   Correct.

17  Q.   Now, the individual gets out of the car, right?

18  A.   Well, I thought he was already out of the car.

19  Q.   Okay.  Before he gets out of the car do you recall

20  hearing an exchange of words?

21  A.   No, not before he got out of the car.  After.

22  Q.   All right.  So let's be clear on that.  Before he gets

23  out of the car, do you have any memory or knowledge of the

24  individual in the car saying anything to anybody?

25  A.   No.

1   Q.   Okay.  So your, your first awareness of any type of

2   exchange of words between this individual and Mr. Outlaw is

3   after the individual is getting out of the car?

4   A.   Correct.

5   Q.   Okay.  And the individual comes towards Mr. Outlaw, is

6   that right?

7   A.   Correct.

8   Q.   All right.  And I think you said, correct me if I'm

9   wrong, that you viewed this from the back seat of the cab

10   and you viewed it as the individual coming at him in an

11   aggressive manner?

12   A.   Correct.

13   Q.   Okay.  And is it fair to say that at that time Ty

14   approached him?

15   A.   No.  Ty never approached him.

16   Q.   Do you recall in your deposition talking about human

17   nature?

18   A.   Yes.

19   Q.   And --

20   A.   And body language and --

21   Q.   Huh?

22   A.   And body language.

23   Q.   Body language.  And that Ty reacted to this individual

24   coming to him?

25   A.   I don't think --

Q.    Do you remember saying that?

A.    Not aggressively.

Q.    Put aside aggressive or not.  Do you recall Ty using basic human nature in reacting to this individual coming at him?

A.    The only reaction I remember is him turning around.

Q.    Turning around?

A.    Like from facing the cab to turning around as the person approached.

Q.    Okay.  And when you first hear this exchange and everything is Mr. Outlaw next to Mr. Carroll?

A.    Yes.

Q.    And when the ultimate struggle occurs is that in front of the cab?

A.    The first kick happened on the side of the cab.

Q.    Which side?

A.    On the right -- on the left side, I'm sorry, of the cab, on the driver's side.

Q.    So this individual came all the way around the vehicle?

A.    He -- the cab is here.  He came out of his car and went around.

Q.    Okay.  So where do you see the actual first kick?

A.    Through my window.

Q.    All right.  And --

A.    Or through -- yeah, through my window.

1  Q.   Through the side window or the front window?

2  A.   Through the front window.

3  Q.   Okay.  And I don't mean to be difficult, the front

4  window is in front of the driver, the glass?

5  A.   No.  The driver's side door window.

6  Q.   Okay.  Okay.  So in your view Mr. Outlaw never moved?

7  A.   Other than facing the aggressor that was all I saw.

8  Q.   Okay.  And then I think you said that soon after that

9  Mr. Outlaw went down and there were a lot of people.  And

10 from that point forward you couldn't tell exactly what

11 happened until they cleared away?

12 A.   I couldn't.

13 Q.   Okay.  So to the extent --

14 A.   I could only see that there was a pile of people and

15 there was fighting.

16 Q.   Do you remember any police officers being there?

17 A.   I remember police officers being there.  I don't recall

18 if they were participating, but I know that he was on the

19 bottom of the pile.

20 Q.   Okay.  This gentleman over here in the police uniform,

21 do you recognize him at all as being there that day?

22 A.   I don't.

23 Q.   Do you remember a cruiser being behind this vehicle

24 that was stopped in the roadway?

25 A.   I only remember that there were cruisers and an

1  ambulance there after, but I don't recall it being there

2  during.

3  Q.    Okay.  Do you remember any type of strobe lights?

4  A.    No.

5  Q.    Okay.  All right.  Thank you.

6         MR. RIGAT:  I have nothing further.

7         THE COURT:  All right.  Thanks for making the trip

8  in.

9         THE WITNESS:  Thank you.

10         THE COURT:  Good luck with the kids.

11         THE WITNESS:  Thank you.

12         THE COURT:  That takes us to the lunch break.  Why

13  don't we get back together at 1 o'clock.  Maybe I can catch

14  the attorneys for a second in this, catch you guys in the

15  little robing room for a second.

16         MR. RIGAT:  Yes.  Thank you, Judge.

17         (The Court recessed at 12:00 noon and resumed at

18  1:00 p.m. without the jury present)

19         THE COURT:  All right.  We're ready for the jury?

20         MR. MELLEY:  Yes, Your Honor.  May we just have a

21  brief, you said something earlier about what you want to do

22  later today about maybe sitting down or was that tomorrow?

23         THE COURT:  Tomorrow.  I figured you were busy

24  last night with the doctor.

25         MR. MELLEY:  I was.

1          THE COURT:  And so the, thank you for reminding

2     me.  I've got four copies I have to print of the second

3     draft.  So if you can read it tonight and we'll let the jury

4     out so we can make some progress tomorrow afternoon at 4,

5     have a charge conference at the end of the day.

6          MR. MELLEY:  I'm trying to plan my witnesses.

7          THE COURT:  Yeah.  Yeah.

8          MR. MELLEY:  And I have a doctor lined up for

9     tomorrow too, but I don't know if the plaintiff is going to

10    be done.  What's on the schedule?

11         THE COURT:  I mean, the charge conference is

12    flexible.  We'll make sure the witnesses come first.  We'll

13    get a full day in.  We won't make it bridge over to another

14    day for the doctor.

15         MR. MELLEY:  Okay.  He's not going to be that

16    long.

17         THE COURT:  He's not going to be long.  But if all

18    things being even let's shoot for sitting down late in the

19    day tomorrow, just marking it up.  And if you guys can read

20    it tonight then we'll be there.  The same draft adopted many

21    of your proposed changes.

22         MR. MELLEY:  Okay.  Thank you.

23         MR. DiCROSTA:  Your Honor, as a housekeeping

24    matter, can we put the exhibits back together?  I think some

25    pages came out of one of the folders.

1          MR. MELLEY:  I hope I put it back exactly where it

2     was.  That was my intent.

3          THE COURT:  Excuse me?

4          MR. DiCROSTA:  I just don't want the jury looking

5     for something that's not in our files.

6          THE COURT:  All right.  We'll bring them in.

7          (The jury returned at 1:05 p.m.)

8          THE COURT:  We'll give you a break at 3 and go

9     through to 4:30.

10         MR. RIGAT:  Your Honor, at this time the plaintiff

11    would call Mr. Nick Sackandy.

12         N I C K   S A C K A N D Y,  The Witness, after

13    being duly sworn, was examined and testified as follows:

14         THE COURT:  Thank you for coming in, Mr. Sackandy.

15         DIRECT EXAMINATION BY MR. RIGAT:

16    Q.   Thank you, Your Honor.  Good afternoon, Mr. Sackandy.

17    A.   Good afternoon.

18    Q.   I would just like to ask a few personal background

19    questions, okay?

20    A.   All right.

21    Q.   We'll go through these quickly.  You're married and you

22    have three children, correct?

23    A.   Correct.

24    Q.   And what are their names and ages?

25    A.   Ava 7, Ila 6 and Ferra 2.

1    Q.    All right.  You are a veteran?

2    A.    Yes.

3    Q.    What service?

4    A.    Army.

5    Q.    And when did you serve?

6    A.    1997 to 2003.

7    Q.    And you were honorably discharged?

8    A.    Yes.

9    Q.    What was your rank at the time you left?

10   A.    B4 Specialist.

11   Q.    Thank you.  You are a businessman?

12   A.    Yes.

13   Q.    What do you do for a living?

14   A.    I own two businesses.

15   Q.    Could you describe those businesses?

16   A.    One business that I own in Glastonbury is a funding

17   company where I fund other businesses.  Sometimes through my

18   own capital or through that of another lender.  That's, and

19   my business in East Hartford is a business, contracting

20   business which does appliance delivery and installation for

21   Sears, PC Richard & Son, multiple other smaller retailers.

22   And we also do energy efficiency audits.  We have contracts

23   with UI, Ever Source, RCRT here in Hartford and the

24   Department of Energy.

25   Q.    All right.  Thank you.  And you are a UConn Storrs

1    graduate?

2    A.    Yes.

3    Q.    What was your major?

4    A.    Communication sciences.

5    Q.    When did you graduate?

6    A.    2001.

7    Q.    And you currently, you coach high school wrestling?

8    A.    Yes.

9    Q.    How long have you been doing that?

10   A.    Wow, about 15 years.

11   Q.    All right.

12   A.    For this particular high school it's my third season.

13   I'm back at East Hartford.

14   Q.    Thank you.  I'm going to direct your attention to the

15   evening of December 17, 2004.  All right.

16        Now, one more background question and then I'll

17   end that.  Were you employed at that time?

18   A.    Self-employed.

19   Q.    You were self-employed.  And what were you doing then?

20   A.    The appliance business.

21   Q.    Okay.  Now you met up with Tylon Outlaw out at the

22   Bourbon Street Restaurant at Union Place in Hartford that

23   night, correct?

24   A.    Yes.

25   Q.    At about what time?

1   A.    Roughly 10 o'clock.

2   Q.    Okay. Is that an exact time?

3   A.    I couldn't give an exact time.

4   Q.    Okay. Do you remember who arrived first?

5   A.    I'm pretty sure I got there a little bit before he did.

6   Q.    Okay. And why were you meeting with Mr. Outlaw?

7   A.    We were actually meeting to discuss the opportunities

8   of opening a business in East Hartford, a sandwich shop.

9   Where, there was a restaurant at the time where I had spoken

10  with the owner who was interested in selling.

11  Q.    All right. So at some point Mr. Outlaw arrives?

12  A.    Yes.

13  Q.    Okay. And what happened next, if anything?

14  A.    We discussed the business, the potential of the

15  business. You know, different aspects of what we would do

16  in the business. And what role we would play. Things of

17  that nature. You know, we also discussed small talk.

18  Q.    Okay. What, if anything, did you offer Mr. Outlaw to

19  drink, if anything?

20  A.    Um, I offered him a drink um, because I was going to

21  have a drink. He declined a drink. And then um, he said

22  just give me a beer. So I did buy him a beer.

23  Q.    Okay. How long did Mr. Outlaw stay with you at Bourbon

24  Street?

25  A.    Give or take an hour.

1  Q.   And were you with him that entire time?

2  A.   Yes.

3  Q.   And were you able to observe him that entire time?

4  A.   Yes.

5  Q.   How was he behaving?

6  A.   Perfectly normal.

7  Q.   Did you have an opportunity to observe him drinking?

8  A.   Other than that beer he didn't drink anything else.

9  Q.   Okay.  Do you remember when he left?

10 A.   Yes.  I remember him saying he was going to go.  And I

11 kind of wanted him to hangout a little longer because we

12 were pretty much done talking about the business.  And I

13 remember, like, oh, he's leaving kind of early.  I remember

14 him leaving.  And he's, like, oh, I just want to get home.

15 So he hung out for a little while longer.

16 Q.   Did you ask him to stay longer?

17 A.   I did.

18 Q.   What did he say or --

19 A.   He was, he just wanted to get home.  I don't really

20 remember the reason.

21 Q.   When he left did you see him leave?

22 A.   Yes.

23 Q.   Okay.  Did you see him walk out the door?

24 A.   Yes.

25 Q.   Was he off balance?

1   A.    No.

2   Q.    So he wasn't stumbling?

3        MR. MELLEY:  Objection, leading.

4        THE COURT:  Sure.  I'll sustain the objection.

5   Q.    Describe how he was walking out the restaurant?

6   A.    Perfectly normal.

7   Q.    Okay.  What, if anything, occurred next?

8   A.    Um, I do remember that I was actually hanging out for a

9   little longer and an acquaintance of mine came in.

10   Q.    And who was that?

11   A.    John Stengel.

12   Q.    Okay.

13   A.    And he's friends with another one of mine, one of my

14   close friends.  They used to work together at a dance

15   studio.  That's how they knew each other.  And I knew John,

16   but not very well.  And he came in because my other friend

17   was there.  And I remember him saying, holly cow.

18        MR. MELLEY:  Objection, Your Honor.  Hearsay.

19        THE WITNESS:  Well, no, I was there.  I heard him

20   saying it.

21        MR. RIGAT:  I'll lay a better foundation, Your

22   Honor, if I can.

23        THE COURT:  Why don't you back up.  I'll sustain

24   the objection on the current record and give you a chance to

25   back up.

1          MR. RIGAT:  Thank you, Your Honor.

2     Q.    All right.  So let me stop for a moment.  So Mr. Outlaw

3     leaves?

4     A.    Umhum.

5     Q.    Sometime later an acquaintance of the yours, Mr. John

6     Stengel, walks in the restaurant?

7     A.    Yes.

8     Q.    And how did he appear to you?

9     A.    A little excited.  Like, he was, like, well, he came

10    in, like, wow, he had a story to tell.

11    Q.    Okay.  Now I'm going to ask you, what did he say, if

12    anything?

13          MR. MELLEY:  Objection.  Objection to the hearsay.

14          THE COURT:  Why don't you guys come up.

15          (Bench Conference held:)

16          MR. MELLEY:  It's hearsay.  He is asking him what

17    another party said.

18          THE COURT:  The question is whether it meets the

19    requirements for an excited utterance.

20          MR. MELLEY:  We don't have any period of time in

21    between when the plaintiff left and to when this -- it's

22    some time later.  That's it.  I don't think that falls

23    within excited utterance.  I understand what he's trying to

24    do.  It's not fair.

25          THE COURT:  What's the proffer?

1    MR. RIGAT:  The proffer, a short time after Tylon

2  leaves this guy comes into the restaurant and is, wow, you

3  wouldn't believe what I just saw as I'm coming in.

4    Mr. Stengel's testimony would be, what he'll

5  testify to as he's walking up Bourbon Street, right around

6  the time this is occurring, sees the incident to the left.

7  What I think it's important for us to establish, that as

8  soon as Stengel comes into Bourbon Street, which, according

9  to Stengel, is around the time he saw what's occurring,

10  while he's walking, he sees a bunch of cops beating Ty.

11    THE COURT:  I'll let it in on two theories.  One

12  is, it's not the most excited utterance that was ever heard,

13  but it was an excited utterance.  And --

14    MR. RIGAT:  Present sense impression also.  I

15  think that's typically while you are seeing the things,

16  historically things he saw moments before, but not long

17  before.  But also apart from the truth of the matter

18  asserted.

