UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____

TYLON C. OUTLAW                    )

            VS                     )   CASE NO: 3:07-CV-01769

TROY GORDON & MICHAEL ALLEN    )

_____)  WITNESS TESTIMONY - DAY 3
                                          TRIAL BY JURY


BEFORE:   HONORABLE GEOFFREY W. CRAWFORD
          DISTRICT JUDGE


APPEARANCES:  ANTHONY P. DiCROSTA, ESQUIRE
                   Mirto, Ketaineck & DiCrosta
                   P.O. Box 428
                   West Haven, Connecticut  06516
                   Representing The Plaintiff


              RAYMOND J. RIGAT, ESQUIRE
                   Gilbride & Rigat
                   23 E. Main Street
                   Clinton, Connecticut   06413
                   Representing The Plaintiff

              (Appearances Continued)


DATE:      January 6, 2016


          TRANSCRIBED BY:  Anne Marie Henry, RPR
                    Official Court Reporter
                       P.O. Box 1932
                    Brattleboro, Vermont   05302

1                    APPEARANCES CONTINUED:

2


3          NATHALIE FEOLA-GUERRIERI, ESQUIRE
                City of Hartford
4               Office of Corporation Counsel
                550 Main Street
5               Hartford, Connecticut   06013

6


7          WILLIAM J. MELLEY, III, ESQUIRE
                Law Offices of William J. Melley, III
8               250 Hudson Street
                Hartford, Connecticut   06106
9               Representing the Defendants

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX

WITNESS:                                          PAGE:

LEWIS CALHOUN
Direct Examination by Mr. DiCrosta                  6
Cross Examination by Mr. Melley


PAUL M. BRUCE
Direct Examination by Mr. Melley                   37
Cross Examination by Mr. DiCrosta                  57
Further Examination by Mr. Melley                  62

TROY GORDON
Direct Examination by Mr. Melley                   63


ANTHONY J. SPINELLA
Direct Examination by Mr. Melley                  100
Cross Examination by Mr. Rigat                     122


TROY GORDON
Cross Examination by Mr. Rigat                    123
Further Examination by Mr. Melley                 139


MICHAEL ALLEN

Direct Examination by Mr. Melley                  141



PLAINTIFF EXHIBITS:                              SHOWN:

1 - Photo Union Place                              76

4 - Photo Union Place                             152

16 - Photo Bloodstain with Meter                    6

17 - Photo Bloodstain & Papa's Pizza                6

INDEX CONTINUED:

PLAINTIFF EXHIBITS:                                SHOWN:

18 - Photo Bloodstain on Curb                         6

19 - Photo Bloodstain with Ruler                      6

20 - Photo Bloodstain with Dollar Bill                6




DEFENDANT EXHIBITS:

C. - Diagram Union Place & Allyn Street        74, 155

D. - Supplement to Report                          80

E. - Hartford Police Incident Report             185

F. - Hartford Police Incident Report             148

G. - Hartbeat Dispatch Summary Record   39, 55, 70, 152

H. - Use of Less Lethal Force Report             190

1

2          (The Court opened at 9:00 a.m. without the jury

3  present)

4          THE CLERK:  This is Tylon Outlaw versus Troy

5  Gordon and Michael Allen, case number 3:07-cv-01769.

6          THE COURT:  All right.  Mr. DiCrosta, what's next?

7          MR. DiCROSTA:  Your Honor, I would like to call

8  Mr. Calhoun back to the stand in order to publish the

9  identification.

10          THE COURT:  Sure.  Okay.

11          MR. DiCROSTA:  The exhibits marked for

12  identification.

13          THE COURT:  The Court will bring the jury in and

14  we'll get to it.  Remind me, he's your last witness?

15          MR. DiCROSTA:  Pardon me?

16          THE COURT:  Is he your last witness?

17          MR. DiCROSTA:  He should be, yes.  He will be our

18  last witness.

19          MR. MELLEY:  I thought Mr. Rakus is coming.

20          MR. DiCROSTA:  We're not calling Mr. Rakus.

21          THE COURT:  One second.  One second.  Whose Lionel

22  Brown?

23          MR. DiCROSTA:  Lionel Brown is the alias assigned

24  to --

25          THE COURT:  Assigned by the police department?

1                MR. DiCROSTA:  We don't know.

2                MR. MELLEY:  There's no evidence of that, Your

3        Honor.

4                THE COURT:  Are you just going to leave the issue

5        alone?

6                MR. DiCROSTA:  We're not -- yes, we're going to

7        leave it alone.

8                THE COURT:  Got it.  That's fine.

9                (The Jury returned at 9:03 a.m.)

10               MR. DiCROSTA:  Your Honor, may Mr. Calhoun please

11       take the stand again?

12               He's been sworn in already, Your Honor.

13               THE COURT:  Yes.  I'll just remind you you're

14       still under oath Mr. Calhoun.  That's okay.  Have a seat.

15       And we have more questions for you.

16               THE WITNESS:  Umhum.

17               DIRECT EXAMINATION BY MR. DiCROSTA:

18               MR. DiCROSTA:  Your Honor, I would like to publish

19       what's marked as Plaintiff's Exhibit 16, 17, 18, 19 and 20.

20       Q.   Good morning, Mr. Calhoun.

21       A.   Good morning.

22       Q.   I draw your attention to the morning of December 18th.

23       A.   Yup.

24       Q.   You recall when you were last here you were testifying

25       you had taken some photographs?

A.    Yes.

Q.    You and I had taken some photographs?

A.    Yes.

Q.    And I'm showing you what's marked as Plaintiff's
Exhibit 17.  And if you can just tell me what that
photograph depicts?

A.    That was the blood that we found on the street there
when we were there.

Q.    Okay.  And can you tell me what it depicts in the
background?

A.    Um, the restaurant that we were -- we were told to look
across the street from Papa's.

Q.    Okay.  And showing you what's been marked as
Plaintiff's Exhibit 16.  Can you tell me what that, what's
demonstrated in that photograph?

A.    That was the same, the blood that we found next to the
parking meter.

Q.    Okay.  And in the close-up view can you, I know the
photograph speaks for itself, is that the parking meter?

A.    Yeah, parking meter 1991.

Q.    And can you tell me what's depicted in that photograph?

A.    That was the measuring tape that we used to measure the
blood away from the curb.

Q.    The same bloodstain?

A.    Yes.

1    Q.    Same parking meter?

2    A.    Yes.  Yeah, you can tell because it's marked 1991.

3    Q.    And is that the condition of the curbing?

4    A.    Yup.

5    Q.    In particular, the stains that appear to be some type

6    of staining?

7    A.    Yes.

8    Q.    And is that the same curb, I'm sorry, tell me what that

9    photograph is depicting?

10   A.    That was the curb um, right there, the same spot where

11   we were looking and found the blood.

12   Q.    Okay.  The curb behind the prior exhibit?

13   A.    Yes.

14   Q.    And, lastly, can you tell me what's depicted in that

15   photograph?

16   A.    It's the blood that we found.  We put down a dollar to

17   show how big it was that we used as a measurer.  We didn't

18   have a ruler or anything other than the tape measurer just

19   to show.

20   Q.    All right.  And the dollar was added to the scene?

21   A.    Correct.  Yup.

22         MR. DiCROSTA:  Thank you.  No further questions,

23   Your Honor.

24         THE COURT:  All right.  Any questions for

25   Mr. Calhoun?

1            MR. MELLEY:  Yes, Your Honor.  If I may?

2                EXAMINATION BY MR. MELLEY:

3    Q.    Good morning again, Mr. Calhoun.

4    A.    Good morning.

5    Q.    If we were to look at this, you are not claiming that

6    those black spots are blood are you?

7    A.    No.

8    Q.    That's oil, right?

9    A.    I believe so.

10   Q.    All right.  And the blood, do you know that it was

11   blood?

12   A.    It looked like blood to me.

13   Q.    Okay.  And was it dried?

14   A.    No, it was still wet.

15   Q.    It was wet?

16   A.    Yeah.

17   Q.    And this is some time between 9 and noon?

18   A.    I believe so, yeah.

19   Q.    Okay.  Thank you.

20            THE COURT:  All right.  Anything further?

21            MR. DiCROSTA:  No further questions.

22            THE COURT:  Mr. Calhoun, thank you very much.

23            THE WITNESS:  Yup.

24            MR. DiCROSTA:  Perhaps we can turn off the

25   equipment.

1    MR. RIGAT:  Thank you, Your Honor.  At this time

2  the plaintiff rests.

3    THE COURT:  All right.  That completes the

4  plaintiff's presentation of their direct case.  Do we need a

5  moment without the jury?  We do.  So why don't we, if you

6  could excuse us for just a few minutes.  We'll give you an

7  early break.  I'll stay here and do some work with the

8  lawyers.  And then the next step will be the defense case.

9    (The Jury was excused at 9:15 a.m.)

10    THE COURT:  Mr. Melley, what do we have?

11    MR. MELLEY:  Your Honor, pursuant to Rule 50 of

12  the Federal Rules of Civil Procedure, on behalf of the

13  defendants, I would move for judgment as a matter of law in

14  this case.

15    In support of that, I would refer the Court to

16  the, I'm not going to get into all the law.  That was

17  submitted as part of the jury requested charge.  And the

18  Court has incorporated a lot of that law into the proposed

19  charges.  So I don't think it's necessary to rehash it, but

20  we have a lawful arrest.  There's no issue on that.  So the

21  question is with regard to the arrest was there excessive

22  force used by the officers.  And the standard is the

23  reasonable officer at the time in light of the situation as

24  it existed.

25    So the standard requires that there be evidence as

1    to what the officers perceived and how they acted in

2    response to what they perceived and a determination at that

3    point whether their actions were reasonable under all the

4    circumstances.

5           Now, the officers are here.  And in the

6    plaintiff's case we have just one side of the equation.  The

7    law is very clear that the standard to be used is from their

8    eyes.  And it's not 20-20.  It's at the time of the incident

9    what did they see, what are they dealing with and then how

10   they acted.

11          There's no evidence at all as to what they saw and

12   how they then responded to the action.  Except the only

13   evidence came from the plaintiff himself when he said that

14   this kick that he described appeared to him to be a

15   defensive move on the part of Detective Gordon.

16          So the only evidence that the jury has at this

17   time is that this detective, in his interaction with this

18   plaintiff, had to act to defend himself.  There's nothing

19   else.  And anything else requires supposition and

20   speculation.

21          And, likewise, nobody identified Officer Allen,

22   other than the plaintiff.  But that comes in after the

23   interaction between Mr. Outlaw and Detective Gordon has

24   begun.

25          So the whole issue of the his actions, in terms of

1    responding to what is before him, which is a civilian and an

2    officer engaged in some sort of event where the officer,

3    based upon the testimony, is defending himself.

4         And, therefore, his conduct, as such, has to be

5    viewed in that light.  And there's no evidence -- and the

6    law as presented indicates that an officer can use force of

7    a different kind when he's presented with a situation where

8    there is a direct threat to himself or someone else.

9         And here we have Officer Allen arriving on the

10   scene where he's responding to an admitted threat to another

11   officer.

12        There's no guidance to the jury to say that any of

13   his actions, under that set of circumstances, was

14   unreasonable.  And, therefore, the plaintiff's case fails as

15   a matter of law.

16        There's, there's no basis to make an inference as

17   to what was in the minds of the officers at the time.

18        THE COURT:  All right.  In considering the facts

19   in deciding your motion, what's the standard that I apply?

20   At this stage I have to consider the facts in the light most

21   favorable to the plaintiff's case, right?

22        MR. MELLEY:  Certainly.

23        THE COURT:  Okay.  It's important that everybody

24   at your table understand that.  That when I rule on the

25   motion I'm not making a decision on the merits.  I'm making

a decision on the facts as they've been presented by the

plaintiff accepting as true what the plaintiffs have said.

          MR. MELLEY:  No, I understand that, Your Honor.

          THE COURT:  Okay.

          MR. MELLEY:  And I'm saying -- I'm going beyond

that.

          THE COURT:  Right.  Right.

          MR. MELLEY:  I'm saying, because we're evaluating

the conduct of the officers.

          THE COURT:  Right.

          MR. MELLEY:  And it starts with Detective Gordon.

          THE COURT:  Right.

          MR. MELLEY:  Why did he get out, why did he -- we

don't know why he got out, but he did get out.

          THE COURT:  Right.

          MR. MELLEY:  And why did he -- why was that first

contact made.  And the only explanation we have is the

plaintiff saying he's kicking in a defensive mood,

defensive.  And it's very clear that if the officer's acting

in a defensive mood somebody else is being offensive.  Even

though it's denied, but there's no other -- there's no other

explanation for a defensive move other than he's dealing

with a threat.  And --

          THE COURT:  The plaintiff's case, this is why I

said that I want to make sure that the officers understand

this, I am looking at the case now from the plaintiff's

side.  I'm not looking at it in a neutral way factually.

I'm accepting as true what they've said.  That's my

obligation at this stage.

          The plaintiff's case, Mr. Melley, is that

Detective Gordon instigated this incident by calling a

civilian an MF, right?

          MR. MELLEY:  That's part of the allegation.

          THE COURT:  That's part of the allegations.

          MR. MELLEY:  Absolutely.

          THE COURT:  That was returned in kind.

          MR. MELLEY:  Part of the allegations.

          THE COURT:  Detective Gordon was in his car in

what I would think of as a safe place sitting in a police

car, right?

          MR. MELLEY:  Yes.

          THE COURT:  He drove past the scene.  The

plaintiff's case is that more unpleasantness was said.  We

don't really know exactly what it was, but along the lines

of, I'm going to F. you up, whatever it was.  And Detective

Gordon stopped his car, stormed out and confronted the man.

That's the plaintiff's case.

          As I listen to it, and I know I haven't heard from

Detective Gordon, and he may have a very different version.

I was thinking stormed out to do what?  To write him a

citation for jaywalking?

I, I haven't heard that part. But, at any rate, came out walking, as the witnesses say, in an aggressive manner, confronted him, kicked him twice, pushed him to the ground, joined by Officer Allen and beat him severely.

So if all that's true it's difficult to understand how that can be reasonable police behavior. The offense of jaywalking, pretty minor, but he was there, there was a double parked car and Mr. Outlaw was not standing on the sidewalk. He was out where he ought not to be.

We've all done it. Usually you just get told to get out of the road, get on the sidewalk or if you're in California you get a ticket for it.

You don't get shoved to the ground and beat up. So looking at it from the plaintiff's side only, recognizing I haven't heard what the officers have to say about the situation from their view, how could there not be a reasonable inference that the amount of force, which puts the man in the hospital for three days, and broke his knee, and has caused the serious troubles involving a couple of surgeries, was not too much?

MR. MELLEY: The Court's explanation of the facts to date, --

THE COURT: Yeah.

MR. MELLEY: -- I would submit, are generally

accurate except we have the missing piece that there is an
acknowledgment that there's an exchange of words.

THE COURT:  Right.

MR. MELLEY:  Rachel Killian talked about an
exchange of words.

THE COURT:  Right.

MR. MELLEY:  So something else is going on.  And
we have in the record that there was probable cause on the
belief of the officer that there was threatening involved.

THE COURT:  I don't think I heard that yet.

MR. MELLEY:  Well, --

THE COURT:  Who said that?  I know that is, that
is coming as part of your case, but I can't remember a
plaintiff's witness that says that Mr. Outlaw threatened to
harm the officer.

MR. MELLEY:  In the plaintiff's direct testimony
--

THE COURT:  Right.

MR. MELLEY:  -- he was asked by counsel what were
you charged with.

THE COURT:  Right.

MR. MELLEY:  And the allegations he was charged
with were four.  And the plaintiff testified, which was
threatening and assault on police, breach of peace second
and standing in a roadway while intoxicated.  He testified

to that.

THE COURT:  That he was charged with those things.

MR. MELLEY:  Correct.  And these -- so it's in evidence that there was probable cause on the belief of the officers to charge him with this.  So when Your Honor said that he's simply driving by and he tells a guy to get out of the road for jaywalking we have this issue of threatening that's part of this case at this moment because the plaintiff injected it.  Put aside anything else that is going to come out on our case the plaintiff has put before the jury that he was charged with threatening.  So this isn't a jaywalking case.

THE COURT:  He could have been charged with felonious assault, but so what?  That doesn't mean he did it.

MR. MELLEY:  But, but -- we have the plea agreement, everything as part of this scenario.

THE COURT:  Right.  Right.

MR. MELLEY:  The point is that it's not as simple as a jaywalking case by the plaintiff's presentation of the evidence.  He acknowledges -- and there's no claim that there was a lack of probable cause for the arrest.  The arrest is not an issue.

So the fact that he's presented on these charges is part of the record.  So it's not a jaywalking case.  It's

1  a threatening case.  It's an assault case.  It's an

2  intoxication case.  And it's a breach of peace case.  And

3  this is all part of the plaintiff's case.

4        So whatever the officers did or didn't do has to

5  be, at this stage, framed as a question of law.  Okay, if

6  that was the probable cause for an arrest, so all this stuff

7  occurred, and the only evidence we have as to what Detective

8  Gordon's thinking is a defensive posture.  It's, it's -- I

9  would disagree with the Court's characterization.

10       THE COURT:  I know.  That's fair.  Sometimes I

11 think about these cases in this way, like lawyers and

12 judges, officers get education.  They go to the academy.

13 And scenarios are presented, right?  And everybody says, is

14 this on the green side, the okay side, is this on the red

15 side, the not okay side.

16       Do you think, having heard the plaintiff's case,

17 the witness scenario, as the plaintiff has described it, is

18 presented to young probationary officers at the academy,

19 that the instructor says, is this within the scope of

20 appropriate response to the situation or would they have a

21 different view?

22       MR. MELLEY:  At this stage --

23       THE COURT:  Yeah.

24       MR. MELLEY:  -- there's no evidence -- the burden

25 of proof is on the plaintiff.  So I would, I would submit

1    that at this stage we don't get to ask that question because

2    if that's the only evidence, and we never hear from the

3    officers, there's no statements against interest that are

4    part of this record.  The plaintiff himself acknowledged

5    that once this occurs he never heard Officer Allen at all.

6            THE COURT:  Right.

7            MR. MELLEY:  There's no words from him at all.

8            THE COURT:  Right.

9            MR. MELLEY:  And the words that we have from

10   Detective Gordon all precede this event which gives rise to

11   the detective acting defensively.

12           So I would submit that if we're doing this in a

13   classroom situation the evidence is not there because at

14   this time we're focused on what has been presented.  And how

15   does a reasonable officer's conduct get evaluated when we

16   don't know what the officers were dealing with.  And that

17   burden does not shift.  Up until this time it's totally been

18   on the plaintiff.

19           The case continues, yeah.  I have to put them on

20   and we go forward and we revisit the issue, whatever, but

21   the point of the matter at this time --

22           THE COURT:  Right.

23           MR. MELLEY:  -- based upon the state of the

24   record, there's not sufficient evidence as a matter of law.

25           We had a discussion, there was a motion in limine

on the intoxication issue and Your Honor ruled.  And that's
fine.  They opened the door.

          THE COURT:  We split the baby on that one.

          MR. MELLEY:  Which is fine.  I'm not questioning
that.  But then the plaintiff in their case put on that he
was arrested for intoxication.  And I think they just threw
that ruling out the window when they, when they had him
testify that he was also charged on threatening or an
assault.  Because that comes in as, it's a, the issue of the
arrest is not here.  The arrest was lawful.  So, therefore,
in light of that lawful arrest for those four charges, was
the conduct reasonable from the perspective of a reasonable
police officer acting under the same situation because
that's what we're dealing with.

          You have to compare not to an every day citizen or
anybody else, it's what would a reasonable police officer do
under the scenario that they are presented with where these
four charges --

          THE COURT:  All right.  I'm catching on what
you're saying.  Mr. Rigat, I will give you a turn.  I'm
sorry.

          MR. RIGAT:  That's fine.

          THE COURT:  I just want to make sure I follow Mr.
Melley right down to the end.

          MR. MELLEY:  I hope I'm not too --

1      THE COURT:  Yeah.  Granted, that from your

2  perspective, the evidence is undisputed that the officers

3  believed that Mr. Outlaw was intoxicated, that he was in the

4  wrong part of the street and that he had said something of a

5  threatening nature to the police officer.  Granted, for

6  point of argument, that they had reason to write him a

7  citation or book him, arrest him, whatever they needed to

8  do, does that also then -- then what you're saying it

9  follows almost as a matter of law that they can also put him

10  in the hospital?  I mean, lots of people get arrested every

11  night, but you don't go to the hospital.

12      MR. MELLEY:  That's a non sequitur, Your Honor, I

13  would submit.  Because when there's an arrest the officer

14  has the authority of law to use reasonable force under the

15  situation.

16      THE COURT:  Right.

17      MR. MELLEY:  And the testimony that this jury has

18  had, the only testimony we have, we have a lot of vague

19  things, like Mr. Carroll saying, I could see Detective

20  Gordon.  I couldn't see the face of the plaintiff.  But we

21  have the plaintiff himself testifying that that first

22  contact appears to him to be a defensive move on the part of

23  the detective.

24      THE COURT:  I've struggled with that.  As I heard

25  it I thought, what does he mean.

1          MR. MELLEY:  It wasn't clarified other than that

2     language.

3          THE COURT:  Detective Gordon was the one, from the

4     plaintiff's case, who approached the plaintiff.  The

5     plaintiff, as he says, froze, didn't know quite what he was

6     dealing with.  Thought he was going to get shot.  So he

7     doesn't move from the plaintiff's case.  And then I think

8     you rush up to a guy and you kick him.  I don't quite

9     understand what defensive has to do with that, but --

10         MR. MELLEY:  That's the only testimony.

11         THE COURT:  -- that's the testimony.

12         MR. MELLEY:  Right.

13         THE COURT:  So that alone, the plaintiff's

14    characterization of the kick as the officer defending

15    himself you think ends the case?  In other words, that

16    establishes that the officer was acting reasonably?

17         MR. MELLEY:  Well, that establishes that whatever

18    the officer did, just assuming that fact, based upon the

19    state of the record, the evidence is that the actions of the

20    detective were based upon his need to defend himself from

21    what?  The only thing out there, and I asked this, is the

22    plaintiff.  That's the only other individual that could be

23    any sort of threat to the detective.  There's no one else.

24         So if he's acting in -- he can say whatever he

25    says in terms of the actual mechanics of moving, or

1  whatever, but the, that first contact occurs as a defensive

2  move.  And --

3       THE COURT:  Defensive against what?  What, what

4  could Officer Gordon be defending himself against?  A man

5  standing in, by the side of a car?

6       MR. MELLEY:  That that, that that's not reasonable

7  under the circumstances because that contradicts the

8  plaintiff's statement as to what he was doing.  And it gets

9  to my point that in terms of what Detective Gordon was doing

10  as a reasonable police officer we don't have.  There's no

11  evidence, there's no basis to make any type of inference.

12  They've never met before as far as the plaintiff knows.

13  There's no prior interaction.

14       THE COURT:  Right.  Right.

15       MR. MELLEY:  There's no prior association or

16  markings of, you know, this club or that, whatever.  Yankee

17  fan.  It doesn't make a difference.  There's no association

18  that would give rise to any sort of idea that there's a

19  connection.

20       So why does he act in a defensive mode?  The jury

21  doesn't know.  That has not been presented.

22       THE COURT:  Well, there's one inference which has

23  occurred to me as I listened to this, and that is, with all

24  respect to Detective Gordon, that he lost his temper.

25  That's a possible inference.

1          It's happened to all of us at one time or another.

2     And he may have felt insufficiently respected when he heard

3     MF directed at him, a law officer, and lost his temper.

4     That's probably the inference that I would draw from the

5     plaintiff's perspective.  And if that is true then how was

6     the rest of what happened reasonable?

7          MR. MELLEY:  There's no basis for that inference

8     without any evidence.  We have nothing from Detective Gordon

9     in our record.  We don't even have his report.

10          THE COURT:  We have his conduct as it's described

11     by the plaintiff and the bystanders, which is getting out of

12     the car, walking back aggressively and kicking the guy.

13          That could be seen as a guide, as a man whose lost

14     his temper.  It could be lots of other things.  And I

15     haven't heard from Detective Gordon.  And I'm sensitive to

16     that.  But that does seem to me on the scale of possible

17     explanations.

18          MR. MELLEY:  But it's an unknown.  And the fact

19     that there are possible explanations does not equate to

20     satisfying a burden of proof.  Because that's what my motion

21     is about.  That they had the burden of proof to satisfy, not

22     that what might have happened or whatever.  It's what did

23     the officer do, was his conduct reasonable under the

24     situation that he was facing.  And there's no evidence.  We

25     can characterize it however it is, but we're left to

speculate.  And --

          THE COURT:  One man's speculation is another man's

inference, right?  I mean, the way you lay it out, every

single plaintiff in a case like this would be required, in

order to meet their burden of proof, to call the officer and

ask them what they were thinking.  How else would we get to

the level of granularity that you're requiring?

          MR. MELLEY:  Or have, have somebody review his

deposition and based upon the facts, or whatever, present an

opinion with regard to having read that so there's a

foundation --

          THE COURT:  Right.

