UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

_____

TYLOON C. OUTLAW                    )

              VS                    )   CASE NO: 3:03-CV-01769

TROY GORDON & MICHAEL ALLEN    )
_____) HEARING ON MOTION IN LIMINE
                                        AT TRIAL BY JURY

BEFORE:   HONORABLE GEOFFREY W. CRAWFORD
          DISTRICT JUDGE

APPEARANCES:   ANTHONY P. DiCROSTA, ESQUIRE
                    Mirto, Ketaineck & DiCrosta
                    P.O. Box 428
                    West Haven, Connecticut   06516
                    Representing The Plaintiff

               RAYMOND J. RIGAT, ESQUIRE
                    Gilbride & Rigat
                    23 E. Main Street
                    Clinton, Connecticut   06413
                    Representing The Plaintiff

          (Appearances Continued:)

DATE:        January 4, 2016

          TRANSCRIBED BY:  Anne Marie Henry, RPR
                    Official Court Reporter
                    P.O. Box 1932
                    Brattleboro, Vermont   05302

1                  APPEARANCES CONTINUED:

2

3            NATHALIE FEOLA-GUERRIERI, ESQUIRE
                City of Hartford
4                Officie of Corporation Counsel
                550 Main Street
5                Hartford, Connecticut    06013

6

7            WILLIAM J. MELLEY, III, ESQUIRE
                Law Offices of William J. Melley, III
8                250 Hudson Street
                Hartford, Connecticut    06106
9                Representing the Defendants

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The Court resumed at 1:00 p.m. without the jury

2     present)

3          THE COURT:  We'll take up the motions in limine.

4     And we'll get to the right spot.  From the defense I

5     thought, there were from the plaintiff, motions in limine.

6          MR. RIGAT:  Yes, sir.

7          THE COURT:  Remind me what --

8          MR. RIGAT:  Your Honor, we had, I think the two

9     most important motion to preclude evidence in reference to

10    prior arrests.  And also, right, we had the motion for

11    judicial notice for life expectancy.

12         THE COURT:  With why don't we start with the

13    intoxication issue.

14         MR. RIGAT:  Yeah.  And I think actually the

15    argument is very similar on all three.  And certainly the,

16    you know, events which took place in high school more than

17    10 years ago I really think have no probative value at all

18    given the facts in this case.  I'm sorry, that's the high

19    school.

20         THE COURT:  The high school thing.  The motion to

21    preclude what amounts to a lay opinion of intoxication?

22         MR. RIGAT:  Oh, I apologize.  We're on something

23    different.  Yeah.  Well, I mean, I think it's okay if, you

24    know, Officer Allen, for example, was to say that I smelled

25    alcohol on his breath, but we don't feel that he should be

1    allowed to opine as an expert witness.

2           And then with respect to 701 lay opinion it seems

3    that there's not really much that got discovered based on

4    his prior statements which would support a conclusion that

5    Mr. Outlaw was intoxicated.

6           THE COURT:  All right.  Mr. Melley, what do you

7    plan to do with respect to this issue?

8           MR. MELLEY:  I think the, the evidence has to

9    develop.  I would point out to the Court that Officer Allen

10   did charge the plaintiff with Connecticut general statute

11   14-300C, Subsection B. parentheses standing on a roadway

12   while under the influence.  And he will testify that in his

13   mind he had probable cause for that change.

14          And his basis for that would be his observations.

15   So I don't see it as an issue.  I think that there's enough

16   of a basis for him to testify as to what he saw and the

17   jury's entitled to hear that.

18          THE COURT:  So he observed this before the

19   altercation or after the altercation or when?

20          MR. MELLEY:  His first observation of Mr. Outlaw

21   is as the altercation begins.

22          THE COURT:  Right.  So no sign of intoxication

23   then, some more dramatic event going on?

24          MR. MELLEY:  No.  Well, unless the whole

25   altercation itself is an indication of intoxication.

1    THE COURT:  I'm looking for unsteadiness of speech

2 or gate, the normal lay person signs that a person is under

3 the influence.  So getting into a fight probably wouldn't

4 really be a sign of intoxication.  It could have many, you

5 know, many explanations.

6    MR. MELLEY:  That's true.

7    THE COURT:  So at some point he smelled alcohol or

8 he saw that he was unsteady on his feet?  I just don't know

9 quite when it happened.

10    MR. MELLEY:  He, during the course of the arrest,

11 bringing him to the hospital, he indicates that there was a

12 strong odor of alcohol emanating from the plaintiff.

