UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____

TYLON C. OUTLAW                    )

          VS                       )   CASE NO: 3:07-CV-01769

TROY GORDON & MICHAEL ALLEN    )

_____) CHARGE CONFERENCE
                                       TRIAL BY JURY

BEFORE:   HONORABLE GEOFFREY W. CRAWFORD
          DISTRICT JUDGE

APPEARANCES:  ANTHONY P. DiCROSTA, ESQUIRE
                     Mirto, Ketaineck & DiCrosta
                     P.O. Box 428
                     West Haven, Connecticut  06516
                     Representing The Plaintiff

              RAYMOND J. RIGAT, ESQUIRE
                     Gilbride & Rigat
                     23 E. Main Street
                     Clinton, Connecticut   06413
                     Representing The Plaintiff

              (Appearances Continued)

DATE:      January 6, 2016

          TRANSCRIBED BY:  Anne Marie Henry, RPR
                     Official Court Reporter
                         P.O. Box 1932
                    Brattleboro, Vermont   05302

1                    APPEARANCES CONTINUED:

2

3          NATHALIE FEOLA-GUERRIERI, ESQUIRE
                City of Hartford
4               Office of Corporation Counsel
                550 Main Street
5               Hartford, Connecticut   06013

6

7          WILLIAM J. MELLEY, III, ESQUIRE
                Law Offices of William J. Melley, III
8               250 Hudson Street
                Hartford, Connecticut   06106
9               Representing the Defendants

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The Court opened in chambers without the jury

2   present for the charge conference at 4:06 p.m.)

3         THE COURT:  Let's go page by page through the

4   stuff.  And I'm looking at the one I've called draft two.

5   It should say draft two at the top of the page.  And there's

6   plenty of stuff to take out, but I was just going through it

7   all together.

8         The easiest thing for me is just to go page by

9   page.  And it's boilerplate for a while.  Page 1, any

10  changes?

11        MR. DiCROSTA:  Nope.

12        MR. MELLEY:  No.

13        THE COURT:  Page 2?  Pretty standard, but glad to

14  tinker with it.  Any changes?

15        MR. RIGAT:  No, not from us.

16        THE COURT:  And Page 3?

17        MR. RIGAT:  Looks good to me.

18        THE COURT:  And 4?  We'll slow down when we get to

19  the guts of the thing.

20        MR. DiCROSTA:  Or come to a sudden stop.

21        MR. RIGAT:  Four looks good.

22        THE COURT:  Take your time.

23        MR. MELLEY:  I'd like to ask a question.

24        THE COURT:  There's a Vermont touch for you.

25        MR. MELLEY:  I figured that.

1    THE COURT:  It's a lot easier about the rain, you

2  know, you see people with the rain jackets on.

3    MS. FEOLA-GUERRIERI:  Right.

4    THE COURT:  Five?  Six?  I added standard language

5  about the impeachment of a witness.

6    MR. MELLEY:  I'm sorry.  You also gave a

7  separately, on the credibility, the expert stuff, is that

8  going in on this section?

9    THE COURT:  Where's a good place for it?

10    MR. MELLEY:  At the end of credibility of

11  witnesses, just in terms of a spot.

12    THE COURT:  Yeah.

13    MR. RIGAT:  You know what, it's a typo.

14    THE COURT:  Yeah, go for it.

15    MR. RIGAT:  But it should be Dr. Lena.

16    THE COURT:  Oh, it's Dr. Lena.

17    MR. RIGAT:  That's okay.

18    THE COURT:  That was my -- that's right.

19    MR. MELLEY:  L-E-N-A.

20    THE COURT:  L-E-N-A.

21    MR. RIGAT:  Tony apparently beat up on his brother

22  on the football field years ago.

23    THE COURT:  Dr. Lena.  Yeah.  Yeah.  Credibility,

24  I would say, what do you think, before credibility of

25  witnesses; right?  Make sense?

1          MR. RIGAT:  Yup.

2          THE CLERK:  The expert witness piece?

3          THE COURT:  The expert witness piece?

4          THE CLERK:  Okay.

5          THE COURT:  Since the credibility would apply

6  to -- that discussion applies to both kinds.  Expert witness

7  insert on Page 5 just above credibility.

8          MS. FEOLA-GUERRIERI:  You know what, I have a

9  problem with the one thing.  Under credibility of witnesses,

10 the third paragraph, how do you determine where the truth

11 lies.

12         THE COURT:  Right.  As opposed to where it lays?

13         MS. FEOLA-GUERRIERI:  I don't know.  I don't know

14 if we need it.  I mean, I don't know.

15         THE COURT:  I can take it out, but it's just

16 throat clearing.  The truth lies meaning --

17         MS. FEOLA-GUERRIERI:  Exactly.  A truth and a lie.

18         MR. MELLEY:  That doesn't seem right.

19         MS. FEOLA-GUERRIERI:  It's too close.  Too close.

20         MR. RIGAT:  Where the truth is.

21         THE COURT:  How do you determine what the truth

22 is.

23         MS. FEOLA-GUERRIERI:  How do you determine the

24 truth?

25         THE COURT:  Yeah.  How do you determine what the

1    truth is.

2          MR. RIGAT:  Now you sound like Pontius Pilate.

3    What is truth?

4          THE COURT:  All right.  That's good.  That will be

5    a permanent contribution because I recycle these things.

6          MS. FEOLA-GUERRIERI:  Thank you.

7          THE COURT:  I'll think of you every time we come

8    to it.

9          MS. FEOLA-GUERRIERI:  Thank you.

10         THE COURT:  So, impeachment is --

11         MR. MELLEY:  Can I just throw something out?

12         THE COURT:  Sure.  That's what we're here for.

13         MR. MELLEY:  And I'm not suggesting rules to be

14   changed, but truth is a very illusive concept.

15         THE COURT:  Right.

16         MR. DiCROSTA:  To some folks.

17         MR. MELLEY:  And I'm just trying to think.  I

18   mean, does a person have credibility, does it ring true,

19   does -- the burden of proof, with regard to an issue, for

20   example, I just indicated in my examination that we had

21   testimony from Gordon and Allen and Outlaw on the same

22   event.  And there are varying degrees in all three.

23         THE COURT:  Right.

24         MR. MELLEY:  That does not mean anyone is not

25   telling the truth as they see it.  The question is, as an

1   issue of credibility, who do you believe.

2        THE COURT:  Right.

3        MR. MELLEY:  So this is just one of these things I

4   have my head.  At trial we search for justice.  Truth is

5   helpful in getting us there, but as a concept I'm just

6   throwing that out.

7        THE COURT:  How about --

8        MR. DiCROSTA:  I think it's necessary.

9        THE COURT:  How do you determine who is telling

10  the truth?

11       MS. FEOLA-GUERRIERI:  You have a problem with the

12  word truth to begin with because what you are really looking

13  at is who do you find more credible under the circumstances,

14  who do you find more credible.

15       MR. MELLEY:  Right.  Because it's credibility.

16       MS. FEOLA-GUERRIERI:  As to what happened, not

17  what the truth is.

18       MR. MELLEY:  Who do you believe?

19       MR. DiCROSTA:  Well, isn't justice the truth?

20  Exchangeable?

21       THE COURT:  So how do you determine who is telling

22  the truth.  A first grader understands that concept.

23       MR. MELLEY:  I don't want to be -- I'm being

24  thick.

25       THE COURT:  Well, probably more deep than thick.

1          MR. RIGAT:  I would have said jesuitical, but --

2          MR. MELLEY:  I went to Holy Cross too.

3          MR. RIGAT:  I know you did.  I'm telling yeah.

4          MR. MELLEY:  Dr. Spinella was there with Clarence

5    Thomas.

6          THE COURT:  All right.  That's good.  I'll leave

7    it alone, how do you determine what the truth is, unless

8    somebody gives me a better suggestion.