19    THE COURT:  I thought we had a bit of a quarrel a

20  day or so ago between you guys about whether Mr. Stengel saw

21  the same events or not.

22    MR. MELLEY:  Right.

23    THE COURT:  And this would go directly to that

24  providing a basis for an inference that the plaintiff walked

25  out of the restaurant and Mr. Sackandy, I haven't got it

1  quite right, immediately heard a description from

2  Mr. Stengel, who is going to testify.

3         MR. RIGAT:  Yes.

4         THE COURT:  So it locates Mr. Stengel's

5  observation within moments of the plaintiff leaving.  So for

6  that purpose as well I think it's admissible and allowed for

7  the --

8         MR. RIGAT:  Truth of the matter.

9         THE COURT:  But the excited utterance takes it

10 past the hearsay exception.

11        MR. RIGAT:  Thank you.  Thank you, Your Honor.

12        (Bench Conference concluded)

13 Q.   Okay.  So Mr. Stengel walks in the Bourbon Street

14 Restaurant?

15 A.   Umhum.

16 Q.   All right.  What, if anything, did he say?

17 A.   I don't have the exact quote, but I don't, I mean,

18 sorry for the language, but he was kind of, like, he said

19 something to the effect, that holly, man you guys should see

20 the Hartford Police are beating the out of some guy outside.

21 Q.   Can I interrupt?

22        THE COURT:  There's no kids in this room.

23        THE WITNESS:  Okay.  Holly shit.

24        THE COURT:  We've heard these words before.  And I

25 promise I will not get angry.  So don't be restrained.

```
 1              THE WITNESS:  Something to the effect --
 2              THE COURT:  Why don't you start over.
 3    A.   He was very excitable.  And he was, like, holly shit
 4    guys you should have seen them.  I mean, there's Hartford,
 5    the Hartford cops are beating the shit out of some guy
 6    outside or were beating the shit of some guy outside.  And
 7    we're like, really?  And he's like, yeah, man, it's freaking
 8    crazy.  And we were, like, wow, that's nuts.  And then I was
 9    like, geese.  And then I was, like, that's crazy.  And then
10    I didn't think it was anybody that I knew.
11    Q.   Okay.  Let me ask you this so we can, because this part
12    is kind of important now.  Was this a long time after Ty
13    Outlaw left Bourbon Street, was it a short time after?  I
14    mean, could you give us a general idea of what your sense of
15    the time was?
16    A.   It wasn't too long after he left, no.
17    Q.   Okay.  Thank you.  I have no further questions, but
18    please remain seated.  Mr. Melley may have some follow-up.
19    A.   Sure.
20              CROSS EXAMINATION BY MR. MELLEY:
21    Q.   Good afternoon, Mr. Sackandy.
22    A.   Good afternoon.
23    Q.   Long time friend of Mr. Outlaw?
24    A.   Yes, sir.
25    Q.   School together?
```

A.    Yes.

Q.    And this particular night you called him to meet at
Bourbon Street?

A.    We had spoken a few times, yes.

Q.    And you were going to meet other people as well?

A.    Um, I threw the idea out there to some other people,
yes.

Q.    So, in other words, you acted as, so to speak, the
gatherer, and you told a number of people that you were
going to this particular bar and you invited them to stop by
if they were in the neighborhood?

A.    True.

Q.    Do you remember taking with you Travis McIntyre?

A.    No.

Q.    Was he there?

A.    I don't know Travis McIntyre.

Q.    What's his name?  Travis -- whose your friend, Travis
Galespi?

A.    I know Travis Galespi.

Q.    Did he go with you?

A.    I don't think he went with me.  I know he showed up
that night.  I know he was there.

Q.    Okay.  If I may show you Mr. Galespi's deposition?

A.    You may, sure.

Q.    And I'm referring to Page 12.  And I'm going to ask you

1    to read to yourself.

2              MR. MELLEY:  If I may approach?

3              THE COURT:  Sure.

4    Q.    Lines 18 to 21.

5    A.    Read it to myself?

6              THE COURT:  Read it silently.

7    Q.    Yes.  Silently.

8    A.    Okay.

9    Q.    Does that refresh your recollection as to, first of

10   all, Travis being there?

11   A.    I know he was there.

12   Q.    And does that refresh your recollection as to whether

13   or not he went with you?

14   A.    No.

15   Q.    Okay.  Do you know where Travis is today?

16   A.    No.

17   Q.    So, do you know who arrived first, you or Mr. Outlaw?

18   A.    I thought I got there before he did.

19   Q.    Okay.  And you think somewhere around 10?

20   A.    Umhum.

21   Q.    Yes?

22   A.    Yes.

23   Q.    Okay.  And you stayed until about 12:30 yourself?

24   A.    Roughly.

25   Q.    Okay.  And in that time you had a couple of drinks?

1    A.    Yes.

2    Q.    Okay.  And a couple of drinks in the world means

3    anywhere from what to what?

4    A.    Two to three.

5    Q.    Okay.  Bourbon Street on a Friday night December 17, a

6    week before Christmas Eve, was it crowded?

7    A.    Not at first.

8    Q.    All right.  Did it get crowded as the night went on?

9    A.    It started to get busy.

10   Q.    And there's live music?

11   A.    I believe there was live music, yeah.

12   Q.    And live music in a bar like Bourbon Street is going to

13   be loud?

14   A.    Yeah.  Near the band, yeah, I'm sure it's pretty loud.

15   Q.    And there's pool tables?

16   A.    Yes.

17   Q.    Were you playing any pool?

18   A.    I was over by there.  I don't know if I actually played

19   a game.  I'm not very good at pool.

20   Q.    If we're looking at Bourbon Street where are the pool

21   tables?

22   A.    Right when you walk in.  They are more prominent when

23   it's empty.  You just kind of hang out there.  When it gets

24   crowded I don't know if they take them away or they

25   disappear.  I don't know.  I don't know what happens to

1  those tables.  I don't know if people actually play.

2  Q.   But were people playing?

3  A.   There were some people playing.

4  Q.   I mean, there's also the noise then from the pool

5  tables as well or no?

6  A.   I suppose there's as much as the noise as a pool table

7  makes, yeah.

8  Q.   Well, I'm just trying to think, as you are sitting

9  here, do you know what time Mr. Outlaw left?

10  A.   I don't know exactly what time.  It was roughly an hour

11  after, after he got there.

12  Q.   Okay.  And when he left was the bar at that time

13  crowded?

14  A.   I wouldn't say crowded.  I would say on its way,

15  there's people, it was picking up.

16  Q.   When you left at 12:30 was it crowded?

17  A.   It was more crowded at 12:30.

18  Q.   So there's a lot of stuff going on there though, right?

19  A lot of people, a lot of interaction with people?

20  A.   Yes.

21  Q.   All right.  And we have Travis and you and Mr. Outlaw.

22  And were there other people that you had contacted?

23  A.   Yes.

24  Q.   And how many others?

25  A.   My friend Chris was there.

Q.    Okay.  What's his last name?

A.    Prechio.

Q.    And then you mentioned this John Stengel.  Did you contact him?

A.    No.

Q.    Okay.  How do you know him?

A.    He worked with Chris.

Q.    So he's a -- did he come with Chris?

A.    No.

Q.    Okay.  Is Chris one of your good friends?

A.    Yes.

Q.    And do you know, based upon your own perception, how much time -- well, let me withdraw it.

        You don't know when Mr. Outlaw left other than somewhere around an hour after he arrived?

A.    I can't pinpoint like a -- I couldn't timestamp it for you, no.

Q.    And, likewise, can you timestamp when John Stengel came in?

A.    No.

Q.    Okay.  So there's a gap of time between when Mr. Outlaw left and when Mr. Stengel arrived, is that fair?

A.    Yeah.

Q.    Do you know if the band is continuing to play in this interim or have they taken a break or what's going on?

A.    I don't know.  We were right by the entrance so that we

weren't near the band.

Q.    Okay.  And are you talking to other people or just the

various guys that you mentioned?

A.    Various guys at that time.

Q.    Okay.  Is anybody reaching out to other people?

A.    I have no idea.

Q.    Is everybody married and staying good that night or are

there -- is there any type of interaction with other people

at the bar?

A.    Not that I remember.

            MR. MELLEY:  All right.  May I have a moment?

            THE COURT:  Of course.

            MR. MELLEY:   Nothing further, Your Honor.

            MR. RIGAT:  Nothing further.

            THE COURT:  Thank you for making the trip.  Good

luck with your family and your wrestling.

            THE WITNESS:  Thank you.

            MR. RIGAT:  Your Honor, at this time we're going

to call the cab driver, Mr. Anthony Carroll.

            A N T H O N Y   C A R R O L L, the Witness, after

being duly sworn, was examined and testified as follows:

            MR. RIGAT:  Thank you Your Honor.

            DIRECT EXAMINATION BY MR. RIGAT:

Q.    Good afternoon, Mr. Carroll.

1   A.   How yeah doing?

2   Q.   Good.  Just a few background questions so we know a

3   little bit about you.  What do you do for a living?

4   A.   Um, I still drive Yellow Cab.  And um, I'm a substance

5   and mental health abuse, I run several houses for the mental

6   health and substance abuse.

7   Q.   And how long have you driven a taxicab?

8   A.   Um, since 1981.

9   Q.   Okay.  Now, you do have a criminal conviction in your

10  past, correct?

11  A.   Yes, I do.

12  Q.   What was that for?

13  A.   Um, it was for -- basically based on a domestic

14  violence.

15  Q.   Okay.  How long ago was that?

16  A.   It was, it was probably in the early '90's.

17  Q.   Okay.  Now, how do you know Tylon Outlaw?

18  A.   We grew up together.

19  Q.   Would that be in East Hartford?

20  A.   Yes, sir.

21  Q.   All right.  Did you go to school with Mr. Outlaw?

22  A.   Yes, I did.

23  Q.   Did you play sports with Mr. Outlaw?

24  A.   Yes, I did.

25  Q.   All right.  I'm going to shift your attention now to

1  the evening of December 17, 2004.

2  A.   Umhum.

3  Q.   Did you have occasion to pick up a fair in front of

4  Papa's Pizza that evening?

5  A.   Yes, sir.

6  Q.   How did that happen?

7  A.   Um, I was in the downtown area and um, was dispatched

8  towards Papa's Pizza.  Um, I was actually sitting there and

9  waiting on a fair.  And as the cab company works it works to

10  a -- you could circle downtown to get fairs or, you know,

11  the radio dispatch from the company gives you a cab fair.

12  Q.   All right.  And were you dispatched?

13  A.   Yes, I was.

14  Q.   All right.  So you arrived, what, in front of?

15  A.   I arrived in front of Papa's Pizza and pulled off

16  towards the left-hand side.

17  Q.   Okay.  Now, were you double parked?

18  A.   Yes, I was.

19  Q.   Okay.  Was there any car parked to your right across

20  the street?  If you recollect?

21  A.   I don't remember that.  I don't remember a car being --

22  I don't think so.

23  Q.   Was traffic able to drive by?

24  A.   Yeah, it was.  Yes.

25  Q.   And so did your fair -- did the fair arrive?

1    A.    Yeah.  Um, yes, they did.

2    Q.    Okay.  Did you recognize the fair?

3    A.    Yes, I did.

4    Q.    Who were they?

5    A.    Um, Rachel Killian and Richard Rakus.

6    Q.    Do you know Rachel Killian and Richard Rakus?

7    A.    Yes, I do.

8    Q.    How do you know them?

9    A.    They are classmates of mine.

10   Q.    To your knowledge, did they go to school the Tylon

11  Outlaw as well?

12   A.    Yes, they did.

13   Q.    Oh, and were you with your uncle?  Was he in the front

14  passenger's seat?

15   A.    Yes.  My uncle was riding with me in the front

16  passenger's seat that night.

17   Q.    So you pick up your fair?

18   A.    Yes, sir.

19   Q.    What, if anything else, occurs?

20   A.    Um, as I am picking up my fair um, I'm coming down --

21  um, I noticed Ty walking down the street.  Um, we sort of --

22  I don't know if I seen him or I don't know if he seen me,

23  but we sort of made contact with each other.

24   Q.    Okay.

25   A.    And he comes, he comes over to the cab.

Q.    All right.  So he crossed the street?

A.    Yes.

Q.    All right.  And do you -- how far away from the cab was he when he crossed the street, if you can estimate?

A.    Probably about five, five yards, seven yards.

Q.    So he comes over to the cab, right?

A.    Yes.

Q.    Then what happens?

A.    Then what ends up happening is he's talking to my uncle and um, on the passenger's side of the cab.  I have the window halfway down.  And um, we had a, you know, a brief conversation.  We're talking for a couple minutes.  And that's when Rich Rakus and Rachel Killian get in the cab.

Q.    Okay.

A.    As they get in the cab um, Ty still is talking with us.

Q.    All right.

A.    And um, me and my uncle.  And he's still on the same passenger's side of the cab at that time.

Q.    At that moment?

A.    At that moment, yes.

Q.    So then what happens?

A.    Then the car pulls up.

Q.    What kind of car?

A.    Um, a Crown Vic.

Q.    Okay.

```
1    A.    Um, --

2    Q.    That's a Ford?

3    A.    A Ford Crown Vic, yes.

4    Q.    Okay.

5    A.    Um, sort of like my cab that I was driving at that

6    time.  Um, as the car pulls up um, Ty is actually -- has

7    actually moved towards the middle of the front of the car.

8    Q.    Okay.  What happens next?

9    A.    The person that was driving the Crown Vic got out and

10   some rush type of reach like manner.  Um, I had my radio on

11   in the cab and my CB for my walky-talky for the cab.

12          So I really couldn't understand -- I really didn't

13   see what they were talking about or if they were even

14   talking.  I seen gesture type of movement.

15   Q.    Let me stop you there.  Rewind back for a moment.

16   A.    Sure.

17   Q.    Prior to this individual jumping out of the car --

18   A.    Yes.

19   Q.    -- did you hear any words exchanged?

20   A.    No, sir.

21   Q.    So was there any identification of, I'm a police

22   officer?

23   A.    No.

24   Q.    Did you see a badge displayed, if any?

25   A.    No.  No.
```

Q.    Okay.  So the person gets out of the car?

A.    The person gets out of the car.

Q.    And you're looking right at that?

A.    I'm looking right at him.

Q.    Did you see any police identification?

A.    No, sir.

Q.    No badge?

A.    No.

Q.    All right.  You didn't hear anything?

A.    No.

Q.    Okay.  What happens next?

A.    What happens next is um, like I said, Ty is in the front of my cab.  And the person that rushed out of the car comes out of the car in a gesture type of manner, in a rage type of manner and goes to kick and swing at Ty.  And when that happened, it happened like towards the front of my cab.  And it moved towards the side of my car.