          MR. MELLEY:  -- to put it in.  We don't have that.

We don't have any -- the plaintiff has the burden to show

what that officer did and why he did it.  The why he did it

is an important component of proceeding on a case for

excessive force.

          And they are here.  It's not like we're dealing

with deceased officers or a situation where there's somebody

missing or whatever.

          THE COURT:  Or retired to Florida.

          MR. MELLEY:  Or retired to South Carolina.

          THE COURT:  Right.  Right.  Right.  I take your

point.  They are here.

          MR. MELLEY:  I mean, they are here.  And they are

1    here defending themselves based upon these allegations.  And

2    the burden does not shift.  If the plaintiffs have not

3    sustained the amount of evidence to present the case to the

4    jury I have no obligation to proceed to put anything on.

5    And that's why this rule exists, to have judgment entered as

6    a matter of law.

7              THE COURT:  All right.  No, I appreciate that.

8    That's very helpful.  Mr. Rigat, I'll give you a turn.

9              MR. RIGAT:  Yes, sir.  Thank you.  Well, again,

10   the Court, I think put it correctly, the prism or the lens

11   that we examine at this point is the light most favorable to

12   the plaintiff.  And, frankly, the events described by the

13   plaintiff, it is not just a permissible inference, it's a

14   very reasonable inference that this incident was so

15   overboard that there was a clear violation of his civil

16   rights.  That he was assaulted by Officer Gordon for no good

17   reason and there could be no reasonable justification to

18   repeatedly strike him in the head with a baton and to break

19   his kneecap.  And that's the testimony we have.

20             And as you've indicated the officers may have a

21   different version of that.  And they get to put their case

22   in on chief.  Thank you.

23             THE COURT:  I tried to be as hard as I could on

24   Attorney Melley.

25             MR. RIGAT:  Yes. sir.

1          THE COURT:  Let me see if I can't be hard on you.

2    The case against Officer Allen is a bit different.

3          MR. RIGAT:  Yes.

4          THE COURT:  The version that we've heard from you,

5    from the plaintiff's side, is that he wasn't the instigator

6    of this altercation.

7          MR. RIGAT:  Yes.

8          THE COURT:  That he saw a physical altercation

9    going on between an officer and a civilian and joined in to

10   assist his fellow officer, something like that.

11         MR. RIGAT:  Umhum.

12         THE COURT:  Is he in a different position than

13   Detective Gordon?

14         MR. RIGAT:  He's in a different position to the

15   extent that he's coming up from behind.  But where the

16   evidence is compelling, taken in the light most favorable to

17   the plaintiff's testimony, the plaintiff's testimony is that

18   deadly force was used.  A strike to the head with a baton

19   that takes you down to the ground, and we've seen numerous

20   photographs of the injuries and the severity, these are not

21   glancing blows to his head.  These are not -- this was not a

22   glancing blow to the right patella.

23         The plaintiff clearly identified Officer Allen as

24   striking him with the baton in both the back of the head and

25   on the right patella breaking his knee while in a fetal

1    position not resisting arrest.

2           He also testified that he was not striking out at

3    Officer Gordon.  That the attack, the attacker was Gordon,

4    Sergeant Gordon, not Mr. Outlaw.

5           And so that's what we're left with.  There is no

6    reasonable justification for these events, for these

7    injuries, given the testimony of the plaintiff, which was

8    largely corroborated by witnesses who were either on the

9    street or in the cab.

10          THE COURT:  All right.  And what do you say to Mr.

11   Melley's point that Mr. Outlaw has described the initial

12   kicks as appearing to him to be motivated by a defensive

13   reason?

14          MR. RIGAT:  I guess it depends on what he meant

15   by, a defensive fashion.  But he was very clear that he's

16   being kicked in a very forceful fashion to his stomach,

17   which is not a defensive blow.

18          Oftentimes we can get readily tripped up in our

19   use of words and words can take on different shades of

20   meaning certainly.  But the description of the encounter

21   initially with Gordon is a non-uniformed individual, not

22   identifying himself as a policeman, no badge, not running,

23   but walking very forcibly and kicking at him in the stomach

24   area.

25          My recollection was, he described it as a kick or

a blow that you would use to knock a door in. That's not a

defensive kick when he also is testifying and was very

emphatic and clear that he did not punch out, kick or

threaten Officer Gordon in any way. That's his testimony,

which this jury at this point in time would be free to

believe.

But it's not just Mr. Outlaw. We heard from

Mr. Carroll, the cab driver, that Mr. Outlaw was not acting

in any kind of aggressive fashion. That this was -- what is

this? This is some guy jumping out of a car who is

attacking Mr. Outlaw. And we also heard that from Rachel

Killian.

THE COURT: All right. So I think one way to

characterize your response would be that you would look at

the facts, not the adject characterization of --

MR. RIGAT: Right. That's just one

characterization on cross examination when he was very clear

that he is not acting in any kind of aggressive way. It may

be that Officer Gordon, you know, acted in such a fashion

that, you know, that you naturally might expect someone to

think is defensive. But that's not the encounter that was

fully described on direct examination.

And this is why this gets to go to the jury. And

perhaps Officer Gordon, if he takes the stand, can explain

to the jury his side of the story.

1          THE COURT:  All right.

2          MR. RIGAT:  That's it.

3          MR. MELLEY:  Your Honor, may I just respond

4   briefly?  This is not like the Court evaluating the summary

5   judgment.

6          THE COURT:  Right.

7          MR. MELLEY:  Or a motion to dismiss based upon the

8   adequacy of the pleadings.  This is beyond that.  This is a

9   trial.  And the idea of facts most favorable to the

10  plaintiff, there has to be a factual basis.

11         And it's interesting that we just heard, yes, Mr.

12  Outlaw did testify that the acts by Detective Gordon were

13  defensive, but at no time was that clarified.

14         Yes, it was cross-examination, but from his

15  deposition, where he used those words.  It wasn't put in his

16  mouth.  It came from him.  And it wasn't clarified at his

17  deposition that he meant anything different.  And it

18  certainly wasn't clarified here that he meant anything

19  different that that was a defensive action.

20         And I didn't hear anything, with regard to the

21  justification by the officers of the arrest, of those four

22  charges.  And that's threatening and an assault.  Those are

23  charges alleged against -- that were brought against

24  Mr. Outlaw.  That that arrest is not contested.  And there's

25  no --

THE COURT: The arrest follows the beating, right?

MR. MELLEY: But it's based upon --

THE COURT: He was beaten up by a group of officers and then arrested subsequently unless I misunderstand.

MR. MELLEY: Correct. But the fact is that the threatening -- there's -- the threatening and the assault are based upon what occurred prior. There's no interaction afterwards. So it has to be before the interaction of the officers and the plaintiff.

So that's what we're dealing with. It's an allegation of an assault. It's an allegation of threatening that occurred before this event. And there's no other evidence.

And, again, just the whole law, it has to be based upon the reasonableness of the officer and based upon what he or she is seeing. That's the law. And we do not have their perspective. It could have been done.

THE COURT: I mean, there's personal subjective perspective?

MR. MELLEY: That's the law. Correct. Because the --

THE COURT: So you look at it from the perspective of a reasonable officer, right?

MR. MELLEY: Yes.

1     THE COURT:  Not what these particular guys were

2 thinking?

3     MR. MELLEY:  No.  It's what were these officers

4 thinking.  And then the standard is, apply that to how, in a

5 variety of different ways, a reasonable officer might act.

6 There's not one choice.  There's many different choices that

7 an officer has.  And he can choose one path or another.  But

8 based upon what he's seeing and feeling he has options as a

9 reasonable officer to act.  It's not one set of rules.  He's

10 got a gambit that he can call upon.

11     THE COURT:  Yeah.  And that's why, and I let you

12 off the hook the first time, I won't this time, that's why I

13 thought of the police academy model.  Right.  The

14 plaintiff's case is played for the young, the young

15 probationers.  You are the professor, do you say, yes, this

16 falls within the reasonable response that an officer could

17 make to this situation or do you say, guys, don't do it that

18 way?

19     MR. MELLEY:  I think as part of the classroom

20 situation the professor has to say, so, class, what do you

21 think is the explanation from the officers as to why they

22 did what they did?  And then let's listen to it and then

23 let's evaluate.  Before you know what those officers are

24 thinking about, before there can be an evaluation of their

25 conduct, there has to be an understanding as to what they

1    are dealing with.  And that is not before this jury.

2              THE COURT:  In other words, they have to be called

3    every time in the plaintiff's case?

4              MR. MELLEY:  Unless --

5              THE COURT:  Or some admission offered or prior

6    testimony?

7              MR. MELLEY:  Correct.  Because otherwise you have

8    a total vacuum.  And that's the whole idea behind the

9    standard of a reasonable officer.  It's not the standard of

10   everyday civilian citizen on the street.  It's what does a

11   law enforcement officer do under the situation.

12             THE COURT:  All right.  Thank you.  I'll deny the

13   motion.  I'll explain briefly why.

14             I think, you know, the discussion which has been

15   helpful has foreshadowed that.  In looking at the case from

16   the plaintiff's perspective only, not having heard from the

17   defense, I think the jury could find, either through direct

18   testimony or through a reasonable process of inference, that

19   this incident was the result of -- was initiated in an

20   unprofessional way by Detective Gordon who called a civilian

21   who was standing in the roadway talking to a cab, a mother

22   fucker.  And the exchange of words escalated from there.

23             That a reasonable jury could believe Mr. Outlaw,

24   that he was not particularly engaged in this discussion with

25   the officer, but was talking to his friend in the cab.  Made

a gesture with his hand.  The jury could infer that all of
this, this exchange caused Detective Gordon to lose his
temper and to stop the car and to walk back in an aggressive
manner.  And instead of addressing Mr. Outlaw as a police
officer to a civilian, to kick him twice and to proceed to
beat him up joined by Officer Allen.

Officer Allen had, from the plaintiff's case,
nothing to do with the original incident and the loss of
temper.  But a jury could find that the blows from the
baton, which were severe enough to cut Mr. Outlaw's scalp,
and from the plaintiff's case, break his knee, were greatly
in excess of what was required under the circumstances,
which was a minor incident, which could and should have been
handled in a diplomatic or a professional way and wasn't by
these officers.

I say all of this, that's why I started at the
beginning, and I'll repeat it again, without having heard
the officer's side of the story.  I simply looked at the
facts from the plaintiff's side.  And I think a reasonable
jury could find, without hearing directly from the officers
about what they were thinking at the time, that this conduct
was beyond the pale for a reasonable police response to a
relatively minor provocation.

From the plaintiff's side there's no evidence that
Mr. Outlaw provoked the incident initially or, or escalated

1  it by taking offensive action against Detective Gordon or

2  Officer Allen.

3        It appears from the plaintiff's perspective to

4  have been either still, standing still or forced to the

5  ground.  And I think both the excessive force and arresting

6  him for the charges for which he was charged were in excess

7  of what was needed under the circumstances from the

8  plaintiff's perspective.

9        So I'll deny the motion and we'll proceed with the

10 defendant's case.

11       MR. MELLEY:  Your Honor, may I indulge the Court

12 to take a short break?

13       THE COURT:  Sure.

14       MR. MELLEY:  I have the witness here.  And I had

15 a, I misplaced my stickers.

16       THE COURT:  Oh, of course.

17       MR. MELLEY:  We have shared, there's no surprises,

18 but I need a little time to just get my act together.

19       THE COURT:  Yes.  10 o'clock?

20       MR. MELLEY:  That should be fine.

21       THE COURT:  Perfect.  Okay.  Good enough.  Thank

22 you.

23       MR. MELLEY:  Thank you.

24       (The Court recessed at 9:52 a.m. and resumed

25 without the jury present at 10:10 a.m.)

1          THE COURT:  Ready for the jury?

2          MR. MELLEY:  Yes, Your Honor.  Thank you for the

3    break.

4          THE COURT:  Of course.  No, my pleasure.

5          Do we have a witness list?  It's a help if you

6    have one.  Exhibit list is what I'm trying to say.

7          MR. MELLEY:  Um, not at this time.  There's,

8    there's not going to be that many.

9          THE COURT:  Okay.  We'll be all right.

10          MR. MELLEY:  Yeah.  There's nothing that was not

11   on my trial management list of exhibits.

12          THE COURT:  Okay.

13          MR. MELLEY:  But --

14          THE COURT:  I'll just try to keep track as they

15   are admitted so we have a back up to her's, but I can make

16   it right here.  There's no problem.

17          MR. RIGAT:  Your Honor, if I may, this is a

18   housekeeping matter.  We don't necessarily have any

19   objection to these exhibits coming in, although there is one

20   part of Officer Allen's report that I --

21          THE COURT:  Let's take it up when it comes up.

22   All right.  Good enough.

23          (The Jury returned at 10:13 a.m.)

24          MR. MELLEY:  If I may proceed, Your Honor?

25          THE COURT:  Please.

1          MR. MELLEY:  I'll call Paul Michael Bruce to the

2    stand, please.

3          P A U L   M I C H A E L   B R U C E,  The

4    Witness, after being duly sworn, was examined and testified

5    as follows:

6          THE COURT:  Good morning.  Thanks for joining us.

7          THE WITNESS:  Thank you, sir.

8          MR. MELLEY:  May I proceed, Your Honor?

9          THE COURT:  Yes, please.

10         DIRECT EXAMINATION BY MR. MELLEY:

11   Q.    Good morning, Mr. Bruce.  How are you employed?

12   A.    I'm the operations manager for the City of Hartford,

13   Department of Emergency Services, the 911 servicing agency

14   for police, fire and EMS.

15   Q.    And how long have you been with the Hartford Police

16   Department in general?

17   A.    I've been -- this is my 12th year.

18   Q.    And what did you do before that?

19   A.    Prior to coming to Hartford I was a captain in the

20   Waterbury Police Department.  I served 27 years for the

21   Waterbury Police Department.

22   Q.    Currently, as the operations manager, did you say?

23   A.    Yes, sir.

24   Q.    Can you describe for us the general scope of your

25   duties?

1   A.   I have day-to-day management for the, all the

2   operations that occur within the 911 center.  We also manage

3   the city's radio system for police, fire, EMS and all the

4   non-emergency agencies.  We have a radio repair facility.

5   An IT staff.  We have approximately 40 dispatchers and six

6   supervisors and an administrative in satellite offices.

7   Q.   So how many employees are there in total within the

8   operations division?

9   A.   Um, about 65.

10  Q.   And is there a particular system that is used with the

11  police department as far as receiving and recording calls?

12  A.   Yes.  We have a computer dispatch system that is known

13  within the city as Hartbeat.  It manages our call in-takes,

14  call recommendations for service, unit recommendations.  And

15  basically keeps track of all the in-coming and out-going

16  calls dispatched for police, fire and EMS.

17  Q.   And how do you spell Hartbeat?

18  A.   H-A-R-T-B-E-A-T.

19  Q.   So it's not a heart it's Hartford Beat?

20  A.   Yes, sir.

21  Q.   And you say it's a computer generated system?

22  A.   Computer aided dispatch.  Yes, sir.

23  Q.   So what does that mean?

24  A.   The information is taken by call in-take personnel when

25  people call on the non-emergency lines or the 911 lines.

1  The call in-takers provide a triaging in effect which allows

2  them to properly classify and code the calls.

3        The calls are then sent forward to a dispatcher

4  and have a unit recommendation assigned to them

5  automatically by the CAD system.

6  Q.   And what is the CAD system?

7  A.   Computer Aided Dispatch.

8  Q.   And was this system in place back in 2004?

9  A.   Yes, sir.

10 Q.   And at my request did you pull together various CAD

11 computer generated calls for the evening of December 17 and

12 18, 2004?

13 A.   Yes, sir.

14 Q.   And can you just take a look at this document, which I

15 marked for identification as G.?   And can you tell us, sir,

16 whether you recognize that?

17 A.   Yes, sir.  I do.

18 Q.   And how would you describe that document, in general?

19 A.   This document is a compilation of and created timeline

20 covering four separate computer aided dispatch records that

21 summarizes the case at hand.

22 Q.   Okay.  And how many pages are there?

23 A.   Ten, sir.

24 Q.   All right.  I'd offer that document.

25        MR. RIGAT:  One moment, Judge.

1    MR. DiCROSTA:  Your Honor, may I just see what's

2    being -- we have a copy, but we have different numbers of

3    pages.  If we could just see what's being offered?  I don't

4    necessarily need to voir dire.  I just want to understand

5    it.

6         No objection, Your Honor.

7         MR. MELLEY:  I didn't put them all in.  I tried to

8    pull some extraneous material out.

9         THE COURT:  Sure.  I understand.  Any objection?

10        MR. DiCROSTA:  No objection, Your Honor.

11        THE COURT:  G. is admitted.

12   Q.   So, Mr. Bruce, I'm going to show you Page 1.  And if

13   I -- we don't need the exhibit number.  Is this what you're

14   referring to as the Hartbeat dispatch summary record?

15   A.   Yes, sir.

16   Q.   And upper left we see the date 12-17-2004.  And next to

17   that it says, event type 1070.  What does that mean?

18   A.   1070 is a breach of peace.  It's a disturbance.

19   Q.   Okay.  And priority, what does that mean?

20   A.   We have three dispatching priorities; A., B. and C..

21   A. is the most immediate.  B. is for just occurred incidents

22   that are not life threatening.  And C. are quality of life

23   issues we have to get to when we can.

24   Q.   So in, let's back up.  Would there be recordings of

25   these calls in?

A.    Audio recordings?  Yes, sir.

Q.    Yes.  Are they kept for a time?

A.    The city maintains a recording standard of current year plus one year.  The state statute retention is 30 days on 911 and radio tech traffic.  The city overdoes that by a year, current year plus one year.

Q.    So these records would have been kept until December, 2005?

A.    2006.

Q.    2006?

A.    Yes.

Q.    You said a year?

A.    Current year.  So it would have been 2006 -- 2005 plus one year.

Q.    It's 2004, the event?

A.    Yes.  Okay.  It would have been -- but it's a sliding scale.  So it would have been December, 2004 to -- it would have been all of 2004 plus 2005.

Q.    Okay.

A.    So if you were to ask for it in 2005 we would have had, 2005 is the current year, plus one year back to 2004.

Q.    Okay.  And as far as you can tell, was any request made for these recordings, the recordings, not the Hartbeat, within the year 2005?

A.    I do not believe so.  No, sir.

1    Q.    So those recordings were not kept because nobody

2    requested them to be made?

3    A.    That is correct.  When a request is made and the

4    recordings are made then the recordings are archived and

5    kept indefinitely.

6    Q.    Okay.  So, if this case is brought in 2007, that's a

7    year or two after the recordings are gone, is that right?

8    A.    That is correct.

9    Q.    So from the city's, from the officer's perspective

10   there's no way to get which, what has been erased because

11   it's gone?

12   A.    That's correct.

13   Q.    And are you sure the 1070 is a breach of peace priority

14   A. or is that something different?

15   A.    I believe it's a breach of peace, but I'm not a hundred

16   percent sure.

17   Q.    Okay.  So what is this -- we have the priority A.,

18   which means a higher level call from a citizen.  And in

19   terms of establishing when this started, what do we do?

20   A.    We have a timeline on the left.  It says time, 2343.

21   That is 11:43 p.m..  This is military time.

22   Q.    Okay.  And that's when it's received.  And what happens

23   when it's received?

24   A.    The call is triaged.  When the triage portion is

25   complete by the call in-take person they hit enter on their

1  keyboard.  And then the call goes into the queue for the

2  proper dispatcher based on the address.

3  Q.  Okay.  And when it gets to the dispatcher what happens

4  then?

5  A.  Being a priority A. a tone would have sounded at the

6  dispatcher's console.  This is to further alert the

7  dispatcher that we have a serious call waiting in queue and

8  they need to review it and prepare to dispatch it.

9  Q.  And can you tell us who was dispatched?

10  A.  The dispatcher that evening was Anthony Guisani.

11  Q.  Where do you see that on this?

12  A.  Um, at the bottom of the second line up from the bottom

13  to the far right.

14  Q.  Right there?

15  A.  Yes, sir.

16  Q.  Just to get back to that 1070, where it has comments on

17  this page, what does that mean to you?

18  A.  That's where the call in-take person puts additional

19  information.  The code only gives the dispatcher the most

20  broad based of indications as to what the call is.

21       The call in-take person then puts additional

22  information in here that gives them a better understanding

23  of the priority and what's taking place so they can notify

24  the officers in the field so they are prepared when they

25  arrive.

1   Q.    All right.  So would the dispatcher relay the
2   information of guys fighting in the street?
3   A.    Yes, sir.
4   Q.    And there's a recommended unit?
5   A.    Yes, sir.
6   Q.    And that's done at the same minute?
7   A.    It's all done by the computer.  It's automatically
8   performed in the background.
9   Q.    All right.  And what does it mean when it says, three
10  recommend unit, nine recommend unit?
11  A.    So two units were recommended for this call.  Unit
12  number three and unit number nine.
13  Q.    And at 2344 what do we have?
14  A.    Unit nine was dispatched to the call.  That was Officer
15  Allen.
16  Q.    And what about unit 30?
17  A.    Unit 30 was also dispatched.  That was Officer Frito.
18  Q.    Okay.  And at 2344 unit nine, what does that mean
19  there?
20  A.    Address changed to 179 Allyn Street.  Now, that
21  information could have come from either the officers in the
22  field or from an additional call from a citizen.
23  Q.    Okay.
24  A.    It was an update to the, to narrow the point of the
25  address where the call was dispatched.

1  Q.   All right.   Does that mean at 2344 unit nine, which

2  would be Officer Allen, would be at 179 Allyn Street?

3  A.   Yes.

4  Q.   Okay.   So, in other words, from the time he was

5  recommended it took him within that minute to get to the

6  location?

7  A.   A minute or less.   Yes, sir.

8  Q.   Which means that he's on duty somewhere in that

9  immediate vicinity?

10  A.   Correct.

11  Q.   And do you know what 179 Allyn Street is?

12  A.   I don't know, sir.

13  Q.   Okay.   So go to the next page.   And we have a

14  continuation, is that right?

15  A.   That is correct.

16  Q.   And so at 2344, this would be Officer Frito?

17  A.   Yes.

18  Q.   And his address is now at 179 as well?

19  A.   That's correct.

20  Q.   And then two minutes later we have unit nine and than

21  it says, additional assignment.   What does that mean to you?

22  A.   That is usually where the officer is requesting another

23  unit to, for back up coverage.

24  Q.   Okay.   So Officer Allen asked for assistance, is that

25  right?

A.    In some way or shape or form, yes.

Q.    And then unit three is again recommended.  We don't see any response from unit three at this stage, right?

A.    That is correct.

Q.    Okay.  So then we have, within that same minute, two other officers responding, is that right?

A.    That's correct.  Nineteen and 21.

Q.    All right.  And they both indicate that they are en route, is that right?

A.    Yes, sir.

Q.    And then we have 2346.  And it says, nine arrived.  Now that's Officer Allen, right?

A.    Yes.

Q.    And what does that mean, arrived?

A.    That he's stepping out or he's stopped his motion and he is exiting his vehicle.  He's arrived at the scene and is prepared to handle the situation.

Q.    Okay.  2346.  And everything else is the same as that first sheet, right?

A.    Yes.

Q.    Do we have a case number at this time?

A.    Not at this time, sir.

Q.    Okay.  So we move on.  And 2346, that's Officer Frito, he's arrived or stepping out as well?

A.    Yes.

1    Q.    And then 2348, Officer Allen, what does that mean?

2    A.    He's making a request for yet another back up vehicle.

3    Q.    Okay.  And, again, we have number three recommended,

4    but, again, we still don't have a response from unit three,

5    is that right?

6    A.    Yeah.  The dispatcher -- it's at the dispatcher's

7    discretion whether he calls for the particular unit that's

8    recommended.  He may know something that that particular

9    officer is doing that might prevent him from, from

10   responding in a more timely fashion than somebody else.

11   Q.    All right.  So then 2348 is, we have unit 213, is that

12   right?

13   A.    That is correct.

14   Q.    And that's Detective Gordon?

15   A.    Yes, sir.

16   Q.    Who indicates he's en route.  And then the next entry

17   is, he's arrived, is that right?

18   A.    Yes, sir.

19   Q.    And then unit 19, that's -- do you know who that is?

20   A.    Um, that would have been from the previous, if I can

21   refer here, 19 was Officer Burgos.  So he was -- he was

22   cancelled prior to the arrival, to his arrival.  He

23   indicated he was en route but for some reason he was

24   cancelled.

25   Q.    And everything else is the same at 2359 in terms of no

case number and we still have the priority A. and we still
have the code, is that right?

A.    That is correct, sir.

Q.    And then we move on.  And now we have a case number,
right?

A.    This is not the same incident, sir.

Q.    This is -- all right.  This is a different call?

A.    Yes, sir.

Q.    All right.  Do you have what happened to the end of
that call?

A.    Yes, I do.

Q.    You have it there?

A.    Yes, sir.

Q.    May I see it?

        MR. MELLEY:  May I have a moment with counsel?

        THE COURT:  Sure.