13    THE COURT:  Okay.

14    MR. MELLEY:  And additionally his, Officer Allen

15 would be testifying in terms of what he saw, what he did and

16 the fact that the plaintiff did not respond at all

17 indicating he's not listening to him.  The plaintiff will

18 testify he did not see Officer Allen, who was in uniform, at

19 any time.

20    THE COURT:  Right.

21    MR. MELLEY:  So that all goes to Mr. Outlaw's

22 overall demeanor and sense combined with the odor of alcohol

23 leads him to the conclusion.

24    THE COURT:  All right.  So no objection to

25 testimony that he smelled alcohol?

1          MR. RIGAT:  No.  I think that's fair enough

2   because that is lay opinion.  But I don't want the word,

3   he's intoxicated, certainly not coming in as expert opinion.

4   But I don't think there's enough basis for it to come in

5   even as lay opinion because all he did was smell alcohol on

6   his breath when he's in the hospital.

7          THE COURT:  If I understand Mr. Melley correctly

8   he just proposes to put in direct observations, including a

9   strong odor of alcohol, but you are not going to ask him, in

10  your opinion, was he drunk?

11         MR. MELLEY:  Your Honor, I mean, he did charge

12  him, which gives rise to his obligation to have probable

13  cause for a charge.

14         THE COURT:  Yeah, but was that charge dropped?

15  What happened to that one?

16         MR. MELLEY:  Yeah, it was plead out.  I mean, the

17  whole thing was plead out.

18         THE COURT:  The whole thing was plead out, but

19  that particular charge was not plead?  It was dismissed,

20  right?

21         MR. MELLEY:  No.  And part of the plea agreement,

22  in return for a guilty and a fine, everything else is

23  nallied, which means, you know, it's a conditional discharge

24  for 13 months before it's dismissed.  It wasn't dismissed at

25  the time the other charges were dismissed.

1        THE COURT:  I guess the narrow question for me was

2    did he make enough observations that a lay person could

3    express a lay opinion that the plaintiff was intoxicated.  A

4    strong odor of alcohol and, what, not responding to a

5    shouted order or something like that, those are the two

6    indicia, right?

7        MR. MELLEY:  And the odor of alcohol is emanating

8    from his body.  So it's not just the breath.

9        THE COURT:  Okay.

10       MR. MELLEY:  So in, I mean, you have the language.

11   You have a lot.  I would think it's an evidentiary ruling

12   based upon what the officer says and whether it amounts, I

13   mean, Officer Allen has his opinion based upon his

14   observation.

15       THE COURT:  All right.  It's undisputed that he

16   can testify that he detected a strong odor of alcohol

17   emanating from the plaintiff's body.  I don't see enough

18   here for him to express a further conclusion that the guy

19   was is intoxicated.

20       He may have reached that conclusion and charged

21   him, but if all he has is a strong smell of alcohol there

22   are plenty of explanations for that.

23       I would have looked for, you know, as I said, the

24   other indicia of being intoxicated.  For all we know he

25   spilled beer on himself or something.  I mean, it's just not

1    enough for a lay opinion.

2              MR. MELLEY:  Okay.

3              THE COURT:  But the factual testimony will come

4    in.

5              MR. MELLEY:  All right.

6              THE COURT:  Life expectancy.  You guys have a

7    printout from the --

8              MR. MELLEY?  That's what I was asking for.

9              MR. RIGAT:  I do, Your Honor.  It's available on

10   the Social Security website.

11             THE COURT:  He needs it more than I do.

12             MR. MELLEY:  Yeah.

13             THE COURT:  But have a look at it.  We don't need

14   to take it up now.  I'm sure it will be stipulated to.  But

15   he, Mr. Melley could look at it in peace and quiet.

16             MR. MELLEY:  Sure.  It's easy, Your Honor.

17             THE COURT:  All right.  Your expert at the table

18   is mute.  Prior arrests.  What would be the relevance of

19   prior arrests?  None from your perspective.

20             MR. RIGAT:  Yes.

21             THE COURT:  Oh, I see a D.U.I. when he was 20 or

22   21.

23             MR. RIGAT:  He was 30 at the time of the incident.

24             THE COURT:  Mr. Melley, any of this stuff

25   probative?

1          MR. MELLEY:  Not in the first instance.  And I

2     don't claim it.  But if there's to be any sort of testimony

3     that, you know, I don't how it's going to come out.  But if,

4     for example, the plaintiff were to testify that he never has

5     had any difficulty with law enforcement, he always obeys

6     them, he's never had any issue with the Hartford Police at

7     all, or if any of the other witnesses testify somewhere

8     along that line, I think the fact that there's an incident

9     less than three months before this is relevant.