9          MR. MELLEY:  Okay.

10          THE COURT:  Impeachment and inferences?

11          MR. RIGAT:  Well, here's where I may have a

12    suggestion, for whatever it's worth.

13          THE COURT:  Great.

14          MR. RIGAT:  Top of Page 7, then it goes to, in

15    making this determination you may consider whether the

16    witnesses purposely made a false statement -- or you may

17    consider whether the witness purposely made a false

18    statement or whether it was an innocent mistake.

19          And Your Honor had said something on one of the

20    side bars that resonated with me about, you know,

21    considering -- do we want wordage about, you know, an

22    innocent mistake considering the passage of time.

23          THE COURT:  Okay.

24          MR. RIGAT:  Does that make sense?  We're at eleven

25    years and --

1          MR. DiCROSTA:  Or an inaccuracy.

2          MS. FEOLA-GUERRIERI:  But that's limiting innocent

3   mistake to that circumstance only, whereas, this is more

4   general.

5          THE COURT:  It's fine the way it is.  I here yeah.

6          MR. RIGAT:  Okay.  All right.  Other than that,

7   fine.

8          THE COURT:  Inferences, burden of proof.  We're

9   getting a little closer to the heart of the thing.

10         Now, qualified immunity appears in the second

11   paragraph, burden of proof.  And I think we are also in

12   agreement that qualified immunity is coming out of the jury

13   side of the case.

14         MS. FEOLA-GUERRIERI:  As an instruction.

15         THE COURT:  As an instruction.  So I will strike

16   this paragraph.

17         MS. FEOLA-GUERRIERI:  Right.  As to specific

18   interrogatories, however.

19         MR. MELLEY:  That's another matter.  We haven't

20   got there yet.

21         MS. FEOLA-GUERRIERI:  Right.  I know, but I just

22   wanted --

23         THE COURT:  So do you want the jury to consider

24   qualified immunity or not?

25         MR. MELLEY:  No.

1          MS. FEOLA-GUERRIERI:  Not as an instruction.

2          THE COURT:  Not in the instructions.  And if they

3  are not in the instructions they are not on the verdict

4  form.  It won't be something that they are asked to make a

5  decision about.

6          MS. FEOLA-GUERRIERI:  Well, the factual --

7          MR. MELLEY:  Well, I don't think that they should

8  be asked any questions that deal specifically with the issue

9  of qualified immunity.

10          THE COURT:  Right.

11          MR. MELLEY:  But there is an issue as to whether

12  or not they should be asked specific factual predicates to

13  assist the Court.

14          THE COURT:  That's how I set it up the first time

15  around.  That's kind of the majority view.

16          MR. MELLEY:  For the interrogatories.  I'm not

17  talking about the charge.

18          THE COURT:  But I'm not going to ask them to

19  answer these questions unless I can tell them the context

20  that they are making the determination in.

21          MR. MELLEY:  I thought essentially it's to assist

22  the Court in its determination.

23          THE COURT:  It is, yeah.  But, I mean, they have

24  to know what they are being -- why they are being asked.  It

25  has to hang together.

1         MS. FEOLA-GUERRIERI:  Well, wouldn't it hang under

2  the provision as to their decision as to whether or not the

3  plaintiff proved the elements of the Section 1983 case?  So

4  that, you know, if they find that the elements were met do

5  you also find that, you know, I'll just say as an example,

6  Detective Gordon reasonably perceived a threat or Officer

7  Allen reasonably, you know, sort of questions following that

8  finding.

9         THE COURT:  Well, there are a fairly infinite

10  variety of factual questions we could would ask them --

11         MS. FEOLA-GUERRIERI:  Right.

12         THE COURT:  -- about qualified immunity.  This one

13  is related, I mean, one of the problems is the burden of

14  proof is different; right?  So if they are going to be

15  making factual determinations and offering an advisory

16  verdict answer to me they have to be applying the right

17  burden of proof.  And it's different from qualified immunity

18  because it's on you as opposed to, on the defense as opposed

19  to on the plaintiff that carries it for everything else.

20         I thought the -- I'm happy to go back to the

21  original plan.  It's still in here.  I thought we had sort

22  of moved to a plan where the judge was going to make the

23  factual and the legal determinations related to qualified

24  immunity, at least under 1983, and take all of this

25  discussion out.  But I can go back to where I started, which

1   is fine too.  And that's sort of the -- in the absence of an

2   agreement that would be the plan.  But I'm not going to do

3   it unless I can explain to them what questions they are

4   answering, in a limited way why, and whose got the burden of

5   proof.

6           MR. MELLEY:  That's very confusing.

7           THE COURT:  Yeah, it's really a confusing issue

8   because it kind of, it's sort of slapped onto -- the hard

9   part is reading that fairly recent Supreme Court case and

10  understanding how a person can be liable under Section 1983,

11  but also, receive qualified immunity.

12          MR. MELLEY:  Right.

13          THE COURT:  That's intellectually difficult

14  because it's sort of a self-contradictory problem, but it's

15  the law and we've got to follow it.

16          MR. MELLEY:  Okay.  Let's just continue for now.

17  We know that it's there.

18          THE COURT:  All right.  But we got to decide it in

19  the next hour.

20          MR. MELLEY:  Yeah.  Yeah.  So right now it's

21  crossed out, the qualified immunity on that page?

22          THE COURT:  No.  I'll leave it in.  It's a lot

23  easier to cross things out than it is to restore them.  I'll

24  leave it in and stay with the original plan, which is the

25  jury will deliver an advisory type ruling in the verdict

1    form as originally set up until I hear from both sides that
2    they want to waive that process and they want the Court to
3    make the entire factual determination, the entire legal
4    determination and exclude that from the jury.  When I hear
5    that from both sides we'll go back and take it out.  But I
6    don't think we have clarity on that at this point.
7            Preponderance of the evidence.  Fairly standard.
8    Any improvements we can make?  All right.
9            Now we're into the guts of the thing, the
10   substance of the law of the case, 1983.  Any problem with
11   the elements?
12           MR. RIGAT:  No.
13           MR. MELLEY:  No.
14           THE COURT:  And, actually, under color of state
15   law it's not in dispute.  So I've just resolved that.  And
16   then there are, there's a description of the deprivation of
17   right.
18           MR. MELLEY:  I'm sorry.  I'm sorry, Your Honor.
19           THE COURT:  Yeah.  Yeah.  Take your time.
20           MR. MELLEY:  I was distracted.  But if I may just
21   go back to the preponderance of the evidence?
22           THE COURT:  Sure.
23           MR. MELLEY:  Usually there's something about if
24   the evidence is -- if the party is in Equipoise (ph) is
25   proving an element then you must find that they have not

```
 1    proved it, you know.

 2           THE COURT:  And it says, if you find that the

 3    credible evidence on a given issue is evenly divided between

 4    the parties then you must decide that issue against the

 5    party having the burden of proof.

 6           MR. MELLEY:  That's what I was looking at.

 7           THE COURT:  It's there.  Yeah, it's there.

 8           MR. MELLEY:  I'm sorry.

 9           THE COURT:  So if they can't get any better than

10    50-50 the plaintiff loses unless it's one of those defenses

11    that you would have the burden on.

12           MR. DiCROSTA:  How about a baseball reference to,

13    tie at first base goes to the runner?  Just something to

14    think about --

15           THE COURT:  Something to think about.  Right.

16           MR. DiCROSTA:  -- for the future.  I'm a baseball

17    guy, as you can tell.

18           MR. MELLEY:  I knew it was there.

19           THE COURT:  Yeah.  Yeah.  There's no problem.

20           MR. MELLEY:  I'm reading it and I'm not reading

21    it.

22           THE COURT:  All right.  Actually, under color of

23    state law, not a disputed issue.  Deprivation of right,

24    described excessive force, described --

25           MR. MELLEY:  If I may make a suggestion on the
```

excessive force?  The, and this gets to what I was referring

to when we had Dr. Lena's deposition.  The claim of

excessive force is not general, but rather, specific.  It's

the striking on the back of the head with a blunt weapon.