      So now the incident that took place in the front is actually moving towards the side and down my left side in between two parked cars.

Q.    Okay.  What, if anything, did this individual, the man who jumped out of the car, what did he have, if anything, in his hand?

A.    I couldn't tell.  It was a black object.  I couldn't tell.  I didn't know if it was a radio or a cell phone or

1   what have you, but I couldn't tell.  I knew there was an

2   object in his hand.

3   Q.   What, if anything, did Tylon do when this individual

4   jumped out of the car, if you saw?

5   A.   It looked like he was scared, you know, like

6   frightened, you know, like somebody jumps out of the car at

7   you and, you know, you're frightened.  I mean, I didn't see

8   the look on his face, but I did look at the person that was

9   jumping out of the car.

10  Q.   And what did you see?

11  A.   I seen him rush at Ty.  Like I said, as Ty moved to the

12  middle of the car I'm looking at both of them.  And now it's

13  like um, almost frightening.  It was, it scared me.

14  Q.   Well let me stop you there.

15  A.   Okay.

16  Q.   You said you had an opportunity to see that

17  individual's face, correct?

18  A.   Yes, sir.

19  Q.   Okay.  And what, if any, demeanor?

20  A.   It was, the demeanor was, like, a rush type of, like,

21  an angry type of demeanor.  Like um, if I was to, like,

22  impose my will on you type of demeanor.  Like a, as he came

23  towards Ty, Ty was -- it was like, you know, the person was

24  like raged, like, a raged type of feeling.  You know, you

25  know, it was a rushed, a rage.  I looked at him and, like, I

1  really couldn't understand, like, what was going on, like,

2  why this was actually taking place or what was happening.

3  Q.    Okay.  So you see him come out --

4  A.    Yes.

5  Q.    -- of his car?

6  A.    Yup.

7  Q.    And he's walking over towards Ty?

8  A.    Yes.

9  Q.    Is he running or walking?

10 A.    Um, he rushed over towards him.

11 Q.    Okay.  And then what happens?

12 A.    And so the kick took place and the lunge took place.

13 Q.    Okay.

14 A.    And so now as they are like -- as they are going

15 through um, Ty, I believe Ty fell back.  And as Ty fell back

16 I believe --

17 Q.    Well, let me stop you there for a moment.  Ty is

18 falling back.  What, if anything, did you observe?

19 A.    Well, as I'm looking I'm, I'm scared for him.  I'm, you

20 know, I'm trying to figure out what is actually, you know,

21 like, why is this actually happening -- what's taking, you

22 know, what's actually taking place here.  You know what I

23 mean?

24 Q.    What did you think was going on?

25 A.    I don't know.  You know, I'm, like, I'm, like, like,

1    why would this just happen, you know.  So I thought what was

2    going on is somebody was attacking him.

3    Q.    Okay.  So let me ask you what, if anything, did Tylon

4    Outlaw do to invite this encounter?

5    A.    Nothing.  He was just talking to me and my uncle on the

6    side of the cab.

7    Q.    Okay.  All right.  So let's fast forward the real

8    again.

9    A.    Sure.

10   Q.    So you see the lunge and the kick, right?

11   A.    Yes.  Yeah.

12   Q.    Is that a fair description?

13   A.    Yeah.

14   Q.    What happens next?

15   A.    Now, as, as the lunge and um, as it took place, he fell

16   backwards, like towards the, towards the side of the car

17   like the -- it was, it moved from the front of the vehicle

18   to the side.  And as he's moving to the side -- as the fight

19   is actually taking place and moving to the side now I lose,

20   you know, now I have to pick up the fight on a, the

21   rearview, I mean, the side view of the cab.

22   Q.    On the left or the right?

23   A.    On the left side.

24   Q.    Okay.

25   A.    So now I'm looking at them falling back and people

1  coming behind him.  Like, as, as it's taking place I'm

2  looking on the side.  And I'm looking towards the back.  I

3  lose some view of the, of the actual fight because now I'm

4  trying to --

5  Q.   Let me stop you for just a moment.  I don't mean to

6  interrupt.  It's hard.  I understand.

7  A.   No.  No, go ahead.

8  Q.   Okay.  You said a group of people came and ran up,

9  right?

10 A.   Yes.

11 Q.   Who were these people, if you knew?

12 A.   I don't know who they were.

13 Q.   Were they in uniform?

14 A.   Um, some of them -- the -- when I seen the group of

15 people rush, no.

16 Q.   Okay.

17 A.   And then after, when I noticed that when Ty was on the

18 ground, yes.

19 Q.   All right.  So there's a rush of people?

20 A.   Rush of people.

21 Q.   What happens next, if anything?

22 A.   Now Ty is on the ground.  Um, they are, they are

23 punching, they are punching at him.  Um, and I, it looked

24 like a football fumble where people were actually jumping on

25 top of him trying to get the ball.  It was, it was like he

1    was, he's on the bottom and, you know, people are just

2    piling on top of him.  And, you know, I --

3    Q.    Okay.  Stop for a moment.

4    A.    Yeah.

5    Q.    So there's a pile on?

6    A.    Yes.

7    Q.    What, if anything, do you see Mr. Outlaw doing?

8    A.    He's on the bottom.  Nothing.

9    Q.    Is he kicking out?

10   A.    Excuse me?

11   Q.    Is he kicking out in any fashion?

12   A.    No.  He's on the bottom.  I mean, he's not doing

13   nothing.  I didn't -- he's not -- I didn't even know if he

14   was moving or not, you know what I mean, because he's on the

15   bottom and he's not doing anything.  The people that are on

16   top of him are punching at him.

17   Q.    Okay.  Then what happens?

18   A.    Then what happened is I inched up my cab a little bit

19   to try to get out of there.

20   Q.    Why did you want to get out?

21   A.    Because I wanted to go, I wanted to, you know, I wanted

22   to go to his rescue.  I wanted to see, you know, if he was

23   okay or not.  So as I, I inched up the cab I squeezed out of

24   there because I was, you know, the cab was double parked.

25   So I'm squeezing out of the cab.  And I'm walking over

towards -- I'm walking over towards, no, rushing over

towards Ty to see if he's okay or not. And what winded up

happening was the, the officer that rushed out of the Crown

Vic --

Q.  Let me stop you there for a moment.

A.  Yup, go ahead.

Q.  You said the officer who rushed out?

A.  Yeah.

Q.  Did you know he was a police officer when he rushed

out?

A.  No, I didn't. Not at that time. I noticed he was a

police officer after he flipped out his badge underneath his

T. shirt.

Q.  When did he do that?

A.  As soon as I got out of the cab and rushed towards,

towards Ty.

Q.  All right. That's the first time?

A.  That I noticed that he was a police officer.

Q.  Okay. Then what happens?

A.  Then he told me to get back in my car, to get back.

Q.  Okay.

A.  I'm still trying to look at Ty to make sure he was

okay. There was a lot of yelling. There was a lot of

blood. So as, as I'm, as I'm rushing towards him the

officer that rushed out of the Crown Vic told me to get back

1   into the car.

2   Q.    Okay.

3   A.    So I get back into the car.  He walks towards the car.

4   Q.    And then what happens?

5   A.    Then he tells me he could have gave me a ticket for

6   double parking and asked me for my license.  And um, told me

7   at that time, well, I could have gave you a ticket for

8   double parking.

9         Still at the time I'm still thinking about Ty

10  being on the ground.  Um, I'm, I see the ambulance.  I see

11  Ty being taken away in the -- the ambulance coming.  I see

12  Ty being taken away in the ambulance out of my rearview,

13  because, you know, I had to get back in the car.

14        So I'm trying to -- I'm trying to keep a eye on --

15  my mind is just racing.  I'm scared for him.  I don't know

16  what happened, what's going on.  Um, as the, as the officer

17  gave me my license back um, I'm trying to chase the

18  ambulance down.  Um, I lose sight of the ambulance.  So I

19  wind up calling his mother and father.

20  Q.    All right.  Let me stop you there.

21  A.    Sure.

22  Q.    Because I think now that's sort of the end of your

23  observation of this incident.

24  A.    Yes.

25  Q.    But I want to rewind the video back just slightly.

A.    Sure.

Q.    You said you saw Mr. Outlaw being placed in an ambulance and taken away?

A.    Yes.

Q.    Okay.  Did you observe a, any police car nearby?

A.    I don't -- um, yes.  As I, as I got out of the car, as I got out of the cab and rushed towards Ty's defense the, I noticed that the Crown Vic was a police car at the -- afterwards.

Q.    Okay.  That's the car that the non-uniformed officer, the gentleman came out of?

A.    Right.  I seen the lights on the back of the car.

Q.    Were they flashing on?

A.    No.  It's just the lights, they were on the back of the car.

Q.    When you say, back of the car, are they outside the -- are they on the window or are they on the bumper?

A.    No, they are on the window, in the back.

Q.    In the back?

A.    Yeah.

Q.    It's like a recessed kind of thing?

A.    Yes.

Q.    Okay.  And that's the first time you noticed that light?

A.    That's the first time I noticed that.

1  Q.    Did those lights ever go on throughout this encounter?

2  A.    No.

3  Q.    Okay.  Let's go, try to remember, go back if you can,

4  if you can't you can't, if you can, behind that car, the

5  unmarked car --

6  A.    Yeah.

7  Q.    -- we'll call it that --

8  A.    Yeah.

9  Q.    -- did you see any police cruiser?

10  A.    No, I didn't.

11  Q.    Okay.  So, was there any flashing lights at all ever

12  behind the Crown, the car that you saw?

13  A.    No.  No, sir.

14  Q.    Okay.

15  A.    No, I did not see any flashing lights.

16  Q.    Did any police officer, other than the officer who took

17  the badge out after the incident, approach you at all to

18  tell you to move the car?

19  A.    No.

20  Q.    Okay.  Had you been approached by a police officer to

21  move your cab because you are blocking traffic would you

22  have moved it?

23  A.    Would I have moved it?

24  Q.    Yeah.

25  A.    Yes, of course.

1  Q.    Okay.

2         MR. RIGAT:  If I may just have one moment?

3         THE COURT:  Sure.

4         MR. RIGAT:  I have nothing further.  Thank you.

5  But please remain seated.  Mr. Melley now gets an

6  opportunity to examination you.

7         THE WITNESS:  Sure.

8         MR. MELLEY:  If I may, Your Honor?

9         THE COURT:  Please.

10        CROSS EXAMINATION BY MR. MELLEY:

11  Q.    Good afternoon, Mr. Carroll.

12  A.    Good afternoon.

13  Q.    I confess to not recognizing you, but we met six and a

14  half years ago.  Do you remember?

15  A.    No, sir.  Where?

16  Q.    In my office when you gave me a statement, deposition?

17  A.    No, I don't remember you, sir.

18  Q.    That's all right.  In preparing for today who did you

19  talk to?

20  A.    I was given a deposition.  I didn't talk to anybody.

21  Q.    Did you read the deposition?

22  A.    Yes, I did.

23  Q.    And the deposition was in my office.  Does that help

24  you?

25  A.    The deposition was in your office?

1  Q.    Yes.  I asked you the questions.

2  A.    I don't remember, sir.  I don't remember you.

3  Q.    That's all right.  That's all right.  It wasn't long?

4  A.    When was the deposition?

5  Q.    Six and a half years ago.

6  A.    Okay.

7  Q.    And we're talking about something 11 years ago.

8  A.    Okay.

9  Q.    So when you are testifying today are you testifying

10  based upon the deposition or your memory?

11  A.    I'm testifying to both, sir.

12  Q.    Okay.  So I want to cover a couple of things.

13  December, 2004, you're working for yourself for Yellow Cab,

14  is that right?

15  A.    Yes.

16  Q.    And you have a Yellow Cab that you operate?

17  A.    Yes, sir.

18  Q.    And you get a call about a fair at Papa's Pizza?

19  A.    Yes.

20  Q.    And you go on this evening, for a period of time

21  anyway, with your uncle Michael Foster, is that correct?

22  A.    Yes.

23  Q.    And where is he today?

24  A.    I don't know.  I haven't spoke to him some time now.  I

25  haven't spoke to him.

Q.   And he is seated --

          THE COURT:  If you could lean back just a little bit.  It will pick you up okay.

          THE WITNESS:  Okay.  No problem.

Q.   He's seated in the front passenger's seat?

A.   Yes, sir.

Q.   And when you arrive at Papa's is it fair to say you don't know who your fair is or do you?

A.   No, I don't.

Q.   So you pull up and you wait and see who comes out saying that they called you?

A.   That's correct.

Q.   All right.  So when you pull up how long are you there before you see Mr. Outlaw?

A.   I was there um, a, a couple minutes.

Q.   Okay.  So you're waiting for your fair to come out?

A.   Yes.

Q.   And is it fair to say for you time is money so if they come out you can get them in the car and you can go and maybe get another fair?

A.   That's correct.

Q.   So you're waiting for the fair when you first see Mr. Outlaw?

A.   Yes.  I'm, I'm there waiting downtown um, yes.  And I'm waiting for the fair to come out.  Yes.

1  Q.   Okay.  So when you first see Mr. Outlaw where is he in

2  relation to Papa's Pizza?

3  A.   Um, he's coming down the street um, at -- go ahead.

4  Q.   Has he reached Papa's Pizza yet?

5  A.   I don't think so.  I think he's, he's just a little bit

6  before Papa's Pizza.

7  Q.   Okay.

8  A.   And, yeah, just a little bit before.

9  Q.   And are you parked south of Papa's Pizza?

10  A.   What do you mean by south, sir?

11  Q.   Going towards the Capital?

12  A.   Going towards the Capital?

13  Q.   Yeah, backing up.  In other words, is Papa to your

14  front right?

15  A.   Papa's to my front right.  Yeah.  That's correct.

16  Q.   Okay.  So do I understand you to say that Mr. Outlaw

17  came over to the car before your fair got in?