        (Attorneys conferring off the record)

        MR. MELLEY:  Your Honor, I have three more pages.
And I was trying to simplify this by reducing the paperwork,
but it looks like we're going to have to go into it.  And I
spoke with counsel and they have no objection --

        MR. DiCROSTA:  No objection, Your Honor.

        MR. MELLEY:  -- to me sliding this into Exhibit G.
These three pages.  So now we're up to 13.

        THE COURT:  Okay.

1  Q.   So just continuing then, Mr. Bruce.   This is the same

2  call, right?

3  A.   It is now the same call, yes.

4  Q.   All right.   And what does it mean 21 unit cleared?

5  That's another officer that was called in but has been

6  cleared not to go there?

7  A.   Originally we just saw briefly earlier that both 19 and

8  21 indicated that they were en route to Officer Allen's

9  request for back up units.

10  Q.   Okay.

11  A.   Here unit 21 is cleared at 2349.   But then at, shortly

12  after that, at 2349 plus, Officer Allen apparently requested

13  yet another additional unit.   And, therefore, at 2349 both

14  19 and 21, again, went en route to location.

15  Q.   And 19 arrives at 2349?

16  A.   Yes, sir.

17  Q.   All right.   And unit 21 arrives?

18  A.   Yes, sir.

19  Q.   And what happens after 2353?

20  A.   At 2353 all four units 213, 19, 21 and 30 cleared with

21  no disposition.   The final disposition of the call was group

22  disbursed.

23  Q.   And other than knowing that the group disbursed, this

24  doesn't give us any more information about whatever was

25  occurring there, is that right?

A.    No, sir.

Q.    Okay.  And just going back, we started this, there was
a review of guys fighting in the street.  And now we have
group disbursed.  But there's no indication that or you tell
us, is there any indication of any actual police activity on
this call?

A.    Um, sometimes the police activity is by the mere
presence, sir.

Q.    But there's no indication of anything further involved
by the police?

A.    Not on this particular call, correct.

Q.    Okay.  So one minute later -- well, let me just go
back, 'cause this location originally was 179 Allyn Street.
And now the location has changed to Allyn and High Street.
Do you know if that's in the same location of 179 Allyn?

A.    Vicinity, sir.

Q.    Excuse me?

A.    Vicinity.

Q.    Okay.  And if we go down Allyn Street and take a right
at the end of Allyn Street that brings us to Union Place, is
that right?

A.    That is correct.

Q.    All right.  So here we are at 2354 officer -- it says,
officer, but Detective Gordon is en route, is that right?

A.    What happens here is when an officer self-generates a

1    call the, the computer assigns these, it can't arrive

2    somebody unless they are even en route first.  It's kind of

3    just, it's lodged within the computer itself.  So it has --

4    even though he says I'm stepping out on a situation on X.

5    and Y. Street, it always indicates that, number one, he's en

6    route.  And, number two, he's arrived.  So there will always

7    be two entries for a self-generated call.

8    Q.    Okay.  And we don't have a reason for this or do we?

9    A.    He, it was originally classified as a 1070.

10   Q.    And do you know if that's the 1070 from Allyn Street or

11   is this something different?

12   A.    No.  This would be a new call, sir.  Excuse me.

13   Q.    All right.  And then at 2354, additional unit.  What

14   does that mean?

15   A.    It means that, 2354, that 213 is requesting additional

16   assignment.  He's requesting a backup unit.

17   Q.    Okay.  Now, and three is recommended, again?

18   A.    Again.  Yes, sir.

19   Q.    And we never hear from three?

20   A.    Not at this stage.

21   Q.    And 19 is en route?

22   A.    Yes.

23   Q.    And that's Officer Burgoes?

24   A.    Correct.

25           MR. MELLEY:  Your Honor, may I have a moment?

```
1              THE COURT:  Sure.

2              MR. MELLEY:  Thank you, Your Honor.

3    Q.    This next record goes back to 179 Allyn?

4    A.    Yes, sir.

5    Q.    So that's different from Officer Gordon on Union Place,

6    is that right?

7    A.    That is correct, sir.

8    Q.    And this indicates that at -- what happens at 2345?

9    A.    An EMS ambulance response was dispatched to the 179

10   Allyn Street call.

11   Q.    So as a result of that initial call an ambulance is

12   sent to 179 Allyn?

13   A.    Yes, sir.

14   Q.    All right.  And it indicates at 2347 it's arrived or en

15   route, right?

16   A.    That is correct.

17   Q.    And then at 2351 it has arrived?

18   A.    Yes, sir.

19   Q.    And then at midnight it's on its way to Hartford

20   Hospital?

21   A.    Yes, sir.

22   Q.    Because Hartford Hospital is 80 Seymour?

23   A.    That is correct.

24   Q.    Okay.  And what type of dispatch summary is this?

25   A.    This is again a Hartbeat dispatch summary for EMS
```

1    response.

2    Q.    Okay.  So the other records we were looking at was for

3    the police?

4    A.    Police side, yes.

5    Q.    The police side.  And this one is in there to show that

6    an ambulance was sent in response to this alleged fight?

7    A.    Yes, sir.

8    Q.    Okay.  And so -- all right.

9          So the ambulance is there, in the area, at 2351 at

10   179 Allyn?

11   A.    Yes, sir.

12   Q.    All right.  And just going forward with this, this is

13   again the EMS summary showing that it arrives at the

14   hospital at four minutes after?

15   A.    Correct.

16   Q.    Okay.  And then at that same time your work is

17   completed for the EMS, for the ambulance?

18   A.    Yes, sir.

19   Q.    Okay.  So that would indicate that it was sent to the

20   scene at 179 Allyn Street, at midnight it leaves and four

21   minutes later it's at the hospital?

22   A.    Correct.

23   Q.    Okay.  So we have this that shows Officer Allen is en

24   route and he's got -- what's going on with him at this

25   stage?

A.    At triple zero three he's indicating that he is en

route and arrived um, but I am not sure if that is

indicating he's en route or had arrived at 80 Seymour.  I

believe that's what's taking place here that he's en route

and arrived at the hospital in conjunction with the

ambulance.

Q.    All right.  So he's arrived at Hartford Hospital at

1203?

A.    Yes.

Q.    Okay.  And then this next indicates at four minutes

after midnight Norman Godard, do you know who he is?

A.    He was a field supervisor or sergeant for Hartford

Police at that time.

Q.    So he is en route as of four minutes after midnight,

right?

A.    Yes, sir.

Q.    And then he arrives at quarter after midnight, is that

right?

A.    Yes, sir.

Q.    All right.  And then at 28 minutes after midnight

that's Officer Allen, arrest made, case number to follow.

What does that mean?

A.    That means he's clearing himself off of this call

indicating that he has made an arrest.  He has a case

number.  And the report will be filed before the end of his

shift.

Q.   Okay.  And then at the end we have, at 5:51 unit 12 is

en route and then arrives.  And what does that mean to you?

A.   Um, it, I believe that unit 12 was sent to the hospital

as a relief for the officer, for an officer guarding the

prisoner at the hospital.

Q.   Okay.  And so at 5:51, number 9 is Officer Allen, and

he is -- his address has changed to where?

A.   50 Jennings, which was the police department.

Q.   So he's off duty at that time?

A.   He has not gone off duty as of yet, no.

Q.   Well, he's off of this particular matter?

A.   He's off of this case, yes.

Q.   Okay.

        MR. MELLEY:  Nothing further at this time.

        MR. DiCROSTA:  May I approach, Your Honor?

        CROSS EXAMINATION BY MR. DiCROSTA:

Q.   Good morning, Mr. Bruce.

A.   Good morning, sir.

Q.   A couple quick questions by way of clarification.

There's a part of the exhibit where, Defendant's Exhibit G.,

the first page, groups disbursed.  Can you --

A.   Sir, may I request you speak up a little bit?

Q.   Certainly.  Can you tell me what that means, group

disbursed, the disposition at the top of the page?

A.    That means the officers managed to break up the group

from what they were doing, but no further action was

necessary.

Q.    And how is that determined?  I know that's, that's

inputted by dispatch?

A.    That's correct.

Q.    Who reports that to dispatch?

A.    A field officer.  They have to provide a clearance code

to the dispatcher so that we can close the call out.

Q.    I see.  And that the comment, guys fighting in the

street, toward the middle of that?

A.    Yes, sir.

Q.    How was that reported to --

A.    That's placed --

Q.    How is that reported to the dispatcher?

A.    That's from the caller, from the complainant whose

calling for the services.

Q.    So dispatch, you see that on your screen?

A.    Yes, sir.

Q.    The date's 12-17.  And is that part of the police

portion of Hartbeat or is that --

A.    No.  This is an EMS portion from Hartbeat.

Q.    So the comments, large fight, who would be reporting

that to the dispatch?

A.    Um, the -- it was placed into the system by the call

in-taker, which was call in-taker ETO Whitney Stewart based

on information he received from a caller.

Q.   Can you explain who the caller is?

A.   The caller, the complaint, whoever called 911 for

services.

Q.   Saying that there's a large fight in the street?

A.   Yes, sir.

Q.   At 179 Allyn Street?

A.   Yes, sir.

Q.   Does the -- I just noticed it indicates method,

citizen.  Is that how we determine whose calling this in, if

you would, or whose providing the information to dispatch?

A.   There's three methods of receiving the call.  One you

would see E911 there, which means it had come over a 911

line.  Citizen indicates that it came over a non-emergency

line, a routine line.  And officer would indicate that it

came from an officer in the field.

Q.   Okay.  Thank you.  You might have explained that.  I

might have just missed it.  I apologize to make you repeat

it.

          I'm showing you the last page of Hartbeat.  Do we

know --is this the part, I guess I'm getting a little

confused.  Is this the part which is the police?  I think we

went back and forth with police and dispatch.  This is a

police, this Hartbeat reflects police activity?

1    A.    That is correct.

2    Q.    And you said it indicates method, officer.  So we can

3    determine from this document that the call came in from an

4    officer, is that fair?

5    A.    The call was originated by an officer.  Yes, sir.

6    Q.    Can you tell me what the comment 18, what the comments

7    mean?

8    A.    Eighteen means unit 18, car 18.  He was assigned to

9    bring leg irons for an item A., which is an arrest.  That's

10   synonomous with arrest in our language.

11   Q.    Can you tell me who he's bringing them to or can you

12   determine --

13   A.    This 32 leg irons changed to U9, unit nine, which would

14   have been Officer Allen.

15   Q.    Does that mean Officer Allen is delivering -- what does

16   that mean?

17   A.    No.  He's the one whose going to be responsible for the

18   leg irons.

19   Q.    So does this indicate that unit 18 -- what was unit 18?

20   Can you tell from this document or do you have that

21   information available?

22   A.    One moment, please.  Unit 18 was Officer Reginald

23   Early.

24   Q.    And he's, am I correct that -- so let me ask you first,

25   what does that mean, 18 is bringing leg irons to whom?

A.    To Officer Allen.  Officer Allen is currently guarding

his prisoner at the hospital.  And at some stage he made a

determination that, for whatever reason, whether the party

was being admitted or was going to be there longer term than

just for ease, brief treatment, that leg irons would have

been necessary for his security.

So he would have made a request through dispatch

or his supervisor to have a set of leg irons brought to the

hospital for his use in guarding his prisoner.

Q.    Can you tell me at what time unit 18 was in process of

bringing the irons, the leg irons to unit nine?

A.    Um, unit 18 was dispatched to manage the leg irons at

0243 in the morning.

Q.    Are you referring to other documents or --

A.    It's part of the documents that this was extracted

from.

Q.    Okay.  2:43 in the morning?

A.    Yes, sir.

Q.    And this is on December 18, 2004?

A.    That's correct, sir.

Q.    And can you tell me, are we looking at the EMS

portion -- how do you tell if it's the EMS portion or the

police, the law enforcement portion of Hartbeat?  Is there a

code anywhere?

A.    Yes, sir.  If you look at the event type on the

1    document here on the top second line.

2    Q.    The 1070?

3    A.    The 1070.  All 10 codes are police codes.  EMS codes

4    are coded 30.  Thirty-XX.  In this case it was 3072.

5    Q.    Okay.

6    A.    And fire calls in the city are designated as 20-XX.

7    Q.    Give me just one second.

8    A.    Certainly.

9    Q.    So the 1032, that's a -- those calls are generated --

10    that would be EMS generated?

11    A.    No, sir.  That's a police generation.

12    Q.    Okay.  1070 was a police generated.  Did I get it

13    backwards?

14    A.    No.  Anything that begins with 10 is police.

15    Q.    Oh, I'm sorry.

16    A.    So here we have 1070, 1032.

17    Q.    I understand now.  It takes me a little while, but I'll

18    get there.

19    A.    No problem, sir.

20    Q.    And then type 3072, that is an EMS?

21    A.    That's EMS.  Yes, sir.

22    Q.    Because it starts with 30 as opposed to 10?

23    A.    Correct, sir.

24    Q.    Okay.  Drawing your attention to what's on the screen

25    now.  That indicates that -- can you tell me what that

1  indicates?

2  A.   This is indicating that, that EMS unit AMR929 arrives

3  at the hospital at four minutes after midnight.

4  Q.   And do we know where that's coming from?

5  A.   Coming from the, from the vicinity of 181 -- from

6  either the Allyn Street call, is what's on here, but I

7  believe he was actually coming from the Union Place call.

8  Q.   And how do we know that?

9  A.   Um, it's not documented on this paper.

10 Q.   Okay.  Do we know what time the ambulance arrived at

11 the Allyn Street call?  I mean, you said you believed it to

12 be from Union Place?

13 A.   Yeah, it was, because in actuality they are basically

14 right around the corner from each other.

15 Q.   But this, this ambulance arriving at four minutes past

16 midnight, you believed that to be the ambulance dispatched

17 from Bourbon Place?

18 A.   It was originally dispatched to the large fight at

19 Allyn Street.

20 Q.   Okay.

21 A.   And it was still, still out on that.  But when the

22 officers cleared that they were still in the area.  And then

23 it is my belief that they were called over or came upon the

24 Union Place event and took that one, but never cleared one

25 call and started a new one.

1  Q.    I see.  I see.  Okay.  Thank you very much.

2  A.    Yes, sir.

3         MR. MELLEY:  Just very briefly.

4         FURTHER EXAMINATION BY MR. MELLEY:

5  Q.    On that last subject, did you do any exploration to see

6  if we had a separate call for an ambulance through the

7  Hartbeat as to the Union Place?

8  A.    I did a search for that and did not locate a specific

9  dispatch for Union Place.

10 Q.    All right.  So, in other words, that's why you said

11 that the ambulance that responded to Union Place was likely

12 the one that responded around the corner to Allyn Street?

13 A.    Well, we know that because it was 929.  And 929 was

14 originally dispatched to Allen and subsequently made the

15 trip to Hartford Hospital with a patient.

16 Q.    Okay.  So the ambulance that responded to this initial

17 call, that didn't arise to anything, is the ambulance that

18 was on site and then brought the patient to Hartford

19 Hospital?

20 A.    That is correct.

21        MR. MELLEY:  Okay.  Thank you.

22        MR. DiCROSTA:  Nothing further, Your Honor.

23        THE COURT:  All right.  Appreciate you coming in,

24 sir.  Thank you.

25        THE WITNESS:  Thank you, Your Honor.

1        THE COURT:  The jurors content to go through noon?

2   Anyone need a break before then?  If something comes up.

3        MR. MELLEY:  If I may proceed?  We call Sergeant

4   Gordon, retired sergeant.

5        T R O Y    G O R D O N,   the Witness, after being

6   duly sworn, was examined and testified as follows:

7        DIRECT EXAMINATION BY MR. MELLEY:

8   Q.   Good morning.

9   A.   Good morning.

10  Q.   I forgot part of an exhibit sheet.  Good morning.

11  Retired Sergeant Troy Gordon.

12  A.   Yes, sir.

13  Q.   All right.  So what are you retired from?

14  A.   Hartford Police Department.

15  Q.   All right.  And when did you retire?

16  A.   March 28, 2014.

17  Q.   So not quite two years?

18  A.   Correct.

19  Q.   And how long were you with the department?

20  A.   Twenty years.

21  Q.   Let's go back.  Prior to being with the Hartford Police

22  Department, what did you do?

23  A.   I worked as a corrections officer.

24  Q.   Where?

25  A.   State of Connecticut.

1    Q.    At what facility?

2    A.    Summers and Cheshire.

3    Q.    And how long were you there?

4    A.    Four and a half years.

5    Q.    And then where did you go from there?

6    A.    To Hartford Police Department.

7    Q.    Okay.  And so when did you enter the academy?

8    A.    That would be March of 1994.

9    Q.    Okay.  And Hartford Police have their own academy for

10   the training and instruction of officers?

11   A.    That's correct.

12   Q.    And how long was that program, course?

13   A.    Approximately six months.

14   Q.    Six months?

15   A.    Yes.

16   Q.    So then where do you go from there?

17   A.    You go to the patrol division.

18   Q.    And what does that mean, patrol division, with the

19   Hartford Police Department?

20   A.    You are assigned to a division within the police

21   department patrolling the different districts within the

22   City of Hartford.

23   Q.    So you would be like a beat officer?

24   A.    Well, you can have a walk beat or you could be in a

25   cruiser or you could be assigned to a headquarters or

1    detention facility.

2    Q.    How long were you a police officer?

3    A.    I believe, from 1994 until 2001 I believe.

4    Q.    So about seven years?

5    A.    Yes.

6    Q.    And then what happened?  Were you promoted?

7    A.    I was promoted to detective.

8    Q.    And how do you become a detective?

9    A.    You apply for the position.

10   Q.    Okay.  So let's back up.  In general, in the 7 years as

11   an officer, were you assigned to any special type of

12   divisions within the Hartford Police Department?

13   A.    Before I went to a detective position I was in the auto

14   theft from 2000 -- I believe from February, 2000 until

15   November of 2000.

16   Q.    Okay.  And what did you do in auto theft?

17   A.    I was attached to the state police, to their task

18   force.

19   Q.    And with that Connecticut State Police Task Force what

20   would you be doing?

21   A.    Anything related to auto theft crimes.  You know,

22   whether it's stolen cars, chop shops, unlicensed garages,

23   those type of things.

24   Q.    And where would you be working with this joint task

25   force?

1   A.    Anywhere in the State of Connecticut.

2   Q.    So even though you were a Hartford Police Officer,

3   because you were with this joint task force, you might be

4   working outside of Hartford?

5   A.    That's correct.

6   Q.    And how many Hartford Police Officers were on this task

7   force?

8   A.    There were two at the time.

9   Q.    You and another one?

10   A.    Yes.

11   Q.    All right.  And how long did you stay with this task

12   force?

13   A.    From February of 2000 until November of 2000.

14   Q.    And what happened in November?

15   A.    I went back to the patrol division on the Hartford

16   Police Department.

17   Q.    Okay.  And how long were you there?

18   A.    From November until, again, February of 2001.

19   Q.    And then what happened in February of 2001?

20   A.    I was promoted to detective.  And then I went back to

21   the state police task force as a detective.

22   Q.    Okay.  So when you went back to the state task force,

23   how long were you there?

24   A.    I believe I stayed there until 2003.  I don't remember

25   what month it was.

Q.    Okay.  And what happened then?

A.    I went back to Hartford Police Major Crimes Division.
And I did homicide investigations, robberies investigations
and burglary investigations.

Q.    And were you working within that major crimes unit as a
detective?

A.    Yes, I was.

Q.    And how did that operate, the unit in general?

A.    What do you mean, sir?

Q.    Well, you said murders or robberies.  I mean, you
investigate every murder or do you go out on one and you
follow it through or how does that work?

A.    Well, you were assigned by your supervisor.  I didn't
know how the rotation came up, but when I first got there I
was assigned to robbery.  And I was somehow drawn into a
homicide because no one else answered up for a shooting that
took place one night.  And it was just a shooting and it
turned out to be a fatal shooting at a scene that I answered
up to the call that became my case.

Q.    And how long were you with that case?

A.    Until I made the arrest.

Q.    And how long was that?

A.    I think the incident happened in November of 2003.  And
I made the arrest in January of 2004.

Q.    Okay.  Were you on the scene of the actual murder?

1    A.    Not at the time, no.

2    Q.    So you came upon it afterwards?

3    A.    Yes.

4    Q.    And were you involved in the gathering of evidence

5    relating to that actual incident?

6    A.    No.  Not gathering of the evidence.  We have a certain

7    evidentiary division that would go out and collect the

8    evidence.

9    Q.    Okay.  So when we get to December of 2004, you just

10   told us what was going on, where were you working?

11   A.    I was back in auto theft at the time.

12   Q.    Okay.  And do you recall approximately when that was?

13   A.    When I went back to auto theft?

14   Q.    Yeah.

15   A.    Not exactly.  No, I don't.

16   Q.    Sometime in 2004?

17   A.    Yes.

18   Q.    All right.  And at that time were you associated solely

19   with the Hartford Police Department?

20   A.    Yes.

21   Q.    And do these task forces with the state or federal come

22   and go depending upon different fundings or whatever?

23   A.    Yes, they do.

24   Q.    So from your perspective you go where you're told, is

25   that fair?

1    A.    That's correct.  Yes.

2    Q.    All right.  So you're back in auto theft.  And, in

3    general, in 2004, what does that mean as far as your regular

4    duties?

5    A.    Again, I deal with stolen cars and crimes related with

6    stolen cars, whether it's chop shops, unlicensed garages um,

7    unauthorized tows, basically illegal tows.  Um, anything

8    dealing with cars basically because a lot of times stolen

9    cars are used to facilitate other crimes.  So sometimes it

10   would overlap to another case, whether it was a drug case or

11   a homicide case or something of that nature.

12   Q.    Okay.  So did you have regular hours in 2004 when you

13   were assigned to this auto theft detail?

14   A.    Well, there's some times I worked on the day shift and

15   some times I worked on the evening shift.  And the day shift

16   usually would start from, in major crimes, from 7 til 3.

17   And the evening shift would start from 3 to 11. And I would

18   fluctuate.

19   Q.    Okay.  And on the evening of December 17, do you recall

20   what your hours were?

21   A.    No, I don't.  I believe, I believe I might have been

22   working the second shift, the evening shift.

23   Q.    The evening.  And what does that mean?

24   A.    I came on at 3 o'clock.

25   Q.    Okay.  And when would you get off?

A.    Normally I would go home around 11 o'clock.

Q.    Okay.  And do you know, of your own recollection, if you were down for overtime this day or was your shift going to end?

A.    I don't remember.

Q.    Okay.  But if your shift was going to end, do you know?

A.    Sometimes, yes, unless I have paperwork that I'm working on or something holds me over.  I normally would go home at 11 o'clock.

Q.    We just went through some events that related to 179 Allyn Street in Hartford.  Do you recall hearing that?

A.    Yes.

Q.    And is 179, is that Coach's?

A.    I believe so, yes.

Q.    And Coach's is what?

A.    Some type of bar.

Q.    And is it a large facility?

A.    I cannot tell you because I've never been in there.

Q.    Okay.  And when that first call went through do you have any recollection as to where you were?

A.    Initially no, I don't know where I was.

Q.    Okay.  If I may approach the clerk?

        THE COURT:  Sure.

Q.    If I may approach?  I'm showing you what was marked as Exhibit G., well, actually, why don't I take it and I can

1    put it on the Elmo.

2              THE COURT:  Sure.  That's fine.

3    Q.    We're back to this.  So when you see event type 1070

4    what does that mean to you?

5    A.    That's a type of an assault.

6    Q.    Okay.  So we heard before a breach of peace?

7    A.    That was incorrect.  It's an assault.

8    Q.    Okay.  And would a breach of peace be a priority A.?

9    A.    It can be a priority A., yes.

10   Q.    All right.  But an assault is clearly a priority A.?

11   A.    Well, it also would depend on if it's something that's

12   active.

13   Q.    Okay.

14   A.    If, because you do have times when it's a non-active

15   call.  Say it happened two hours ago, or something like

16   that, then it would be a priority C. because it's no longer

17   active.  Maybe the victim's at the hospital or something

18   like that.  So then that would reduce it down to a C. call

19   because it's no longer active.

20   Q.    But this is a priority A. call?

21   A.    Yes.  That means it's something that's going on right

22   then.

23   Q.    And what does that mean to you as a detective working

24   in the City of Hartford?

25   A.    That means we should get there pretty quickly.

Q.    And why?

A.    Because someone's actively being assaulted.

Q.    Okay.  So were you ever dispatched to this call?

A.    No, I was not.

Q.    But in response to hearing the radio did you go to the scene?

A.    Yes, I did.

Q.    And why?

A.    Well, if I'm close to a call that comes in, something like a priority A. or a priority B. call, regardless of what my assignment is, if it's something that I can pull away from I will respond to that to assist.

Q.    Okay.  So at this time we're very close, we're actually past when you would get off duty, is that right?

A.    That's correct.

Q.    All right.  And do you have any recollection as to why you were not done at 2343?

A.    I do not remember what I was doing that day.

Q.    But something brought you into the general vicinity and when you heard the call you responded?

A.    Right.

Q.    Okay.  So when we get to 2348 that's you, right?

A.    Unit 213, correct.

Q.    Unit 213 is en route and then you arrive?

A.    Yes.

1   Q.   All right.  And do you have a memory as to what was

2   there when you arrived?