10         THE COURT:  All right.  So that's a normal door

11    opening problem.

12         MR. MELLEY:  Correct.

13         THE COURT:  They open the door, you walk through.

14    If they keep that door shut we never hear about it.

15         MR. MELLEY:  As I said in chambers, it would not

16    be my intention to open that door at all without consulting

17    the Court.

18         THE COURT:  Unless Mr. Outlaw says that his record

19    is spotless since birth which, none of us are, I don't mean

20    it, you know, unless he says something like that then it's

21    staying out?

22         MR. MELLEY:  Yes.  Your Honor, may I have a moment

23    with counsel?

24         THE COURT:  Sure.

25         (Attorneys conferring off the record)

1          THE COURT:  We don't want to cheat him out of the

2     10 years he's already lived.

3          MR. RIGAT:  No, but what the squabble Judge is he

4     had 47.76 years of life back in 2004 to the 2011 charge.

5          MR. MELLEY:  So today it's 37.54.  And I have no

6     problem stipulating to that.  But this just means nothing in

7     the world of things.  I don't stipulate that the plaintiff

8     has that.  I stipulate that the tables indicate that an

9     individual of 41 years of age has a life expectancy.

10    Because that part of the charge includes he could live

11    longer, he could live shorter, whatever.

12         MR. RIGAT:  Of course, it's just a marker.

13         THE COURT:  Right.  Right.  Of course.  He's good

14    for 50, 55 I guess.

15         MR. MELLEY:  Absolutely.

16         THE COURT:  Let's not talk about Mr. Wakes until

17    you know if he's going to come.

18         MR. RIGAT:  That sounds fair.

19         THE COURT:  Wait a day or two.  We're wasting our

20    time unless we know for sure.

21         MR. MELLEY:  I'm expecting conceivably by the end

22    of tomorrow if not certainly by Wednesday morning.

23         THE COURT:  You'll know?

24         MR. MELLEY:  Yes.

25         THE COURT:  So we'll take it up then if it becomes

1  an issue.  And I think, does that cover all of the

2  plaintiff's motions in limine?

3          MR. RIGAT:  I believe so.

4          THE COURT:  So I had a group from the defense.

5  Everybody totally agrees that the City of Hartford is

6  completely out of the case, right?  So the motions that

7  related to evidence against the City of Hartford is not

8  necessary?

9          MR. RIGAT:  Yes, Your Honor.

10          THE COURT:  We talked about the prior arrests.  We

11  talked about the intoxication.  Motion in limine,

12  Mr. Zimmerman and, these are the records that are hard to

13  read, handwritten?  How do you see it from the defense side?

14          MR. MELLEY:  From my side?

15          THE COURT:  It's your motion, right?

16          MR. MELLEY:  Yeah.  Yeah.  If I can put my fingers

17  on it I can show the Court from Mr. Zimmerman there's

18  multiple pages.  And they are not decipherable.  It's in

19  handwriting.  And I don't think that has a basis to go in as

20  a medical record.  There's not enough there.

21          So we don't know what's missing.  So, therefore,

22  the record is not complete.  And we're waiting on the time

23  to do that.  That's simply with regard to the records as to

24  both.

25          THE COURT:  Both are that way?

1          MR. MELLEY:  No.  No.  No.  There's the one set

2   that is clear.  Dr. Ranade, but I have a separate objection

3   to that under the Federal Rules dealing with experts.

4          THE COURT:  Do you have anything?  Why don't we do

5   this, if you can submit, one of you, the plaintiff can let

6   me have a copy of those two exhibits I can read them over

7   the evening and then it's a lot to talk about in the

8   abstract.

9          MR. RIGAT:  Your Honor, I believe our intent was

10  only to put in the billings from Dr. Zimmerman, not his

11  progress notes.  And brief mention would be made that

12  Mr. Outlaw saw him for just a few sessions.  And then with

13  respect to Dr. Ranade-Kapur we were just going to put in her

14  final recommendation in her report.

15         THE COURT:  All right.

16         MR. MELLEY:  I have a problem with both.  Bills

17  should not go in unless we know why.  There has to be a time

18  and for it to be relevant.  In other words, you can have a

19  bill, but if it's not connected to anything that deals with

20  us why should it go in.  The bills only go in if the record

21  go in.  And if the record's not legible or readable, as a

22  threshold issue, I don't think the Court deals with it.

23         The summary by Dr. Ranade brings up my other

24  objection under the Federal Rules that if you have an

25  exhibit the expert has to be prepared to testify as to

1    what's in that exhibit to explain it, otherwise the jury

2    could easily be swayed without having the background.