THE COURT:  Right.

MR. MELLEY:  Falling to the ground, being beaten,

and then being struck in the right knee with a blunt weapon

such that his knee fractured.  That's the specific

allegation that they have of the excessive force.

THE COURT:  Right.  Right.

MR. MELLEY:  And I think that should be in the

charge, that they are specifically alleging that.  Because

that's part of the claim.  That brings us together.

THE COURT:  I mean, I thought some more about it

after we talked about it.  You would almost have the Court

say, you know, if, on the other hand, you find that the knee

was broken because he was struck on the head and, and

knocked to the pavement, but that it happened through

contact with the pavement and not from the baton then the

defendants win.  And I don't think that's the law.

MR. MELLEY:  Well, they are making a specific

allegation.  They didn't plead in the alternative that it's

a result of the incident.  They are saying, it's a claim of

excessive force.  He did this and he hurt him in the knee.

THE COURT:  Right.

1    MR. MELLEY:  I mean, that's, I don't know how much

2  more specific they can get.  They have the burden of proof

3  on that.  It's not a generalized, they beat me up and I

4  suffered injuries.  It's specific.  And, you know, this

5  complaint is dated November, 2007.  You know, we're nine

6  years, eight years.

7    THE COURT:  Yeah.  And that's what the plaintiff

8  thinks happened.  And that's what the doctor thinks was the

9  cause of the injury.  But he's also -- this only comes up

10  because the doctor has suggested that there's an alternative

11  cause which is that he cracked his kneecap when he landed on

12  the ground.

13    MR. MELLEY:  Right.

14    THE COURT:  And you want judgment as a matter of

15  law on that theory.  And I can't give it to you.

16    MR. MELLEY:  No, I understand that.

17    THE COURT:  Yeah.  Yeah.

18    MR. MELLEY:  I'm not asking you that.

19    THE COURT:  Right.

20    MR. MELLEY:  To throw the case out now, but I'm

21  just -- because we're past that.

22    THE COURT:  Right.

23    MR. MELLEY:  But I'm just saying that when they

24  make a specific allegation of excessive force, right to be

25  free from excessive force.  Well, what are they alleging?

1    What did we do?

2         THE COURT:  I don't know, you actually tell me.

3         MR. RIGAT:  I like it as is.  I think you're

4    right.

5         MR. DiCROSTA:  We described quite a bit of

6    behavior, not just one behavior.  So I don't think this is

7    taking anyone by surprise.  So I don't see the prejudice

8    here.

9         MR. MELLEY:  I don't have a problem throwing the

10   paragraph in.  This is what they allege.  This is the

11   specific allegation of excessive force that brings us

12   together.  Paragraph 5 of the complaint.

13        THE COURT:  But why are they limited to what they

14   knew in 2004 before discovery?  Why does that -- why can

15   they only win on that theory when the facts could come in

16   somewhat differently or at least with more options?

17        MS. FEOLA-GUERRIERI:  It's their burden.  This is

18   their case.  They presented this case as such.  This is what

19   they have to prove.

20        THE COURT:  Right.

21        MS. FEOLA-GUERRIERI:  So the jury should be

22   instructed that they claim that the right to be free from

23   excessive force was violated when X. occurred and you have

24   to determine whether or not they proved that.  That's their

25   case.

1       THE COURT:  I think we're slicing it too fine;

2  right?  That's their case.  That X. is that the one officer

3  kicked and pushed him back and the other officer hit him

4  with a club.  In the course of this fracus we all agree that

5  his knee was broken.

6       MR. MELLEY:  Yeah, but we don't agree that it

7  occurred as a result of excessive force.  And the excessive

8  force is the wack of the baton on the knee.

9       MR. DiCROSTA:  That's more of a defense than it is

10  a burden.

11       MS. FEOLA-GUERRIERI:  It's causation.

12       THE COURT:  I think you can both argue, but I

13  don't want to -- I don't want to limit the plaintiffs

14  artificially to -- I don't want to open the door to a theory

15  that he can win only if the baton -- if he's proved that the

16  baton cracked his knee.  If he's proved that the baton

17  knocked him to the ground and the pavement cracked his knee

18  I think he wins the same way.

19       MR. MELLEY:  I disagree.  I mean, one of the

20  things I would do then is offer this as an exhibit.

21       THE COURT:  Offer what?

22       MR. MELLEY:  This paragraph.  This is the

23  allegation.  It's a judicial admission by them of their

24  complaint.

25       THE COURT:  From the complaint.

1          MR. MELLEY:  From the complaint.  That paragraph.

2          THE COURT:  Yeah.  You don't have an objection to

3    their reading the complaint; right?

4          MR. RIGAT:  No.

5          THE COURT:  You can offer in the complaint.

6          MR. MELLEY:  All right.  I mean, I can handle it

7    that way.

8          THE COURT:  Sure.

9          MR. MELLEY:  Um, can I mark it?

10          THE COURT:  No.  It's not going into evidence, but

11    you can read the complaint, you know.

12          MR. MELLEY:  Okay.  So um, I'll do that tomorrow.

13          THE COURT:  Okay.

14          MR. MELLEY:  Okay.  And just so we're clear, and I

15    don't want to -- I would ask the Court to publish, meaning

16    read not publish in the sense of paragraph 5 of their

17    complaint against the officers.

18          THE COURT:  Can I borrow it?

19          MR. MELLEY:  Sure.  I want to refer to the date of

20    the complaint as well.

21          THE COURT:  Any objection?  I mean, it's

22    consistent with your theory.  The only wrinkle is this

23    causation issue that --

24          MR. MELLEY:  A good wrinkle.

25          THE COURT:  What's that?

1          MR. MELLEY:  It's a good wrinkle.

2          THE COURT:  Sure.  I'll give you full march.

3          All right.  So back to the charge itself, any

4    complaints about the rest of the elements of the 1983

5    action?  All the way through, go back to qualified immunity

6    at Page 14, but until that?

7          MS. FEOLA-GUERRIERI:  Page 11, I didn't know if we

8    meant to say, the second paragraph under excessive force, if

9    a police officer uses force or excessive force.

10         THE COURT:  Where are we?

11         MS. FEOLA-GUERRIERI:  The second paragraph.  The

12   second line.

13         MR. MELLEY:  Under excessive force.

14         THE COURT:  Oh, yeah.  Yeah.  Excessive.  Yeah.

15   Yeah.  Thank you.

16         MS. FEOLA-GUERRIERI:  Okay.  Even on Page 12,

17   second sentence.  I mean, the second line, that a reasonable

18   officer on the scene would believe it is reasonably

19   necessary.

20         THE COURT:  I know I had that and I took it out.

21   I mean, --

22         MS. FEOLA-GUERRIERI:  You have reasonably

23   required.

24         THE COURT:  Sure.  That's fair.  You could have a

25   reasonable, generally reasonable, but holding an

1    unreasonable belief in this particular circumstance.

2              MS. FEOLA-GUERRIERI:  Yes.

3              THE COURT:  So a reasonable officer on the scene

4    would believe it is reasonably necessary.  Fair enough.

5              MS. FEOLA-GUERRIERI:  And, likewise, under

6    paragraph 4 on Page 12.  To be reasonably necessary.