18  A.   That's correct.

19  Q.   Okay.  So when Mr. Outlaw comes over -- well, first of

20  all, do you know who recognized who first?

21  A.   No, I don't.

22  Q.   Okay.

23  A.   No.

24  Q.   Do you have electric windows?

25  A.   Yes, I do.

1  Q.   And do you remember having them down on your

2  passenger's side and your driver's side or what was --

3  A.   I believe the windows was -- I believe I let the window

4  half down.

5  Q.   Okay.  And did Mr. Outlaw come over to the side where

6  your uncle is?

7  A.   That's correct.

8  Q.   Okay.  And while he was there did you exchange

9  pleasantries?

10 A.   Yes.

11 Q.   And how long had it been since you saw him?

12 A.   It's been a while.  Um, it's been a while.  I, I --

13 he's been busy.  I've been busy.  It's been a while.

14 Q.   That's okay.  So you hadn't seen each other in a while?

15 A.   That's correct.

16 Q.   So this is the first time, it's the holiday season,

17 he's over on the passenger side talking into the vehicle and

18 you and your uncle are responding back?

19 A.   That's correct.

20 Q.   And I think I just heard you say that during this time

21 period your fair comes out?

22 A.   That's correct.

23 Q.   And they get into the car while Mr. Outlaw is still

24 standing there?

25 A.   Umhum.  Yes, sir.

1  Q.   All right.  So do you remember if they both got in on

2  the passenger's side or --

3  A.   No, sir.  I don't remember.

4  Q.   All right.  And did you recognize your fair before they

5  got into the car?

6  A.   I don't remember, sir.

7  Q.   All right.  Do you know who they were?

8  A.   Yes, I do.

9  Q.   And did you figure out who they were once they got

10 inside?

11 A.   Yes, sir.

12 Q.   All right.  And then --

13 A.   I -- yeah.  Yeah.

14 Q.   And what happened then?  I mean, it's a small world?

15 A.   Yeah, we're conversating.  You know, I'm still talking

16 to Ty.  My uncle is talking to Ty.  I don't know if Ty was

17 -- I don't remember if Ty was talking to them, but I'm

18 pretty sure if, you know, we know each other, you know, I'm

19 pretty sure he did say something to them, but I'm not sure.

20 Q.   Okay.  That's fine.  But, in any event, you do recall

21 that there's this ongoing discussion between you, Michael

22 Foster and then conceivably Rachel Killian and Richard Rakus

23 while Mr. Outlaw is still on the passenger side of your cab?

24 A.   That's correct.

25 Q.   And when we say, on the passenger's side of your cab,

1   that would be in the traveled portion of Union Place, is

2   that fair?

3   A.   I was pulled over to the left-hand side.  I don't know

4   what you mean by travel portion, sir.

5   Q.   All right.  So let's back up and clarify that.  On the

6   right-hand side along Papa's, Bourbon Street, Federal Cafe,

7   there's parking, is that right, on that right-hand side?

8   A.   Yes.

9   Q.   And then on the left-hand side there's parking as well?

10  A.   Yes.

11  Q.   And you are double parked on the left-hand side?

12  A.   That's correct.

13  Q.   So that would mean that your passenger's side would be

14  towards the traveled portion of Union Street, Union Place,

15  is that right?

16  A.   No.  That's -- I don't, I mean, yes, if you're saying,

17  if you're saying so.  I mean, I was parked, double parked to

18  um, I mean, I was parked towards the left-hand side of the

19  car so --

20  Q.   And he's on the right-hand side?  That's all I'm trying

21  to get.

22  A.   Okay.  That's fine.

23  Q.   And you're close to the car on your left-hand side?

24  A.   That's correct.

25  Q.   As a matter of fact, you're so close that you can't

1 open your door to get out, is that right?

2 A. That's correct.

3 Q. So it's a very tight space between you and this other

4 vehicle?

5 A. Yes.

6 Q. All right. Now, at some point in time do you hear Mr.

7 Outlaw saying anything to another individual that is not in

8 your cab? And I'm including Rachel and Richard Rakus.

9 A. No, I don't.

10 Q. Okay. So we talked about this other vehicle and the

11 individual gets out. But in terms of any interaction

12 between Mr. Outlaw and that individual, you didn't hear

13 anything?

14 A. No, sir.

15 Q. Okay. I think you said you're talking, you are also

16 listening to your radio, but in terms of anything else that

17 might have been going on out there you don't know, is that

18 fair?

19 A. No, sir. Yup. Yes, sir.

20 Q. Okay. So at some stage Mr. Outlaw is still talking on

21 that passenger window and your fair has got in and this

22 vehicle comes along at the same time, is that a correct

23 statement? Is this all happening --

24 A. Yeah, it's all happening together at one time. But

25 you're saying did my fair get in when the vehicle pulled up?

1   Q.   I'm sorry?

2   A.   You're saying that my fair -- was my fair already in

3   the back of the car when the vehicle --

4   Q.   Yeah, Rachel and Richard, are they, are they already

5   situated?

6   A.   Yes, they are in the car.  Yes, they are.

7   Q.   Okay.  And how long after they are in the back of your

8   cab do you recall seeing this vehicle to your right?

9   A.   It was just a couple minutes, sir.

10   Q.   Minutes?

11   A.   You're saying how long has -- we're only talking for a

12   couple of minutes.

13   Q.   Okay.  All right.  So that's what I'm trying to

14   clarify.  So, in other words, your fair is in the back seat?

15   A.   Umhum.

16   Q.   Mr. Outlaw is still at the passenger's side door --

17   A.   Yes.

18   Q.   -- for a couple more minutes after they got in?

19   A.   Yes.

20   Q.   Okay.  So when this vehicle comes by you and comes to a

21   stop where is the back end in relation to your front end?

22   Are they close?

23   A.   Where is the vehicle's back end?

24   Q.   In relation to the front of your -- I --

25   A.   I don't know where the vehicle's back end was.  I know

1  when the car pulled up the driver's door was close to my

2  front bumper.

3  Q.  Okay.  So he, so this vehicle that pulled up did not

4  pull past your vehicle?

5  A.  No.

6  Q.  Entirely?

7  A.  No.

8  Q.  Okay.  So you said later on you saw the lights in the

9  back of this vehicle?

10  A.  Yeah, as I got out of the car to go help Ty.  Yes.

11  Q.  Okay.  So eventually you were able to get out of your

12  vehicle?

13  A.  Yeah, I pulled, I, after the -- after -- as the fight

14  was towards the back of my vehicle, the back and left side

15  of my bumper, I pulled up the cab a little bit to inch out.

16  I got out of the cab.  And I rushed over there towards what

17  was happening.

18  Q.  Okay.  All right.  And at that point did you see the

19  lights on the back?

20  A.  No, I -- no.  No.  I didn't see the lights in the back

21  until um, as I, as I was told to get back into my car.

22  Q.  Okay.  Okay.  All right.  Now, let me ask you --

23  A.  Yes.

24  Q.  -- besides cab drivers and police officers, who else

25  would be driving a Crown Vic?

```
1    A.    Anybody.

2    Q.    Were they available for sale?

3    A.    Yes, sir.

4    Q.    To the public?

5    A.    Yes.

6    Q.    Would it surprise you that this was not a Crown Vic but

7    a Taurus?

8    A.    It would.

9    Q.    So you are not sure if it was a Crown Vic or not?

10   A.    It looked just like my car.

11   Q.    And what did you have?

12   A.    A Crown Vic.

13   Q.    Okay.  The individual that got out of the vehicle, you

14   said you identified right away that it was an object similar

15   to a radio or a cell phone, is that right?

16   A.    That's correct.

17   Q.    And to you that was very clear that it was one of those

18   two, is that right?

19   A.    No, sir.  I didn't know what it was.

20   Q.    Well, you said it was either, it looked like a black

21   radio or --

22   A.    It looked like a black radio.  I said it looked like a

23   black radio or it could have been a cell phone, but I didn't

24   know what it was.

25   Q.    There's an interaction between this individual and Mr.
```

1  Outlaw?

2  A.    Yes, sir.

3  Q.    Is that right?

4  A.    Yes.

5  Q.    And in terms of any words that were spoken between the

6  two of them do I understand from your testimony you don't

7  know what that is?

8  A.    That's correct.

9  Q.    Okay.  And you also indicated you could see the face of

10 this individual, but you could not see the face of Mr.

11 Outlaw when it first began?

12 A.    Yeah, because his back was --

13 Q.    Okay.  And the initial interaction that you saw between

14 this individual and Mr. Outlaw, where did it take place in

15 terms of the center of your hood in the front of the

16 vehicle?  You said the front.  I'm trying to --

17 A.    You said where did it take place?

18 Q.    Right.

19 A.    No, I said Ty moved towards the front.

20 Q.    Okay.  All right.  So let's back up.  When the vehicle

21 comes to a stop is Ty still at the passenger window?

22 A.    No, he moved towards the front.

23 Q.    Okay.  And when the individual gets out of the vehicle

24 is Ty still moving towards the front?

25 A.    Towards the front of my vehicle?

1  Q.    Yeah.

2  A.    He's towards the left-hand side.  He's moving towards

3  the left-hand side of the parked car and my vehicle.

4  Q.    Okay.  Does he ever move towards this individual that

5  you see?

6  A.    No.

7  Q.    Okay.  And you say that there's this interaction.  So

8  I'm trying to find out where was the interaction.

9  A.    Well, the interaction was towards the back of the

10  vehicle.  Towards the back of the vehicle.  The initial kick

11  and swing was towards, towards the front.

12  Q.    Right.  Where towards the front?

13  A.    Towards the front left side of my car.

14  Q.    Okay.  And did you see both at the same time, a kick

15  and a lunge with the hand?

16  A.    What do you mean, both at the same time, sir?

17  Q.    You said you saw a kick and then a swing of some sort?

18  A.    Yes.

19  Q.    Did they occur simultaneously?

20  A.    Yes.  Yes.

21  Q.    Do you know which foot he kicked from?

22  A.    No, sir.  I don't.

23  Q.    Do you know which arm he swung from?

24  A.    No, sir.  I don't.

25  Q.    Do you know if he swung with the arm that had the

1    object or the other arm?

2    A.    The arm that had the object?

3    Q.    Yeah.  You said that there was an object in his hand?

4    A.    Yes.  That's the arm he swung with.

5    Q.    Okay.  Did you see any contact between either the arm

6    and or the foot with Mr. Outlaw?

7    A.    Yes, I did.

8    Q.    Did you see, what, both contacted?

9    A.    Well, I seen the foot contact.  And I seen the radio,

10    or whatever it was, that was in his hand.  I said it was a

11    radio or a cell phone, but I didn't really know what it was.

12    Q.    Whatever it was?

13    A.    Yes.

14    Q.    Did you see that object make contact with Mr. Outlaw?

15    A.    Yes, I did.

16    Q.    Okay.  And that's all in the front left of your cab?

17    A.    Yes.

18    Q.    Okay.  And then it continues down the side of your cab?

19    A.    It continued down the two parked cars.

20    Q.    To your left?

21    A.    To my left, yes.

22    Q.    And this is this tight space where you can't open the

23    door to get out?

24    A.    That's correct.

25    Q.    And these two guys go down that left side of your

1  vehicle?

2  A.    Yes.

3  Q.    And does there come a time when you lose them because

4  your mirror doesn't extend that far?

5  A.    Yes, I lost a little bit of it.

6  Q.    Do you ever recall seeing Officer Allen at the scene?

7  A.    Who is Officer Allen?

8  Q.    The gentleman over there.

9  A.    No, sir.  No, I don't, sir.

10          MR. MELLEY:  If I may have --

11  Q.    The individual that got out of this car, the Crown Vic

12  that came to a stop, do you remember seeing him get knocked

13  down, Detective Gordon?

14  A.    Did I remember seeing him get knocked down?

15  Q.    Yeah.

16  A.    How?

17  Q.    At some point, do you see him go down?

18  A.    Yes.  Towards the back, towards the back of the car.

19  Q.    Okay.  And when you say, go down, he goes down on the

20  ground, right?

21  A.    I see, I seen him, it looked like when I lost sight of

22  them they were falling, Ty was falling.  You know, it seemed

23  like Ty was falling back, falling towards the ground.  And I

24  believe the officer was also falling down from, I believe,

25  the kick and the lunge had made him go, the momentum made

1    him go forward.

2    Q.   Well, do you recall saying Detective Gordon went down

3    in an off balance?

4    A.   That's what I just said, yeah.

5    Q.   Okay.  And do you see him get up?

6    A.   I don't remember, sir.

7    Q.   And you talked to, was it this Detective Gordon

8    afterwards?

9    A.   Yes, sir.

10   Q.   And he got your information?

11   A.   Yes, sir.

12   Q.   And did he say anything to you other than, I could have

13   given you a ticket?  Did he tell you you had to move along

14   or what did he say?

15   A.   I don't remember.  What I do remember is that as I'm

16   rushing back to try to help Ty he came towards me.  He

17   flipped out his badge.  Asked me to get back in the car.  I

18   get back in the car.  Um, he asked me for my license.  I

19   gave him my license.  And he told me he could have gave me a

20   ticket for double parking.

21   Q.   And then did you move along?

22   A.   No, I tried to chase the -- I tried to follow the

23   ambulance.

24   Q.   With your fair in the back?

25   A.   Yeah.

1  Q.   So where did you go?

2  A.   Well, because I was blocked, the ambulance went the

3  other way.  So the ambulance was on the back side of me.  So

4  I had to go north, then take a right, then try to chase the

5  ambulance.  I don't know which way they went.

6  Q.   So you didn't follow the ambulance ultimately?

7  A.   I was trying to.

8  Q.   I know, I understand.  But you didn't catch up to them?

9  A.   No.  No, I didn't.

10        MR. MELLEY:  Okay.  May I have a moment?  Very

11  briefly.

12  Q.   Mr. Carroll, the object that was in the hand that was

13  swung, do you know where it landed?

14  A.   What do you mean, where it landed?  On Ty?

15  Q.   Right.

16  A.   No, I don't.  I know he swung and he got hit, sir, but

17  I don't know where he landed at.

18  Q.   But you can't say head, chest, hand, arm, leg?

19  A.   No, sir.

20        MR. MELLEY:  Thank you.

21        FURTHER EXAMINATION BY MR. RIGAT:

22  Q.   Just very briefly.

23  A.   Yes, sir.

24  Q.   So I'm clear.

25  A.   Yeah.

Q.   Okay.  This incident, the encounter with Sergeant
Gordon and the police, did you see threat, from start to
finish, did you see Ty Outlaw punch or kick or fight with
these officers?