3   A.   As far as this call?

4   Q.   Yes.

5   A.   When I got there um, I didn't see a fight.  I saw, I

6   saw cars that were moving through, down Allyn Street kind of

7   slowly turning onto Union Place.  But I saw no fight there.

8   There was a lot of people out walking and a lot of vehicular

9   traffic.  I didn't see a fight.

10  Q.   Okay.  So did there come a point where it was decided

11  that there was nothing for the police to do at this site?

12  A.   Yes.

13  Q.   Okay.  So did that effectively end your involvement on

14  Allyn Street?

15  A.   Yes.

16  Q.   Which brings us to you leaving the scene of this

17  incident.  And where were you then headed?

18  A.   Because I came all the way down Allyn Street you have

19  to make a right turn onto Union Place because it's a one way

20  going northbound on Union, on Union Place.  So I made that

21  right turn onto Union Place.

22  Q.   So that was your only way out of the Allyn Street

23  address?

24  A.   Yes.

25  Q.   I would like to show you a diagram.  Can you identify

1   that for us?

2   A.   This is a diagram of Union Place and Allyn Street going

3   from Allyn Street northbound toward -- up Union Place

4   toward, I think it's Church Street.

5   Q.   Okay.  And is that the way the street looked by way of

6   a diagram in 2004?

7   A.   Yes.

8              MR. MELLEY:  I would offer it.  I offered it.

9              MR. RIGAT:  No objection.

10             THE COURT:  What's the exhibit?

11             MR. MELLEY:  C..

12             THE COURT:  C. is admitted.

13             MR. MELLEY:  If I may?

14             THE COURT:  Please.

15  Q.   I think this is about as well as we can do.  All right.

16             So let's orientate ourselves, please.  Does the

17  top of the page point north, to the best of your knowledge?

18  A.   That's correct.

19  Q.   And to the right of the page would mean it's east?

20  A.   Yes.

21  Q.   And if we go east from here, just by way of

22  orientation, we're going to end up eventually, what is it,

23  Anne Street, High Street?

24  A.   High Street I believe is one street up.

25  Q.   And then Trumble?

1   A.   Oh, God.  I don't remember now.

2   Q.   All right.  But eventually we end up Main Street and

3   the river?

4   A.   Yes.

5   Q.   So that's the whole downtown area?

6   A.   Right.

7   Q.   All right.  And then if we look to the left side of

8   this, is this all the train station and transportation

9   center?

10   A.   Yeah.  The train station is to the left of us.  And to

11   some other part or building, that's a little northbound to a

12   part that's not part of the train station.  I don't

13   remember -- there's some kind of -- there used to be

14   businesses in there.  There used to be a club there.  I

15   don't know what it is at this time.

16   Q.   And behind us, we saw a picture earlier, all the way

17   directly behind us southbound would be running into the

18   State Capital?

19   A.   Correct.

20   Q.   Okay.  So looking at this, when you would come down

21   Allyn Street, just so we're clear, I think you indicated you

22   had to take a right because you can't take a left, it's one

23   way?

24   A.   That's correct.

25   Q.   All right.  If I may, so if we do a quick switch and we

1    go to Plaintiff's Exhibit 1, this is describing what you

2    just told us about.  Whoops.  Is that right?

3    A.    Yes.

4    Q.    And there's, right in the middle, that do not enter

5    sign, is that right?

6    A.    Right.

7    Q.    So you described a fair amount of traffic in the area,

8    vehicular?

9    A.    Vehicular and pedestrian.

10   Q.    And pedestrian.  So did you normally work in this area?

11   A.    No, I didn't.

12   Q.    Were you familiar, in general, with the various

13   establishments on Union Place?

14   A.    Somewhat, yes.

15   Q.    And are there a number of bars?

16   A.    Yes.

17   Q.    And in this particular area are there a number of bars

18   that cater to a younger crowd, younger being 20's, 30's?

19   A.    Yes.

20   Q.    In other words, you are not going to see a lot of older

21   people, it's mainly a younger crowd?

22   A.    That's correct.

23   Q.    And a lot of these bars have music, is that right?

24   A.    Yes.

25   Q.    And a lot of them are open late?

A.    Yes.

Q.    And let me just direct your attention.  You've heard about Papa's.  Do you know Papa's, did you?

A.    Yes, I did.

Q.    It's long closed, right, or do you know that?

A.    I haven't been there in years.

Q.    All right.  And, to your knowledge, was that open 24 hours a day?

A.    Back then it was, yes.

Q.    And would that attract a lot of people as well?

A.    Yes, it would.

Q.    So, directing your attention back to Exhibit C., can you tell us where Papa's would be on this map?

A.    Papa's would be this um, on the corner of Allyn and Union Place, that building, the first building there would be on the northern, the northern end of it.  Like, part of this building belonged to some type of club or something. And then Papa's was on the north side of it, the north end of it, the north half.

Q.    So we have numbers there 48, 50, 52?

A.    Right.

Q.    Is it one of those?

A.    Right.  Yes.  I believe Papa's was 54 Union.  54 Union Place.

Q.    So that puts it not that far from the corner?

1    A.    That's correct.

2    Q.    All right.  And that puts us on a spot on Union Place

3    that's, is that 30 point -- 30 feet, nine inches?

4    A.    The width of the street?

5    Q.    Yes.

6    A.    That's correct.  I don't know the exact measurements,

7    but it --

8    Q.    That's what this indicates, right?

9    A.    Right.

10    Q.    And when you come down Allyn Street, and you take your

11    right-hand turn onto Union Place, do you recall cars being

12    parked on the right side of Union Place?

13    A.    Yes.

14    Q.    And on the left side of Union Place, in this vicinity

15    of Allyn Street going north, were there cars parked?

16    A.    Yes.

17    Q.    And when you came around was there a cab double parked

18    in this vicinity?

19    A.    Yes.

20    Q.    So in terms of where the cab was doubled parked, can

21    you give us a marker as it relates to Papa's?

22    A.    It was -- it was across from where Papa's was, directly

23    across the street from Papa's.

24    Q.    Okay.  So if it's in that vicinity does that

25    indicate -- are you indicating to us that there were three

1    vehicles taking up the roadway, one parked on the right

2    side, one parked on the left side and the cab double parked?

3    A.    That's correct.

4    Q.    So if we have those three vehicles double parked is

5    there a lot of room for a lane of traffic?

6    A.    There is a lane of traffic.  And I wouldn't say there's

7    a lot of room.

8    Q.    Okay.  And when you finished up on the Allyn Street

9    call, I just want to be clear, there's people moving around

10   this whole area?

11   A.    Yes.

12   Q.    So when you come down and you take your right-hand turn

13   what do you see?

14   A.    I see the double parked vehicle.  And I see a civilian

15   standing outside of the double parked car on the passenger

16   side talking inside, talking to the people inside the double

17   parked vehicle.

18   Q.    Okay.  Now, later on the next morning, at some point,

19   you did a report, is that right?

20   A.    Yes.

21   Q.    And let's go back to the beginning.  When you were in

22   the academy, to what extent were you trained on writing

23   reports?

24   A.    Basically you write whatever happened, whatever you

25   observed.

Q.    Okay.  And --

A.    The action that you took and the reason why.

Q.    Okay.  And do you do that at or about the time or soon after the actual event?

A.    Yes, sometimes you can.

Q.    And do you do -- did you do your best in terms of recording that which you recalled?

A.    Yes.

Q.    And to your knowledge, are these records kept in the ordinary course of the Hartford Police Department?

A.    Yes.

Q.    And from your perspective was your report an accurate summary of what you saw and heard that night?

A.    Yes.

          MR. MELLEY:  I'd offer it.

          MR. RIGAT:  Your Honor, we have no objection.

          THE COURT:  Okay.  What's the exhibit number?

          MR. MELLEY:  D..

          THE COURT:  D. is admitted without objection.

          MR. MELLEY:  I'm going to hand it to the witness if I may, Your Honor?

          THE COURT:  Sure.

Q.    And, Sergeant Gordon, as we're going forward, to the extent that you need your report to assist you in recalling the events, can you please refer to it?

A.    Yes.

Q.    All right.  I'm just trying to think if I can -- I don't think it's going to show up here.  So we'll just go through this.

At the time that you wrote the report you indicated --

MR. MELLEY:  Your Honor, may I indicate, or the jury will have this ultimately when they get the case?

THE COURT:  You will have all the exhibits when you get the case, including Exhibit D..

MR. MELLEY:  Thank you.

Q.    So at the time that this incident occurred you were in your 11th year?

A.    Yes, sir.

Q.    And you were assigned to the major crimes?

A.    Yes.

Q.    And you were operating an unmarked police vehicle?

A.    Yes.

Q.    What is that?

A.    It's a police vehicle that has no um, visual markings identifying it as a police vehicle.

Q.    Okay.  And what was it?

A.    It was a Ford Taurus.

Q.    And was that vehicle assigned to you or was it shared with other detectives?

1   A.   No.  It was shared with my other detectives.

2   Q.   Okay.  But this was your vehicle for the evening?

3   A.   Yes.

4   Q.   And you've indicated that you were dressed in plain

5   clothes?

6   A.   That's correct.

7   Q.   And what does that mean, plain clothes?

8   A.   Dressed in regular street clothes with no uniform.

9   Q.   And why?

10   A.   Because of the assignment that I work.

11   Q.   Okay.  So what did you have on?

12   A.   I don't remember exactly what I was wearing, but I know

13   I had on a jacket.  I'm not sure which jacket I was wearing

14   at the time.  I had boots, long pants, gun belt and my

15   equipment.  And I believe I might have had a hat on, a

16   winter hat.

17   Q.   Okay.  What kind of jacket, sports jacket or a winter

18   coat or what?

19   A.   Hartford Police has -- major crimes has two different

20   types of jackets.  Um, one was a black one with yellow print

21   that has a Hartford Police Badge on it with my first

22   initial, my last name and my arrest code.  And it's like a

23   nylon type.  I think it's more of a rain coat, wet weather

24   type thing, wet weather type jacket.

25         And then the other one is a bluish color with gold

1    or yellow print that has the same thing; the badge on the

2    front, it has my first initial, my last name and my arrest

3    code underneath.  And on the back it says, in big letters,

4    HPD, major crimes.

5             On the black one I think it says, major crimes

6    Hartford Police Major Crimes and it has a picture of a badge

7    I believe.

8    Q.   Did you have --

9    A.   I don't know which -- I don't know what I was wearing

10   that day.  I don't know -- normally, when I'm doing

11   surveillance or something like that, I don't want those type

12   of jackets.  I usually wear some type of other civilian

13   jacket to hide my identity if I'm doing surveillance.

14   Q.   Okay.  So do you know which jacket you were wearing?

15   A.   I have no idea which jacket because I don't remember

16   the assignment I was doing that day.

17   Q.   Okay.

18   A.   So I don't know if I had one of those jackets on or if

19   I had one of the jackets I'd use for when I'm doing

20   surveillance.

21   Q.   You described a gun belt.  What is that?

22   A.   That's a duty belt that has --

23   Q.   A what?

24   A.   A duty belt.

25   Q.   A duty belt?

A.    That has, as Officer Allen is wearing right now, where
you have a service weapon, radio carrier um, your baton,
your handcuff case and OC.  I don't wear the OC in my plain
clothes because it affects me.  So I don't use it.

Q.    Did you have on a gun belt this evening?

A.    Yes, I did.  And I also wear a police vest as well.

Q.    And what is a police vest?

A.    The ballistic vest that we wear.  It's a bullet
resistant vest that I wear underneath the clothing.

Q.    Okay.  So even though you are in plain clothes, are you
still required to wear that vest?

A.    You're not required, no, but I do.

Q.    Okay.  And as plain clothes, are you required to have a
gun belt?

A.    No, you are not.

Q.    But did you?

A.    Yes, I always do.

Q.    Okay.  And do you recall if you had a radio that night?

A.    Yes, I did.

Q.    And where would you keep the radio as you are moving
around?

A.    Well, if I'm in the car it's not in a holster because
it always keys the miche from when I sit.  So I'd have that
stuffed between the seat in the vehicle.  Once I get out, if
I'm going to walk around or something, I would put it in the

1  carrier.

2  Q.   Okay.  And can you describe the radio that you would

3  have had on December 17?

4  A.   It's a green radio, like an olive drab green, the

5  military green.  Approximately eight inches in length, maybe

6  four inches thick and maybe three inches wide.

7  Q.   Would you have used that radio on this evening to

8  indicate your presence at Allyn Street?

9  A.   Yes.

10  Q.   And would you have used it when you turned onto Union

11  Place?

12  A.   Yes.

13  Q.   And did you use that before you got out of the vehicle?

14  A.   I don't recall if I used it when I said I -- when I was

15  on scene.  I don't really remember.

16  Q.   Okay.  In any event, you're alone at the time?

17  A.   Yes.

18  Q.   All right.  Do you have a computer in the car?

19  A.   Yes.

20  Q.   And how --

21  A.   Correction, no.  I did not have a computer in that

22  vehicle.  No.

23  Q.   Okay.  So, let's back up.  Outside of Coach's, whatever

24  was going on, never goes to anything, you're going to return

25  to whatever you're doing, and you go down Allyn, you take a

1  right and you said that you saw a group of people standing

2  outside this cab, is that right?

3  A.   Not a group of people.  Just one person standing

4  outside the cab.

5  Q.   Okay.  And when the person was standing outside the cab

6  could you tell where the person was in relation to the cab?

7  A.   Standing next to the front passenger door of the

8  vehicle.

9  Q.   Okay.  And how was this person situated?

10  A.   He was leaning, he was leaning like on the car talking

11  to the people inside the car.

12  Q.   Okay.  And when you came around and you saw this

13  individual what did you think?

14  A.   He was causing a -- he was interfering with the flow of

15  traffic.

16  Q.   Okay.  Do you have knowledge of, in general, what type

17  of incidents take place down there?

18  A.   A lot of fights.  If you're talking about Mr. Union

19  Place?

20  Q.   Union Place.

21  A.   There's a lot of fights that go on there.  There are

22  occasions when you have car breaks, different kind of

23  disturbances.

24  Q.   Okay.  So why is the flow of traffic important?

25  A.   Because a lot of people are walking to and from clubs,

business establishments, going to their cars.  And they're
out there just socializing.  So you need to have, for safety
reasons you need to have the streets clear.

Q.    Okay.  So when you see this individual, and you make
the observation that he's impeding the traffic, what do you
do?

A.    I asked him to move out of the street.  Once I was able
to get up to where he was I asked him to move out of the
street.

Q.    How did you ask him?

A.    The same way, can you move out of the street please.

Q.    Did you swear at him?

A.    No.  No, sir.

Q.    And did you have your window down?

A.    At the time I did, yes.

Q.    Okay.  And do you recall how far you were from him when
you asked him to move?

A.    Maybe, maybe three feet.  Maybe about three feet behind
him.

Q.    Okay.  And did you shout it or say it?

A.    No, I just spoke it to him.

Q.    Okay.  And what was his response?  And you can look at
your report if you need to.

A.    He replied, why don't you shut the F. up.

            THE COURT:  That's okay.  You can say the words

1   too.

2           THE WITNESS:  But I don't swear.

3           THE COURT:  All right.  Just initial is fine.

4           THE WITNESS:  So he says shut the F. up.

5   Q.   All right.  You put, you wrote down?

6   A.   Yes.  That, because those aren't my words.  Those are

7   his words.

8   Q.   Okay.  And when he said, why don't you shut the F. up,

9   what did you do?

10  A.   I repeated it.  I repeated, can you please move out of

11  the street.

12  Q.   Okay.  And while you were doing that were you still

13  moving in the vehicle?

14  A.   When I spoke to him, no, I was stopped.

15  Q.   When you spoke to him the first time?

16  A.   When I spoke to him the first and the second time I was

17  stopped.  And when I said to -- when I said to him the

18  second time I started to ease forward.  And then I was just

19  going to keep on going.  And then he says, if you get out of

20  the car I'm going to kick your A..   And it was at that time

21  I decided to place him under arrest.

22  Q.   Why?

23  A.   He was making threats.  I mean, you have someone

24  downtown in that area, where it's known for having, you

25  know, various altercations.  A lot of times alcohol is

1    involved.  So people don't think rationally.

2            And I figure this is going to be a problem.  If

3    he's talking to someone whose just asking him politely to

4    move out of the street, if he's saying these types of things

5    to him, what happens if someone else comes up to him and

6    says something differently in a different demeanor and a

7    different type of verbiage and it escalates to something

8    else.

9    Q.    So in your mind, at that moment, when he said, why

10   don't you get out of the car -- or wait a minute.  Did we

11   miss something?  How many times did he speak to you?

12   A.    It was twice.  Because he said the second time, he

13   says, why don't you get out of the car and see what happens.

14   That one, I just blew that off.  But as I started to move

15   forward that's when he says, if you get out of that car I'm

16   going to kick your A..

17   Q.    When you heard, if you get out of the car I'm going to

18   kick your A., how did you interpret that phrase?

19   A.    I took that as a threat.

20   Q.    A threat to what?

21   A.    A threat to my safety and to anybody else who would

22   approach him in any type of negative way.

23   Q.    So at that point in time -- well, let me ask you this,

24   did you recognize this individual at all?

25   A.    I've never seen him before.

Q.    Did you recognize the cab at all?

A.    No.

Q.    Did you recognize anybody else in the area?

A.    At that time?  No, I didn't.

Q.    Okay.  So when he says this to you, to what extent did you feel you had a duty or an obligation to take some sort of action?

A.    Once he made that threat, once he told me, if I get out of that car he's going to kick my A., that's when I felt I had a duty to act.  I mean, the fact that he's blocking traffic is one thing.  You know, yes, it's a safety issue. And I would have felt bad if I had left and he stayed there and someone who may have been intoxicated or something, or misjudged the turn, come around and strikes him and severely hurts him or kills him or something like that, I would have had a hard time dealing with that.  But the fact that once he made that threat it went to a different level.

Q.    So when it goes to that level, as a detective assigned to auto theft, to what extent do you have any obligation to act in your mind?

A.    Well, you have a duty to act.

Q.    Why?

A.    Because if you don't take some type of action, and this guy does something to someone else after you've had contact with this person, you find that he's, you know, he has that,

1  that potential to maybe instigate something else, someone

2  gets seriously hurt and you fail to act, then you are liable

3  for it.

4  Q.   Okay.  So this is right around the time you are

5  supposed to be gone for the end of the day.  Why don't you

6  just drive away?

7  A.   I'm not in it for the money.

8  Q.   Okay.  Did you take an oath?

9  A.   Yes, I did.

10 Q.   What does that oath say?

11 A.   I don't remember verbatim what it says, but I know that

12 I have a duty to protect the people who are weak.  Protect

13 the people and make them feel safe.  To look after those who

14 are incapable of standing up for themselves.  That's my job,

15 to look out for them.

16 Q.   So when you heard this threat, as you phrased it, in

17 your mind did that give further rise to the idea that you

18 got to follow that oath and you got to take some action?

19 A.   Yes.

20 Q.   So what do you do at that point?  Do you put the car in

21 park?

22 A.   I pull up a little bit.  I put the car in park.

23 Q.   What's a little bit?

24 A.   Maybe, I don't know, a couple car lengths maybe.

25 Q.   Okay.

A.    Um, because I wear a badge around my neck underneath my clothing I took that out.

Q.    Can you show us?

A.    (So indicated)

Q.    I saw that up close.  That says retired?

A.    Yes, it does.

Q.    Is there any difference, other than that, from what you had when you were on the force?

A.    No, but this is a sergeant's badge.  It's a little different than a detective's.

Q.    When were you promoted?

A.    To sergeant?

Q.    Yeah.

A.    November, 2005.

Q.    Okay.  So not quite a year after this whole incident?

A.    Correct.

Q.    So, you pull up, you start to pull out the badge, do you get it out?

A.    Yes, I got it out.

Q.    All right.  And what do you do?

A.    I let it hang around my neck.  I get out, I open the door, I grab my radio.  I close the door.  And I start walking back to Mr. Outlaw.  I didn't know his name at the time.  But walked back to the gentleman that I was having the words with.

Q.    Where is he?

A.    He's still in the same location.  He's standing next to the passenger's side of the double parked vehicle.

Q.    Okay.  And as you go back do you say anything to him?

A.    No.

Q.    Why not?

A.    I'm not up to him yet.

Q.    Okay.  And what happens?

A.    When I got closer to him he looked at me and he just came toward me and he like threw a punch at me.

Q.    Okay.  Did he say anything?

A.    No, he didn't.

Q.    So as he's coming towards you what are you thinking?

A.    He's trying to assault me.

Q.    Okay.  So you are thinking that, you see him moving towards you, what do you do?

A.    Well, when he went to punch me I leaned back and toward -- I had the radio in my right hand, I leaned back and I kicked at his shin with my left, with my left foot.  And I made contact with his shin which caused him to stop advancing towards me.

Q.    What kind of move is that, a kick towards the shin?

A.    It's a defensive move.  It's just to back someone off of you.

Q.    Is that something you are trained in or just something

1   that you picked up or what is it?

2   A.   Just something that I picked up.

3   Q.   Okay.  Did you make contact with him?

4   A.   Yes, I did.

5   Q.   And why did you make contact with him at that point?

6   A.   I felt he was trying to assault me and I needed to keep

7   him, keep him away from me.  He was bigger than I was.

8   Q.   Okay.  So when the kick connected what happened next?

9   A.   From that point um, it just happened really fast.  And

10  other police officers were in the area.  Um, I proceeded to

11  subdue Mr. Outlaw.

12  Q.   Okay.  Did Mr. Outlaw make physical contact with you

13  when he swung at you?

14  A.   He hit me in the vest area, in the upper chest area.

15  Q.   And from your perspective was that an assault?

16  A.   Yes.

17  Q.   And an assault is a crime?

18  A.   Yes.

19  Q.   So before we had, yeah, impeding traffic, but then we

20  have a threat.  And now, from your perspective, we have an

21  assault?

22  A.   Yes.

23  Q.   And the assault is the actual touching of you without

24  your permission?

25  A.   Correct.

1   Q.    So after that one kick by you of his shin, did you ever

2   touch him again?

3   A.    Never.  Not again.

4   Q.    Okay.  You indicated that other officers suddenly

5   appeared in this timeframe?

6   A.    Yes.

7   Q.    And this is all pretty quick?

8   A.    Yes.

9   Q.    All right.  And do you recall Officer Allen being

10  there?

11  A.    Initially, no.  I didn't know, I didn't know who was

12  there.

13  Q.    Okay.  So, in terms of the actual observations that the

14  other officers, including Officer Allen, might have made,

15  it's fair to say you don't know what they saw?

16  A.    That's correct.

17  Q.    Because you're, you're just focusing on what you're

18  seeing, is that right?

19  A.    Right.  Yes.

20  Q.    And from your perspective, do these other officers help

21  you out?

22  A.    Yes, they did.

23  Q.    And was their actions the reason that the assault on

24  you, in your mind, stopped?

25  A.    Correct.  Yes.

1    Q.    Now, looking at your report there's an indication Mr.

2    Outlaw is subdued and handcuffed.  And you don't have any

3    part of that, is that right?

4    A.    No, I do not.

5    Q.    Okay.  Do you recall somebody then coming up to you

6    saying that they witnessed it and they wanted to give a

7    statement?

8    A.    Well, they didn't come up and say they wanted to give a

9    statement.  Um, --

10   Q.    You can look at your report.  And specifically I'm

11   referencing the second page in the lower portion.

12   A.    Right.  Um, Mr. Richard Rakus, I believe it is, he

13   approached me claiming that he witnessed the entire

14   incident.

15   Q.    And do you know where Mr. Rakus came from?

16   A.    No, I didn't.  I had no idea where he came from.

17   Q.    Okay.  And to this day do you know where he came from?

18   A.    I heard that he was in the cab.  I didn't know he was

19   in the cab, but --

20   Q.    We heard the other day, through Mr. Outlaw, that he was

21   in the cab?

22   A.    Right.

23   Q.    And just so we're clear, this is -- so you got his

24   basic information of his name and his date of birth?

25   A.    Yes.

1   Q.    And how did he appear to you?

2   A.    I smelled alcohol on his breath.

3   Q.    Okay.  And how was he speaking?

4   A.    Just rambling on.

5   Q.    What does that mean, rambling on?  You use that word,

6   what does that mean?

7   A.    He was just going on and on talking to me.  It seemed

8   like a bunch of nonsense.

9   Q.    Okay.  Did a supervisor show up?

10   A.    Yes.

11   Q.    Who was that?

12   A.    That was Sergeant Norman Godard.

13   Q.    Okay.  Is that noted on this?

14   A.    It's on the second page um, on the second to the last

15   sentence I believe it is.

16   Q.    There it is.  Sergeant Godard.  So did you refer Mr.

17   Rakus over to Sergeant Godard?

18   A.    I didn't refer him over, but I, I gave that

19   information, Mr. Rakus' information to Sergeant Go in case

20   he wanted to speak to Mr. Rakus about it.