3                I believe in, and I alluded to a case here by

4    Magistrate Fitzsimmons dealing with this whole idea that the

5    reports don't go into the vacuum.  They have to be explained

6    by a medical provider.

7                So, in other words, if there was somebody to say

8    what is PSTD there's a vernacular understanding of what that

9    is, but it's coming in as an alleged medical condition.

10   You need a medical provider to explain that.  We don't have

11   that.  And therefore it should not come in.

12               THE COURT:  And the orthopedist isn't going to go

13   there?

14               MR. MELLEY:  No, he hasn't been disclosed for

15   that.  And I don't think he's qualified to do it.

16               THE COURT:  So let's just leave it I'll read

17   these, I'll look at the two exhibits and make a ruling in

18   the morning.

19               MR. RIGAT:  Thank you, Your Honor.

20               THE COURT:  It's not a rush.  You've got plenty of

21   time.

22               MR. RIGAT:  I would think.

23               MR. MELLEY:  The only thing if the plaintiff were

24   to testify this afternoon I would not want that information

25   to come in until we do know.  Because, as a simple matter,

1    if he testifies something happened and we don't have the

2    backup for it it shouldn't come in.  It's not relevant.

3               THE COURT:  So he won't say that he went to see

4    Dr. Zimmerman or Dr. Ranade-Kapur until --

5               MR. RIGAT:  I don't think we're going to get to

6    that part of his testimony until tomorrow anyway, Your

7    Honor.

8               THE COURT:  All right.  And how about his

9    testimony regarding his own experiences?  Is it going to

10   take us to the motion to preclude plaintiff's testimony

11   regarding the self-diagnosed post traumatic stress disorder?

12              MR. MELLEY:  I think he's entitled -- he's not

13   qualified.

14              THE COURT:  What do you plan to ask him?

15              MR. RIGAT:  Well, I believe we are entitled to ask

16   him has he been told that he suffers from post traumatic

17   stress disorder.  And Dr. Ranade-Kapur did indicate that in

18   her report.  But we can save that until tomorrow too until

19   you've had the opportunity to review the report.

20              MR. MELLEY:  I would have a further objection.

21   That would be hearsay.

22              THE COURT:  Right.  I mean, the medical report is

23   easier to get in than just the patient's statement about

24   what the doctor said, which is almost certainly not coming

25   in.

1          MR. RIGAT:  I certainly understand.  Makes sense
2     to me.
3          THE COURT:  Blue role of silence and similar
4     phrases, I'm not going to get -- you both were very
5     restrained in your openings.  I expect you'll continue to be
6     anyway.  And I can't kind of predict people's rhetorical
7     direction.  If it becomes so bad you have to object then
8     you'll object to what is said rather than trying to edit it
9     in a vacuum.
10          MR. MELLEY:  If I man, Your Honor, and I don't
11     have any problem with that during the course of the trial
12     with regard to the evidence because I think the evidence
13     that's going to be presented will be pretty straightforward.
14     I am more concerned in terms of, as Your Honor just phrased
15     it, the rhetorical comments during the closing argument.
16     Because that's what brings this motion to bare.  Because I
17     think it is outrageous to make that sort of allegation and
18     try to paint with a paintbrush against officers.  And I'm
19     just trying to preclude that now.  And I think I have a
20     basis in the law for that.
21          THE COURT:  You said a standard objection or is
22     this related to the particulars of this particular case?  .
23          MR. MELLEY:  It's my little issue that I have when
24     I'm representing officers.  I don't want to hear somebody
25     referring to something else.

1          THE COURT:  Right.

2          MR. MELLEY:  Or any type of paintbrush as to

3     officers.  So this is, this has nothing to do with anything

4     plaintiff's counsel has done in this file.  And I'm not

5     suggesting that at all.  It's just I'm -- I like to keep the

6     horse in that barn.

7          THE COURT:  All right.

8          MR. RIGAT:  Well, Your Honor, the plan right now

9     is that I'll be making closing argument.  And I wasn't

10    intent on mentioning the phrase, blue wall of silence.  I do

11    think it's fair game to talk about the fact that there are

12    missing, you know, that there were more than two police

13    officers at some point in this transaction and that we don't

14    know who the others are.  But I'll shy away from the broad

15    paintbrush, blue wall of silence.

16          THE COURT:  All right.  That sounds fair.

17          MR. MELLEY:  It does occur there will be an

18    objection because there's only two defendants.  And I

19    object.  And I will object to an attempt to bring other

20    people in and when we're looking for an ultimate verdict

21    here to try to imply that what somebody else might have done

22    should be put on these two.