7              THE COURT:  Amount of time the change in

8    circumstance, that one?  The time in which the officer had

9    to determine the type and amount of force that appeared to

10   be necessary?

11             MS. FEOLA-GUERRIERI:  Reasonably necessary.  I

12   mean, if we want to be consistent.

13             THE COURT:  Yeah.  I mean, these are -- you care

14   one way or the other?

15             MR. RIGAT:  No.

16             THE COURT:  That's fine.  Thirteen?

17             MS. FEOLA-GUERRIERI:  I guess one of the things

18   that I had broadly noticed is that there are times within

19   this charge where it's appropriate to just group the

20   defendants --

21             THE COURT:  Right.

22             MS. FEOLA-GUERRIERI:  -- as plural, but then when

23   we're talking about -- we had proposed a charge on multiple

24   defendants.  I don't know if there's anything that addresses

25   that here.  But under proximate cause, for example, it says,

1  the final element which the plaintiff must prove is that the

2  defendants' acts.  I mean, I don't want to give them the

3  impression that they have to --

4          THE COURT:  That's fair.  So maybe we should add a

5  paragraph about multiple defendants.  What did you have

6  before?  Do you have it there?

7          MS. FEOLA-GUERRIERI:  Yeah, it was actually the

8  first of the proposed jury charges that were filed on

9  December 21st.

10         THE COURT:  Right.

11         MS. FEOLA-GUERRIERI:  Document 134.  In this case

12  there's more than one defendant.  If you find that one of

13  the defendants is not liable that does not mean that the

14  other defendant is also liable.  Each defendant is entitled

15  to a fair consideration of his or her own defense and is not

16  to be prejudiced by the fact, if it should become a fact,

17  that you find the other defendant to be liable.  Unless

18  otherwise stated, all instructions given to you govern the

19  case, as to each defendant.

20         THE COURT:  Perfect.

21         MR. RIGAT:  Could we take out the first sentence

22  and start with the, each?

23         THE COURT:  What was the first sentence?

24         MS. FEOLA-GUERRIERI:  The first sentence of?

25         MR. RIGAT:  Just read the paragraph.

1    MS. FEOLA-GUERRIERI:  There's two paragraphs.  In

2  this case there is more than one defendant.

3    MR. RIGAT:  Okay, that's fine.

4    MS. FEOLA-GUERRIERI:  If you find that one of the

5  defendants is not liable that does not mean that the other

6  defendant is liable, it should say is liable, not also

7  liable.  Is also not liable.  I would say is liable.

8    MR. RIGAT:  Right.  I thought get rid of that

9  sentence and just say, each defendant is entitled to a

10  defense; right?  Isn't that the next --

11    MS. FEOLA-GUERRIERI:  Well, that paragraph maybe

12  could be changed a bit, but what we want to make clear to

13  the jury is that if you find one not liable it doesn't mean

14  the other one's not liable; right?  And in the same token,

15  if you find that one is liable you shouldn't think that you

16  have to find the other one liable.

17    MR. RIGAT:  No.  No.  I get that.

18    MS. FEOLA-GUERRIERI:  So maybe we say this --

19    MR. DiCROSTA:  Why don't you say it the way you

20  said it?

21    MS. FEOLA-GUERRIERI:  What I just said, yes.

22    THE COURT:  Okay.

23    MS. FEOLA-GUERRIERI:  If you find that one of the

24  defendants is not liable that does not mean the other

25  defendant is --

1    MR. DiCROSTA:  Also not liable.

2    MS. FEOLA-GUERRIERI:  -- also not liable.  And

3 then you say it the other way.  If you find that one of the

4 defendants --

5    MR. RIGAT:  Right.  But you know what, by the time

6 we get to this part, Page 13, they start --

7    MR. MELLEY:  They stop listening.

8    MR. RIGAT:  They do kind of stop listening.

9    THE COURT:  Well, no, they look later.  They look

10 later is what they do.  They are going to get copies of

11 this.  They use it as a questionnaire.  They can't take it

12 in.

13    MR. RIGAT:  Right.

14    MS. FEOLA-GUERRIERI:  But maybe before burden or

15 after burden of proof or before burden of proof.  Maybe

16 after --

17    THE COURT:  Yeah.

18    MS. FEOLA-GUERRIERI:  -- I would think.

19    THE COURT:  Yeah.  Right after burden of proof.  I

20 will stick it in.  It's an excellent idea.  So why don't you

21 dictate it to me?  I'll write it down.

22    MS. FEOLA-GUERRIERI:  Do you agree on all the back

23 and forth on the liable and not liable or do you want to

24 keep it the way it is?

25    THE COURT:  That struck me as totally confusing.

1          MS. FEOLA-GUERRIERI:  The last part.

2          THE COURT:  The critical thing is they be told to

3  consider the elements of the causes of action against each

4  defendant separately.  That's really the point.

5          MS. FEOLA-GUERRIERI:  Okay.  So it would be

6  entitled, multiple defendants.  In this case there is more

7  than one defendant.  It goes on to say, if you find that one

8  of the defendants is not liable that does not mean that the

9  other defendant is also not liable.

10          MR. MELLEY:  You have to treat each defendant

11  separately.  So that means that you can find both defendants

12  responsible, one responsible and one not or both defendants

13  not responsible.

14          THE COURT:  You should consider the liability of

15  each defendant separately.

16          MS. FEOLA-GUERRIERI:  And then another paragraph,

17  each defendant is entitled to a fair consideration of his --

18  well, we don't have a her so we don't need that.  To a fair

19  consideration of his defense and is not to be prejudiced by

20  the fact, if it should become a fact, that you find the

21  other defendant to be liable.  Unless otherwise stated, all

22  instructions given to you govern the case as to each

23  defendant.

24          So, in other words, they have to consider --

25          MR. MELLEY:  Yeah.

1          MS. FEOLA-GUERRIERI:  -- all of these things

2    twice.

3          THE COURT:  Yeah.  That's how I set up the verdict

4    form.

5          MS. FEOLA-GUERRIERI:  So that might be a good

6    introduction to that.

7          THE COURT:  How about this?  In this case there is

8    more than one defendant.  You should consider the liability

9    of each defendant separately.  Each defendant is entitled to

10   a fair consideration of his defense and should not be

11   prejudiced by your decision concerning the other defendant.

12         MR. RIGAT:  I like that.  Yes, that's fine.

13         THE COURT:  That cover the ground?

14         MS. FEOLA-GUERRIERI:  It does.  Yes.  Thank you.

15         MR. RIGAT:  With pellucid clarity.

16         THE COURT:  Any other concerns about 1983?  We'll

17   return to the qualified immunity question and the state law

18   claims.  I hope I didn't make heavy weather of that.  State

19   constitutional claims, any changes?

20         MR. RIGAT:  No, they look good to me.

21         MS. FEOLA-GUERRIERI:  That also has a statement

22   about, in quotes, under claims arising under the state law

23   of Connecticut under the qualified immunity.  I just made a

24   note of that.

25         THE COURT:  Yeah.  Yeah.  We'll have to deal with

1  that as well.  Right.  Oh, yeah.  Where is that?

2          MS. FEOLA-GUERRIERI:  That's in the claims arising

3  under the state law of Connecticut paragraph on Page 15.

4          THE COURT:  Yeah.  Yeah.  Yeah.  All right.  I'll

5  put a little mark on there and we'll get back to it.

6          Assault and battery?  Okay.

7          MS. FEOLA-GUERRIERI:  Oh, I'm sorry.  There was a

8  typo here on Page 15 under violations of the Connecticut

9  Constitution.  Section 9 guarantees that no person --

10          THE COURT:  Oh, yeah.  Is it person or persons?

11  Do you guys know?  You don't read the constitution every

12  night?