A.   No, sir.  I didn't.

Q.   Okay.  All right.  And, finally, you said that you, the
officer, excuse me, Sergeant Gordon flipped out his badge
when he approached you?

A.   Yes.  Yes.

Q.   And that was -- I mean, flipped out from where?

A.   From underneath, from underneath his shirt.

Q.   Was the shirt covering the object?

A.   Yes, sir.

Q.   All right.

A.   Yes.

Q.   Were you able to see it unless he flipped it out?

A.   Yes.  I mean, I was unable to see it unless he flipped
it out.

Q.   You were unable to see it?

A.   That's correct.

Q.   Okay.  Thank you.  I have no further questions.

        THE COURT:  All right.  Thank you for coming in
and joining us.

        THE WITNESS:  Thank you.

        MR. RIGAT:  Your Honor, at this time we're going

1    to call Mr. John Stengel.

2          J O H N   S T E N G E L,  The Witness, after being

3    duly sworn, was examined and testified as follows:

4          DIRECT EXAMINATION BY MR. RIGAT:

5    Q.   Good afternoon, Mr. Stengel.  I would like to ask you

6    some background questions, if I may?

7    A.   Sure.

8    Q.   You currently married?

9    A.   Yes.

10   Q.   How many children do you have?

11   A.   One.

12   Q.   How are you employed?

13   A.   Ballroom dance instructor, owner and a gym owner.

14   Q.   Okay.  And do you own a series of dance studios?

15   A.   I do.  Six.

16   Q.   With your wife?

17   A.   She's involved in a couple of them, yes.

18   Q.   Okay.  And this is Arthur Murray, right?

19   A.   Yes.

20   Q.   How did you get interested in dance?

21   A.   My grandmother.  She got me involved at a young age.

22   So, and the rest was women that I met.

23   Q.   Okay.  I want to bring you back to December 17, 2004.

24   All right.  That evening did you happen to be walking on

25   Union Place in Hartford across from the railroad station?

```
1    A.    I did.

2    Q.    All right.  Where were you going?

3    A.    I was going to the bar that was located there at the

4    time.  I believe it was Bourbon Street.

5    Q.    Okay.  And as you are walking in a northerly direction,

6    okay?

7    A.    Umhum.

8    Q.    What, if anything, did you happen to see?

9    A.    To the left of me um, I noticed a lot of activity.  At

10   first I didn't know what it was.  And I glanced over to

11   notice that there was a crowd of people converged on what

12   looked to be one person.

13          And then I noticed there was police officers

14   involved along with people in plain clothes.  So I um,

15   noticed the situations that the police were involved,

16   somebody must have handled it, and so I moved onto the bar.

17   Q.    You said you observed this interaction?

18   A.    Yes, I did.

19   Q.    Describe this interaction?

20   A.    The interaction seemed to be multiple people, five or

21   six, again, beating somebody up pretty badly, kicking,

22   throwing punches.  Whatever they had they were -- it was on

23   the ground.  It was towards the ground, but it was behind

24   the car so I couldn't see who the individual was.  I just

25   saw that it was pretty brutal.
```

1  Q.   And did you happen to be able to observe any resistance
2  by this person on the ground?
3  A.   I did not.
4  Q.   Okay.  Let me step back.  When you said you did not,
5  you did not --
6  A.   I did not see any resistance from the individual on the
7  ground.
8  Q.   How long was this going on?
9  A.   Um, it could have been 15 to 20 seconds that I was
10 within eyesight of it.  I was walking so it was a walking
11 view.  And then long enough to make that distance to the bar
12 entrance and then in.
13 Q.   All right.
14 A.   So maybe 30 seconds.
15 Q.   Let's step back.  So you observed this occurring?
16 A.   Umhum.
17 Q.   How far were you from Bourbon Street, the restaurant?
18 A.   Um, I was on that block.  So what's the adjacent street
19 to that?  Um, what is it?
20 Q.   Well, I guess what I'm trying to get at, I don't mean
21 to confuse you.
22 A.   Sure.
23 Q.   So you are walking up Union Place?
24 A.   Yup.
25 Q.   Walking towards Bourbon Street?

1    A.    Correct.

2    Q.    That's where you're going to go hangout?  It's after

3    work?

4    A.    Correct.

5    Q.    As you are walking up you look to your left and see

6    what you've described as uniformed and others pummeling,

7    beating somebody?

8    A.    Yeah.  It must have been just as I crossed that

9    perpendicular street, I guess, what is it, Anne?

10   Q.    So from the moment you started to see that --

11   A.    Umhum.

12   Q.    -- how far did you walk to get to Bourbon Street, to

13   the best of your recollection?

14   A.    Feet, yards.

15   Q.    How many yards?

16   A.    I don't know, 50 to 100 maybe.

17   Q.    Okay.

18   A.    I don't know how far that distance is.

19   Q.    And did you maintain a regular pace or did you try

20   to -- did you maintain a regular walking pace or were you in

21   a rush to get off the street?

22   A.    No, I was not in a rush.  I think I probably slowed

23   down my cadence a bit just because of the observance of the

24   altercation.

25   Q.    Okay.  Did you hear any noise?

A.   Um, typical noises that would probably be involved with people beating somebody up.  You know, it was, it was a lot of commotion.  So, yeah, nothing audible per se, but definitely noises.

Q.   Okay.  And so you get to Bourbon Street?

A.   Umhum.

Q.   What, if anything, happened when you entered Bourbon Street?

A.   First thing I said to my friend um, that was there, and probably the group of friends around him, is you should see what's going on outside, the police are really wailing into somebody.

Q.   Okay.  Now, finally, --

A.   Umhum.

Q.   -- on, up to, you know, December 17, 2004, did you know Tylon Outlaw?

A.   Never met him.

Q.   So you are not a friend or --

A.   Never seen him.  Never talked to him.

Q.   All right.  Do you socialize with Mr. Outlaw now?

A.   Never.

Q.   All right.  I have no further questions, Judge.  Thank you.

        CROSS EXAMINATION BY MR. MELLEY:

Q.   Good afternoon, Mr. Stengel.

1   A.    Good afternoon.

2   Q.    You don't know, of your own personal knowledge, whether

3   Mr. Outlaw was the person involved in that, is that correct?

4   A.    Correct.

5   Q.    Do you recognize Officer Allen?

6   A.    No.

7   Q.    Do you have any knowledge as to whether or not Officer

8   Allen was in the general vicinity when you arrived on

9   December 17, 2004?

10  A.    Somebody in uniform was, but I don't know if it was

11  Officer Allen.

12  Q.    How about the gentleman to his left, Detective Gordon,

13  do you recognize him at all?

14  A.    No.  There was a lot of people facing the ground.

15  Q.    Thank you.  So you've worked all day?

16  A.    Yes.

17  Q.    And you are going to go out for a couple of drinks with

18  some friend of yours, is that right?

19  A.    Correct.

20  Q.    And this is on Union Place where you've been before?

21  A.    Correct.

22  Q.    And it's a very busy area?

23  A.    This night it didn't seem too busy, but, yes, typically

24  it can be depending on the night.

25  Q.    Okay.  And does it get busier as the night goes on?

1    A.    Um, it depends I guess on the circumstances and the

2    evening.  But to my recollection the streets were pretty

3    clear or the sidewalks were at least.

4    Q.    Do you remember, in the general vicinity where you had

5    these observations, if there were cars in the travel portion

6    of the roadway?

7    A.    Um, there were cars parked.  I don't recall cars

8    passing at that time.  I believe the street was -- there's a

9    lot going on so no cars were passing at that time.

10    Q.    Well, was there an open lane?

11    A.    Um, if there was it was clear.  There was nothing

12    obstructing -- there were cars parked or cars -- there was

13    one car I remember kind of being askewed or kitty corner to

14    a parked car nearby where the skirmish was happening.  So I

15    do remember that.

16    Q.    But beyond that?

17    A.    I didn't take in a whole lot, just kind of what was

18    happening in front of me.

19    Q.    And do you recall where you were?

20    A.    I was on the sidewalk walking towards Bourbon Street.

21    Q.    No, I understand that.  But were you near On The Rocks,

22    which is closest to Allyn Street, or were you farther down

23    or were you close to Bourbon Street?

24    A.    I was in the process of walking.  So I was through all

25    of those places that you mentioned.

1    Q.    Do you know if you were past Papa's?

2    A.    Um, again, within that vicinity, but I wasn't paying

3    attention to the right of me.  I was more worried about what

4    was going on on the left.

5            MR. MELLEY:  May I have a moment?  Nothing

6    further, Your Honor.

7            THE COURT:  All right.

8            MR. RIGAT:  Just very briefly.

9            FURTHER EXAMINATION BY MR. RIGAT:

10   Q.    Do you remember about what time this was when you saw

11   this incident?

12   A.    I get out of work at 10 typically.  At least I was back

13   then.  So it would have been shortly after 10 during that

14   timeframe.

15   Q.    But were you looking at your clock?

16   A.    No, not at that time.  No.  I was engaged in where I

17   was going to be going and watching what that was.  I don't

18   remember looking at my watch at all.

19           MR. RIGAT:  Thank you.

20           FURTHER EXAMINATION BY MR. MELLEY:

21   Q.    Where were you coming from at 10?

22   A.    Work.

23   Q.    Where was work?

24   A.    Glastonbury, Connecticut.

25   Q.    How long would it take you to get --

A.   We got out a little early that night.  So typically
during the holiday seasons we don't work up until 10.  So I
don't know, 10 minutes, 15 at the most.
Q.   So that would put you at Union Place around 10 p.m.?
A.   A little earlier.  But, yeah.
Q.   A little earlier than 10 p.m.?
A.   Yeah, because during the holiday season we close about
9:30.
Q.   Okay.
A.   Umhum.
Q.   Thank you.
A.   You are welcome.
          THE COURT:  Anything further?
          MR. RIGAT:  Nothing further.
          THE COURT:  I appreciate you coming in.
          THE WITNESS:  Okay.  Thanks.
          MR. MELLEY:  Your Honor, may we have a quick side
bar?
          THE COURT:  Yeah, sure.
          (Bench Conference held:)
          MR. MELLEY:  I don't know how you want to do it,
but I move to strike Mr. Stengel's testimony.  We don't have
an excited utterance where the event happens just before
midnight and he's saying he's there at 10 p.m..  It doesn't
relate at all to our incident.

1     THE COURT:  You think it was a different fight?

2     MR. MELLEY:  It very well could have.

3     THE COURT:  Was there a different fight at what

4 time?

5     MR. MELLEY:  Our officers responded to another

6 fight at 11:53.  This is at 11:54.  There's fights all

7 night.  I can, I mean, I don't --

8     THE COURT:  Fights involving the officers, the

9 officers are the principal people?

10     MS. FEOLA-GUERRIERI:  Not the other fight.

11     THE COURT:  Was there another fight?

12     MS. FEOLA-GUERRIERI:  There were guys fighting in

13 the street.

14     THE COURT:  You guys would know because they are

15 your clients.

16     MR. MELLEY:  They are -- my guys don't even work

17 down there.

18     MS. FEOLA-GUERRIERI:  There was an incident

19 earlier with guys fighting in the street.

20     THE COURT:  Civilians fighting each other?

21     MS. FEOLA-GUERRIERI:  Correct.  And we were sent

22 to break it up.

23     THE COURT:  Okay.  But do you know that was what

24 Mr. Stengel observed?  Because he saw uniformed officers

25 fighting with the civilian on the ground.

1    MS. FEOLA-GUERRIERI:  And other people, yeah.

2    MR. MELLEY:  I don't have any idea.  It's just a

3  different timeframe.

4    THE COURT:  What's your response?

5    MR. RIGAT:  It goes to the weight.  And so, of

6  course, he's saying as soon as he arrives on Bourbon Street,

7  which is confirmed by Nick Sackandy, you know, wow, you

8  should see what the Hartford cops are doing.  They are

9  beating the be-jesus out of somebody which happened shortly

10  after Mr. Outlaw left.  And so I understand that when he's

11  saying I arrived at around 10'ish and, of course, that goes

12  to the weight.  I think his time is off.

13    THE COURT:  All right.  Here's what we'll do, I'm

14  going to deny the request to strike the testimony.  There

15  are two issues that you've raised.  The first one is

16  revisiting the issue of excited utterance.  The first

17  witness plainly described the excited utterance with cursing

18  and excited expression.  That works for me.

19    MR. MELLEY:  Correct.

20    THE COURT:  This man obviously was never asked by

21  either of you whether he was excited.  And his demeanor

22  today 11 years later is very calm, as you would expect from

23  a dancing instructor whose probably seen it all.  But I

24  think that the foundation was laid by the first witness who

25  described a man coming in, having seen a violent incident

and describing it in profane and excited terms.

I don't want to overstate it, as I said before, it wasn't the most excited utterance anyone has heard, but I thought it met the threshold. The second question is somebody is wrong about the time. After 11 years it's not surprising. It might be this guy, it may be Mr. Sackandy, but somebody is an hour off on their time. And that is not unusual. And also particularly after the passage of over a decade. But that is not a basis for striking testimony. That's argument. Someone is messed up, whatever it is. But we don't have a rule that every witness has to say it happened at 11:30 or the same.

I wanted to make certain there wasn't a possibility that we got a second police civilian incident mixed up here and anybody knows there was another incident in which uniformed and plain clothes officers struck a civilian that night on that street. So I don't think there's a reason to think that there's a second incident for which these guys are being, which are being attributed to them.

I think at most we have a fairly typical, whether it was 10 o'clock or 11 o'clock or 11:30 or 11:54, you know, that's as much as we can do.

MR. MELLEY: I understand. All right.

THE COURT: We'll carry on.

1    MR. RIGAT:  If I may make a request at this point,

2    Judge, we don't have any more live witnesses.  We'd like to

3    play the doctor so we're not wasting time.  But if we can we

4    wanted to make a proffer to get the blood photographs in.

5    We have Mr. Calhoun, who was there who took the pictures.

6    So I don't know if you want to do that outside the presence

7    of the jury so maybe take a break and we can lay a

8    foundation.  And then Jay if you don't have I --

9    THE COURT:  I'm sorry to interrupt you.  I thought

10   he was just a witness describing how the evidence came into

11   being just like anybody else.