21   Q.    Okay.  And in terms of what Sergeant Godard did or

22   didn't do, do you have any direct personal knowledge?

23   A.    No, I don't.

24   Q.    And do you have a memory of Sergeant Godard being at

25   the scene soon after this event happened?

1    A.    Yes.

2    Q.    And is that standard?

3    A.    Yes.

4    Q.    You get a supervisor to any sort of incident, they come

5    down and evaluate it?

6    A.    Well, any type of major incident or any type of

7    incident involving an off duty, on duty police officer, yes,

8    the supervisor will show up on scene.

9    Q.    Do you recall if he gave you any instructions?

10   A.    He did not.

11   Q.    Okay.  Did you go to the hospital?

12   A.    Yes.

13   Q.    And do you recall if you spoke to Officer Allen there?

14   A.    Yes, I did speak to Officer Allen there.

15   Q.    Okay.  And other than exchanging -- well, what did you

16   talk about with Officer Allen?

17   A.    I told him about the incident that happened between

18   myself and Mr. Outlaw.

19   Q.    Okay.  So you reported to Officer Allen?

20   A.    Yes.  He was the officer that was taking the case.  So,

21   yes, I did.  I told him my, my incident.

22   Q.    Okay.  And do you recall if that was before or after

23   you wrote your report?

24   A.    That was --

25   Q.    If you know?

A.    I think that was before I wrote my report.  I'm not a
hundred percent sure though.

Q.    There's a case number at the top of this?

A.    Yes.

Q.    Do you know where that came from?

A.    I got it from Officer Allen I think.

Q.    At the top of this page, it's kind of cutoff, but right
in that language, it refers to supplement.  What does that
mean?

A.    That means it's additional to the, the, let me get the
word right here, the main report.  So it's basically like an
addendum.  Like, one officer would write the initial report
and then any other officer that has information pertaining
to that would write a supplement report.

Q.    Okay.  So this is a supplement to the report that
Officer Allen did because he was the arresting officer?

A.    That's correct.

        THE COURT:  It's about the time.  Are you done
with questions or are you ready to start in after lunch?

        MR. MELLEY:  I may be very close to being done,
but if we take a break now it will speed it up.

        THE COURT:  Sounds good.  Why don't we give you
until 1:15, okay.  Catch you guys then.

        (The Court recessed at 12:00 p.m. and resumed
without the jury present at 1:25 p.m.)

1          THE COURT:  All right.  We're going to take Dr.

2   Spinella out of order.

3          MR. MELLEY:  Yes, please.

4          THE COURT:  That work for you?

5          MR. MELLEY:  I appreciate counsel agreeing.

6          MR. RIGAT:  Yes, Your Honor.

7          THE COURT:  So let's bring in the jury.

8          (The Jury returned at 1:27 p.m.)

9          THE COURT:  We're going to suspend the testimony

10  of Sergeant Gordon for a little while and take, with the

11  agreement of the lawyers, and the Court, take a witness out

12  of order whose here, a physician who will testify for the

13  defense now.  Once he's finished then we'll go back and

14  complete the testimony of Sergeant Gordon.

15         MR. MELLEY:  If I may, Your Honor?

16         THE COURT:  Yes.

17         MR. MELLEY:  I would call Anthony J. Spinella, MD,

18  please.

19         A N T H O N Y   J.   S P I N E L L A,  The

20  Witness, after being duly sworn, was examined and testified

21  as follows:

22         DIRECT EXAMINATION BY MR. MELLEY:

23  Q.   Good afternoon, doctor.

24  A.   Good afternoon.

25  Q.   At my request, did you do a review of some medical

1  records on the case of Tylon Outlaw?

2  A.    Yes.

3  Q.    Let's back up.  You are a doctor?

4  A.    Yes.

5  Q.    What kind of doctor?

6  A.    Orthopedic surgeon.

7  Q.    And what do you do?

8  A.    We take care of people who have musculoskeletal

9  problems which involve the muscles and bones of the limbs.

10 Medical treatment and surgical treatment.

11 Q.    Can you briefly describe your educational background

12 for us?

13 A.    Pardon me?

14 Q.    Your education?

15 A.    Yes.  I graduated from Kingswood School in West

16 Hartford in 1966.  I graduated from the College of Holy

17 Cross in Worcester, Massachusetts in 1970.  In 1974 I

18 graduated from St. Louis University Medical School in St.

19 Louis, Missouri.  And then I did my residency at Boston City

20 Hospital in Boston, Massachusetts.  And left there in 1979.

21 Came back to my hometown of Hartford.  Started practice in

22 Hartford at Saint Francis Hospital where I've been since

23 1979.

24 Q.    And while you were in medical school did you achieve

25 any honors?

1   A.    Yes.

2   Q.    And what was that?

3   A.    Well, there was a clinical award that I received in

4   medical school.  I also had belonged to honor society.

5   Q.    Have you published anything?

6   A.    Yes, I have.

7   Q.    In the nature of orthopedics?

8   A.    Yes.

9   Q.    And have you had an occasion to teach?

10  A.    Yes.

11  Q.    Can you just briefly describe that for us?

12  A.    We teach residents that come through Saint Francis

13  Hospital from the University of Connecticut.

14  Q.    And have you been affiliated with any hospitals, you

15  mentioned Saint Francis, any others?

16  A.    Yes.  Early on in my career I was at Newington

17  Children's Hospital, which is now Connecticut Children's

18  Hospital.  When they switched from Newington to Connecticut

19  I stopped going there.

20        I also was a consultant at the Rocky Hill

21  Veteran's Home and Hospital in Rocky Hill, Connecticut.  And

22  my main practice is always at Saint Francis.

23  Q.    Have you been affiliated with any sports?

24  A.    Yes.

25  Q.    And can you briefly describe that?

A.    Well, I was with the Hartford Whalers when they were
here.  And prior to that I took care of a soccer team that
was called the Hartford Hellions.  They were around for a
little while.  They were an indoor soccer team.  I've also
taken care of some college and high school teams.

Q.    Now, you and I met on this file?

A.    Pardon me?

Q.    You and I met on this file?

A.    Yes.

Q.    And when was that?

A.    When was I what?

Q.    When did we meet on this file?

A.    On this file.  The first time we met was about a week
or two ago in my office.  You had called me.  We had spoken
before, but the first time we met on this file was about a
week ago.

Q.    And in the past have I asked you to review other files?

A.    Yes.  One or two.

Q.    One or two over how many years?

A.    Oh, since 1979 to here.  So 36.

Q.    Okay.  So can you -- do you have your file with you?

A.    Yes, I do.

Q.    And can you briefly describe for the jurors the medical
information that you had an opportunity to review regarding
this matter?

1  A.   Sure.  Just let me take my file out for a second.  I

2  basically reviewed these two folders.  The first folder

3  includes, actually three sub-folders, which one is 1A. I

4  called it.  The medical records on this case involving this

5  injury.  The second volume is 1B..  And in that I reviewed

6  some imaging on a CD that Attorney Melley sent me that

7  involved the injury.

8        And then there's a third volume, which is volume

9  1C., which was the initial deposition of Dr. Lena.

10  Q.   And what was the date on that deposition?

11  A.   On the first depo?

12  Q.   Yes, please.

13  A.   October 15, 2010.  That's the first deposition.

14  Q.   Thank you.

15  A.   And then in the second volume I have more medical

16  reports, more CD imaging.  And included in that I have

17  volume number 3, which I just received by FAX, which is Dr.

18  Lena's second deposition, which was done a short time ago.

19  Q.   All right.  And let's just talk about the imaging that

20  you received on the CD.  Can you describe for us what that

21  is, what type of imaging?

22  A.   Sure.  The basic imaging, when the patient came to the

23  emergency room at Hartford Hospital, he had numerous x-rays.

24  And those x-rays involved both lower extremities and

25  specifically the knees.  I believe he also had a chest

1  x-ray.

2        And after that, shortly after that, I believe the

3  next day or hours later, he had surgery on his fractured

4  kneecap.  There were more x-rays done during the surgery and

5  after surgery of the knee.  And then later on there were

6  x-rays in numerous stages of healing of the fracture as the

7  fracture went on to heal.

8  Q.   And the x-rays appear on the CD in an image, in other

9  words, you can see that x-ray?

10 A.   Did I what?

11 Q.   You saw the x-rays on the CD?

12 A.   Yeah.  I mean, the CD, you know, it's -- you put

13 photographs on a CD and put it in a computer.  It's the same

14 sort of thing.  In these cases they are x-rays or the MRI,

15 CAT Scan, whatever you have is given to you on a CD.

16        And they have various tools involved with that CD

17 that you can make the pictures bigger or smaller, darker or

18 lighter, zoom in on certain areas.  Similar to what you do

19 with photography if you have some pictures you might be

20 looking at on your computer at home.

21 Q.   Let's go back to the beginning.  You said that on the

22 date of the incident, when he was initially brought into

23 Hartford Hospital, before the surgery, there were x-rays

24 done of both knees?

25 A.   Yes.

Q.    So from your perspective what did those x-rays show

you?

A.    Okay.  Starting with the right knee, which was the more

symptomatic of the two knees, the most obvious thing was

there was a fractured kneecap straight across the kneecap in

the junction between the upper one third and the lower two

thirds of the kneecap.  Pretty clean break into two pieces

separated about a sonometer.  So there was a gap in the

bones.  And those two fragments were slightly out of

position.

        Also there was additional arthritis in that knee

between the major bones in the leg, which would be the

kneecap, which was also fractured, the femur and the tibia.

        On the left side there was no fracture, but

symmetrical, slightly less arthritis.  And both knees, the

tibia, which is the lower portion of the leg, was slightly

out of position compared to the upper portion, consistent

with an old tear that had been described in the records of

PCL injuries to the knee.

Q.    Okay.  Now, did you ever figure out when that original

PCL injury occurred to that left knee?

A.    No, I never saw it.

Q.    And were you ever able to determine what type of

surgery was done?

A.    Later, the second deposition that Dr. Lena gave, he

1    referred -- he must have had records that I didn't have

2    because he said it was orthoscopy done to the left knee.  I

3    don't know the extent of the orthoscopy that was done, but

4    there was a prior orthoscopic procedure of the left knee.

5            Left knee surgery had been mentioned several times

6    as being performed prior to this accident.  I never could

7    figure out what kind, but in this last deposition Dr. Lena

8    said it was orthoscopy.

9    Q.   You refer to an old tear of the PCL.  Did you bring

10   with you a model, at my request, of the knee?

11   A.   Did I what?

12   Q.   Bring a model of the knee?

13   A.   Yes, I did.

14   Q.   Can you describe to us what you're talking about when

15   you refer to the PCL?  And please use the model to assist?

16   A.   Sure.  You want me to stand up and go over here?

17   Q.   If that's the easiest way with the Court's permission?

18   A.   It's okay?  Okay.  So basically what we're talking

19   about -- can you hear me okay?  Basically what we're talking

20   about is you have three major bones in the knee, but there's

21   four, the three majors.  The upper bone, which is called the

22   femur.  That would be your thigh.  Okay.  The lower bone,

23   which is called the tibia.  And then you have the kneecap

24   which slides over the femur and down toward the tibia.

25           So when the knee bends and straightens the femur

and the tibia move this way and the kneecap is sliding this way, which on this model doesn't do too well.

The kneecap is embedded in the tendon of the quadriceps, which is the major muscle in your thigh.  That goes to the kneecap and then to the lower leg, which allows you to straighten your leg out.

Now, on the x-rays, let me go further on, there are ligaments that hold the knee in place.  They stop the knee from going too far this way, stop the knee from going too far this way, stop the knee from going too far forward and back.  So it's like a hinge on a door.

Now, the PCL is the ligament in the back of the knee right where your knee bends.  It's actually one of the major ligaments in the knee.  And in the front of the knee you have the anterior cruciate, which is the ACL, which is in front of the knee.

Now, the model doesn't really do justice completely to those structures, but the PCL is probably about twice as thick as the ACL.  And what the PCL does, it holds the knee from going like this.  It stops it from sagging back.  Because you have this ligament back here that holds the knee in position.  And the ACL stops it from going forward.

So when the knee goes partially forward or partially back we call that subluxation.  The knee is

1    partially out of place.

2          Now, on the patient's x-rays, which he had looking

3    at the knee from the side, so he'd be looking at it the way

4    most of you are looking at this, this bone was back this

5    way.  So that, therefore you knew there was something wrong

6    with that PCL in the knee, which was an old injury.  It

7    wasn't completely out of place, but it was slightly out of

8    place.  And it was slightly out of place in both knees.

9          And then you could see that because of the way

10   that bone was slightly out of place, it probably is what

11   contributed to the arthritis which was seen on the x-rays

12   the day of the injury.  And for you to see arthritis on the

13   x-ray the day of the injury it would have to be present for

14   months to years before the injury because that's something

15   that develops over time.

16   Q.   Thank you.  You can go back.

17         In your initial review of the x-rays from the date

18   of the incident before the surgery, how would you compare

19   the amount of this arthritis that you saw in the right knee

20   to the left knee?

21   A.   The right was always worse than the left, slightly

22   worse, but both were symmetrical because of the way that

23   tibia was sagging posteriorly from the ACL or PCL injury.

24   Q.   So for an individual, like Mr. Outlaw here, whose, at

25   the time of this incident 20 or 30 years old, is that to be

1  expected to have that arthritis?

2  A.   Well, there are different types of arthritis.   There

3  are inflammatory types of arthritis, which you can get at

4  any age.   You can get it as a youngster before you're even a

5  teenager.   And that's called inflammatory arthritis.   And

6  that would be like a rheumatoid arthritis, lupus, that type

7  of a thing, which is an autoimmune disease.

8           Then you have post-traumatic arthritis.

9  Post-traumatic arthritis is arthritis that occurs due to

10  trauma.   In this case the trauma that was sustained, that

11  probably caused the symmetrical arthritis in both knees,

12  were the PCL injuries.   And when those PCL injuries occur,

13  number one, the only thing that you're mentioning is the PCL

14  injury, but there are other associated injuries to the

15  bones, to cartilage, to meniscus in the knee which are not

16  seen on the x-ray.

17           Over time, with the knee being slightly out of

18  position, and these injuries to the cartilage in the knee,

19  wear and tear occurs and the knee degenerates much earlier

20  than you would think if your knee was not injured.   So those

21  are two major things.

22  Q.   So, just so we're clear, to the extent there's any

23  arthritis in both knees, it pre-dates, by some substantial

24  period of time, months or years, before December 17, 2004?

25  A.   That's correct.

Q.   Okay.  Now, in that x-ray done on December 18 at
Hartford Hospital, you indicated that there was a clean
fracture to the patella?

A.   Yes.

Q.   And what do you mean when you say, a clean fracture?

A.   Well, the break you're talking about?

Q.   Yes.

A.   Okay.  The, we divide fractures up into fractures that
we say are two pieces, which means the bone was just snapped
in half.  Which in layman's terms, you would call a clean
break.  And that is usually broken into two pieces.

        If the bone were shattered, as if you hit it with
a hammer, something of that nature, a direct force, it would
be comminuted in multiple pieces.

        So when we look at x-rays normally when we say
there's a fracture an orthopedist will go beyond just saying
there's a bone broken.  He'll say it's comminuted or it's
not comminuted, displaced or undisplaced, into the joint or
not into the joint.  So these are terms that we use so we
can converse with one another and tell them what we're
dealing with.  Just add more details to the situation.

        So the clean break that I'm referring to is that
it was as if you had just taken a knife or a piece of paper
and cut it straight through so it was broken in two places,
but separated.

1   Q.   So it was not comminuted, as you say, or shattered?

2   A.   The fracture wasn't visibly comminuted on the x-ray.

3   Dr. Lena had commented, I think during the surgery, that

4   there was no comminution, which normally you will see things

5   during surgery that you won't see on an x-ray, but

6   radiographically it was a transverse non-comminuted fracture

7   of the kneecap.

8   Q.   In general, how does that type of break occur?

9   A.   It's two major ways that these fractures occur.  Almost

10   any fracture, there's two major ways.  You have indirect

11   injury, direct injury.  And then the third way is a

12   combination of both.

13         An indirect injury would be, make believe that you

14   have a plastic chain and you're pulling a chain apart and

15   one of the links gives way, that chain has fractured or

16   separated through one of the links, not by a direct force

17   onto the link.  It's been overpowered by your pulling.  So

18   it's an indirect force that causes it.

19         A direct force would be now you take that plastic

20   chain and you lay it down on the floor and you take a hammer

21   and you smash it directly over one of those links.  That

22   link now has been broken by a direct force.  And you would

23   expect that that force would cause that link to be broken

24   into multiple pieces, which when we're dealing with a bone,

25   we call comminution.

1    Now, the combination of direct and indirect would

2  be that the muscle is pulling on a bone, say in this case

3  we're talking about the kneecap, so the muscle's pulling on

4  the kneecap holding the leg straight, plus the patient falls

5  or is hit.  And those combination of injuries cause what

6  you're seeing on the x-ray.

7    The more the fracture is non-comminuted the more

8  you would be saying that it is due to an indirect force.

9  The more it's comminuted you would be saying it's due to a

10 direct force.  But this patient didn't have a normal knee

11 going into the situation.  His kneecap and his knee was

12 slightly out of position.  So that explanation might not be

13 perfect for that patient or really any patient, but it's the

14 way we understand it.

15 Q.   So how does this -- you refer to direct or indirect, as

16 a practical matter how do most fractured patellas occur?

17 A.   Well first thing is we don't care.  We really don't

18 care whether it's direct or indirect injuries specifically.

19 The bone's broken.  We know what we have to do to fix it.

20 But it does change the way we try to fix it.  It does change

21 the way we would approach it.

22    The biggest thing with the direct force injury,

23 remember that's the one where the hammer is hitting the

24 plastic link, is that there's going to be injury to the skin

25 and things below the skin on the way down to the bone.

1    So the more force that you're hitting the bone

2    over the bone directly the more you're going to see a bruise

3    over the area.  And sometimes the skin will actually be

4    broken, scratched, abraded.  Or you might see an imprint if

5    you felt that the patient -- say if the patient was kicked

6    with somebody who had spikes on you would see spike marks.

7    You know, that's what you would see on the skin.  That isn't

8    what you would see on the bone.

9    So when you would operate on somebody like that

10   you'd be more concerned about infection.  You'd be more

11   concerned about trying to keep away from that area of

12   damaged skin.  So it affects a little bit about the way you

13   take care of it.  But it's not that critical to the care.

14   It might be critical to the outcome.  And it's

15   often critical when you're talking about medical-legal

16   causation, how did this happen, but we don't have to

17   determine that to take care of the patient.

18   Q.   So, we'll get to the care that was rendered in a

19   moment.  But in the first instance, do you have an opinion,

20   based upon medical probability, as to the cause of this

21   fractured patella, based upon your review of those records?

22   A.   I would say that most likely it would have been

23   primarily indirect injury.  Probably or possibly, let's say

24   possibly, with a component of a direct injury.  And that's

25   the typical way these things happen.

1    Somebody is standing.  Their knee gets bent too

2  far.  They fall.  And then you find out they had a fractured

3  kneecap.  The question's always, did they fracture the

4  kneecap before they hit the ground or did they fracture the

5  kneecap when they hit the ground.

6    And sometimes, looking at the comminution, the

7  skin bruises, this type of a thing, you can add a little bit

8  more information on that.  But it's not critical to the way

9  we're taking care of it.

10  Q.  So in terms of the component of the indirect and the

11  direct here, do you have an opinion as to what that direct

12  would likely be?

13  A.  Well, there is several things that have been introduced

14  in the record.  And one is that when the patient hit the

15  ground that was one component that could have happened from

16  the direct injury.

17    There were other mentions in there about being hit

18  with an object.  It wasn't completely described.  And that

19  could have been a component of it.

20  Q.  Okay.  In your review of the x-rays, is there evidence

21  of an object on that skin or in the medical records that

22  would indicate that an object was the cause?

23  A.  No.  That would have synched it completely.  You know,

24  if you would have seen, like we talked about, the spike

25  marks, if somebody got kicked.  If you could see an imprint

of an object. Say if somebody is hit with a Louisville bat

in the knee, and they fractured it, and you look at the knee

and it says Louisville where that stick hit it, that would

synch it for you. But then obviously there are other less

subtle variations of that, but nobody mentioned in any of

these records about seeing any direct force injury to the

skin.

Q. And you already indicated there's no evidence of any

comminution of a significant amount or a -- what was the

other word you used?

A. Right.

Q. Shattering of the bone. There was no evidence of

shattering?

A. There was no evidence of trauma to the skin.

Q. Right. But --

A. Yes.

Q. But the fracture itself did not show a shattering, is

that right?

A. No. As I said, x-ray-wise no comminution. At the time

of surgery Dr. Lena said that he saw a small area of

comminution, which is not unusual, even with an indirect

injury. But what I'm talking about seeing comminution due

to direct injury, it's something that's very obvious when

you look at the x-ray. You don't need to go to surgery to

see that type of a problem.

Q.    And we don't have that here?

A.    That's correct.

Q.    So broken patella, Dr. Lena takes him into the operating room, does the repair.  Anything unusual about that whole process of the surgery and the post-surgery?

A.    No.  Dr. Lena did a good job to put that kneecap together very nicely.  He used proper hardware.  Got the fracture to heal in good position.  The patient did very well.  Recuperated in the expected amount of time.  And did well from that fracture.

Q.    As we proceed in time, after the surgery, at some point Mr. Outlaw returns and there are additional x-rays being taken.  And I think from your initial viewpoint that would be your folder that shows in the beginning up to 2010 when we had certain records.

       And can you describe, in general, what those records show to you as far as what's on the imaging as to what's going on with his knees?

A.    Sure.  What happened is that the patient recuperated very nicely from the surgery.  He didn't get an infection.  The bone stayed together.  The hardware stayed together.  And the kneecap healed.

       Later on, Dr. Lena removed the hardware, which is typical that you would remove the hardware in this area because it's right below the skin.  You can feel it.  It

1    causes irritation.  It's best off removing it.

2         So he removed the hardware.  Later on, as time

3    went on over many years, he developed progression of his

4    arthritis in both knees.  And he had progressive symptoms in

5    both knees, more on the right than on the left.

6         So the arthritis progressed.  And it progressed

7    not really extraordinarily fast, but about what you would

8    expect the way it presented from the PCL's, the way it

9    continued over time.  You would expect that to get worse.

10        Certainly having fractured the kneecap didn't help

11   that knee, but when you look at the comparison of both

12   knees, and the left knee wasn't hurt that bad, both those

13   knees progressed about the same and presented about the same

14   with the right always being worse.

15        So as time went on it got more arthritic symptoms.

16   And Dr. Lena treated him for that.  They used medicines.

17   They used injections.  He also did orthoscopic surgery at

18   one time and removed some debris from the knee, which is

19   typical that you'll get that kind of a debris from arthritis

20   as time goes on.

21        And there were discussions about maybe the future

22   holding out that he might need knee replacements for this

23   problem with the arthritis that he had in both knees.

24   Q.   To what extent is the arthritis issue related to the

25   fractured patella?

1   A.   There probably is a small component of the arthritis

2   that's related to the fractured patella.  In this case it's

3   very difficult to determine that.  The major reason being

4   because of those PCL injuries to the knee we know from

5   people who sustain those injuries, who never fracture their

6   kneecap, that they get a certain amount of arthritis as time

7   goes on, independent of any intervening injuries.  And that

8   most of the times it's in the patella, in the kneecap itself

9   which is the same area that was fractured.

10          So it's hard to differentiate how much of that was

11  pre-existent.  We know there was a certain amount because it

12  showed up on the x-rays and how much of that is due to the

13  fractured kneecap.

14          So we are relying on the judgment of previous

15  cases and the surgeon to determine how much of this is

16  related to the previous problem and how much of this is due

17  to the present problem.

18  Q.   So how would you compare the two knees in this last set

19  of imaging that you saw?

20  A.   How would I compare the two knees?

21  Q.   Yes.

22  A.   The same as when he came in.  You know, the right

23  knee's always been worse than the left.  Both are pretty

24  much symmetrical right from the start.  And both got worse

25  over time.

He's had more treatment on that right knee because he had to have the hardware taken out. He had the additional problem of having a fractured kneecap. So there's no doubt that that right knee is slightly worse than the left knee from the start. And that kneecap fracture didn't help it. But there was arthritis going on already that was going to get worse with time if the patient was fortunate enough to live long enough. It's a typical, natural history of that problem.

Q. To what extent did the records show the patient's return to activity after the surgery?

A. Well, you know, initially, of course, there was the -- normally a fracture like this, acute healing is going to take place in about three months. So about three months you're pretty much done with what the doctor is going to do for you, but the process of healing from nature, God, whatever you believe in, is taking place over a year or two for the further heal.

As time went on the patient returned, by the description of the record, to a fairly high level of activity. There's talk about him running, playing football, doing things of that nature.

But then as the years went on you could also see that there was evidence of deconditioning. The patient fell once when his knee gave out. Probably due to weakening of

1  the muscles.  He gained a significant amount of weight.  It

2  looked like he gained about 10 or 20 in comparing the notes

3  in the records.