23          MR. RIGAT:  Oh, right.  That's not the intent.

24    The intent is I do think it's fair game to inquire into why

25    we don't know the names of these individuals, why we don't

          have reports from these individuals.

                    THE COURT:  We'll take it as it comes.

                    MR. RIGAT:  As it comes?  Yeah.  Thank you.

                    THE COURT:  Future surgery.  Is that still on the

          table?

                    MR. RIGAT:  Yes.  And I think this evening with

          Dr. Lena he'll discuss what his recommendations are with

          respect to future surgery.

                    MR. MELLEY:  That would be fine in a discovery

          situation.  We're past that.  Future surgery, as I'm

          standing here, I don't know if that means 2016 or 2030.

          There's no indication at all.  Yeah, I have my own expert

          and I have sat down with him and I disclosed my conversation

          with him on Christmas Eve.  But this whole idea of future

          surgery occurring at a specific time or the cost, it's

          like --

                    THE COURT:  So it's a late disclosure problem?

                    MR. MELLEY:  Yes.

                    THE COURT:  And so what did the defense know about

          it and when did they know about it?

                    MR. RIGAT:  Your Honor, that wasn't -- the final

          report we received from Dr. Lena didn't come in until about

          what, two and a half weeks ago.

                    THE COURT:  What does it say?

                    MR. RIGAT:  It basically says he will need a

1  future -- it's likely that he'll need future either knee

2  replacement surgery or a more --

3  THE COURT:  And did he give an estimate or is he

4  going to give an estimate of the cost?

5  MR. RIGAT:  I believe he can, yeah.  I mean, we do

6  have an estimate.  In his prior report he estimated there

7  will be a need for some future surgery at about $7,000.  So,

8  I mean, I think we have some range as to what that should

9  cost.  And we can get that tonight from Dr. Lena.

10  THE COURT:  The first report has been disclosed

11  for a long time?

12  MR. RIGAT:  Yes.  Yes.  And then we had a

13  supplemental report because on December 8th Dr. Lena did

14  evaluate Mr. Outlaw again.  And we disclosed on the 11th,

15  although we didn't get his report until that following

16  Monday.

17  THE COURT:  Right.

18  MR. RIGAT:  We, that was the report.  That was the

19  first time we had gotten that report which indicates that he

20  does need future surgery or may need future surgery.  So we

21  think it's fair game.

22  THE COURT:  It sounds like it was disclosed along

23  the lines of the sort of catch up discovery that the three

24  of us talked about at the status conference in early

25  December.

1          It's not an unknown issue.  And it got firmed up

2   and you got it, if not on the 11th, at least on the next

3   business day after that.

4          MR. MELLEY:  Well, I don't have the -- when this

5   is going to happen if it's --

6          THE COURT:  Right.  But Dr. Lena probably doesn't

7   know.  He's probably going to give a ballpark right?  He

8   can't say it's going to be in 2019 in January that it

9   becomes urgent.  I'll allow the testimony.  Obviously you

10  can renew the objection, but I, I think as to disclosure it

11  sounds like the disclosure was made.

12         I mean, he's going to have to jump through the

13  hoops that it's reasonable and necessary and part of his

14  professional opinion.

15         MR. MELLEY:  I was going to say something else.

16         THE COURT:  Yeah, go for it.

17         MR. MELLEY:  In the September, 2008 report --

18         THE COURT:  Right.

19         MR. MELLEY:  -- from Dr. Lena, in response to this

20  report I did take his deposition.

21         THE COURT:  Right.

22         MR. MELLEY:  He says, he may also require

23  orthoscopic debridement of his knee at an estimated cost of

24  the $7,000.

25         THE COURT:  Right.

1      MR. MELLEY:  The replacement of the knee does not

2 occur until December.  And he had this debridement in August

3 of 2015.  We got those records in December.  This is

4 something new.  This is a different procedure, different

5 costs and different effect on a person.

6      And Dr. Lena has not expressed any opinions with

7 regard to that.  And that was what I addressed to the Court

8 when we had our telephonic conference before the deadlines

9 were given because I said I need time to put all this

10 together.

11      THE COURT:  But in the meantime you got a report

12 from him that says the larger more extensive operation will

13 be necessary in the future?

14      MR. MELLEY:  With no timeframe and no cost.  So my

15 objection now is I don't think we should have to get into

16 the cost of what it's going to cost in the future.

17      THE COURT:  All right.  Let's see how Dr. Lena's,

18 I'm inclined to let it in.  I mean, it's never a perfect

19 system, but one thing this case has not suffered from is a

20 lack of preparation time.  So I think the, it's likely to

21 come in.