13          MR. MELLEY:  No.

14          MR. RIGAT:  Your Honor, I have a book on this at

15  my office.

16          THE COURT:  All right.  I'll just leave it no

17  person.

18          MS. FEOLA-GUERRIERI:  It's not, no personal.

19          THE COURT:  Yeah, it's definitely no personal.

20  Right.

21          MS. FEOLA-GUERRIERI:  I think we're good on that.

22          THE COURT:  We're good on that.  And it's pretty

23  much a borrowing from the 1983, the same standards for

24  excessive force and for proximate cause, assault and

25  battery.  Then there is the justified use of force.

THE CLERK:  It's no person, singular?

MS. FEOLA-GUERRIERI:  No person.  Thank you.

THE COURT:  And see why we keep her around.

MR. DiCROSTA:  What did we do before the internet?

THE COURT:  What did we do?  Intentional infliction of emotional distress.  I'll get rid of these irritating hyphens.

MR. MELLEY:  Just so you know I'm going to move for judgment which I think I have to do.

THE COURT:  Sure.  Of course.

MR. MELLEY:  At the conclusion of their case.  And I'm going to move that this burden was not proven, there's no evidence that there was severe emotional distress.  He said a couple of things.  And that's it.  We don't have anything else.

THE COURT:  Okay.  Okay.

MR. MELLEY:  And you still, Your Honor, have those two exhibits.

THE COURT:  There were two exhibits to clean up.

MR. MELLEY:  That was part of the plaintiff's case.

THE COURT:  Right.  Right.

MR. MELLEY:  So, I mean, this is the standard charge.

THE COURT:  Yeah, okay.  So there's nothing wrong

1    with the law, it's just whether it's available here?

2              MR. MELLEY:  Some of the judges -- I hate to look

3    at the Connecticut -- do they -- there used to be a charge

4    where they capitalized outrageous.  The idea was it had to

5    be --

6              THE COURT:  Like super bad?

7              MR. MELLEY:  It had to be outrageous.

8              MS. FEOLA-GUERRIERI:  With an exclamation point.

9              MR. MELLEY:  Whereas, every letter in outrageous

10   was capitalized.  I don't know if it's still -- it's on the

11   standard site.  Maybe that's where you got it.

12             THE COURT:  Right.

13             MS. FEOLA-GUERRIERI:  Yeah.

14             THE COURT:  All right.  And then into damages,

15   punitive damages.  I don't know, do you think you've made it

16   as to each of the defendants separately?

17             MR. RIGAT:  I would say yes because Mr. Outlaw is

18   claiming that Gordon kicks him in the face in the eyebrow

19   with the boot while he's on the ground.  You know, whether

20   the jury believes it or not is another issue.

21             THE COURT:  Yeah.  Yeah.

22             MR. RIGAT:  I think repeated blows to the head are

23   enough for puni's.  And I think getting dragged 62 feet, or

24   however far, with a broken patella, there is no reason for

25   that.  So I think we have a claim.

1          THE COURT:  It's easier for me to see it for your

2     version of the case against Gordon, which is basically that

3     he picked a fight in a thuggish manner and then beat the

4     civilian up.  I'm not making a judgment about what happened.

5     I felt terrible talking in front of the guys in a way that

6     they were thinking, oh, that guy made up his mind before he

7     even heard our testimony.  I didn't know if they understand

8     that -- anyway, I think that's straight ahead.  If you

9     proved that happened that's a punitive case.

10          What about Allen though?  I mean, Allen's been

11    following along, it's undisputed that he's following along

12    in the next car and he sees a fight break out involving an

13    officer.  And he jumps to that officer's defense.

14          Now, maybe that was the right thing to do, maybe

15    it was the wrong thing to do.  Maybe he hit him too hard,

16    maybe he should have done something different.  But is that

17    sort of the almost criminal type conduct that punitives are

18    reserved for?

19          MR. RIGAT:  Well, I think if you believe Mr.

20    Outlaw that he was hit in the back of the head, not in the

21    arm, and then there are two more blows to the back of the

22    head, and then continues to pound him with a baton and crack

23    his right patella I think that's pretty bad.

24          THE COURT:  Right.  Right.

25          MR. DiCROSTA:  That's a beating versus an arrest

1  or subduing somebody.

2          THE COURT:  Yeah.  Right.

3          MR. RIGAT:  Particularly when we now have evidence

4  of other officers who could have, you know, --

5          MR. MELLEY:  Well, I'll wait.  I mean, there's no

6  evidence that he's not entitled to use that baton.

7          MR. RIGAT:  Well, we didn't say he's not entitled

8  to use the baton.

9          THE COURT:  Do you agree that if they prove that

10  Gordon instigated the incident, picked a fight because he

11  was in a bad mood, came back, shoved, kicked the guy and

12  started the whole mess, that punitive damages would be a

13  part of the case?

14          MR. MELLEY:  There has to be something done

15  maliciously or wantonly.  The testimony narrows down to this

16  entire incident taking place from the beginning until he's

17  in the ambulance in six minutes.

18          THE COURT:  Right.

19          MR. MELLEY:  So the idea that punitive is

20  associated with a certain contemplation and action and, I

21  don't see how that develops in this period where there's no

22  prior history at all.  So --

23          THE COURT:  No, you won't game on that.  I didn't

24  expect you to.  And then Allen, how do you see Allen?

25          MR. MELLEY:  That's totally different.  I think

1    he's totally justified where it's through his eyes to act in

2    response to what he perceives is an immediate threat to

3    another officer, another human being.

4         So, he's assisting, again, quickly in response to

5    something that he sees.  And I don't think there's any

6    dispute about that.  There's nothing that ties Allen into

7    anything before whatever happened between Gordon and Outlaw

8    began.

9         THE COURT:  That's correct.  No, I think their

10   claim is that the actual use of force was so severe that,

11   that he brought a gun to a knife fight, if you will.  That

12   he hit him too hard.

13        MR. MELLEY:  Well, --

14        MR. DiCROSTA:  Hit him too many times.

15        MR. RIGAT:  While in a fetal position.

16        MR. MELLEY:  The only testimony that we have is he

17   hit him until it did his job.

18        THE COURT:  Well, that's his.  But in a punitive

19   case I'm looking at it, again, from their perspective, which

20   the guy was in a fetal position on the ground getting

21   thumped.

22        MR. MELLEY:  See, part of the problem is that

23   they -- the plaintiff has injected this idea, now there's

24   evidence, that there are other people there that are not

25   defendants.  And the only potentially responsible people are

1 | Allen and Gordon.
2 |    THE COURT:  Right.
3 |    MR. MELLEY:  So if another officer happened to do
4 | something you can't pin it on these guys.
5 |    THE COURT:  The only evidence that somebody was
6 | using a club is that it was Allen.  There's no evidence that
7 | somebody else was using a club.
8 |    MR. MELLEY:  Well, --
9 |    THE COURT:  There is certainly evidence that
10 | others piled on.
11 |    MS. FEOLA-GUERRIERI:  And if they believe Allen
12 | they could infer that there were others that caused this
13 | incident and not us.
14 |    THE COURT:  Yeah.  Yeah.  Well, that's really a
15 | proximate cause problem, not really a punitive damages
16 | problem.
17 |    MR. MELLEY:  I mean, we saw today in the Hartbeat,
18 | you know, there are other officers in the area --
19 |    THE COURT:  Right.
20 |    MR. MELLEY:  -- that were never called as
21 | witnesses or defendants.  And what did they do or not?  I
22 | mean, Allen has been very clear about what he did.  Can he
23 | be more open?  I mean, so I, I have a problem with that.
24 |    THE COURT:  All right.  I'll sleep on it.  It's
25 | easy, not easy, but it's clear I think as, as to the

```
1   plaintiff's case the punitive case against Gordon and I
2   think Allen is a tough call, but let me sleep on it.  But if
3   we do award punitive is the charge standard normal or are
4   there --
5           MS. FEOLA-GUERRIERI:  It's pretty extensive.  It
6   takes up like three pages.
7           THE COURT:  I know.  I'd be glad to cut it down.
8           MS. FEOLA-GUERRIERI:  Maybe we should cut it down
9   a bit.  I don't know if there's anything duplicative here.
10          THE COURT:  Yeah, I know.
11          MR. MELLEY:  I don't know.  You know, I mean, in
12  order to find --
13          MS. FEOLA-GUERRIERI:  Talk about malice and this.
14          MR. MELLEY:  Callous.
15          MS. FEOLA-GUERRIERI:  Maybe that paragraph on
16  intent to injure.
17          MR. MELLEY:  Well, they got to find it.
18          THE COURT:  It's kind of a big complicated deal to
19  award punitives.  So it's a little hard --
20          MR. MELLEY:  And it should be.
21          THE COURT:  And it should be.  So it's a little
22  hard to see where to -- you know, we could probably do
23  without the last full paragraph because it just kind of sums
24  up; right?
25          MR. RIGAT:  Which?
```