12   MR. RIGAT:  Who?

13   THE COURT:  Mr. Calhoun.  In other words, it's not

14   something that would be outside the presence of the jury.

15   It would be like anybody else.

16   MR. RIGAT:  I didn't know in order for you to -- I

17   didn't want the pictures to be near the jury.

18   THE COURT:  You can show them the pictures, but

19   that was the piece that was iffy, was when they were taken,

20   who took them.

21   MR. RIGAT:  Okay.

22   THE COURT:  Am I getting it wrong?  Is there

23   something I'm missing?  Something I'm asking?

24   MR. MELLEY:  In my disclosure request.

25   THE COURT:  Right.

1      MR. MELLEY:  This case was filed in 2007.

2      THE COURT:  Right.

3      MR. MELLEY:  I have many photos but don't know who

4  took them when I got photos.  I've asked in the deposition

5  of Mr. Gordon who took them when.  He didn't know.  Nothing

6  has ever been produced.  I would object to a witness coming

7  on now to supply information that was asked nine years ago.

8      THE COURT:  Well, that's a little bit of a

9  different theme.  The problem yesterday was that you're

10 legitimately uncertain about when the, when the photos were

11 taken, whether they were showing the right person's blood

12 and whether it was blood at all, those sorts of problems.  A

13 disclosure problem is larger to cope with on the fly.  Can

14 you tell by the pictures?

15     MR. RIGAT:  Yeah, they are --

16     MR. DiCROSTA:  They've been disclosed.

17     THE COURT:  These photos?

18     MR. RIGAT:  We disclosed these in 2008 in part of

19 our answers to interrogatories.

20     THE COURT:  Maybe you can lay your hands on some

21 sort of a cover letter or --

22     MR. DiCROSTA:  They admit they were disclosed.

23     MR. MELLEY:  The photos --

24     MR. RIGAT:  We didn't say who the photographer

25 was.

1          THE COURT:  You had the photos all the long?

2          MR. MELLEY:  Yes.

3          THE COURT:  You can always ask who the

4 photographer was.

5          MR. MELLEY:  I asked who took the photographs was.

6          MR. RIGAT:  No, that was never asked.

7          THE COURT:  So we'll give the jury, I'm satisfied

8 that we'll hear that.  We've got time we'll hear from --

9          MR. RIGAT:  Mr. Calhoun.

10         THE COURT:  Mr. Calhoun.  I misunderstood the

11 photos were turned over.  I, it's hard for me six, eight, 10

12 years later to go back through your files and figure out who

13 told whom what and what was asked when, but I'm satisfied at

14 least you were on notice that you had the photos and they

15 raised questions in your mind.  There was years to chase

16 these, you know, the plaintiffs down and --

17         MR. MELLEY:  That's why I filed the motion.

18         THE COURT:  And filed the motion.

19         MR. MELLEY:  I filed a motion in limine because it

20 wasn't disclosed.

21         THE COURT:  You had them two weeks ago, but a

22 motion to compel would have been the course if there was

23 information that you didn't have.  So let's get Mr. Calhoun

24 on and we'll give everybody a break.

25         MR. RIGAT:  Yes.  Thank you, Your Honor.

1       (The Bench Conference concluded)

2       MR. DiCROSTA:  Your Honor, we call Mr. Calhoun,

3   Lewis Calhoun to the stand.

4       L E W I S   C A L H O U N,   The Witness, after

5   being duly sworn, was examined and testified as follows:

6       DIRECT EXAMINATION BY MR. DiCROSTA:

7   Q.   Mr. Calhoun, good afternoon.

8   A.   Afternoon.

9   Q.   Can you tell me what your relationship is to defendant

10  Ty Outlaw?

11  A.   He's my brother-in-law.

12  Q.   And can you tell the jury, ladies and gentlemen of the

13  jury a little bit about our relationship?

14  A.   We grew up together since 10th grade.

15  Q.   Okay.  And I draw your attention to December 17, 2004?

16  A.   Yup.

17  Q.   Do you recall an event which took us to Hartford?

18  A.   I'm sorry?

19  Q.   An event which took us to Hartford?

20  A.   Yup.

21  Q.   Do you recall calling me, I believe, on December 3rd or

22  December 16th?

23  A.   No, it was that -- it would be the 18th at that point

24  because it was at night.  It was after midnight.

25  Q.   And did you and I travel, in separate cars, of course?

```
1    A.    Correct.

2    Q.    Did we travel to Hartford?

3    A.    Yes.

4    Q.    Did there come a point in time where you and I together

5    took a ride to Union Place?

6    A.    Yes.

7    Q.    In Hartford?

8    A.    Yup.

9    Q.    Okay.

10              MR. DiCROSTA:  Your Honor, may I approach?

11   Q.    And you recall you and I taking some photographs that

12   day?

13   A.    Yes.

14   Q.    Do you recall approximately what time on the 18th it

15   might have been?

16   A.    It was sometime between, I'm going to say, 9 and 12

17   that morning, I believe.  It was, it was after 7 in the

18   morning.

19              MR. DiCROSTA:  May I approach the witness, Your

20   Honor?

21   Q.    I show you what's been marked as Plaintiff's Exhibit

22   for identification 16 through 19.  Take a look at those

23   photographs please, Mr. Calhoun?

24   A.    Yup.

25   Q.    With regard to what's been marked Plaintiff's Exhibit
```

1  16, is that a fair and accurate representation of, I'm

2  sorry, did you and I locate -- let me back up just a little

3  bit.

4          Did you and I locate a certain spot on Union

5  Avenue, Union Place where we took some photographs of a

6  substance on the ground?

7  A.   Yes.

8          MR. MELLEY:  Objection as to, a certain spot.

9  Q.   Is that the spot that you and I --

10         THE COURT:  Well, give him a chance.  That's the

11 first question and the answer is yes.  And I'll allow the

12 question.

13 Q.   Did you and I -- you can answer the question -- did you

14 understand the question?

15 A.   Yes.

16 Q.   You want me to repeat it?

17 A.   No.  Yes.  Yes, we did.

18 Q.   All right.  And is that a fair and accurate

19 representation of the spot where we located what appeared to

20 be some type of liquid on the ground?

21 A.   Yes.

22 Q.   And showing you Plaintiff's Exhibit 17, is that the

23 same spot just from a different angle?

24 A.   Yes.

25 Q.   And is that a more close-up view?

A.    Yes.

Q.    Showing you Plaintiff's Exhibit 19.  Do you recall who put the tape measurer -- there's a tape measurer in the photograph?

A.    I believe I did.

Q.    Was that tape measurer on the ground when we -- is that a fair and accurate representation of the photograph taken with the tape measurer in the photo?

A.    Yes.

Q.    I show you what's been marked as Plaintiff's Exhibit 20.  Is that a fair and accurate representation of that same liquid with the item placed next to it?

A.    Yes.

        MR. DiCROSTA:  Would Mr. Melley like to voir dire?  I'd offer them as a full exhibit, Your Honor.

        THE COURT:  Any voir dire?

        MR. MELLEY:  Yes, Your Honor.  Please.

        VOIR DIRE BY MR. MELLEY:

Q.    Good afternoon, Mr. Calhoun.  Do you know whose camera was used?

A.    I'm sorry?

Q.    Whose camera?

A.    It was um, I think it was one of the disposal cameras we bought.

Q.    You bought a disposable?

1    A.    Yes.

2    Q.    All right.  So where are the other shots?

3    A.    I don't know.  I didn't have them -- I didn't have them

4    developed.

5    Q.    But you had a camera, right?

6    A.    I didn't have a camera.

7    Q.    Who had the camera?

8    A.    Mr. DiCrosta had the camera.  He had gotten it from my

9    sister.

10   Q.    Okay.  So your recollection is you met him sometime

11   between 9 a.m. and noon?

12   A.    No.  I was at the hospital by 2, 3 in the morning.

13   Q.    Okay.  When did you meet Mr. DiCrosta?

14   A.    Around 3 in the morning at the hospital.

15   Q.    So he came to the hospital at, a couple hours after the

16   incident?

17   A.    Yes.  I called and asked him to come with us.

18   Q.    Okay.  And before you went to Union Place did you have

19   an opportunity to speak to Mr. Outlaw?

20   A.    No.  They wouldn't let anyone speak to him except his

21   attorney.  And we had to fight for that.

22   Q.    So did Mr. DiCrosta speak with Mr. Outlaw, to your

23   knowledge?

24   A.    As far as I know he did.  I wasn't with him every

25   second.

1   Q.   Okay.  When would that have been?  If you were there

2   from 2 or 3 a.m. on?

3   A.   We were there from -- we were there for a total of

4   almost eight hours.  Because they wouldn't let me past a

5   certain area anyway.  He was only allowed to because he was

6   the attorney.  So that might have been when he spoke to him.

7   Q.   Okay.  And as you are sitting here now you don't know

8   what time that was?

9   A.   What time what was?

10   Q.   When Mr. DiCrosta met with Mr. Outlaw.

11   A.   I don't know the exact time.  We were there a long

12   time, like I said.  They tried to tell us first of all that

13   he wasn't even in the hospital.

14   Q.   Okay.  Well, I'm just trying to narrow down times.

15   A.   I know.  I'm trying to help you narrow them down.

16   Q.   Thank you.  So you think you were in the hospital for

17   about eight hours?

18   A.   We arrived at the hospital between, I'm going to say

19   right around 2 to 3 o'clock.  We left probably, like I said,

20   it was between 9 and 12 I think we went out to take

21   pictures.  I don't know the exact time.

22   Q.   Okay.  And who did the actual taking of the pictures?

23   A.   Tony took the pictures.  I was helping.

24   Q.   Okay.  So is it fair to say that you had no knowledge

25   of the event?  You weren't present on Union Place --

1   A.   No.

2   Q.   -- whenever this occurred, right?

3   A.   Nope.

4   Q.   And do you know if anybody at the hospital had put down

5   on paper for you or Mr. DiCrosta the location of where this

6   happened?

7   A.   I don't know that.

8   Q.   Did you meet Mr. DiCrosta at the scene?

9   A.   No.  We drove over there from the hospital in a car.

10  Q.   Separately or together?

11  A.   Together.

12  Q.   Okay.  And who established where to go?

13  A.   He did.

14  Q.   Okay.

15  A.   How would I know where to go?

16  Q.   I'm trying to figure it out.

17  A.   Well, you're asking me the same question.

18  Q.   No, that's fine.  So Mr. DiCrosta chose the location to

19  take the photos is that, is that a fair statement?

20  A.   Yeah.

21  Q.   Okay.  And I just want to be clear that you were

22  accompanying him and you were just along for the ride

23  assisting where Mr. DiCrosta said, let's take a shot of

24  this, let's take a shot of that?

25  A.   What do you mean by that?

1  Q.   Well, you were there accompanying him, assisting him?

2  A.   No, I was going there out of concern.  I wasn't

3  accompanying him for the fun of it.

4  Q.   I'm not suggesting that.  But you assisted him in his

5  taking of the photos, is that right?

6  A.   I don't like -- I don't understand what you mean by the

7  question.

8  Q.   Well, you said you had the tape measurer?

9  A.   Yup.

10  Q.   And you used the tape measurer?

11  A.   Right.

12  Q.   So you were assisting?

13  A.   Well, I don't know what you mean by, assisting.  That's

14  my problem.

15  Q.   Okay.  But, if I may look at these other photos?  If I

16  may approach the witness?

17        THE COURT:  Sure.

18  Q.   I have in my hand Exhibit 1 and 3.  Can you take a look

19  at these, sir, please?

20  A.   Yup.

21  Q.   Were you present when those photos were taken?

22  A.   I'm not sure who took these pictures.

23  Q.   Were you there?

24  A.   I don't know.  I don't know who took these pictures.

25  Those pictures I knew.

1    Q.   Okay.  Okay.  All right.

2              MR. MELLEY:  I have nothing further for the

3    witness.

4              THE COURT:  All right.

5              MR. DiCROSTA:  I'd offer them.

6              THE COURT:  All right.  We're going to give the

7    jury a break and we'll talk about it for a few minutes and

8    I'll give the lawyers a break too.  So we'll get going in 20

9    minutes.  I'll stay behind.

10             (The jury was excused at 2:45 p.m.)

11             THE COURT:  Can I have 16 through 19?  Is it 20 in

12   the group as well?  Yeah, that's what I had in my notes.

13   All right.  Mr. DiCrosta, how are these going to make it

14   into evidence?

15             MR. DiCROSTA:  Pardon me?

16             THE COURT:  How are these going to make it into

17   evidence from your perspective?

18             MR. DiCROSTA:  They are a fair and accurate

19   representation of -- Mr. Calhoun testified they are fair and

20   accurate representations.

21             THE COURT:  He just says he went to a certain spot

22   and helped you take some photos.  But he doesn't know where

23   the altercation took place.

24             MR. DiCROSTA:  We're not offering it for that.

25   We're offering -- we're not trying to say the altercation

happened within a certain relation.  We're offering at that

point in time there was a pool of blood.  Mr. Tylon

indicated he had been dragged.  And we found blood at that

site.  Any arguments Mr. Melley is making goes as to the

weight, not to the admissibility.

If he wants to say, well, how do we know it's not

somebody else's blood, why aren't there tire tracks.  And

incidentally there is some foot traffic that went through

there, there's some smudges on the curbing.  But, again,

that all goes to the weight, not as to the admissibility.

THE COURT:  And help me remember what Mr. Outlaw

said, his recollection was that these photos show this place

where he ended up after being dragged where he sat waiting

for the ambulance?  Was that what it was?

MR. DiCROSTA:  That's where he was dragged to and

waited.

THE COURT:  Where he was dragged to and waited.

MR. DiCROSTA:  And waited for the ambulance.

THE COURT:  All right.  We're kind of making heavy

weather of this because there's no doubt that he was

bleeding when we have the photos of his injured head.  But

it doesn't go to admissibility.

MR. DiCROSTA:  Right.  But it supports Mr.

Outlaw's testimony that he was dragged to a certain

distance.

THE COURT: So the state of the evidence, as you

recall it, is that Mr. Outlaw testified that these photos

showed this place where he was dragged to, waited for the

ambulance while blood dripped onto the ground?

MR. DiCROSTA: He indicated he was thrown down or

put down and he turned around and he sat. And he recalls

blood dripping from his forehead.