4          He had elevation in his cholesterol and lipids,

5  which is a mark of deconditioning, being overweight.  And I

6  think the added weight, the deconditioning and the

7  progression of arthritis all come together in what was

8  happening, plus the factor obviously.

9  Q.   As a result of the patella fracture to what extent do

10 you think he has a rating of a disability?

11 A.   A rating?

12 Q.   Yes.

13 A.   Dr. Lena had given him two different ratings.  One was

14 10 percent.  One was 20 percent.  I agree with the

15 10 percent rating which Dr. Lena had said in his first

16 deposition that was strictly for the fracture.  I would

17 agree with that.  That that fractured kneecap lead to a

18 10 percent impairment of the lower extremity because of the

19 fracture.  Additional problems with arthritis and other

20 things going on in the knee were probably added to that.

21 Q.   So do you have a craw with a 20 percent as a total or

22 do you think that's --

23 A.   No.  I think 10 percent of impairment is what he had

24 due to the fractured kneecap.

25 Q.   Okay.

1    A.    I think the total impairment of the knee is more

2    because of the arthritis.

3    Q.    Okay.  And the arthritis --

4    A.    But not as part of the fracture.

5    Q.    And the arthritis is that which pre-existed?

6    A.    Correct.

7    Q.    And progressed normally?

8    A.    Right.

9    Q.    Okay.

10          MR. MELLEY:  All right.  May I have a moment?

11   Thank you, doctor.

12          THE WITNESS:  You are welcome.

13          THE COURT:  All right.  Cross?

14          MR. RIGAT:  Yes, thank you.

15          CROSS EXAMINATION BY MR. RIGAT:

16   Q.   Good afternoon, doctor.  I'm Attorney Rigat.  I

17   represent Mr. Outlaw.

18          Your record review, it reveals that Dr. Lena has

19   been -- he was the surgeon that first treated Mr. Outlaw as

20   a result of the incident in 2004, correct?

21   A.    What was that again?  I'm sorry.

22   Q.    Let me rephrase that.

23          Dr. Lena has been treating Mr. Outlaw since 2004,

24   correct?

25   A.    Yes.

Q.   Okay.  And in that time you haven't examined him once, correct?

A.   Just -- no.

Q.   Thank you.

A.   As far as I know.

          MR. RIGAT:  Thank you.  I have no further questions.

          MR. MELLEY:  Thank you, doctor.

          THE COURT:  All right.  Appreciate you coming in, sir.

          THE WITNESS:  Thank you.

          MR. MELLEY:  I'll walk the doctor out as Sergeant Gordon returns to the stand.

          THE COURT:  That's fine.  Come on up and resume the stand.

          MR. MELLEY:  I have nothing further.

          THE COURT:  For Sergeant Gordon?

          MR. MELLEY:  Right.

          THE COURT:  All right.  Sergeant Gordon, I'll remind you you're still under oath from this morning.

          THE WITNESS:  Yes, sir.

          THE COURT:  Cross?

          MR. RIGAT:  Thank you, Your Honor.

          CROSS EXAMINATION BY MR. RIGAT:

Q.   Good afternoon, sergeant.  I just want to have my

1  recollection refreshed a bit.  So you arrived on scene at
2  what time?
3  A.   According to the computer I guess it was like 11:50
4  something.  I'm not exactly sure.
5  Q.   And there was an incident that you were responding to?
6  A.   That's correct.
7  Q.   All right.  And what was that incident?
8  A.   It was some type of fight that had taken place.  An
9  officer, supposedly was an off duty officer that was
10 involved or something.  I'm not sure.
11 Q.   An off duty officer was involved.  I understand.  And
12 as it turns out Mr. Outlaw had no involvement in that
13 incident, correct?
14 A.   That's correct.
15 Q.   Okay.  So you were turning from Allyn Street onto Union
16 Place?
17 A.   Yes, sir.
18 Q.   All right.  So you took a right?
19 A.   Yes.
20 Q.   And you proceeded in a northerly direction, correct?
21 A.   That's the direction I was heading in, yes.
22 Q.   All right.  And at some point you encountered Mr.
23 Outlaw?
24 A.   Yes.
25 Q.   All right.  And you're in an unmarked vehicle?

1 A. Yes.

2 Q. Right?  Okay.  And you're in plain clothes?

3 A. Yes, sir.

4 Q. All right.  And earlier in that evening you were

5 working as an undercover officer?

6 A. A plain clothes capacity.  Not undercover.

7 Q. I see.  Plain clothes capacity.  So you first noticed

8 that he's in the roadway?

9 A. Yes.

10 Q. All right.  And you asked him to move out of the road,

11 correct?

12 A. Yes.

13 Q. But you don't remember exactly what you said, correct?

14 A. It was something along the lines of, can you please

15 move out of the street.

16 Q. Right.  But you don't remember exactly what you said?

17 A. It was something to that effect.

18 Q. Okay.  And you never said, I'm a police officer,

19 correct?

20 A. Correct.

21 Q. All right.  And at that point in time you didn't take

22 out your badge from under your vest, right?

23 A. Correct.

24 Q. Okay.  And then you moved the car forward again or did

25 you?  Were you continuously moving or did you -- had you

1  stopped the car when you asked him to move out of the

2  street?

3  A.    I stopped the car when I addressed him.

4  Q.    Okay.  And then you moved the car forward again?

5  A.    Eventually.  Yes, that's what I did.

6  Q.    Did it occur to you -- let me step back.

7         Did you -- at that point in time did you indicate

8  that you are a police officer?

9  A.    No.

10 Q.    Okay.  Did you ever put on your -- did you have lights

11 in the car?

12 A.    I'm not a hundred percent sure if that particular car

13 did or not.

14 Q.    But you never flashed lights on or anything like that?

15 A.    No, I didn't.

16 Q.    And you never went and got out of the car to ask the

17 cab driver to move his double parked car?

18 A.    No, I didn't.

19 Q.    So then you moved forward.  And as you're passing Mr.

20 Outlaw he yells out something to you?

21 A.    Yes.

22 Q.    Okay.  And did you yell back?

23 A.    No.

24 Q.    Did you indicate at that time verbally that you are a

25 police officer?

1    A.    At what time, sir?

2    Q.    As he's yelling at you as you're driving by?

3    A.    I didn't say anything else to him.

4    Q.    And you didn't take out a badge or any identification

5    that you are a police officer?

6    A.    No.  Not at that point.

7    Q.    So then you drive by and you cleared the double parked

8    cab, right?

9    A.    Yes.

10    Q.    Okay.  And you're in front of the double parked cab as

11    you're proceeding in a northerly direction, correct?

12    A.    I'm ahead of him.  I don't know if I'm directly in

13    front of him, but I'm ahead of him.

14    Q.    You are ahead of him?

15    A.    Yes.

16    Q.    You were able to proceed down the road despite the

17    obstruction?

18    A.    Yes.

19    Q.    And so then that's when you got out of the cab, I mean

20    out of your car?

21    A.    Say that again, sir?

22    Q.    I'm sorry.  So you drive past the cab, right?

23    A.    Okay.

24    Q.    Okay.  Despite the obstruction of being double parked

25    and he's in the road and you come to a stop?

A.    Yes.

Q.    Okay.  And that's when you come out of the car?

A.    Once I put the car in park, yes.

Q.    Okay.  Now, how far away were you when you got out of your car, as best you can remember, and I realize it's been a while, to Mr. Outlaw?

A.    Probably about two car lengths.

Q.    And what would that be, about 15, 20 feet?

A.    Maybe a little bit more than that.  I'm not sure.

Q.    Okay.  A little bit more than 20 feet?

A.    A little more than 15.

Q.    I understand.  Okay.  As you get out of the car did you say, hey, I'm a police officer?

A.    No, that's not what I said.

Q.    You didn't say anything, right?

A.    Correct.

Q.    Okay.  And I believe, as I understood your testimony, that you had on dark clothing?

A.    I didn't say I had on dark clothing.

Q.    But you had plain clothes on, correct?

A.    That's correct.

Q.    All right.  And you had your badge under a vest?

A.    No, I did not.

Q.    Under your shirt?

A.    No, I did not.

1   Q.   What did you have your badge under?

2   A.   The badge was out and hanging.

3   Q.   Okay.  When did you take your badge out?

4   A.   Before I got out of the car.

5   Q.   As you got out of the car or before you got out of the

6   car?

7   A.   Before I got out of the car.

8   Q.   I see.  Okay.  Did you hold up the badge so that he

9   could clearly -- so somebody would see it and say, hey, I'm

10  a police officer?

11  A.   No, I did not.

12  Q.   You had in your hand a police radio, correct?

13  A.   Yes.

14  Q.   And it was, let's see, I believe you testified, eight

15  inches long by four inches, three inches wide?

16  A.   Something close to that.

17  Q.   All right.  And it's in military green, right?

18  A.   Yes.

19  Q.   Okay.  And it's at night?

20  A.   Umhum.

21  Q.   All right.  And as you're moving towards Mr. Outlaw,

22  that more than 15 feet, you don't verbally identify as a

23  police officer, correct?

24  A.   Correct.

25  Q.   Okay.  At some point you kicked him, correct?

A.   It didn't exactly happen that way, but, yes, eventually
I did.

Q.   All right.  Now, as this is happening you see a group
of people converging on behind Mr. Outlaw, correct?

A.   I'm sorry, say that again, sir?

Q.   Okay.  So you kicked at Mr. Outlaw and you saw a group
of, a swarm of individuals coming forward?

A.   No, I didn't see them coming forward at all.  I was
actually focused on Mr. Outlaw.  So I didn't see where they
came from.

Q.   Okay.  But at some point there were other police
officers on scene?

A.   Yes.

Q.   And they effectively took Mr. Outlaw down to the
ground?

A.   Yes.

Q.   Okay.  And you stated that Mr. Outlaw tried to hit you
by throwing a punch, correct?

A.   Yes.

Q.   It was one punch, correct?

A.   I believe so.

Q.   Okay.  And that that sole punch hit you in the chest,
right?

A.   Yes.

Q.   And you weren't injured?

1    A.    No.

2    Q.    And you didn't go to the hospital or your doctor to

3    seek treatment for that, correct?

4    A.    I did go to the hospital, yes.

5    Q.    But you didn't seek treatment for that?

6    A.    I declined police, I'm sorry, medical attention.

7    Q.    That's okay.  Now, when Mr. Outlaw is taken down to the

8    ground by other officers, these officers are in uniform?

9    A.    Yes, sir.

10   Q.    Okay.  Could you identify these officers?

11   A.    No, I couldn't.

12   Q.    Now, in your training as a police officer, prior to

13   this incident, you had been educated in Hartford, the

14   Hartford Police Department's Continuum of Force Standing

15   Order?

16   A.    Yes.

17   Q.    And the first, the first use of force in an encounter

18   is supposed to be verbal, you know, trying to calm somebody

19   down, right?

20   A.    Well, it would depend on the situation.

21   Q.    Okay.  But you're more than 15 feet away from him, you

22   are in a car, you could have talked to him, right?

23   A.    I did talk to him.

24   Q.    Okay.  Now, this is an area at that time of night that

25   has a large police presence, correct?

1   A.   Yes.

2   Q.   All right.  Did you bother to call -- you actually

3   called other police officers to assist?

4   A.   I'm not a hundred percent sure on that.

5   Q.   Okay.  But they were right there, right?

6   A.   Yes.

7   Q.   Okay.  So any threat that Mr. Outlaw might have

8   represented to anybody in the area at that moment in time

9   could have been addressed by just waiting a brief moment for

10   other officers to arrive, correct?

11   A.   You want to repeat that for me, please?

12   Q.   Okay.  You testified on direct examination that you got

13   out of the car because he made a threatening statement to

14   you, right?

15   A.   Yes.

16   Q.   All right.  And that threatening statement was, it was

17   qualified, get out of that car and see what happens, or

18   words to that effect, correct?

19   A.   Yes.

20   Q.   Okay.  So if you remained in your car nothing would

21   happen?

22   A.   That wasn't the threat.

23   Q.   Okay.  But had you waited and remained in your car

24   other officers could easily have come up uniformed and taken

25   care of the problem, correct?

A.    The officers weren't standing right next to me.   So they probably did not know what transpired.

Q.    I see.   Now, as you're seeing Mr. Outlaw as you approach in the car, as words are being exchanged -- well, before words were being exchanged, he's leaning in talking to the occupants of the cab?

A.    Yes.

Q.    Okay.   And did he have any weapons visible?

A.    When you say weapons, what type of weapons?

Q.    Yeah.   Did he have a gun or a knife or an object in his hand?

A.    No, he didn't have any of those weapons that I could see.

Q.    All right.   And he wasn't acting loud or in any demonstrative way at that point, right?

A.    That's correct.

Q.    It was only when you went by that it became this problem between Mr. Outlaw and you?

A.    It wasn't when I went by.   I was right next to him.

Q.    As you're right next to him?

A.    Yes.

Q.    That's when some words were exchanged?

A.    Correct.

Q.    And something occurred, that according to you, he testified, come out of that car and see what happens, right?

1  A.    Yes.

2  Q.    Okay.  But you don't remember saying anything to him

3  other than, please get out of the road, or words to that

4  effect, right?

5  A.    That's all I said.

6  Q.    That's all you said?

7  A.    That was all I said, yes.

8  Q.    And it was upon making that statement that Mr. Outlaw

9  then made the threat, get out of that car and see what

10 happens?

11 A.    That was not the threat.

12 Q.    What was the threat?

13 A.    The threat was when he said, get out of that car and I

14 will kick your A..  That was the threat.

15 Q.    Oh, okay.  Fair enough.  Fair enough.  I don't want you

16 to feel too uncomfortable.

17        So get out of that car and I'll kick your ass.

18 And you got out of the car?

19 A.    Yes, I did.

20 Q.    All right.  And you got out of the car after proceeding

21 two car lengths forward?

22 A.    Is that a question?

23 Q.    Yeah.

24 A.    Yes.

25 Q.    Okay.  Now, at some point Mr. Outlaw is on the ground,

1  he's been taken down to the ground by other police officers

2  who are uniformed, correct?

3  A.    Yes.

4  Q.   All right.  And at some point in time he's handcuffed,

5  correct?

6  A.    Yes.

7  Q.   Okay.  And then he's picked up?

8  A.    Yes.

9  Q.   Did you see him brought to his feet?

10  A.    No, I did not.

11  Q.   Okay.  Where were you when all this was taking place?

12  A.    I was watching the crowd.

13  Q.   Okay.  How far away were you from where he's being

14  picked up or handcuffed as you're watching the crowd?

15  A.    Maybe eight to 10 feet.

16  Q.   Okay.  And no one else verbally identified themselves

17  as a police officer to Mr. Outlaw?

18  A.    Not that I heard.

19  Q.   Okay.  And they are running up behind him, correct?

20  A.    I guess because I don't know where they came from.  I

21  don't know what direction they came from.  I don't know if

22  anybody ran past me or came from the side.  I don't know.

23  Q.   Okay.  But, I mean, as I'm visualizing it, you are

24  standing in front of Mr. Outlaw as he's throwing a punch at

25  you, right?

A.    Yes.  Sort of indirectly.

Q.    So you're unaware of what's behind him as that's occurring?

A.    I'm not looking behind him, correct.

Q.    You are not, okay.

      Now, as you approached Mr. Outlaw he is still standing on the side of the car?

A.    Yes.

Q.    Okay.  And he's not quite at the front fender?

A.    He's standing at the side um, the passenger front door window.

Q.    Okay.  And as you are approaching him that 15 feet he's standing there, right?

A.    Until I got closer.

Q.    And then he turns around?

A.    Then he walks toward me, stepped toward me.

Q.    Okay.  Did he jump at you?

A.    What do you mean, jump?

Q.    Well, you said he turned towards you and then stepped towards you?

A.    Yeah.  That's what I said.  He turned towards me. Stepped toward me.

Q.    But he didn't lunge at you?

A.    No.  He tried to punch me when I got closer.

Q.    Fair enough.  But he tried to punch you when you got

1  right close to him, right?

2  A.    When I got closer to him, yes.

3  Q.    At that point in time and you still hadn't said, I'm a

4  police officer, stop?

5  A.    That is correct because I did not have time.

6  Q.    I understand.  And you're in plain clothes?

7  A.    Yes.

8  Q.    And it's dark at night?

9  A.    It's illuminated, but it's dark, yeah.

10  Q.    Yeah.  Yeah.  And you have an object in your hand about

11  eight inches long, four inches wide by three, right?  I

12  mean, it was your radio, fair enough, but it's in military

13  green, right?

14  A.    Yeah.  That's the color it was supposed to have been,

15  but --

16  Q.    Okay.  So if Mr. Outlaw didn't happen to see the badge

17  that you said you took out at that time, he doesn't know who

18  you are, right?

19  A.    Yes.

20  Q.    That's correct?

21  A.    I'm sorry.  Yes, that's correct.

22  Q.    Okay.

23        MR. RIGAT:  Okay.  Thank you, Your Honor.  If I

24  may have a moment?  Thank you, sergeant.  I have no further

25  questions.

1          MR. MELLEY:  Very briefly, Your Honor.

2          FURTHER EXAMINATION BY MR. MELLEY:

3    Q.    Sergeant, you said it was dark out?

4    A.    Yes.

5    Q.    Because it's midnight, right?

6    A.    Close to midnight, yes.

7    Q.    Are there lights in this area?

8    A.    Yes.

9    Q.    Do the stores and the bars have lights?

10   A.    Yes.

11   Q.    Is it a well lit area?

12   A.    Yes.

13   Q.    Any reason why your badge wouldn't be reflecting off

14   some of that light that you're aware of?

15   A.    No, sir.

16   Q.    In other words, the badge should be visible under the

17   lighting conditions that existed there?

18   A.    Yes.

19   Q.    And you described what happened.  And then you said

20   there are other officers present.  And then you said you

21   were watching the crowd?

22   A.    Yes.

23   Q.    What do you mean by that?  And as part of that, why

24   would you do that?

25   A.    Well, a lot of times um, police, when they are

1   effecting arrests they are not paying attention to what is

2   around them.  They are more focused on the situation that

3   they are dealing with.  And someone in the crowd sometimes

4   may get aggressive toward the police by throwing rocks or

5   bottles or something like that or come up and even assault

6   the police officers while they are taking someone into

7   custody.

8   Q.    So what was your role?

9   A.    My role was to just watch and make sure that none of

10   that happened.

11   Q.    And is that part of your duties and obligations as an

12   officer on a scene like this?

13   A.    We have to protect each other when we're out there.

14         MR. MELLEY:  Thank you.  Nothing further.

15         MR. RIGAT:  Just a couple more follow-up questions

16   along these lines.

17         FURTHER EXAMINATION BY MR. RIGAT:

18   Q.    You said it is well lit, the area, right?

19   A.    Yes.

20   Q.    Okay.  Well, Mr. Carroll didn't see a badge hanging

21   around your neck did he?

22   A.    I don't know what Mr. Carroll saw.

23   Q.    No, but you heard him testify.  You were present in

24   court when he testified, right?

25   A.    I don't remember.

1      MR. MELLEY:  I object to him being asked to

2   comment on somebody else's credibility.

3      THE COURT:  No, I think the question is all right.

4   We'll take a simple answer and we'll move along.

5      MR. RIGAT:  Of course.

6   Q.   You heard Mr. Carroll, the cab driver, testify, right?

7   A.   I don't know who Mr. Carroll is.  I don't remember

8   which one he is.

9   Q.   You don't remember the cab driver?

10  A.   No.

11  Q.   Okay.  Fair enough.  You know, he did say that you came

12  up to him afterwards, after the, you know, the dust kind of

13  settles and told him to move the cab?

14  A.   I don't remember talking to him after.

15  Q.   You don't?

16  A.   No, I don't, sir.

17  Q.   So then it would surprise you to learn that he

18  testified that that's when you took out the badge around

19  your neck?

20  A.   Okay.

21  Q.   And you also heard Miss Killian testify, Rachel

22  Killian, she was one of the passengers in the cab?

23  A.   Yes.

24  Q.   And you heard her testify that she didn't see a badge

25  around your neck, correct?

```
1   A.    Okay.

2   Q.    Okay.  But it was a well lit area?

3   A.    Yes, it is.

4   Q.    Okay.  Thank you.  I have no further questions.

5              THE COURT:  All right.  Thank you very much.

6              THE WITNESS:  Thank you, sir.

7              MR. MELLEY:  Shall I proceed?

8              THE COURT:  Yes.

9              MR. MELLEY:  Officer Michael Allen.

10             M I C H A E L   A L L E N,  the Witness, after

11  being duly sworn, was examined and testified as follows:

12             THE COURT:  Good afternoon.  I appreciate you

13  coming up.

14             THE WITNESS:  Yes, sir.

15             DIRECT EXAMINATION BY MR. MELLEY:

16  Q.   Is there anything up there, any exhibits?  There's

17  nothing up there, right?

18  A.    Negative.

19  Q.    All right.  Good afternoon, Officer Allen.

20  A.    Good afternoon, sir.

21  Q.    How are you employed?

22  A.    I am employed by the Hartford Police Department, City

23  of Hartford.

24  Q.    And what is your current rank?

25  A.    Patrolman.
```

```
 1    Q.    When were you first employed by the Hartford Police
 2    Department?
 3    A.    July 1st, 1998.
 4    Q.    And can you briefly describe for the jury what you did
 5    before that?
 6    A.    Prior to that I was 16 years aerospace.  I was a
 7    licensed FAA aircraft, airframe and power plant mechanic.
 8    Q.    And where did you do that?
 9    A.    I worked for Leer Jet, which is associated with
10    Bombardier.  And I was also, also worked with Hamilton
11    Standard in the hot field lab.
12    Q.    And when did you start any type of work in the law
13    enforcement field?
14    A.    Upon being honorably discharged from the U.S. Coast
15    Guard I immediately got involved with the Mobile County
16    Sheriff's Department down in Mobile, Alabama, the state that
17    I was in when I got out of the service.
18    Q.    How long were you in the Coast Guard?
19    A.    Three and a half years.
20    Q.    And what did you do?
21    A.    I was an aircraft mechanic and a flight mechanic.
22    Q.    So how long did you live down in Mobile?
23    A.    Six years.
24    Q.    And what type of law enforcement did you enter at that
25    time?
```

A.    It was the Mobile County Sheriff's Department.  It was
attached to the Air Flotilla, which is a water unit, because
I was a certified diver.  I was a rescue diver.

Q.    And what did you do in that capacity?

A.    Whatever the sheriff told me to do.

Q.    Did you have specific training for that?

A.    Yes.  I was a certified diver.

Q.    Okay.  But, I mean, beyond that, as far as any type of
sheriff related duties specifically related to enforcement
of law?

A.    No.

Q.    And subsequent to that did you have any additional law
enforcement experience before coming to work for Hartford?

A.    I was part-time with the town of Munson as an
auxillary.

Q.    Okay.  July 1st, 1998, when you joined the Hartford
Police Department, did you go to their academy?

A.    Yes, I did.

Q.    And how long was that academy?

A.    Six months.

Q.    So that would bring us to right around the beginning of
1999?

A.    Yes, sir.

Q.    And when you started work where were you assigned?

A.    The patrol division.

1    Q.    So you are still patrol now?

2    A.    Yes, sir.

3    Q.    And what does a patrolman do on the Hartford Police

4    Department?

5    A.    You basically respond to calls for service.  The

6    dispatcher will dispatch you where ever they need you.  You

7    self-initiate calls, call any life issues you address, and

8    you back up other officers who are stepping out on their

9    assignments.

10   Q.    When you refer to, responding to calls, that's

11   something to which you would be sent by dispatch?

12   A.    Correct.

13   Q.    And you're dressed here?

14   A.    Like I am today.

15   Q.    And you have around your right shoulder what appears to

16   be a radio.  Is that going out or coming in or both?

17   A.    It's both.

18   Q.    So you would receive specific assignments through that

19   radio?

20   A.    Correct.

21   Q.    And then you indicated quality of life patrol.  What

22   does that mean?

23   A.    I'm also the -- for several years I was the community

24   service officer for the Sheldon Charter Oak neighborhood and

25   eventually at the Parkville neighborhood.

1   Q.   And what do you do as a quality of life service

2   officer?

3   A.   You directly meet with the individual business owners,

4   property owners and residents in the neighborhood.  And you

5   address their specific problems with their business.  And

6   you basically take a collective approach to finding ways in

7   which resources within the City of Hartford to activate to

8   solve their problems.

9   Q.   So that means that you are involved with dealing face

10   to face with people?

11   A.   With everybody.

12   Q.   All the time?

13   A.   Correct.

14   Q.   And have you also been on a bicycle?

15   A.   Yes, police mountain bike.

16   Q.   And what does that entail?

17   A.   If you want to get somewhere you peddle.

18   Q.   As opposed to a cruiser?

19   A.   Correct.

20   Q.   Why would you be on a bicycle as opposed to a cruiser?

21   A.   It, it supplements the walk beat assignment.  Hartford

22   has a certain number of or they had a certain number of walk

23   beat assignments.  If you're police mountain bike certified

24   you can use the bicycle to perform your duties.  And it's a

25   year round assignment.