22      If he does a complete fall on the floor and waffle

23 and he can't really say for sure, if anything, then that's a

24 different problem.

25      MR. RIGAT:  I understand, Judge.  Thank you.

1          THE COURT:  Prior or subsequent actions.  What are

2     we talking about?

3          MR. MELLEY:  Your Honor, I was going through the

4     list.

5          THE COURT:  Oh, this is with respect to defendants

6     Allen and Gordon.  Did you plan to put in any of the

7     incidents not related to this?  One of these guys put down

8     the raccoon.  Who put down the raccoon?

9          MR. RIGAT:  Yeah, the raccoon we need not get

10    into.

11         THE COURT:  That was a light touch.  They were

12    putting down the raccoon, you had a rabid raccoon in your

13    backyard.  I heard a whole lot about it the last time we

14    were all together.  So, but seriously, are there other

15    incidents that --

16         MR. RIGAT:  The only other incident, Your Honor, I

17    do think is fair game under 404B is possibly reference to

18    the incident with Clement Nurse which occurred about a month

19    prior to this incident, the use of a baton by Officer Allen.

20         I mean, he literally broke the baton.  You know,

21    his deposition indicated he broke the baton over Clement

22    Nurse's head when he was coming in with rear century duty as

23    they were executing an arrest warrant.

24         Now, I mean he may have had cause, I don't know,

25    but there seems to be a lot of use of a baton.  And what we

have is two people in a very short timeframe getting hit in

the head.  And what we do know is police are trained really

to avoid the head.  And so that to me gets more to method or

intent, lack of accident.  I think that's fair game under

404B.  But I'm certainly not going to be calling Clemtn

Nurse as a witness or getting too far down that path.

THE COURT:  The one thing the defense is not going

to argue is that Officer Allen struck Mr. Outlaw

inadvertently, right?  I mean, it was, from his

perspective --

MR. MELLEY:  He intended.

THE COURT:  He intended to for police reasons.  So

inadvertence or accident is not really in the case?

MR. RIGAT:  Well, no.  He's saying that he struck

at Mr. Outlaw and hit him in the arm and he inadvertently

hit him in the head.  That was the blow that took him down

to the ground.

So, you know, that actually is at issue or at

question.  You know, our client's position is that he was

deliberately hit in the head so that he could be taken down.

And that's improper conduct on a police officer given these

circumstances.

THE COURT:  How do you see it?

MR. MELLEY:  I don't see that that other incident,

such that it has been described, has any relevance at all.

1　It's an entirely different set of facts, different set of

2　circumstances.  And there's no indication that anything that

3　was done at that time was a violation of any police

4　procedure.  There's no aftermath to that.

5　　　　He testified that, yeah, this happened.  And

6　that's the end of the story.  There's too many outside

7　things and the prejudicial effect is huge to allow the

8　plaintiff to try to paint a picture of somebody going around

9　wacking people with a baton.

10　　　　Without a finding, without more evidence just

11　trying to get that little picture painted is to me

12　inappropriate because --

13　　　　THE COURT:  All right.  I see it the same,

14　probably not as colorfully as you do, but I'll exclude the

15　evidence of the prior action.  It's an unrelated event in

16　time and in personnel except both involved Officer Allen.

17　But I don't see that it proves much about the incident with

18　Mr. Outlaw.

19　　　　Let's change streets.  Have we got photos of blood

20　in the street?

21　　　　MR. RIGAT:  Yes.

22　　　　THE COURT:  They are coming in from your

23　perspective?

24　　　　MR. DiCROSTA:  Yes, they are.

25　　　　THE COURT:  Then why do we keep them out?

MS. FEOLA-GUERRIERI: Who took them? When?
According to disclosure that I received they were taken
while the plaintiff was in the hospital and he had nothing
to do with taking them. And there's been no indication that
any of the witnesses was involved in the actual taking of
the photos. So it's a matter of identification. And beyond
that, I have a real issue with regard to what the photos
apparently are trying to reflect. There's red stuff in the
sidewalk and on the road. And they are making an allegation
that that belongs to the plaintiff. I don't see any chain.

THE COURT: All right. So it's a foundational
objection?

MR. MELLEY: Yeah.

THE COURT: So whose going to lay down the
foundation? It doesn't hae to be the photographer.

MR. RIGAT: Right. I believe Mr. Outlaw will be
able to, with respect to street scenes, to identify that
these photos are a fair and accurate representation of the
layout of that street. And so it's demonstrative evidence
that are good to have.

With respect to the blood, Your Honor, he can
testify that he recognizes the blood where he was sitting,
the parking meter, the number.