1          THE COURT:  If you find by a preponderance of the

2     evidence that the defendants acted with malicious intent,

3     with callous disregard, it's discretionary, well that's, you

4     know, you may decide to award punitive damages, you may

5     decide not to award them.  I can live without that paragraph

6     if you want me to take it out.

7          MS. FEOLA-GUERRIERI:  It seems like it's --

8          MR. MELLEY:  Which paragraph?

9          MS. FEOLA-GUERRIERI:  The last paragraph of the

10    whole --

11         THE COURT:  Twenty-one, the last full paragraph.

12         MS. FEOLA-GUERRIERI:  Twenty-one or 22?

13         THE COURT:  Twenty-one.

14         MR. MELLEY:  Well, I think they have to know that

15    to punish the defendant for extreme or outrageous conduct,

16    you say or do you say that up above?

17         MS. FEOLA-GUERRIERI:  Right.  I was looking at

18    that.

19         MR. MELLEY:  The whole purpose is to punish.  And

20    if we're talking about Gordon he's retired and gone.  We'll

21    never see him again.

22         THE COURT:  Right.  Right.

23         MR. MELLEY:  It's supposed to deter.  He's gone.

24         MS. FEOLA-GUERRIERI:  It's working already.

25         THE COURT:  All right.  I'll leave it alone.  If

somebody over the evening comes up with any editing idea happy to make it shorter.  It's kind of standard stuff.

MR. MELLEY:  May I inquire?  Do you intend to give them the entire charge or just the guts?

THE COURT:  I read the whole darn thing.

MR. MELLEY:  I know you're going to read it.  I know that.  But when you give them the charge?

THE COURT:  You mean when I send them copies?

MR. MELLEY:  Yeah.

THE COURT:  Yeah, the whole thing.  I'll send six copies back.  Well, I usually send fewer.  I'll send eight.

MR. MELLEY:  No, you said eight.

THE COURT:  Did I say eight?  Eight.

MR. MELLEY:  No, you said there's eight copies didn't you?

THE COURT:  That's what we'll do.  With 12 jurors I send fewer back.  All right.  We'll make all those changes.  And thank you.  It's super helpful.  I always enjoy the jury charge conference.

Verdict form.  You know, before we get there you got to tell me what you want to do about qualified immunity because there's no sense in taking it in, taking it out and leaving it.

MR. MELLEY:  I think, I'm thinking it's a crazy case I have with Judge Hall who said, qualified immunity is

1   mine.  I'm just thinking out loud as to what happened.

2              THE COURT:  Sure.  Yup.

3              MR. MELLEY:  And what we had done, I had done, is

4   put together a whole list of questions.  She didn't like any

5   of them.  And she wanted it revised.  And plaintiff's

6   counsel and myself went back and forth.  She didn't like any

7   of it.

8              THE COURT:  Right.

9              MR. MELLEY:  And at the end of the day there were

10  no questions dealing with qualified immunity and she was

11  okay.

12             THE COURT:  She issued a written decision?

13             MR. MELLEY:  No, we never got there.

14             MS. FEOLA-GUERRIERI:  No, she didn't have to go

15  there.

16             THE COURT:  Oh, the case settled or --

17             MS. FEOLA-GUERRIERI:  No, there was no --

18             MR. MELLEY:  The way the verdict came down --

19             THE COURT:  It wasn't necessary?

20             MS. FEOLA-GUERRIERI:  Correct.

21             THE COURT:  Yeah, okay.

22             MR. MELLEY:  So I think at the end of the day

23  that's probably the way to go.  In other words, Your Honor

24  has that on your lap, period.

25             THE COURT:  Right.  Just issue a post-verdict

```
 1   decision probably in writing --
 2              MR. MELLEY:  Right.
 3              THE COURT:  -- in the next week or so after the,
 4   after, like next week.
 5              MR. MELLEY:  If necessary.
 6              THE COURT:  If necessary.
 7              MR. MELLEY:  Right.
 8              THE COURT:  That works for you?
 9              MR. MELLEY:  Yes.
10              THE COURT:  Does that work for you?
11              MR. RIGAT:  Sure.
12              THE COURT:  So that means, going back to the
13   charge, I'll take out all reference --
14              MR. RIGAT:  To qualified immunity?
15              THE COURT:  To qualified immunity.
16              MR. MELLEY:  Is it just that paragraph?
17              THE COURT:  No, so it's scattered through.
18   Nathalie's been really good about keeping an eye on where it
19   is.
20              MS. FEOLA-GUERRIERI:  I like the term.  It's on
21   Page 8 first.
22              THE COURT:  Yup.
23              MS. FEOLA-GUERRIERI:  Second paragraph.
24              THE COURT:  So the second paragraph of burden of
25   proof comes out.  And we don't have to talk about -- wasn't
```

1  there somewhere else earlier on?

2        MS. FEOLA-GUERRIERI:  No there's another --

3        THE COURT:  That the burden of proof is almost

4  always on the plaintiff but not -- yeah.  All right.  So

5  that second paragraph under burden of proof is gone.  And

6  then --

7        MS. FEOLA-GUERRIERI:  Page 14.

8        THE COURT:  Page 14, qualified immunity comes out

9  in its entirety, 14 on to 15.

10        MS. FEOLA-GUERRIERI:  But then on 15 under,

11  claims, you see the qualified immunity again.

12        THE COURT:  And the last sentence under claims

13  under the state law of Connecticut comes out.  And I think

14  that was all of it; right?

15        MS. FEOLA-GUERRIERI:  Umhum.  Oop, sorry.

16  Nineteen.

17        THE COURT:  Page 19.  Yes.

18        MS. FEOLA-GUERRIERI:  Second full paragraph.

19        THE COURT:  Yup.

20        MS. FEOLA-GUERRIERI:  So that sentence there can

21  go.

22        THE COURT:  Right.  And it somehow escaped -- it

23  wasn't part of assault and battery; right?  Just the, just

24  the justification, the self defense, protection of the

25  public kind of stuff.  Okay.

1       And I'll read this all over with fresh eyes first

2  thing in the morning, but I think that gets it all out of

3  here.  It's a much better way to do it.  I appreciate you

4  agreeing to it.  I mean, I was scratching my head how to --

5  I read all those cases that say it's a highbred judge, jury.

6  And then it's like, yeah, easy for you guys to say, but, you

7  know --

8       MR. RIGAT:  This is me.

9       THE COURT:  Right.  All right.  So the verdict

10  form.  The easy part is Roman III comes out.  That's the

11  qualified immunity for federal claims.  And Roman X comes

12  out, which is the qualified immunity for state law claims.