THE COURT: So, Mr. Melley, why don't they come

into evidence?

MR. MELLEY: The only way that they could come in

is if the plaintiff himself could identify, yes, that's

where it was, that's where I told Attorney DiCrosta to go.

I think the only way to do it is have Attorney

DiCrosta testify. And it would open up that bag of worms,

which I think disqualifies him from the case if he's going

to testify in the case. There's not a chain that brings

those photographs back to this incident.

THE COURT: So what is your recollection of what

Mr. Outlaw said when he looked at the photos? Did he say

that was where he sat and waited for the ambulance? Because

I think that's how I remember it. I know it was in the

middle of a long day.

MR. MELLEY: Very long day. I do not recall

specifically. I do recall him saying he couldn't say when

those photos were taken. Whether it was one or two or three

1    days later.  That he was not involved.

2         THE COURT:  He was definitely not involved in

3    that.  Absolutely.

4         MR. MELLEY:  So we're having this exhibit being

5    offered to go in through the back door.  It's a creation by

6    counsel of a scene.  And we don't have that chain.  I don't

7    see it.

8         THE COURT:  Well, you don't really need a chain.

9    We just need a, somebody who can identify the location as

10   the place where he sat.  And someone else who can say that's

11   what it looked like the next morning, right?

12        MR. DiCROSTA:  If fact, Your Honor, Mr. Outlaw

13   testified that he knows the photos were taken the next day.

14        THE COURT:  The what?

15        MR. DiCROSTA:  The photographs were taken the next

16   day.

17        THE COURT:  Well, how could he know it?  He was in

18   the hospital.

19        MR. DiCROSTA:  As Mr. Melley pointed out, you

20   couldn't have taken them because you were in the hospital.

21        THE COURT:  Right.

22        MR. DiCROSTA:  So it was quite a bit of discussion

23   by Mr. Outlaw as to where he was thrown down between some

24   parked cars, how he was thrown down and flipped around.

25        MR. RIGAT:  Your Honor, if I may also just add --

1         MR. MELLEY:  I'm going to object to two on one.  I

2  think one counsel speaks when there's an issue, not both.

3         THE COURT:  I normally enforce that.  I'll hear

4  from Mr. Rigat and then I won't let him do it again.  Okay?

5         MR. RIGAT:  And I promise I won't do it again.

6         THE COURT:  Two on one is about even in this case,

7  right?

8         MR. DiCROSTA:  Uneven to the defendants to the

9  plaintiffs.

10         MR. RIGAT:  You know, we agree to allow the

11  ambulance records in as part of the evidence package.  Mr.

12  Melley asked for that.  And that's fair game.

13         The ambulance report, it just notes that there's a

14  small amount of blood involving Mr. Outlaw.  Mr. Outlaw

15  testified that after being thrown or thrust forcibly onto

16  the sidewalk or onto the curb he ends up in a sitting

17  position leaning forward.  I believe, my recollection may be

18  faulty, but he indicated he's somewhere across from Papa's

19  Pizza, which is exactly where this incident began.

20         And he's bleeding.  He sees the blood dropping

21  into the street.  So the only purpose of Mr. Calhoun is to

22  demonstrate that, look, I am present the next day.  I'm in

23  the area of Papa's Pizza.  It doesn't matter whether or not

24  he knows that this is where this event occurred.  I looked

25  down on the street, I'm here assisting Attorney DiCrosta.

1  He takes the photograph.  I recognize what's in that

2  photograph.  That's what I saw just a few hours, 6, 7 hours

3  after this incident.

4          THE COURT:  Right.

5          MR. RIGAT:  Now, is it possible that somebody went

6  on the same area, slit their wrist and dripped blood on the

7  street?  That's possible.  That goes to weight.  But is it

8  likely?

9          And I believe that those photographs create a

10  permissible inference on the part of a juror that supports

11  that Tylon Outlaw, after a savage beating, is bleeding on

12  the street after this incident.

13          And that while the ambulance records may reflect

14  that there's a small amount of blood, that's not the case.

15  Those photographs and their import is that there's a

16  considerable amount of blood.  That's a considerable amount

17  of blood.  And I don't want to exaggerate that, but that's

18  not a small amount of blood.  And that's the weight of those

19  photographs and why they should be seen by this jury for

20  whatever they take from those photographs.

21          Maybe Mr. Melley is able to convince six citizens

22  that this is paint.  I don't believe that that's what they

23  are going to draw from that photograph.  But that's a weight

24  issue, not a is it allowed in.

25          And they are not overly prejudicial.  There is

probative value here.  And I believe they should be allowed

in.  And, again, Mr. Calhoun did more than enough to

authenticate that that's a fair and accurate representation

of what he saw shortly after this incident.  That's all.

Thank you.

MR. MELLEY:  May I have just one moment, Your

Honor?  I would like to direct the Court's attention to

Exhibit 7.  May I approach?

THE COURT:  Sure, yeah.

MR. MELLEY:  According to Mr. Outlaw that

photograph was taken within an hour of the incident when

he's at the hospital.  I have the hospital record that says

it was probably done six hours later.

What we have is a live person with blood that is

dried and presumably close to the source which means that if

there's more coming it's going to stay red.

What's being offered is something red in the

street.  Some nine to 12 hours later.  And we don't have an

identification that it's blood.  We have an assumption that

it's blood.  And we don't have a clear chain.

It's extremely prejudicial.  There's a photograph.

An hour later, based upon Mr. Outlaw, six hours later.  It's

dried.  How big a puddle are we talking about?  It, there's

no logical explanation.  And that chain has not been

established.

THE COURT:  All right.  I'm going to admit the exhibits.  I'll explain why.  It seems to me there's two variables that matter.  One is time, one is location.

Mr. Calhoun's testimony establishes, for purposes of the plaintiff's case, maybe true, maybe not true, I mean no disrespect to Mr. Calhoun, but that's the jury's decision.  It establishes that these were taken within a short period of time.  They weren't something that was cooked up a year and a half later like that.

The other is place.  Mr. Calhoun really can't help us with the issue of whether it's the location where the plaintiff dripped blood onto the street.  But I think Mr. Outlaw, if his testimony on this issue is believed by the jury, was able to establish that these photos showed the location across from Papa's, which is visible in one of the pictures.  And as we now know close to the Bourbon Street Restaurant, on the, I'm not even going to say east or west side of the road, but the, the side where the Bourbon Street Restaurant is.  So I think we have time.  I think we have location through two different witnesses.

And the, whether the theories which concerns Mr. Melley just expressed are legitimate, I think either part of his case or part of his argument, but I don't think they go to the exclusion of the photos.

So I'll admit 16, 17, 18, 19 and 20.  And give

1  everybody 10 minutes off, okay.

2          MR. RIGAT:  Your Honor, I'm sorry, before we

3  break, we just need to set up the video equipment.

4          THE COURT:  Let me know.  We're hard, but let me

5  know when you're ready.

6          MR. MELLEY:  Can I just clarify what video

7  equipment for what purpose?

8          MR. RIGAT:  I'm sorry.

9          THE COURT:  It's the doctor's depo.

10         MR. MELLEY:  What doctor?  I indicated I had an

11 objection.

12         THE COURT:  Oh, okay.  Here we are.  So what's the

13 trouble?

14         MR. MELLEY:  The doctor is a witness of an expert.

15 And I was going to bring up, when we have our charging

16 conference, we probably need a little charge on expert

17 testimony.

18         THE COURT:  Yup.

19         MR. MELLEY:  The Court has already in the charge

20 the plaintiff's burden of proof and a preponderance of

21 evidence and what it means.

22         THE COURT:  Right.

23         MR. MELLEY:  And if it has to tilt in favor of the

24 plaintiff.

25         THE COURT:  Right.

1       MR. MELLEY:  And if it's equipoise it does not

2   tilt.  And, therefore, on that particular issue the jury

3   finds against the plaintiff or the person with the burden of

4   proof on that particular issue.

5       So with regard to Dr. Lena, we have his testimony

6   on direct exam where he opines a lot of things, but he says

7   Mr. Outlaw has a broken patella as a result of being struck

8   by a police baton.  And then he goes through what he did.

9   And then the different procedures, etcetera, etcetera, which

10  certainly ties in with the plaintiff's complaint.

11      The plaintiff's complaint is specific in terms of

12  alleging that in paragraph five Officer Allen struck Outlaw

13  in the right knee with a blunt weapon with such force that

14  Officer Allen fractured the right knee.

15      So there's a direct allegation.  And then there's

16  this direct testimony.  However, Dr. Lena testified that

17  actually, from a medical point of view, he cannot

18  differentiate if this fracture was, in fact, caused by a

19  blow or caused by a fall.  From a medical viewpoint it's

20  possible either way.

21      And this was less than 24 hours.  I haven't read

22  the transcript.  I do recall the doctor having an outbreak

23  towards me saying I've said it three times now.  It could

24  either be a blow or it could be a fall.  If it's one of the

25  two, and the allegation from a medical viewpoint is that

1    it's a, it's a toss up that issue fails.

2            And it's important because we don't have a

3    hypothetical question.  Assume doctor, assume, assume,

4    assume then the doctor can offer an opinion.  That's not in

5    this record.

6            What we have is a record that is bare of saying,

7    assume this and exclude that.  This is what you get.

8            So what we have is a lot of medical testimony

9    regarding what happened, which the issue of an injury to the

10   knee, as I indicated in my opening, is not an issue in the

11   case.  He got hurt.

12           THE COURT:  Right.  In this incident.

13           MR. MELLEY:  Absolutely.

14           THE COURT:  Right.

15           MR. MELLEY:  But the allegation, which is of prime

16   importance, and this is not a matter of argument for a jury,

17   it's of whether or not it qualifies for admission where the

18   expert, and this requires expert testimony because it's

19   outside of the kin of everyday ordinary knowledge to say

20   yes, it's due to this and exclude the other.  And I would

21   submit where the doctor cannot it should not come in.

22           And I say this using the hindsight of 19 hours

23   without having read the transcript which was ordered

24   expedited.

25           THE COURT:  Sure.

MR. RIGAT:  Thank you, Your Honor.  Well, I believe it's a canard.  I don't know what other word to describe it.

Let's see, the testimony so far is that Officer Allen clocked Mr. Outlaw, and I think I'm being generous in that description, on the back of the head with a billy club. Sent him down to the ground.

Now, if I understand Mr. Melley's theory, in fact, what he has consistently argued is that Mr. Outlaw broke his knee when he fell down to the ground.  Well, that's the direct result of a billy club hitting you in the back of the head.

THE COURT:  It's at least a contributing cause.

MR. RIGAT:  Absolutely.  Mr. Outlaw's testimony is that I got hit right on the patella with a billy club.  And I felt it.  And that's when my leg broke, it died.  It had no movement.  It went dead, I think that's what his description was.  My leg went dead.

What Dr. Lena testified last night is that what he described, his injuries are consistent with blunt force trauma.  And that would be consistent with getting wacked in the knee with a billy club and, yes, depending upon how his feet would have been when he was taken down to the ground, where he was forcibly thrown to the ground or whether he gets clocked in the back of the head and that's why he fell,

1    that resulted in the fractured patella.

2         So I think the argument is heartfelt and sincere,

3    but at the same time, intellectually disingenuous.  And so

4    the deposition testimony comes in.

5         Now, so it's clear, I did order a written

6    transcript as we were leaving.  I asked the court reporter

7    could we have them by tomorrow.  She did indicate yes, but

8    that it's cheaper if we can get it to you within two days.

9    I asked Mr. Melley, you know, is that okay?

10        You know, now, maybe he misunderstands or didn't

11   hear me.  And I understand it was a little bit contentious

12   towards the end, there was no objection to that.  But we did

13   order a written transcript.

14        I would invite the Court, if you have any

15   reservation about this deposition, to watch it yourself, but

16   I do believe it gets to come in.  And that's it.

17        MR. MELLEY:  There was nothing contentious between

18   me and counsel.

19        THE COURT:  Yeah, I understand.

20        MR. RIGAT:  No, it was not us.

21        THE COURT:  I appreciate that.  I understand the

22   doctor was a little prickly maybe.

23        MR. MELLEY:  I would just get back to the

24   complaint and the specific allegation as to the broken

25   kneecap.  It's not as a result of a fall.  There's an

1  allegation of a fall in this paragraph.

2          THE COURT:  Right.

3          MR. MELLEY:  But the allegation is specific that

4  the patella was fractured by Officer Allen's baton.  That's

5  a specific allegation.

6          I wanted to see the transcript.  I'm running

7  through my head, Ashcroft versus Iqbal, in terms of stating

8  a cause of action you have to be specific.  You can't wander

9  off.

10         THE COURT:  Well, this is the opposite, from your

11  perspective, too specific?

12         MR. MELLEY:  Well, I'm not complaining.

13         THE COURT:  Right.  But really, fundamentally,

14  isn't what you've done, you've identified an alternative

15  theory of causation which the doctor has signed onto.

16         MR. MELLEY:  Correct.

17         THE COURT:  As is a -- and which would be a huge

18  problem for the plaintiff's prima facie case if that

19  alternative theory of causation weren't, as Mr. Rigat has

20  pointed out, equally actionable, right?

21         I mean, if the doctor had said, you know, there

22  was that thing that happened to him six weeks before and

23  that could easily have been the cause of it I would

24  completely buy your perspective that the plaintiffs didn't

25  have expert testimony to support their case.  But there's no

1  doubt that Mr. Outlaw did not have a broken knee before the

2  altercation.

3  MR. MELLEY:  Correct.

4  THE COURT:  The officers, they haven't testified

5  yet, but I understand your perspective is, that they don't

6  disagree that they hit him, they just say they had reason to

7  do so.  So that the knee wasn't a self-inflicted injury by

8  Mr. Outlaw by himself.

9  So he was, as Mr. Rigat said, either he was hit on

10  the knee with the baton or he was, or he was shoved or

11  knocked to the ground, but, either way, there would be

12  actual tortious conduct except, you know, it's setting aside

13  here the defense of proper use of force.

14  MR. MELLEY:  The problem I have, Your Honor, and I

15  understand, is the doctor expressing an opinion that the

16  broken knee is due to the blow.