1  Q.   So the area that brings us together is down on Union

2  Place.  How often would you work in that particular area?

3  A.   Only if I was assigned to the car in that area or

4  dispatched to that area.  It's a different zone.

5  Q.   What does that mean?  Where would you normally be?

6  A.   2004 I most likely would have been a relief officer

7  assigned to north.

8  Q.   And what does that mean, north?

9  A.   It's um, you have a south district, say south of I84.

10  And from 84 up to, say where the Albany Avenue starts, would

11  be like a central district all the way across the city.  And

12  then north of Albany and Main would be considered north

13  district.

14  Q.   And what type of area is that?  Residential,

15  commercial, both?

16  A.   Both.

17  Q.   Okay.  And, generally speaking, how long were you up

18  there?

19  A.   Second shift I'd probably say four years.

20  Q.   Okay.  And back to Union Place, how often would you

21  work down there?

22  A.   Only when directed.

23  Q.   Is the Union Place area different from other areas of

24  Hartford?

25  A.   Yes.

Q.    And how is it different?

A.    It's downtown.  It's considered the bar district.  Um,
and where the other areas of Hartford, the neighborhoods
have patrol cars that patrol their zone, the bar district
has two cars, car nine and car 12.  And they also have a,
what do you call it, a downtown special, where officers are
on an overtime basis, a set number of officers and
supervisors to patrol that area specifically to handle the
downtown bar activity.

Q.    And on a Friday night in December, a week before
Christmas Eve, how would you describe, in general, the type
of activity one would find at Union Place, in general?

A.    On a Friday night you'd have the happy hour crowd.  You
would have different agencies having their Christmas parties
at different establishments downtown.

Q.    We've heard it from others, but let's hear it from you.
Can you describe the type of bars that were down there in
2004?

A.    Very popular.

Q.    And how many different bars would there be, if you
know?

A.    There were many all next door to each other.  There's
quite a few.

Q.    All right.  So when we get close to midnight on the
17th how would you describe the pedestrian traffic in the

1  area?

2  A.    It would be busy.

3  Q.    And how about the cars in the area?

4  A.    It would be tough to find a parking spot if you didn't

5  get down there early.

6  Q.    Okay.  Now, do you have your report in front of you?

7  A.    No, I don't, sir.

8          MR. MELLEY:  I have Exhibit F..  Do you want to --

9  which I can have him identify it if I need to.

10         MR. DiCROSTA:  Can we do a quick side bar, Your

11  Honor?

12         THE COURT:  Sure.

13         (Bench Conference held:)

14         MR. DiCROSTA:  I have an issue with the

15  introduction of the document because it has hearsay within

16  hearsay.  So we have to redact hearsay.

17         THE COURT:  Which parts is it hearsay within

18  hearsay?

19         MR. DiCROSTA:  Page 3, the last paragraph of Page

20  3.  I'll give it to Your Honor to read.  The conversation

21  with Dr. Pachucki.

22         THE COURT:  This is not part of your concern is it

23  anyway?  It may be, but it's not really the purpose of

24  getting in the exhibit which has to do with what the police

25  did, not what the random doctor at the hospital told him.

1    MR. MELLEY:  No, but this says, while being

2    treated the accused reported.

3    THE COURT:  Right.

4    MR. MELLEY:  So that's a statement from him.

5    MR. DiCROSTA:  That comes -- I don't have a

6    problem with that, but I have a problem with Dr. Pachucki

7    reports what was stated by Dr. Pachucki.

8    THE COURT:  At a later time?

9    MR. DiCROSTA:  Right.

10   THE COURT:  So we'll take out this last sentence.

11   It's extraneous.

12   MR. MELLEY:  It's already in through Dr. Lena.

13   THE COURT:  How is that?

14   MR. MELLEY:  I asked him about that.

15   THE COURT:  Yeah, but this statement -- so any

16   objection to taking out these last three lines, that cures

17   your problem?

18   MR. DiCROSTA:  Yes.  Regardless of what Lena said

19   before it's still hearsay.

20   MR. MELLEY:  That's fine.

21   THE COURT:  Okay.

22   MR. MELLEY:  So we can do that.

23   THE COURT:  You can do that when the jury is not

24   around.

25   (Bench Conference concluded)

1          MR. MELLEY:  Can I have a moment?  If I may?  I

2    fixed it.

3          THE COURT:  It looks like you fixed it.

4          MR. MELLEY:  And I'll do a little better job at

5    the break, but we can proceed.  This is, I'll offer it as

6    Exhibit F. with this.

7          THE COURT:  All right.  With an alteration

8    everybody's agreed to.  Any objection to F.?

9          MR. DiCROSTA:  No objection, Your Honor.

10          THE COURT:  F. is admitted.

11          MR. MELLEY:  And I'll, if I may approach the

12    witness?

13    Q.    I heard you might need these.

14    A.    I didn't need those in 2004.

15    Q.    So you are on duty on the evening of December 17, 2004,

16    is that right?

17    A.    Yes, sir.

18    Q.    And you are on patrol?

19    A.    Yes, sir.

20    Q.    And do you know what time you would have started?

21    A.    I'm not sure.  If I was assigned to car 9 B. squad it

22    would have been, let's see, 2:45 to 10:45.  Um, if I was on

23    the C. squad it would have been a 10:45 p.m. start time til

24    6:45 in the morning.  So it's possible I was assigned to car

25    9 on C. squad for this night.

1  Q.    Okay.  And as a result of this incident you did a

2  report?

3  A.    Yes, sir.

4  Q.    And the first part that we're going to deal with is

5  what's in front of you marked as Exhibit F.?

6  A.    Yes, sir.

7  Q.    And is that something you did in the ordinary course of

8  your duties as a patrol officer?

9  A.    Yes, sir.

10  Q.    And you did it at or about the time that all the events

11  took place?

12  A.    It would be at the conclusion, towards the end of my

13  shift, I would have left and gone to the station and started

14  writing.

15  Q.    But it would have been done that --

16  A.    Before the end of the shift, yes.

17  Q.    -- that shift?  So I'm going to be asking you a series

18  of questions.  And please refer to the report if you need

19  it.

20        We've heard about this area.  And you talked about

21  the different bars and the pedestrian traffic, etcetera.

22  Can you describe, in general, the lighting on Union Place?

23  A.    Street lights on Union Place.  Street lights on Allyn

24  Street.  You have the Union Station, which has a significant

25  amount of outdoor lighting.  You've got the lights coming

1  from within the inside of establishments.  So it's fairly

2  well lit, sidewalks as well as the street.

3  Q.    And Union Station, is that the train station?

4  A.    Yes.  The train station and bus station.

5  Q.    And the buses come in on the other side, the far side?

6  A.    The west side.  Correct.  The pedestrians on the east

7  side.

8  Q.    And the building is, I think we saw in a couple

9  pictures, we saw some of it.  If I can put this in here,

10 Exhibit 4.  We see some of the train station on the left --

11 on the right-hand side?

12 A.    Correct.  It basically takes up the entire block.

13 Q.    Okay.  And that has lighting off of it, to the best of

14 your knowledge?

15 A.    Yes, it does.

16 Q.    All right.  So let's go back to what we did with

17 Mr. Bruce.  And this is Exhibit G..  At 2343 there's

18 reference to something being received.  And we already heard

19 the tapes of this are gone, but do you have any sort of

20 memory as to what was going on?

21 A.    Yes, I do.

22 Q.    And what is your memory of what that call was?

23 A.    I was dispatched to the area of Allyn and High on a

24 report of a serious assault where the victim sustained a

25 broken nose.  Um, and responded to that location.

1    Q.    Okay.  At the top of this it says 1070.  What does that
2    mean?
3    A.    That's a serious assault.
4    Q.    Okay.  We heard it was, from Mr. Bruce, a breach of
5    peace.  Is he incorrect?
6    A.    71 would be a breach of peace.  But if you don't use
7    those codes you are not going to remember them.
8    Q.    You use the codes?
9    A.    We have to.
10   Q.    Okay.  And what does it mean to priority A.?
11   A.    That's the highest level of priority that you can place
12   on a call.
13   Q.    And code two?
14   A.    Code three would be -- lights and siren it would be
15   high priority.
16   Q.    This says code two.  Right here?
17   A.    That would apply to somebody else's classifying of the
18   call system.
19   Q.    Okay.  But from your perspective, when you heard the
20   call of the 1070, and the reference to the broken nose, what
21   did that cause you to do?
22   A.    I responded to the area of Allyn and High, which would
23   basically put me right in front of Coach's Bar.
24   Q.    And what is Coach's Bar?
25   A.    It's a nightclub.  It's a bar, restaurant.

1  Q.  And how big is it, if you know?

2  A.  Inside I would say equivalent to the room we're in now.

3  Q.  So it's a good size?

4  A.  Yes, sir.

5  Q.  And is it fairly highly attended, especially on a

6  Friday night?

7  A.  It's one of the most popular.

8  Q.  So you get to the scene, 179 Allyn Street, what do you

9  do?

10  A.  First, I attempt to look for a victim, which I did not

11  find.

12  Q.  Did you ever establish the identity of who this person

13  was?

14  A.  No, sir.

15  Q.  Do you recall other officers also responding to this

16  call?

17  A.  Yes.  I believe Detective Gordon responded as well.

18  Q.  Okay.  Do you recall physically parking your vehicle

19  and getting out of it at 179 Allyn?

20  A.  I don't remember.

21  Q.  Okay.  Do you remember having any sort of conversation

22  with Detective Gordon there?

23  A.  I don't recall the conversation, but we did have one.

24  I believe it was window to window, through my passenger

25  window into his driver's window discussing what we received,

what we observed.  And additional information was coming
from the dispatcher.

Q.   And what was that additional information?

A.   That the suspect was believed to be moving in a
westerly direction on Allyn Street towards the front of Up
And On The Rocks.

Q.   And where is that?  Right on the corner?  Up And On The
Rocks.

A.   Yes.  On the corner of Allyn and High and now Union
Place.

Q.   This is Exhibit C..  So on Allyn Street is that the
entrance to Up On The Rocks where that indentation is right
around here, if you know or is --

A.   No.  The entrance exactly is on that 90-degree corner
that leads to number 56.

Q.   Okay.

A.   Fifty-six would be Up On The Rocks.  And the entrance
is actually on that corner.

Q.   Okay.  Any information as to who this suspect might be?

A.   Nothing.

Q.   Nothing?

A.   No.

Q.   No description of --

A.   There might have been one, but I don't remember it.

Q.   Okay.

1          So according to what we have here, if you arrive
2  at 2343 -- first of all, do you know where you came from?
3  A.    No, sir.
4  Q.    All right.  Can you help us at 2348 additional
5  assignment, do you know what that refers to?
6  A.    I would have requested an assisting unit.
7  Q.    And that's when we have, en route Troy Gordon?
8  A.    Correct.
9  Q.    So he would have arrived about five minutes after you?
10 A.    If he took his time.
11 Q.    So a minute later, 2349, unit 21 is cleared.  What does
12 that mean?
13 A.    To me this would indicate that he never showed up.
14 Q.    Okay.  And then 2349, additional assignment for number
15 9.  And that's you asking --
16 A.    Asking for another car.
17 Q.    Again?
18 A.    Yes, sir.
19 Q.    And why?
20 A.    Because I hadn't received one yet.
21 Q.    Okay.  Did you -- when Detective Gordon came was he
22 assigned to patrol at that time?
23 A.    No.  I believe he was assigned to the auto theft
24 bureau.
25 Q.    Okay.  So you are at the Allyn Street address for a

1    period of time.  And is that ever closed out?  I mean, is

2    anybody found?  Does anything happen?

3    A.    It was never closed out because it was never validated.

4    And I had nothing to sustain that an actual assault had

5    taken place.  The victim was gone and the suspect was gone.

6    And in checking with people who were on the sidewalk around

7    us we couldn't develop further information to pursue either

8    a suspect or treat a victim.

9    Q.    So it was a dead end?

10   A.    It wasn't a dead end because when the dispatch

11   mentioned the suspect was heading towards Up And On The

12   Rocks our focus was to move from the Coach's area over

13   towards Up On The Rocks.

14   Q.    Okay.  So at some stage Detective Gordon leaves Allyn

15   Street, is that right?

16   A.    Correct.  He's in front of me.

17   Q.    And he leaves ahead of you?

18   A.    Yes, sir.

19   Q.    And when he leaves do you have any idea as to where

20   he's going?

21   A.    No, sir.

22   Q.    And when you leave Coach's where are you going?

23   A.    I'm going to take the opportunity to go and look for

24   the suspect.

25   Q.    Okay.  So Detective Gordon takes that right-hand turn

1  in front of you, is that right?

2  A.   Yes, sir.  Yes, sir.

3  Q.   Do you have any idea of time or distance between you

4  and Detective Gordon when he leaves and then you leave?

5  A.   I would say at a safe distance behind him.

6  Q.   Are you essentially following him?

7  A.   Pretty much.

8  Q.   Okay.  So do you see Detective Gordon take that

9  right-hand turn onto Union Place?

10  A.   Yes, I do.

11  Q.   Okay.  And as you follow him, in your report, if you

12  can look at that, you have a notation of a time.  2354?

13  A.   Yup.  Yes, sir.

14  Q.   And where does that come from?

15  A.   It's -- where does the time come from?

16  Q.   Right.

17  A.   When I go to write the report, when I pull a case

18  number I'll say, dispatch give me 13 and the times, 13 is

19  the case number, give me a case number and the time that it

20  was dispatched to me.  So that's my reference point.  So the

21  time of incident is when it was given to me initially.

22  Q.   Okay.  So the 2354 we know is when Detective Gordon had

23  called in?

24  A.   No.  That would be the time that I was dispatched to

25  the area of Allyn and High in front of Coach's on the

1    assault.  That's when the clock starts.  As soon as dispatch

2    gives out the information the clock is ticking.

3    Q.    If you can look at this?

4    A.    Yes, sir.

5    Q.    This is --

6    A.    2344, okay.

7    Q.    2344.  And later on we have Detective Gordon arriving

8    at 2354, which is the time you used for this incident?

9    A.    Okay.

10    Q.    So does that indicate to you that when Detective Gordon

11    got out of his car he called it in?

12    A.    Best way to explain it is that that time is given to me

13    by the dispatcher.  When I asked for the case number, for

14    the related incident for the case number, that's when it

15    was, you know, when the call started.

16    Q.    Okay.

17    A.    And I take right off.

18    Q.    So, in other words, you are not saying you have any

19    other knowledge about this time of 2354 other than dispatch

20    gave it to you?

21    A.    Dispatch gave it to me.

22    Q.    And if we look at these records at 2354 Detective

23    Gordon refers to an additional assignment?

24    A.    It's possible.

25    Q.    Okay.  In any event, when you wrote the report you said

1  at the end of your shift -- so you're trying -- what are you

2  doing in the report, in general?  When you write a report

3  what are you doing?

4  A.    You document how you received the report, where you

5  responded, what you observed and what actions you took.

6  Q.    Okay.  So this indicates that you're traveling north on

7  Union Place behind Detective Gordon who is in an unmarked

8  cruiser, is that right?

9  A.    Yes, sir.

10  Q.    And were you here when Detective Gordon said where he

11  was when he saw this individual?

12  A.    Yes, sir.

13  Q.    Okay.  And do you agree with that, that it was around

14  Papa's Pizza, which would be 5452?

15  A.    Yes, sir.  I also saw him standing there.

16  Q.    Okay.  And when you saw him standing there, to what

17  extent was he having an effect on the flow of traffic?

18  A.    He blocked the flow of the northbound traffic that

19  could have gone around the taxicab.

20  Q.    Why is that an issue?

21  A.    Because you're downtown.  Sometimes when the patrons

22  are at the different events the events spill out onto the

23  street.  It's, it tries to turn into a block party.  And

24  they think that just because they are outside the

25  establishment that they can carry on and have their

1  conversations where ever they are and with no regard for

2  traffic.  That's why the downtown special was established to

3  keep the streets open primarily.

4  Q.    Are there occasions where there are block parties and

5  the streets are closed off?

6  A.    Yes.

7  Q.    That's a different type of day?

8  A.    It is.  Those establishments apply for a permit.

9  There's cones, there's officers assigned to it.  And it's

10  clearly visible that you are not going to be driving through

11  this area.  It's set up so that the patrons can go inside

12  and come out onto the street at the same time.

13  Q.    Is Union Place ever a block party?

14  A.    I believe it is during the summer.

15  Q.    During the summer?

16  A.    Yes.

17  Q.    But not this December 17?

18  A.    No.

19  Q.    So you want to keep the traffic going?

20  A.    Yes, sir.

21  Q.    So when Detective Gordon comes around that corner do

22  you see his vehicle stop?

23  A.    Yes, sir.

24  Q.    And what do you see --

25  A.    I have --

1    Q.    -- at that moment?

2    A.    I have to stop behind him because he's no longer making

3    forward motion.

4    Q.    And do you see why he stops?

5    A.    Yes, sir.

6    Q.    And why is that?

7    A.    I see Mr. Outlaw standing at the passenger window of a

8    taxi cab.

9    Q.    And what is Mr. Outlaw doing?

10   A.    I would assume it was just a conversation with the

11   occupants.

12   Q.    Now, at this point in time do you have windows up or

13   down?

14   A.    Mine would be down.

15   Q.    You are alone in your cruiser?

16   A.    Yes.

17   Q.    And did you see or hear any conversation between

18   Detective Gordon and Mr. Outlaw?

19   A.    Not that I remember.

20   Q.    Okay.  Do you remember making a notation that there was

21   some sort of conversation?

22   A.    Yes.  Yes, sir.

23   Q.    What did you see Mr., Detective Gordon do next?

24   A.    Detective Gordon exited his cruiser and he approached

25   Mr. Outlaw.

Q.    And could you hear anything that might have been
exchanged between the two of them at that stage?

A.    No, sir.

Q.    Okay.  And then what did you see?

A.    I saw Mr. Outlaw lunge toward Detective Gordon and he
threw several punches to his face and chest area.

Q.    Now, you are seeing this from inside your cruiser
looking north on Union Place, is that right?

A.    Negative.

Q.    Where are you?

A.    No.  At the point where Detective Gordon gets his
vehicle to a stop and exits it um, now you've got a closed
front.  Now I can't have motorists approaching us from the
rear.  I throw my rears on.  I step out of the car and start
walking towards the event that's unfolding.

Q.    What do you mean, you throw your rears on?

A.    Well, you have three-way switches on your lights.  You
got position one for front, two for rear and three for front
and rear.

      And since it's a one way street there's no need to
have lights in front of me because cars aren't going to be
coming towards me.  So you throw your rears on so that the
cars behind you will automatically, they'll have to take a
right onto Allyn Street and avoid us totally.

Q.    Well, actually, can they take a right on Allyn or are

1  they stuck?

2  A.   No, you can take a right on Allyn.

3  Q.   You're talking about traffic on Union Place would not

4  be allowed go through the street?

5  A.   You couldn't go northbound past Allyn Street on Union

6  Place, correct.

7  Q.   So when you put on your rears, as you say, what does

8  that mean?

9  A.   The light bar, the rear of the light bar would be

10  illuminated to oncoming traffic that it's police activity

11  and you're not going to continue north.

12  Q.   All right.  And what is that light bar doing, is it

13  just, is it flashing, blinking?

14  A.   It flashes.

15  Q.   It flashes.  And to what extent does it show any type

16  of reflection to the side?

17  A.   It would reflect off of windows and buildings.

18  Q.   Okay.  So when you see Detective Gordon come to a stop

19  and get out of his vehicle, is this when you take that

20  action that you just described?

21  A.   Yes.

22  Q.   Okay.  And before you see anything being thrown, what

23  are you doing?  You are outside your vehicle?

24  A.   Stepping out of the car.

25  Q.   Okay.  And when you step out and you -- do you start to

1  approach them?

2  A.    Yes.

3  Q.    And what do you see as you start to approach them?

4  A.    I see Mr. Outlaw.  I see him grab the clothing on the

5  front of Detective Gordon and pull it towards him, cocks his

6  hand back and he delivers a solid punch right to the

7  sternum, right to the center of the sternum.

8  Q.    And that's something that you saw?

9  A.    Yes, sir.

10  Q.    And then what do you do?

11  A.    I hollered.  I identified myself.  He never turned

12  around to look at me.  Um, and at that point he cocked his

13  right hand back again to hit.  I withdrew my baton and I

14  went after the bicep.  I went after the extremity that was

15  going to do the damage to Detective Gordon.

16  Q.    So as you are approaching that would be on his, Mr.

17  Outlaw's right side?

18  A.    It would be his right side.

19  Q.    Okay.  And while he's in the process of using his arm

20  do you make contact?

21  A.    Yes, I do.

22  Q.    And where do you make contact?

23  A.    With the bicep.

24  Q.    And what happens?

25  A.    Nothing.

1   Q.   What do you mean?

2   A.   He cocked it back again to hit Detective Gordon.

3   Q.   So what did you do?

4   A.   I struck the arm again.

5   Q.   Why?

6   A.   The first one had no effect. You try to stop the

7   offensive actions of Mr. Outlaw. They were moving. It was

8   like a fist fight and you're just trying to stop it.

9   Q.   And what happened on that second swing?

10   A.   The second swing Detective Gordon disappears out of my

11   sight. Mr. Outlaw turns himself towards me and engages me.

12   Q.   And what do you do? If you need your report please do.

13   A.   Yeah. Mr. Outlaw was brought to the ground where he

14   continued to fight.

15   Q.   How did he go down to the ground?

16   A.   All I can say is he dropped. He dropped to the ground.

17   The next thing I know he's on his butt and his elbows. And

18   now his legs are coming, his legs -- I'm being assaulted

19   with a lower extremity.

20   Q.   Did you strike him in the head with the baton?

21   A.   After the incident, when I was escorting Mr. Outlaw to

22   the cruiser, I, I noticed there was some blood on his scalp.

23   I assumed that I did it with my nightstick. Since I was

24   swinging and he was swinging, if there's blood there I

25   assumed I did it. So I assume it was from the nightstick.

Q.    Were you trying to hit him in the head?

A.    No, sir.

Q.    To what extent was Mr. Outlaw moving while you were present for this encounter?

A.    He was still violently struggling with me resisting arrest.  And if it wasn't for the assisting officers that joined in I would not have got him handcuffed when I did.

Q.    You say the accused was brought to the ground and continued to fight.  What do you mean?

A.    After the strike with the baton he was brought to the -- he's now on the ground.  He's on his backside.  And he's coming at me with his legs.  The legs are basically 10 times stronger than the arms.  I don't know what kind of training and experience he has.  I know what we get in the academy.  We're taught to use our legs.  But it's one thing you don't want to be connected with is somebody's foot.

Q.    Do you know which foot or feet are moving?

A.    No, sir.

Q.    So what do you do?

A.    I use my baton to strike the muscle portion of either the thigh or the calf that's being presented to the front of you.

Q.    And is that in accordance with your training?

A.    Yes, sir.

Q.    And, to your knowledge, did you ever strike him in the

1  knee?

2  A.    No, sir.

3  Q.    When you say the thigh area, I just want to be clear

4  what you're talking about?

5  A.    The muscle portion above the knee and below the hip.

6  Q.    And did you make contact there?

7  A.    Yes, sir.

8  Q.    And eventually what did it take to get him handcuffed?

9  A.    There was multiple individuals that surrounded us.  And

10  I looked up and I recognized some of the, I won't say plain

11  clothes, because they were in regular street clothes,

12  whether they were patrons at a club, but all of a sudden

13  these guys were there and they pitched in to help grab his

14  arms and get them behind his back so I could handcuff him.

15  Q.    So who handcuffed him?

16  A.    I did.

17  Q.    And you say there that it was double locked.  What does

18  that mean?

19  A.    The reason you double lock a handcuff is you initially

20  get them on, you set them to a certain level.  And then

21  there's a pin on it and you take the back of your cuff and

22  you pop it with the pin.  So if he was to fall back and hit

23  a wall or sit on it or move the cuffs don't tighten up and

24  cut off circulation, which is also department policy under

25  handcuffing.

1  Q.   So let's back up.  When you saw Mr. Outlaw moving

2  towards Detective Gordon what went through your head as to

3  your responsibility at that time?

4  A.   Why isn't this guy just moving, why is he giving the

5  detective a hard time.

6  Q.   And why did you feel -- why did you act?

7  A.   Because anything can happen.  Sometimes your worse

8  assaults come from simple motor vehicle stops, a simple

9  minor accident can be your worst call.

10  Q.   You indicated that you went and did strike Mr. Outlaw

11  first on the arm?

12  A.   Yes, sir.

13  Q.   And you believe the second one was on the arm, but you

14  are not contesting that he's got a head wound?

15  A.   Correct.  Yes, sir.

16  Q.   Why did you do the first strike?

17  A.   Well, because the first strike was going to connect

18  with, I believe, Detective Gordon's face.

19  Q.   So what were you trying to do?

20  A.   Prevent Detective Gordon from getting a broken nose or

21  a busted jaw.

22  Q.   And why is that your responsibility?

23  A.   Because that's what you do.  That's what we do as

24  police, whether it's for a civilian or for a brother

25  officer.

1  Q.    Did you hear Mr. Outlaw say anything before this whole

2  encounter?