If we need to lay better foundation we can
certainly call his brother-in-law. We're actually, Attorney

1  DiCrosta, they went out the day after the event and found

2  the bloodstains and took a photograph of that.  So whatever

3  is Attorney Melley's pleasure.  But those come in.  They are

4  relevant.  It supports Mr. Outlaw's version of events that

5  he was bleeding on side of the road.  And it's not just a

6  little blood.

7          THE COURT:  If he testifies that it's a fair and

8  accurate representation of the scene he saw the night he was

9  hit that works for me.  If he says he didn't see, he

10  couldn't remember, he was in a state of confusion and agony

11  and doesn't really know then obviously the foundation is not

12  there.

13          MR. RIGAT:  Yes.  And if we can't get it in

14  through Mr. Outlaw we'll make an attempt to get it in

15  through --

16          THE COURT:  Through Mr. DiCrosta?

17          MR. RIGAT:  Either Mr. DiCrosta or Mr. Calhoun.

18  Because mr. Calhoun is actually present in courtroom.  He

19  was with Attorney DiCrosta the day after.  He's Ty's

20  brother-in-law.

21          THE COURT:  All right.  We'll see how the

22  foundation comes in.  I mean, there's one, it's the next

23  day, right?

24          MR. RIGAT:  I believe the next day, correct?

25          MR. DiCROSTA:  Within hours, Your Honor.

1    THE COURT:  Okay.  Like the next morning after the

2   nighttime event?

3    MR. DiCROSTA:  As soon as it got light.  So --

4    THE COURT:  I'll rule after I hear the foundation.

5   It sounds likely that it's going to come in, but I haven't

6   seen the photos.  It's a little hard to say.

7    Lost wage claim.

8    MR. RIGAT:  We have none.

9    THE COURT:  You have none.  That's easy.  That's

10  granted.  And Mr. Outlaw's wife is not going to testify.

11   MR. RIGAT:  No she's not.

12   THE COURT:  By your choice not a ruling?

13   MR. RIGAT:  Yes, no.

14   THE COURT:  And Stengle, what's the problem with

15  Mr. Stengle?  He's a bystander, a friend or just a --

16   MR. MELLEY:  Yes to both.

17   THE COURT:  Yes to both, okay.

18   MR. MELLEY:  He's a friend of the friends of the

19  plaintiff.  I took his deposition.

20   THE COURT:  Right.

21   MR. MELLEY:  He arrives while something is going

22  on.  He makes observations of individuals.  He does not

23  specifically identify, by his observation, the plaintiff.

24  He does not identify any of the defendants here.  He goes

25  inside, he reports, I just saw something.  The next day he's

1   told that had to be the plaintiff.  And it's like, oh, wow..

2   But there's no testimony that what he saw is in fact the

3   plaintiff and these defendants.

4          THE COURT:  It might have been some other guys

5   having an altercation?

6          MR. MELLEY:  And this place, it's not unusual.

7          THE COURT:  Okay.

8          MR. RIGAT:  I guess twofold.  First, Jonathan

9   Stengel is not a friend of the Tylon Outlaw.  They never met

10  prior to this evening.

11         THE COURT:  Right.

12         MR. RIGAT:  He's a dance instructor.  He owns a

13  series of dance studios.  And he's walking up the street to

14  go to Bourdon Street to meet up with some friends, to

15  include Nick Sackandy, people that are mutual acquaintances.

16         As he's walking up the street, or let me step

17  back, Nick Sackandy will testify, as an offer of proof, that

18  as soon as Ty leaves the restaurant shortly thereafter

19  Jonathan Stengel comes in and says words to the effect of,

20  wow, you wouldn't believe what I just saw, the Hartford cops

21  are out beating some guy out on the street.

22         THE COURT:  Are you going to offer that as an

23  excited utterance?

24         MR. RIGAT:  Yes.  Or as a present sense

25  impression.  I believe that comes in through Rakus.  Stengel

is important because what Stengel can testify is as he's

going to Bourbon Street, which is right around the same

time, it's the exact area, he sees a car parked next to a

double parked cab.  And he can see the police doing a

number, both uniformed officers and plain clothes, what he

took to be plain cloths officers, violently punching and

kicking some guy on the ground.

So, no, he didn't see who the guy on the ground

was, but what he could see -- in fact, I believe his words

were, I saw enough, I knew what was going on.  While I

didn't run into Bourbon Street I walked to get off the

street as soon as I could.  I didn't want to get mixed up in

that.

THE COURT:  And does he know the time?