13       I thought this thing was going to take me an hour.

14  It took me most of the day.  And then the way I set it up is

15  that, yeah, each defendant, all the elements.

16       So it's sort of like, not being disrespectful,

17  like, Los Vegas when you put the quarter in you have to get

18  like four peaches all the way across, all yes's, before they

19  go to the damages for that.  You see what I mean?

20       MR. MELLEY:  Right.

21       MS. FEOLA-GUERRIERI:  Right.

22       THE COURT:  Yeah.

23       MR. MELLEY:  Obviously at the end of question six.

24       MS. FEOLA-GUERRIERI:  We'll have to change the

25  numbering.

1          THE COURT:  I have to fiddle with the numbering.

2    That's all right.

3          MS. FEOLA-GUERRIERI:  Yeah, all references to that

4    paragraph should be taken out.

5          THE COURT:  So the 1983 questions, they look

6    appropriate?

7          MR. MELLEY:  Yeah, I would say.

8          THE COURT:  The same for Allen, that's Roman II.

9    Roman III is gone.  This will be the new Roman III, the

10   Connecticut constitutional claims.

11         MR. MELLEY:  This is really going to confuse

12   people.

13         THE COURT:  The Connecticut constitutional thing?

14   I know.  I invited these guys to drop it.  Some people do

15   sometimes.  You want to keep it?  That's fine.

16         It will be super weird if you win on that cause of

17   action and not on the 1983.

18         MR. RIGAT:  I do think that they are almost, if

19   not I never would have --

20         THE COURT:  We'll deal with it when it comes.

21         MR. RIGAT:  Right.  Yes.

22         THE COURT:  We'll get there.  I tried to, like, I

23   have an answer for that.  So IIII will be claims against

24   Allen.  IIII.  Assault and battery; right?  Everybody like

25   the elements?  IED as to each.

1          MR. MELLEY:  IED?

2          THE COURT:  Intentional infliction of emotional

3    distress.

4          MR. MELLEY:  Okay.

5          THE COURT:  Qualified immunity comes out again.

6    And then here's what I fretted about on damages, which is I

7    don't want to award -- here's another qualified immunity

8    thing before we get into the guts of it on Page 7, that

9    third paragraph comes out about you do not need to take any

10   action about the qualified immunity questions.

11         So with two defendants, the part that sort of

12   puzzled me was how to make certain that there wasn't a

13   double award.  So I've just --

14         MR. MELLEY:  Well, the damages are the damages.

15         THE COURT:  Right.  That's what I thought.

16         MS. FEOLA-GUERRIERI:  The same injury.

17         THE COURT:  The same injury.

18         MR. MELLEY:  The same injury.

19         THE COURT:  So they put them all down.

20         MR. MELLEY:  Right, but I --

21         THE COURT:  And then we go back and fill in a,

22   assuming it's a plaintiff's verdict, then we fill in a final

23   judgment order that --

24         MR. MELLEY:  So generally what I was seeing is

25   under the state law, and it would follow here, I believe,

there's two kinds of damages; economic and non-economic.

THE COURT:  Yup.

MR. MELLEY:  And the economic are the medical bills, period.

THE COURT:  Right.

MR. MELLEY:  There's no distinguishing between past and future.  It's just economic.  And then non-economic refers to pain, suffering, anything else.

MS. FEOLA-GUERRIERI:  Well, there's no lost income claim either.

THE COURT:  Because I just saw that there's no past or future loss of earnings.

MR. RIGAT:  No, we're not.  We're not doing that.

THE COURT:  So hang onto your thought for a minute because that's in the charge; right?  So we got to bring it out of the charge before we lose it.

MR. RIGAT:  No, I think it might be out because I think we --

MR. MELLEY:  I thought you pulled it out already.

THE COURT:  We pulled it out already when I made the second revisions?

MR. RIGAT:  You did a nice generic, you give him a sum of money that you believe will fairly and justly compensate him for any injury.

THE COURT:  Oh, okay.  And this doesn't state what

1  the, what the particular ones are.

2          MS. FEOLA-GUERRIERI:  No.

3          MR. RIGAT:  No.

4          THE COURT:  All right.  So I interrupted you.

5  What were you going to say?

6          MR. MELLEY:  Generally, the way I've seen it

7  presented is economic damages X., non hyphen economic

8  damages Y. and a total.  That's your total compensatory

9  damages.  And then I suppose it -- because the liability is

10  not joint and several, it's separate, it could be asked to

11  apportion a percentage to equal 100.

12          THE COURT:  No, that's not the law; right?

13          MR. MELLEY:  Well, how else do we do it?  Are the

14  damages joint and several?

15          THE COURT:  Yeah.

16          MR. RIGAT:  Umhum.

17          MR. MELLEY:  Never mind.

18          THE COURT:  But I could write a new paragraph

19  about damages, put it in the charge and say, the damage, the

20  elements of damage which you may award are A., economic

21  loss, past medical bills and expenses, future medicals

22  bills.  B., non-economic loss, pain and suffering, emotional

23  distress.  And, C., punitive damages.

24          MR. RIGAT:  Judge, I'm sorry?

25          THE COURT:  And then we would have in the, in the

1    verdict form a separate list for, a separate entry for Allen

2    and a separate entry for Gordon.

3            MR. MELLEY:  As to the punitive?

4            MS. FEOLA-GUERRIERI:  As to all of them?

5            THE COURT:  As to all of them.  See, if they are

6    awarded -- if medical bills are awarded against one they are

7    awarded against both; right?  I mean, there's no difference.

8            MR. MELLEY:  If they find against both.

9            THE COURT:  Yeah.  Yeah.  Yeah.  If they find

10   liability against both.

11           MS. FEOLA-GUERRIERI:  They have to find liability

12   first.

13           THE COURT:  I started this way, not the other way

14   around.  If they find for liability, and then they give us a

15   number for medical bills, that medical bill number will

16   apply equally to either guy.

17           MR. MELLEY:  Yeah.  Yeah.

18           THE COURT:  That work?

19           MR. MELLEY:  Yes.

20           THE COURT:  The same for future medical bills.

21   And then punitive are separate because the conduct is quite

22   distinct.

23           MR. MELLEY:  Correct.

24           THE COURT:  Yeah.  So that we could, if we had a

25   past medical bill number, --

1          MR. MELLEY:  I think -- I don't mean to interrupt,

2     but I think it's just medical bills, period.  Tort reform

3     one in Connecticut, it's really tort reform two.  Tort

4     reform one you did do past and then you add a separate line

5     for future.  Tort reform two said one line, economic

6     damages.  And the same with the non-economic damages.  One

7     was past, future.  Now it's just one.

8          THE COURT:  Right.  I'm not sure that applies to

9     the 1983 claim, but I hear yeah.

10          MR. MELLEY:  I mean, just to --

11          THE COURT:  Yeah.

12          MR. MELLEY:  It's another line.

13          THE COURT:  Yeah.  How do you guys want to do it?

14          MR. RIGAT:  I think we're pretty flexible.  The

15     only suggestion I had was with the non-economics.  It's pain

16     and suffering and loss of life's enjoyment as well.

17          So if you could include that.  And if you want to

18     do it one lump number that's fine if it makes -- I think

19     that would make it easier.

20          THE COURT:  Pain, suffering --

21          MR. RIGAT:  And then loss of life's enjoyment.

22          THE COURT:  You want to take out emotional

23     distress?

24          MR. RIGAT:  Oh, no.  Leave emotional distress in.

25          THE COURT:  You just want to add loss of life,

loss of life enjoyment.  It's not a beautiful phrase, but it

will work.  Loss of enjoyment of life.  That's what you're

trying to say?