17  Now, if we're going to have the testimony of the

18  doctor, he sustained a broken patella as a result of the

19  events of October 17, and this is what I did with him, and,

20  yes, it could be caused by a fall or it could be caused by

21  the strike.  That's another --

22  THE COURT:  I thought that's what he said.

23  MR. MELLEY:  No.  No.  He says, he said that

24  ultimately.  But his original testimony is what I find

25  objectionable.  That he says it's due to the patella.

THE COURT:  That's why we have cross examination.
You bring up other points.  He gives a concession to you.
You've made some headway with him.

MR. MELLEY:  But I --

THE COURT:  You create a doubt, but at the end of
the day either of the doctor's theories would be one which,
if believed by the jury, could support a verdict in the
favor of the plaintiff.

MR. MELLEY:  But then there would need to be an
amendment to the complaint 11 years after the event because
it does not plead in the alternative that he was injured one
way or another.  It was specific alleging that Officer Allen
caused the specific injury.  That's my problem.

THE COURT:  That's really nothing to do with the
deposition.  But I think Iqbal and Twombly go to the
opposite problem which is complaints that are too vague.

MR. MELLEY:  Right.

THE COURT:  You know, it just says the defendant
did something bad to the plaintiff some day.  Or maybe a
little better than that.

This one the plaintiff very specifically, the
facts have come out maybe that way, maybe in a slightly
different way, but neither in a way that would absolve the
defendant of, the defendants of potential exposure on the
limited issue of medical causation.  Either way it could be

1    seen as a proximate cause of the injury.  So I'll allow the

2    testimony to roll on the video.  Are there a lot of

3    objections to deal with on the way?

4              MR. MELLEY:  There's essentially one, Your Honor,

5    dealing with the undisclosed medical.  And it's --

6              THE COURT:  About the future cost?

7              MR. MELLEY:  What he said was, you know, I might

8    recommend it now.  However, he should put it off as long as

9    possible.  I wouldn't do it today.  If it was done today it

10   would cost 30,000.

11             THE COURT:  It being the knee replacement?

12             MR. MELLEY:  A partial.  But it might not.

13             THE COURT:  Right.

14             MR. MELLEY:  So it's like, it's back and forth.

15   He doesn't give a definitive --

16             THE COURT:  Oh, I see.

17             MR. MELLEY:  -- opinion that in three years he

18   will definitely need it.  He says at some time in the future

19   he will.

20             THE COURT:  Right.

21             MR. MELLEY:  But he's going to instruct him to

22   hold off as long as possible.

23             THE COURT:  Right.  Is it a ruling, an issue that

24   we can take up after we've heard it and after the jury's

25   heard it?  I mean, I could read it if it was available on a

1  paper transcript.

2        MR. RIGAT:  I think you can, Your Honor, from this

3  perspective.  What the doctor testified to is that the

4  entire cost of knee replacement would be something just

5  short of $30,000 today.

6        THE COURT:  Today, yeah.

7        MR. RIGAT:  Right.  And he said, you know, he's a

8  candidate right now for that surgery.  Okay.  But he wants

9  Mr. Outlaw to delay it as long as he can withstand the pain.

10  Because every time you do this corrective surgery it has a

11  very limited shelf life.

12        And now that Mr. Outlaw is 41 years old, not that

13  that's old, it will only last for a little while, you know,

14  for just so long.  And then he's going to need it again.

15        So the way I understood his testimony was we want

16  him to delay this for as long as possible, but if you would

17  do it now it's about 30,000.

18        Now, that's something you can instruct the jury on

19  within your discretion as to whether or not that number is

20  fair or not.  But I think that's fair game because that goes

21  towards what this is going to cost him.

22        And we don't know if he has health insurance.  I

23  mean, right now he does.  But I think that's fair.  And it

24  certainly gives you the magnitude of what this operation is.

25  It's an expensive operation.  It's not a cheap operation.

1       THE COURT:  Your argument, if I can interrupt your
2  argument, is going to be limited to one procedure, you're
3  not going to say he's going to need this 15, not 15, but,
4  you know, six times?
5       MR. RIGAT:  No.  No.  No.  But just to give scale
6  to what this is.  It's not going in with an impacted wisdom
7  tooth and getting it pulled.  It's a little bit more
8  involved than that.
9       THE COURT:  Right.  But you'll be arguing for the
10 future medical bills in the amount of $30,000 in today's
11 dollars?
12      MR. RIGAT:  Yes.  I'm not going to ask and say
13 this is worth half a million dollars in future medicals.
14      THE COURT:  Right.  Or 60, in five years.
15      MR. RIGAT:  At some point that becomes, you know,
16 astrology trying to look into the future.  But it is
17 reasonable to believe that he'll need this operation at
18 least one time because he's a candidate now.  And the doctor
19 did a good job explaining that.  Better than I did.
20      THE COURT:  I think we'll listen to the testimony,
21 not, no really, no ruling I can make at this point on that
22 problem.  I will get out of here and let you guys get some
23 time off, okay?
24      (The Court recessed at 3:10 p.m. and resumed at
25 3:20 p.m. without the jury present)

1          THE COURT:  Everything work with the video, Mr.

2     Rigat?

3          MR. RIGAT:  Yes, Your Honor.  But I am just

4     waiting for Mr. DiCrosta.

5          THE COURT:  Oh, absolutely.

6          MR. RIGAT:  He may have just taken -- our plan

7     was, just briefly, to publish the photos that were recently

8     admitted to the jury and then play the video.

9          THE COURT:  I'm not loving it.  I don't know why.

10    Yes, I suppose you can.  Sure.  It's just sort of out of

11    context without any testimony or anything.

12         MR. RIGAT:  All right.  Well, we'll hold off on

13    that then.  We can maybe recall Mr. Outlaw and figure out

14    how we're going to do that.

15         THE COURT:  I'm not staying no, never.  But it

16    seems a little funny about putting them up out of the blue.

17         MR. RIGAT:  Okay.  Thank you.

18         MR. MELLEY:  I also would like to inquire as to

19    what's next.

20         THE COURT:  The video I think.

21         MR. MELLEY:  Correct.  And then that's about an

22    hour.  So that will take us through --

23         THE COURT:  That will take us to the end of the

24    day.  Oh, what they start out with in the morning?

25         MR. MELLEY:  Yes.

1          THE COURT:  Yes, we'll find out when we break.

2          MR. MELLEY:  Okay.

3          MR. DiCROSTA:  Sorry, Your Honor.

4          THE COURT:  No, totally fine.  I just wandered out

5     here to see how the video was coming along.

6          MR. MELLEY:  Can I just say something?

7          THE COURT:  Of course.

8          MR. MELLEY:  Ms. Feola-Guerrieri told me I did not

9     request who the photographer was.  So to the extent I said

10    otherwise I'll apologize.  I haven't seen it yet, but she

11    told me I was wrong.

12         THE COURT:  I didn't follow you.

13         MR. MELLEY:  I was objecting before because I

14    didn't know who the photographer was.  She told me I didn't

15    ask it.  And I said I mis-spoke.

16         THE COURT:  Oh, I see.

17         MR. RIGAT:  In his discovery.

18         THE COURT:  I got it.  No problem.  While we're on

19    the subject of apologies, I didn't mean to make light of,

20    counsel's been marvelous in this case.  And when I said two

21    equal to one I was just kidding.  Okay.  I didn't see a tear

22    leak out of Mr. -- all right.  Good enough.

23         Let's get the jury in and we'll get to it.

24         So it shows up on these screens?

25         MR. DiCROSTA:  It shows up on all of them.

1    MR. RIGAT:  If all has been done right.

2    MR. DiCROSTA:  You want me to introduce it into

3 evidence and then --

4    (The Jury returned at 3:25 p.m.)

5    THE COURT:  What we're going to do next is watch a

6 video.  And there will be no commercial interruptions, but

7 it's a video of a physician's deposition.

8    And the main thing about video testimony that I

9 want to impress upon you is the equal of live testimony.

10 It's a normal part of the process.  Some people are hard to

11 schedule or are unavailable or out of state or whatever.  In

12 this case the doctor I think is busy and everybody, the

13 parties, the Judge all agreed that a video would serve in

14 lieu of a live appearance.  So it was done last night.  And

15 so it's fresh.

16    But the important point is that you accept it with

17 the same level of dedication that you address to all of the

18 witnesses here in the last two days.  All right.  Sure.

19    MR. DiCROSTA:  Thank you, Your Honor.

20    THE COURT:  Is it marked as an exhibit?

21    MR. DiCROSTA:  Not yet, Your Honor.

22    THE COURT:  All right.

23    MR. DiCROSTA:  Your Honor, any objection to

24 marking it into evidence?

25    MR. MELLEY:  The Judge has already ruled on it.

1          THE COURT:  Yeah.  Just on the sleeve or

2    something, probably not on the --

3          MR. DiCROSTA:  Your Honor, the videotape has been

4    marked as Plaintiff's Exhibit 37.

5          THE COURT:  Okay.  We'll watch it.

6          (Video Deposition playing of Dr. Christopher Lena

7    and concluded)

8          THE COURT:  All right.  I think that concludes our

9    work for the day.  I just remind you what we talked about at

10   the very beginning of the case, which is, don't do any

11   research tonight.  Just go home and enjoy your family and

12   your dinner.  And don't look up patella repairs, don't look

13   up any of this stuff.  There will be plenty of it for

14   tomorrow at 9.  All right?  I'll stay behind for a second.

15         (The Jury was excused at 4:29 p.m.)

16         THE COURT:  Have a seat.  Let's just make plans

17   for tomorrow.  What do we have left on the plaintiff's side?

18         MR. RIGAT:  Your Honor, we have Mr. Richard Rakus.

19         THE COURT:  Right.

20         MR. RIGAT:  And I believe perhaps Mr. Calhoun one

21   more time just to get the photographs so we can have them

22   published to the jury.

23         THE COURT:  So they have some sort of context?

24         MR. RIGAT:  Yeah.

25         THE COURT:  Mr. Rakus is sort of another event

1  witness, a half hour?

2        MR. RIGAT:  He was Rachel Killian's boyfriend at

3  the time.  He was in the cab.

4        THE COURT:  He was in the cab.  Okay.  So you'll

5  be resting by 10 o'clock?

6        MR. RIGAT:  Yes.

7        THE COURT:  Okay.  And then what can we look for

8  from the defense?

9        MR. MELLEY:  At the conclusion of the plaintiff's

10  case I would just like to take a brief break, perhaps stay

11  on the record.  I can then begin calling the officers.  I do

12  have Dr. Anthony Spinella lined up for 2 o'clock.

13        THE COURT:  That's right.

14        MR. MELLEY:  And I had said 2, I can see Your

15  Honor has a preference to go to lunch from noon to 1, I can

16  see if I can move him up to 1.

17        THE COURT:  See what you can do.  You know, it

18  would be probably slightly better because it would give us

19  more time late in the day to get things organized.  But

20  either way we'll, don't, don't have a heart attack about it.

21  If he comes at 2 he comes at 2.  We'll make it work.

22        MR. MELLEY:  And then that should be about it.  I

23  have, I do have, I'm going to talk to counsel, I have the

24  computer listing.  It's called the Hartbeat of the spelling

25  out of the times.  And I listed a witness.

1      THE COURT:  Oh, sure.

2      MR. MELLEY:  And I described that.  But I may have

3  the officers testify to it.  I don't know if that's going to

4  be an issue.  It is what it is.

5      THE COURT:  Each of them will be like an hour and

6  a half or something like that?

7      MR. MELLEY:  Yeah.

8      THE COURT:  So you'll be finishing --

9      MR. MELLEY:  Conceivably --

10      THE COURT:  -- conceivably Thursday, Wednesday or

11  Thursday morning?

12      MR. MELLEY:  Correct.

13      THE COURT:  Okay.  So we're --

14      MR. RIGAT:  Your Honor, I was going to say I don't

15  think we're going to have any objection to the Hartbeat

16  records coming in so --

17      THE COURT:  Sure.  And the expert is coming or no?

18      MR. MELLEY:  No.

19      THE COURT:  No, I don't mean Dr. Spinella, but I

20  mean the police procedure expert is not?

21      MR. MELLEY:  Correct.  Correct.

22      THE COURT:  Okay.  I'm happy to include sort of

23  standard language about expert witnesses.  If they are only

24  two doctors I'm not really sure what it buys us, but you are

25  certainly entitled to it.

1    MR. MELLEY:  It's the whole idea that they are not

2    entitled to extra credibility, you trust them as you would

3    anybody else.  But that they are needed for --

4    THE COURT:  You got it.  I'll put it in.  That's

5    fine.  When I was a law clerk a dear man that I clerked for

6    went on for -- he never met a paragraph of Black that he

7    didn't love.  And it was 60 pages.  And it would have taken

8    an hour and 10 minutes for him to read the charge.  And I

9    was so traumatized as a young guy.  I tried to make it

10   short, but I won't fight you on it.  I'm glad to put in a

11   paragraph about expert witnesses.

12   MR. MELLEY:  Thank you.

13   THE COURT:  Can you, the four of you wrestle to

14   the ground the collateral source issue?  It's kind of loose

15   in my mind exactly what you've agreed to.  If you don't

16   reach an agreement that's okay.  But we'll sort of have to

17   do it by the book with a Rule 59 Motion, a Rule 60 Motion.

18   I mean, it's an odd way to do it.  And I think you have a

19   working understanding, but I like a document that you both

20   sign that we file so we know, for example, if the medical

21   records are less than the amounts that you put in, for

22   whatever reason, it doesn't seem likely, but if they were

23   awarded and if they were less than that that you apply a

24   percentage or there be some mechanism so we don't have to

25   have a head scratcher about what to do.

1            MR. RIGAT:  We understand, Your Honor.  And I

2      think that's something that we can come to an accommodation

3      on.  I don't see that as a problem.

4            THE COURT:  What else is open?  Not very many

5      issues, right?

6            MR. MELLEY:  No.

7            THE COURT:  We'll be calling again about our

8      prayer meeting and --

9            MR. MELLEY:  That has started.

10           THE COURT:  Okay.  We'll catch you guys at 9

11     tomorrow.  Thanks.

12           MR. MELLEY:  Thank you, Your Honor.

13           MR. RIGAT:  Thank you, Judge.

14           (The Court recessed at 4:34 p.m.)

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

I, Anne Marie Henry, Official Court Reporter for the United States District Court, for the District of Vermont, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

_____

Anne Marie Henry, RPR
Official Court Reporter