3  A.    I can't remember.

4  Q.    You don't document anything?

5  A.    No.

6  Q.    That there's some sort of conversation?

7  A.    Correct.

8  Q.    All right.  So you're aware that there's something

9  going on between the two of them?

10  A.    Yes, sir.

11  Q.    But you don't know what it is?

12  A.    Correct.

13  Q.    Okay.  So --

14         THE COURT:  Why don't we just, being conscious of

15  the time, let's give everybody 10 minutes to stretch and

16  take a break.  Come back in 10 minutes, okay?

17         (The Court recessed at 3:07 p.m. and resumed

18  without the jury present at 3:20 p.m.)

19         THE COURT:  Call him back up and we'll bring the

20  jury back in.

21         MR. MELLEY:  Your Honor, may I just have a point

22  of clarification before we begin?  We talked about this

23  briefly yesterday.  And I forgot the ultimate word.

24  Originally we had a motion to preclude anything dealing with

25  intoxication.

1          THE COURT:  Right.

2          MR. MELLEY:  And then they opened the door by

3    saying he was charged with being on the roadway intoxicated.

4    So that's in evidence through the plaintiff.  And it was

5    done by this officer.  So I want to ask him why he felt he

6    had probable cause to do that.

7          THE COURT:  No.  I don't think they opened the

8    door to anything.  I do think that the officer can recount

9    his, which is how I thought we left it, recount his direct

10   observation that he detected a smell of alcohol emanating

11   from the, from Mr. Outlaw.  But that unless the ground

12   changes greatly on his testimony I don't see that he has the

13   basis for forming a lay opinion that he was intoxicated.

14         MR. MELLEY:  I get it.  I just thought -- I didn't

15   think that we finished the conversation after I said --

16         THE COURT:  Right.

17         MR. MELLEY:  -- opening of the door.

18         THE COURT:  Right.  So I think we really did.  I

19   said, we sort of split the baby on it.  I mean, the direct

20   observation comes in, but the opinion seems inadequately

21   supported.

22         MR. MELLEY:  I'm fine.

23         THE COURT:  Okay.

24         MR. MELLEY:  I just want, can I just, one more

25   point.  There is in the report that's in evidence that Mr.

Outlaw told the doctor he had been drinking.  I mean, that's already in now.  It's in his report.

THE COURT:  Are you with us here?

MR. RIGAT:  I'm sorry, Your Honor.

MR. MELLEY:  In what was marked as the officer's report it says, and there was no objection to it, that he heard Mr. Outlaw tell the doctor that he had been drinking.  That's in.

THE COURT:  Okay.

MR. RIGAT:  Yeah, that's fine.

THE COURT:  I don't think -- you mean you just pointing that out so we're aware of it?

MR. MELLEY:  Yeah, I didn't want anybody jumping up and saying --

MR. RIGAT:  No, he testified he had a beer.

THE COURT:  Everybody knows he had a beer.  He said he had a beer.

MR. MELLEY:  Okay.  All right.  Thank you.

MR. RIGAT:  But, Your Honor, I think your intent is to admit the Standard Form 60, use of force.  Page 1 we have no problem with, but page 2 --

THE COURT:  What are we talking about now?

MR. RIGAT:  I'm sorry?

THE COURT:  I don't know what we're talking about.

MR. MELLEY:  I wasn't aware of an objection.

1          MR. DiCROSTA:  Well, you just handed it to us.

2          MR. MELLEY:  No.  No.  This was on my exhibit

3     list.  If I may approach?

4          THE COURT:  Yeah.

5          MR. MELLEY:  It's a two page Form 60, which is a

6     form filled out by the officer that's required.  It's kept

7     in the ordinary course of business.  It's done at or about

8     the time.  And he has to submit it to his supervisor, which

9     was done.  And then his supervisor has to sign off on it.

10    It's all part of the record.  It was longtime disclosed.

11         THE COURT:  Objection to it or not?

12         MR. RIGAT:  Your Honor, I'm sorry.

13         THE COURT:  Is there an objection to it?

14         MR. RIGAT:  Just that the first page is fine, but

15    the second page is rather self-serving.  And, you know, we

16    didn't object to the admission of the police reports.  We

17    could have --

18         THE COURT:  Right.

19         MR. RIGAT:  -- for that reason, but there was no

20    advantage for us to make those objections since, you know,

21    for different reasons.  But this document, it's saying

22    Sergeant Godard is making the statement that these guys did

23    what they were supposed to do.

24         THE COURT:  Right.

25         MR. RIGAT:  And I think that's self-serving.

1     THE COURT:  You didn't want to put in the

2  supervisor's conclusions blessing the actions, right?  Or

3  you didn't, wouldn't, in reflection, say that was part of a

4  business record?

5     MR. MELLEY:  Well, the supervisor, as part of his

6  job, has to review.  And it's based upon what Detective

7  Gordon and Officer Allen stated.  It's not -- it's based

8  upon their view.  Period.

9     THE COURT:  You could get into trouble at this

10  rate.  I can't allow in, as a business record, the statement

11  of a supervisor about his conclusion about the merits of the

12  event.  So the first page he says he has no problem with.

13  The second page we could take out the statement of findings

14  and recommendations or we could just pull the whole second

15  page off because I don't see that it has anything else of

16  much relevance, but you know better than me.

17     MR. MELLEY:  I would think -- well, the first half

18  of the page is filled out by the officer.

19     THE COURT:  Right.  I mean, it's not much in

20  dispute, right?  I mean, is there something here that's

21  important to the jury's understanding of the case not

22  otherwise available to them?

23     MR. MELLEY:  Yes, it is because it's actually very

24  important.  The whole idea of the form that it's, it goes to

25  the whole idea.  And we had Detective Gordon asked about the

1   use of force.  And this is what this officer has to do

2   whenever he uses force.  He has to fill this form out in its

3   entirety and submit it to his supervisor.

4           Your Honor's ruled the supervisor's comments come

5   out.  I don't have a problem with that.  But everything the

6   officer did and why he did it I think he is entitled to

7   explain.

8           THE WITNESS:  Sir, if I can add?

9           THE COURT:  No.  No.  No.

10          MR. MELLEY:  No, you can't.

11          THE COURT:  No disrespect.  What do you want to do

12  so we can get going on this?  Do you want to remove the

13  supervisor use of force review paragraph or do you want to

14  take out the whole second page?

15          MR. RIGAT:  Just remove that portion of it.  I

16  mean, the paragraph is fine.  Whatever is easier.

17          THE COURT:  That's fine.  So I'll admit it without

18  objection with this paragraph filled in by the supervisor

19  removed over the course of the evening.

20          MR. RIGAT:  Thank you, Judge.

21          MR. MELLEY:  Your Honor, if I can find scissors I

22  can do it real quick.  And that can be done while we're

23  getting the jury set up.

24          THE COURT:  Sure.

25          (The jury returned in at 3:25 p.m.)

1    MR. MELLEY:  If I may continue, Your Honor?

2    EXAMINATION CONTINUED BY MR. MELLEY:

3  Q.  Officer Allen, you just described for us this whole

4  series of events; you coming around and then the actions

5  that you took.  How is this playing out in a time sense?

6  How fast is all this?

7  A.  It goes by quick.  Very quick.

8  Q.  So when you are seeing Mr. Outlaw, and you are seeing

9  Detective Gordon, do you recall Detective Gordon getting out

10  of the vehicle?

11  A.  Yes.

12  Q.  And from that first contact between the two of them how

13  much time are we talking about?

14  A.  I couldn't tell you, sir.  It's fluid.  If I was to get

15  up and walk towards you right now it would be at the same

16  pace.

17  Q.  But in terms of the length of time, that once they had

18  their first encounter, to when it's done and he's

19  handcuffed, how much time is that?

20  A.  I'd have to guess.

21  Q.  Don't guess.

22  A.  Okay.

23  Q.  But is it fair to say it's very quick?

24  A.  Very, very quick.

25  Q.  So in your mind did you act quickly?

1   A.   Yes, sir.  I did.

2   Q.   And why did you feel the need to act quickly?

3   A.   Because I perceived a threat to Detective Gordon from

4   Mr. Outlaw.

5   Q.   And what did you see as your role in dealing with that

6   threat?

7   A.   I saw a violent assault taking place against an officer

8   and I had a duty to act.

9   Q.   I'm sorry, what was the last part?

10   A.   I had a duty to act.

11   Q.   From your perspective, using that baton, to what extent

12   did you have other alternatives?

13   A.   If it had just been words exchanged between the two of

14   them and the detective was still attempting to effect an

15   arrest, and the suspect was fleeing, I would use physical

16   force to approach him and take him down by hand.  But once a

17   suspect goes to a weapon, now the hands-on part, you just

18   raised the bar.  It's no longer hands-on.  It's using an

19   instrument to stop the initial assault against the officer.

20   Q.   And you're talking about you using an instrument?

21   A.   Yes, sir.  By me using it.

22   Q.   Now, the baton that you used, where did it come from?

23   A.   From the ring on the side of my duty belt.

24   Q.   And when you say duty belt, is this something that's

25   issued to you by the department?

1  A.    Yes, sir.

2  Q.    And why is it given to you?

3  A.    It's a tool that you use on a regular basis like

4  everything else on your belt.

5  Q.    Do you have OC Spray?

6  A.    Yes, sir.

7  Q.    Why didn't you use that?

8  A.    Because due to the close proximity to the patrons in

9  the area, not having the time to say, okay, where's the wind

10 coming from, is it going to blow back in my face and

11 incapacitate me or another officer.  It wasn't feasible.

12        And also just the use of the OC doesn't

13 necessarily guarantee that the offensive actions are going

14 to stop because it's been proven that people will continue

15 their assault regardless of being sprayed.

16 Q.    You had a gun on you, right?

17 A.    Yes.

18 Q.    But you chose the baton?

19 A.    Yes, sir.

20 Q.    And in terms of your options, let's just be clear why

21 you chose the baton, in relation to your training and

22 experience on the force in the City of Hartford down at

23 Union Place at midnight on a Friday night?

24 A.    Because it was the least amount of force that I could

25 use in an attempt to effect an arrest.

Q.    In your mind, the times that you swung the baton, do
you think it was reasonable for you to use that amount of
force?

A.    Yes, sir.

Q.    In terms of the number of strikes that you made, to
what extent were there unnecessary strikes by you?

A.    There weren't any unnecessary.  When the desired effect
was reached um, you also begin what is called a deescalation
of force.  And that's the part where the other assisting
officers were able to get the hands behind him.  Now you're
starting to come down.  You're cuffing.  Now he's no longer
a threat with his hands.  Get him over onto his seat, pick
him up and escort him to the cruiser, take him to booking.
You go on to the next call after you write your report.

Q.    Did you put him in your cruiser?

A.    No, sir.

Q.    Why not?

A.    No.  Because I believe once he was handcuffed, and we
got him up on his feet, we started to go towards the
cruiser.  If he complained of pain um, and said he didn't
want to walk any further I said, you know what, we'll make
the ambulance come to you.  They've got a stretcher, they
can come to you, you don't have to go to them.  So we
stopped and we stayed right in the middle of the road and
wait for them.

1  Q.   Can you direct your attention to the middle of the

2  second page of your report as to what you saw as you were

3  escorting him to your cruiser?

4  A.   While walking to the cruiser I'm doing a basic

5  assessment.  And I noticed there was blood on his scalp.

6  And I assumed it was from the nightstick.  So immediately I

7  start a 1010.  And they'll ask you why.  I say, we've got a

8  laceration to the scalp.

9       And within seconds the ambulance was there.  And

10 then he was basically no longer being placed in my cruiser

11 or taken to booking.  He's now -- it's a medical response.

12 Now you got to take him to the hospital, take care of the

13 medical stuff.  The booking stuff can be done at a much

14 later date.

15 Q.   So why didn't you put him in the cruiser?

16 A.   Because you don't -- there's no need to.  He's not

17 going to be transported to booking.  There's no longer a

18 booking function.  Now it's a caretaking function.

19 Q.   Well, what is the policy with regard to putting a

20 bleeding person into the cruiser?

21 A.   It's not a policy about putting a person bleeding into

22 the cruiser.  It's a policy of rendering first aid to

23 someone who is injured, that they be taken to Hartford

24 Hospital, get the necessary treatment and then brought to

25 booking.

1       The booking sergeant, if they ever see anybody

2  with an open wound or bleeding, the first thing they are

3  going to do is chew you out and say, why didn't you take him

4  to the hospital.  So it's standard practice.  And in this

5  case it was necessary.

6  Q.   So once you saw the blood in your mind he had to go in

7  an ambulance?

8  A.   Yes, sir.

9  Q.   And once you made that determination that an ambulance

10  was needed, were you aware that the ambulance had been

11  responding to the call at Coach's Bar and Grill?

12  A.   They would have been.

13  Q.   So was the ambulance right there anyway?

14  A.   Yes, sir.

15  Q.   I think we saw a note that the ambulance is responding

16  right at midnight, if I can find it.  This was what

17  Mr. Bruce gave us initially.  And this is the report of the

18  EMS or the ambulance?

19  A.   Yes, sir.

20  Q.   And it shows the call being to the Coach's at 2344, 16

21  minutes before midnight?

22  A.   Yes, sir.

23  Q.   And then it arrives at 2351, is that right?

24  A.   Yes, sir.

25  Q.   And then it leaves scene at midnight.  So does that tie

1  in with having him into the ambulance by midnight?

2  A.    According to these records it does.  However, I don't

3  have the unit number of the ambulance that transported,

4  otherwise I would have included it in my report.

5  Q.    Okay.  And continuing on with what Mr. Bruce said, this

6  indicates it arrived at the hospital at four minutes after

7  midnight.  Does that sound --

8  A.    Yes, sir.

9  Q.    Does that sound right?

10  A.    Yes, sir.

11  Q.    And you would have arrived a minute earlier before the

12  ambulance at the Hartford Hospital, is that right?

13  A.    Yes, sir.

14  Q.    So this whole dynamic of the scene begins at 2354 when

15  the first note is made by Detective Gordon and six minutes

16  later he's in the ambulance on his way to the hospital, is

17  that right?

18  A.    Yes, sir.

19  Q.    So, again, getting back, this entire scene was very,

20  very quick, is that fair?

21  A.    Yes, sir.

22  Q.    And in that six minutes, from your perspective, a lot

23  of things happened, is that fair?

24  A.    Absolutely.

25  Q.    And you're viewing it through your perspective of your

1  eyes, as is Detective Gordon, as is Mr. Outlaw, is that
2  right?
3  A.   Yes, sir.
4  Q.   And your report, to what extent do you intend to
5  reflect the events that you saw, that you saw?
6  A.   Correct.
7  Q.   I mean, is that correct?
8  A.   Yes, sir.
9  Q.   Now, when you get to Hartford Hospital, we heard some
10 testimony on this, is there a practice with regard to
11 somebody in custody that goes to the hospital as to whether
12 or not they are handcuffed or shackled or what?
13 A.   Yes.  They have to be, by policy they have to be
14 handcuffed.  And it becomes a 91, which is a prisoner detail
15 at a hospital, in which case leg irons are mandatory,
16 whether you're going to 101 Lafayette to transport a
17 prisoner for meds, shackles have to go on and they also have
18 to be handcuffed.
19 Q.   So is there any discretion in that?
20 A.   No, there's not.  Because we've actually had people
21 escape from hospitals.
22 Q.   So once the decision was made he's going to the
23 hospital, as part of that, have you determined that he's
24 also going to be arrested?
25 A.   Yes, sir.

1   Q.    When did that first click, this guy's going to get

2   arrested?

3   A.    When the, when the attempt on the assault started.

4   Q.    So before you arrived at this interaction between

5   Detective Gordon and Mr. Outlaw, in your mind, were you

6   already comfortable with the idea that you had seen enough

7   where he was going to be arrested?

8   A.    I wasn't comfortable.  I didn't have the idea.

9   Detective Gordon would have been the primary on it.  It was

10  his decision to handle the interaction as best he could.  As

11  the, as the incident progressed it became obvious that it

12  was going to be an arrest.

13  Q.    Okay.  Now, when you get to the hospital you see that

14  he's treated by Dr. Pachucki, is that right?

15  A.    Yes, sir.

16  Q.    And did you -- if you look at your report on the second

17  page, at the last sentence.  What did you note as to what

18  you heard Mr. Mr. Outlaw say to the doctor?

19  A.    Um, during the triage of being interviewed by the staff

20  Mr. Outlaw reported that he had been drinking, but that he

21  was not allergic to any medications.

22  Q.    Okay.  Now, to what extent were you able to detect any

23  scents of alcohol?

24  A.    While the person is speaking I try to be close enough

25  to where I can detect any odors from his breath.  And I

1  detected the stench of the booze on his breath.

2  Q.   And you put that in your report?

3  A.   Yes, I did.

4  Q.   Now, you are at the hospital, and this is going to

5  incorporate two parts, but does Detective Gordon show up?

6  A.   I don't have a record of it, sir.

7  Q.   All right.  Let me show you what we marked as Exhibit

8  E., which I have shared with counsel.  And ask you, is that

9  a report that you created?

10 A.   Yes, it is.

11 Q.   And is that a report tied in with this event?

12 A.   It's related under a different case number.  It's also

13 10 coded as a 32, which is a code we use for an officer

14 that's injured in the line of duty.

15 Q.   And based upon that document, does that refresh your

16 recollection as to whether or not you saw Detective Gordon

17 at the hospital?

18 A.   Yes.  I saw him there as a patient, not as

19 investigating the initial case.

20 Q.   When an officer is involved in any type of altercation

21 or incident what is the policy as far as getting checked out

22 at a hospital?

23 A.   You are instructed to go to the hospital and to be

24 cleared by, by the staff.

25 Q.   So is there any discretion, whether a person's

1    complaining or not, the officer, or does he just have to go?

2    A.    It depends on the nature of the injury.

3    Q.    Okay.  You heard Detective Gordon say he declined

4    treatment, but do you recall him -- why did you do this

5    form?

6    A.    Because it's an injury report.  And he was, did go to

7    Hartford Hospital.  If he declined treatment from the staff

8    that's his discretion, but at least you get checked out.

9    Q.    Okay.  So while he's at Hartford Hospital, and you

10   conversed with him, do you document his complaints of pain?

11   A.    Yes, I do.

12   Q.    And what do you put down?

13   A.    In interviewing Detective Gordon he reported to the

14   hospital, Hartford Hospital staff, he was evaluated for

15   complaints of pain to his forehead and to the center of his

16   neck.

17   Q.    Okay.

18   A.    Sergeant Godard was notified and also responded to

19   Hartford Hospital.

20   Q.    Do his complaints tie in with what you saw?

21   A.    Yes, sir.

22   Q.    So whether or not he got treatment doesn't take away

23   from the fact that, from the fact --

24             MR. DiCROSTA:  Objection, Your Honor.  He's --

25             THE COURT:  What's the objection?

1    MR. DiCROSTA:  He's leading the witness.

2    THE COURT:  Sustained.

3  Q.   Do you know what happened to Detective Gordon after he

4  arrived at the hospital, yes or no?

5  A.   No.

6  Q.   Okay.  You did converse with him about what had

7  happened, is that correct?

8  A.   Yes, I did.

9  Q.   And is that in the presence of Mr. Outlaw or to his

10  exclusion?

11  A.   To his exclusion.

12  Q.   Okay.  And in your report you noted essentially what

13  Detective Gordon told you?

14  A.   Yes, sir.

15  Q.   Okay.  Now, you just referred that Sergeant Godard

16  showed up.  And is this the same sergeant that was on the

17  scene at Union Place?

18  A.   Yes, sir.

19  Q.   And so he shows up at the hospital?

20  A.   Correct.

21  Q.   Is that right?

22    And are you present when Sergeant Godard speaks

23  with Mr. Outlaw?

24  A.   When the sergeant speaks to Mr. Outlaw?

25  Q.   Correct.  And I'm specifically referring to Page 3, the

1 full paragraph right after it says, Sergeant Godard was

2 notified of the incident.

3 A.    Sergeant Godard was notified of the incident and

4 responded to Hartford Hospital.   While speaking to the

5 patrol supervisor Mr. Outlaw reported that he had a

6 conversation with Detective Gordon, but he couldn't remember

7 what he said to him.

8 Q.    All right.   And that's something that you heard in the

9 presence of Sergeant Godard?

10 A.    Yes, sir.

11 Q.    So you just read, and this is in quotes, can you read

12 that again?

13         MR. DiCROSTA:   Objection, Your honor.   It calls

14 for hearsay.

15         THE COURT:   This is the report which is in

16 evidence, right?

17         MR. MELLEY:   Yeah.

18         THE COURT:   Yeah.   So he can read it a loud.   But

19 maybe I'm missing something.   What's the problem?

20         MR. DiCROSTA:   The document speaks for itself, but

21 I believe he's testifying as to what Officer Gordon told

22 him.

23         THE COURT:   No, you can read from it as long as

24 it's admitted.   I understand it's been admitted.

25         MR. MELLEY:   Yes, Your Honor.

1    THE COURT:  Okay.

2    Q.    You have quotations?

3    A.    Yes, sir.

4    Q.    And I want you to read in between the quotations?

5    A.    Yes.  That he had a conversation with Detective Gordon,

6    but couldn't remember what he said to him.

7    Q.    Okay.  And why is that in quotes?

8    A.    Because it's a statement from Mr. Outlaw.

9    Q.    Okay.  So you heard him say, Mr. Outlaw, that he had a

10   conversation?

11   A.    Yes.

12   Q.    All right.  And, but he didn't remember what he said?

13   A.    Correct.

14   Q.    Now, when all this is going on what is the pedestrian

15   scene like at Union Place?

16   A.    I'm not looking at the pedestrians.

17   Q.    Okay.

18   A.    I'm focused.

19   Q.    Were you present when Mr. Outlaw had further

20   conversations with Dr. Pachucki?  And I'm specifically

21   looking at the bottom of Page 3 of your report.  Maybe I

22   should make sure we're on the same page.  May I see that?

23   A.    Yes, this is the bottom.

24   Q.    And directing your attention to that, did you hear Mr.

25   Outlaw make any comments to Dr. Pachucki at the Hartford

1    Hospital emergency room regarding his knees?

2    A.    Yes.  It says, while being treated by Dr. Pachucki the

3    accused reported that he felt pain to both knees.  That he

4    previously had been treated for torn ACL's from a prior

5    football career injury.

6    Q.    And that's something you heard?

7    A.    Yes, sir.

8    Q.    Now, let me show you what was marked Exhibit H..  Can

9    you tell us, first of all, what is that?

10   A.    It is a Hartford Police Department Form 90.

11   Q.    90 or 60?

12   A.    Sixty.  It's basically a use of force form.  At any

13   time an officer makes an arrest where you use more than the

14   mere placing of the hands behind their back for handcuffing

15   you've got to document all the particulars, whether you are

16   alone, with somebody, was there any injuries, any charges.

17   And then this goes to, up the chain of command for review.

18   Q.    And has this been the policy for a period of time?

19   A.    As long as I've been there, yes.

20   Q.    So at least since 1998?

21   A.    Absolutely.

22   Q.    And when you say it's got to be filled out any time

23   that there's force beyond what?

24   A.    Any time that there's more than the mere taking of

25   somebody's hands and placing them under arrest, and put

1  their hands behind their back and you put the cuffs on,

2  that's standard.  But if you've got to use strength to get

3  their wrists behind their back, or somebody needs to help

4  you, or there's injury, yes, you've got to pull a UF Number.

5  Q.   So when was this done?

6  A.   Sergeant Godard was notified at 0015 hours, so 12:15

7  a.m..

8  Q.   Okay.  And you said you had to pull a number?

9  A.   Yes, it's a number that's generated, like through the

10  CAD system, where you pull a case number.  The next

11  available number is given to you.  Kind of like being at the

12  deli.  You pull a UF number.  You get the next number that

13  hasn't been used.  That's assigned to you.  And that is

14  related directly to your case number and yours only.

15  Q.   So did you fill this out based upon your use of force

16  on this day with Mr. Outlaw?

17  A.   Yes, sir.

18  Q.   So to the extent you were involved in any type of

19  force, is there any place where you didn't document it where

20  you were supposed to document it?

21  A.   Nope.

22  Q.   And in terms of what you did and what you saw, did you

23  use your best efforts to reflect that in your reports, the

24  two reports and in this Form 60?

25  A.   Absolutely.

1     MR. MELLEY:  May I have a moment, Your Honor?

2  Nothing further, Your Honor.  Thank you.

3     THE COURT:  All right.  I said we'd stop at 4.

4  We'll stop now.  We'll resume with Officer Allen in the

5  morning.  And I've got work to do tonight with the lawyers.

6  And I'll catch you guys at 9 o'clock.

7     (The jury was excused at 3:55 p.m.)

8     (End of transcript that was requested)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I   I C A T E

I, Anne Marie Henry, Official Court Reporter for
the United States District Court, for the District of
Vermont, do hereby certify that the foregoing pages are a
true and accurate transcription of my shorthand notes taken
in the aforementioned matter to the best of my skill and
ability.

_____
Anne Marie Henry, RPR
Official Court Reporter