MR. RIGAT:  Well, we know -- he can guesstimate

the time, but we know the time through Rakus or, excuse me,

through Sackandy because Sackandy is saying that shortly

after Ty leaves my friend John Stengel enters.  And as soon

as he comes in he gives the excited utterance which is, I

can't believe what is happening, I think it was wow --

THE COURT:  Assuming it comes in that way it's

likely to come in.  I think it goes to weight, yeah.

MR. RIGAT:  Yup.

MR. MELLEY:  The problem is without -- he is

testifying to a number of officers --

1          THE COURT:  Right.

2          MR. MELLEY -- beating up this individual.  He

3     doesn't identify these two.  How do we know it is the same

4     incident?  The prejudice, he's got -- it's this idea that

5     he's talking to his friend whose a friend of the plaintiff

6     in a bar at midnight and all of a sudden this connection is

7     being --

8          THE COURT:  All right.  Those are all good reasons

9     that the jury shouldn't put, from your perspective, put much

10    weight on the testimony.  But I don't think they make it

11    invisible.  You could infer that since the time was the same

12    and the guys knew each other indirectly that it was the same

13    incident.  Anybody else is free to prove that there was a

14    second altercation in the same location.  As you said, that

15    happens quite a bit here.  But I don't think I could exclude

16    it just on the -- it's sufficiently reliable to come in.

17         Medical witnesses using certain words, you must be

18    just about done here, this is, oh, for the lay witnesses.  I

19    don't know, I don't know what they are going to say so I

20    can't tell them what to say.  What kind of ruling were you

21    looking for here?

22         MR. MELLEY:  In the opening counsel referred to

23    this beating, this beating.  It's argumentative.  There's a

24    dispute.  That's a conclusion.  The jury can determine what

25    happened and why.  But to put in the colorful language

1  continually, especially through witnesses, I believe is

2  harmful.

3         I don't think it's appropriate because it's

4  subliminal and it's continual and I don't think it has a

5  place.

6         MR. RIGAT:  I mean, how else do you describe a

7  beating?  That's what this was.  I mean, that's the theory

8  of the plaintiff's case.

9         THE COURT:  Yeah, I'll deny the motion.

10         Lack of time.  And nobody's going to get into

11  this, right?  I'm not quite sure why this case took so many

12  years to get here, but --

13         MR. RIGAT?  And we won't mention that.  I mean,

14  we're not looking to blame Hartford or the two police

15  officers.

16         THE COURT:  Right.

17         MR. RIGAT:  These things can take a long time.

18         THE COURT:  Right.  Right.

19         THE COURT:  So that's off the table.  The motion

20  is granted.

21         I think that's it.  We'll bring in the jury.

22  Anything else we need to talk about?

23         MR. MELLEY:  Can we just have a short break so I

24  can explain to Officer Allen what Your Honor did?  And then

25  we can go?

1          THE COURT:  Sure.  I'm going to say put, otherwise

2     a short break will turn into 20 minutes, but take the time

3     you need to talk to him.

4          MR. MELLEY:  Okay.

5          MR. DiCROSTA:  Your Honor, as a housekeeping

6     matter, do you want exhibits marked for identification?

7          THE COURT:  You have the list and stuff?

8          MR. DiCROSTA:  I don't have the list.  I through

9     we would -- we probably should --

10          MR. MELLEY:  We should go through the exhibits

11     before the jury.

12          MR. DiCROSTA:  Before you bring the jury out.

13          THE COURT:  You have a list?

14          MR. DiCROSTA:  Perhaps we can create one.  We

15     know --

16          MR. RIGAT:  The list is what we disclosed in our

17     trial memo.

18          MR. DiCROSTA:  I'm sorry, there was a list in the

19     trial memorandum, Your Honor.

20          MR. MELLEY:  It would nice to actually see them

21     and get them marked to speed it up.

22          THE COURT:  I've got to bring these people in.  I

23     told them 1:30.  We'll have to do it the old school way and

24     make them as we go along.

25          MR. DiCROSTA:  That's fine.

1          THE COURT:  But we can't take another 30 minutes

2     to do homework.

3          MR. RIGAT:  You got it.  You got it.

4          THE COURT:  All right.  Bring in the jury.  Thank

5     you both.

```
 1                    C E R T I F I C A T E

 2

 3          I, Anne Marie Henry, Official Court Reporter for

 4   the United States District Court, for the District of

 5   Vermont, do hereby certify that the foregoing pages are a

 6   true and accurate transcription of my shorthand notes taken

 7   in the aforementioned matter to the best of my skill and

 8   ability.

 9
                           _____
10

11                           Anne Marie Henry, RPR
                             Official Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```