MR. RIGAT:  There you go, yeah.  Yeah.

THE COURT:  Okay.  So if we get numbers on this

verdict form am I going to have any trouble entering a

judgment from you guys?  You agree that any numbers on here

is for the categories except punitive damages will be the

ones that go onto the verdict form against defendant A. and

against defendant B., the judgment order, rather?

MR. MELLEY:  The only issue would be just in

terms -- it would be a post-verdict proceeding if, for

example, we have 50 odd thousand in medical bills.

THE COURT:  Right.

MR. MELLEY:  There's this potential of 30,000,

that's 80,000 if they return a verdict of 340 for economic

damages.

THE COURT:  Oh, yeah.  Yeah.  Yeah.  I didn't mean

to foreclose that.  Yeah.  Yeah.  Yeah.  If the medical

bills that are awarded are in excess of the amounts in

evidence then we fix it.

MR. MELLEY:  Okay.  But or you send them back or

whatever.  But um, so I didn't understand your question.

THE COURT:  That, assuming that the medical bills

are the same or less than the amounts in evidence, that a

past medical bill award of $25,000 will translate, without

objection, to a $25,000 line item on a judgment order

against both defendants.

MR. MELLEY:  No, I understand that.

THE COURT:  That make sense?

MR. MELLEY:  Yeah.

THE COURT:  Yeah.  All right.  So I think --

MR. MELLEY:  Why wouldn't it?

THE COURT:  I just don't want to get gummed up.

No, I agree.  I can't see a problem.

MR. MELLEY:  No.  Because then there would be --

this is a verdict form the jury would be finding it.  That

would give the Court a basis to enter the judgment based

upon the verdict forms.

THE COURT:  Exactly.  That's exactly what I'm

after.

MR. MELLEY:  Yeah.  I don't have a problem with

that.

THE COURT:  Okay.  And where are we on the

collateral source problem?

MR. MELLEY:  We haven't figured that out, but

tomorrow, when we resolve the issue of the actual -- the

only outstanding issue I think is whether that medical bill

for Zimmerman is going to go in for $800 or whatever.  And

once we resolve that we'll know exactly what the medical

1　claim is.  It will be around 51,000.

2　　　　And then I think we can probably agree that the

3　collateral source will be whatever it is.  You guys have the

4　total.  It's like 38 or it's like 38,000, right, or whatever

5　between forgiveness and --

6　　　　MR. DiCROSTA:  I think it's closer to 50, but I

7　have it out there.

8　　　　THE COURT:  You have it out there?  Why don't you

9　go get it.  Let's just wrestle it to the ground because it's

10　one of these things that comes back and bites us in the A.

11　as we say in this case.

12　　　　MS. FEOLA-GUERRIERI:  Say or not say.

13　　　　MR. MELLEY:  So the total bills are 51,000,

14　whatever.

15　　　　THE COURT:  Okay.  So when we know -- the thing

16　that I haven't seen, and I don't mean to be shy about this,

17　I haven't seen the illegible record.  Somebody's got it.

18　And really the objection to that is, is that it's illegible;

19　right?

20　　　　MS. FEOLA-GUERRIERI:  Non-disclosure.

21　　　　MR. MELLEY:  But then I had my federal rule.

22　　　　MR. DiCROSTA:  The Zimmerman notes.

23　　　　THE COURT:  Is it late disclosure?

24　　　　MR. MELLEY:  No.  No.  No.  Just in terms of

25　the -- and I attached that case that says if you're going to

put in medical you need a doctor to explain it.  You can't

just put in medical.  So you need somewhere an expert along

the line.  And we don't have that.

THE COURT:  Right.  Right.  Right.  Well, it's not

going to hold us up long.  It's an $800 bill.  Doctor Ranade

looked like a non-starter because it's not a medical record.

It's a report.

MR. RIGAT:  No.  Right.  We understood that.

THE COURT:  So that's not coming in.

MR. RIGAT:  No.

THE COURT:  She hasn't done a bill.  So first

thing tomorrow I'll have a look at Zimmerman.  We'll talk

about it briefly on the record and we'll be done.

My point is we've got to this and then we can --

this is face amount or --

MR. RIGAT:  This is face amount.  We would agree

certainly that you could reduce that award by the collateral

source.  And so we think the records are a part of the

billing.  They are in there.  It's not much, I don't think;

right?  I mean, how much is the out of the pocket?

MR. MELLEY:  No, he's got the judgment of 10 or

12,000.

MR. RIGAT:  Right.

MR. MELLEY:  I mean, the net is around 15.  So the

reduction is 36, seven thousand.

1          THE COURT:  I'm not with you.

2          MR. MELLEY:  Thirty-six, seven thousand was paid

3    by insurance.  So that would be the collateral source.  So

4    if there's an award of 52,000 you'd subtract the 37 to have

5    a net judgment of an economic award for 15,000.  I'm doing

6    ballparks.

7          THE COURT:  Is that how you guys do it down here?

8    That works for you?

9          MR. RIGAT:  Um-hum.

10         THE COURT:  And there's no lien?

11         MR. MELLEY:  There is no lien.

12         MS. FEOLA-GUERRIERI:  No he had insurance.

13         MR. MELLEY:  We have a state statute --

14         MS. FEOLA-GUERRIERI:  They have a judgment lien.

15         THE COURT:  What I'm saying is, the insurance

16   company sometimes wants their money back.

17         MR. MELLEY:  Only if it's an URISA.  We have a

18   statute that says if an insurance company, like Blue Cross,

19   pays on a bill they cannot assert a lien.  So any insurance

20   policy that is sent out under state law that lien does not

21   exist.

22         So the only liens that would exist would be those

23   where the medical bills are paid through an URISA plan,

24   which is federal, which supercedes the Connecticut statute.

25         THE COURT:  Right.  Okay.  Which he doesn't appear

1    to have?

2            MR. RIGAT:  He does not appear to have that.

3            THE COURT:  All right.  So your agreement is that

4    if there's an award of medical bills that all amounts paid

5    by insurance would be subtracted from the, from the jury

6    verdict amount and the judgment will be for the net figure?

7            MR. RIGAT:  Yes.  But there is one wrinkle.  What

8    about futures?  Because while he's employed now he will be

9    covered if he needs future surgery, but if --

10           THE COURT:  So if there's an order of future

11   expenses it just goes in at face value because we don't

12   know.

13           MR. RIGAT:  Right.  That's right.

14           THE COURT:  And that works for you?

15           MR. MELLEY:  Yes.

16           MS. FEOLA-GUERRIERI:  We should get that number

17   down.

18           THE COURT:  The future?  I heard it.

19           MS. FEOLA-GUERRIERI:  No.  No.  Not the future.

20   The collateral source reduction amount.

21           MR. MELLEY:  It's about 37,000.

22           MS. FEOLA-GUERRIERI:  About.

23           MR. MELLEY:  It will take 10 minutes to do.

24           THE COURT:  What we just put on the record

25   probably covers it.  That both parties have agreed that

1   you'll subtract it off of any award of past medical

2   expenses.

3            MR. RIGAT:  Yes, sir.

4            THE COURT:  The amount paid by insurance.

5            MR. RIGAT:  Yes, Your Honor.

6            THE COURT:  All right.  I think we're there.  We

7   can go off the record.

8            (The Court recessed at 5:15 p.m.)

1           C E R T I F I C A T E

2

3        I, Anne Marie Henry, Official Court Reporter for

4 the United States District Court, for the District of

5 Vermont, do hereby certify that the foregoing pages are a

6 true and accurate transcription of my shorthand notes taken

7 in the aforementioned matter to the best of my skill and

8 ability.

9

10                    _____

11                  Anne Marie Henry, RPR
                    Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25