UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____

TYLON C. OUTLAW                    )

          VS                       )   CASE NO: 3:07-CV-01769

TROY GORDON & MICHAEL ALLEN    )

_____)   MORNING MOTION HEARING AT
                                       TRIAL BY JURY


BEFORE:   HONORABLE GEOFFREY W. CRAWFORD
          DISTRICT JUDGE



APPEARANCES:  ANTHONY P. DiCROSTA, ESQUIRE
                    Mirto, Ketaineck & DiCrosta
                    P.O. Box 428
                    West Haven, Connecticut
                    Representing The Plaintiff


              RAYMOND J. RIGAT, ESQUIRE
                    Gilbride & Rigat
                    23 E. Main Street
                    Clinton, Connecticut   06413
                    Representing The Plaintiff

                    (Appearances Continued:)


DATE:        January 7, 2016


        TRANSCRIBED BY:  Anne Marie Henry, RPR
                    Official Court Reporter
                    P.O. Box 1932
                    Brattleboro, Vermont   05302

1               APPEARANCES CONTINUED:

2


3          NATHALIE FEOLA-GUERRIERI, ESQUIRE
                City of Hartford
4               Office of Corporation Counsel
                550 Main Street
5               Hartford, Connecticut   06013

6


7          WILLIAM J. MELLEY, III, ESQUIRE
                Law Offices of William J. Melley, III
8               250 Hudson Street
                Hartford, Connecticut   06016
9               Representing the Defendants

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (The Court resumed without the jury present at

2  9:42 a.m.)

3      THE COURT:  I think we have two issues to talk

4  about overlapping.  I'll hear from Mr. Melley on his motion.

5  And I also have to deal with the question of punitive

6  damages, which I didn't decide at the charge conference and

7  slept on.

8      So glad to hear from Mr. Melley on both those

9  issues and then give Mr. Rigat a turn.

10     MR. MELLEY:  I'd like to put a third issue in the

11 mix, if I may?  And if I may approach?

12     THE COURT:  Of course.

13     MR. MELLEY:  This is the, directing the Court's

14 attention to the state claim of intentional infliction of

15 emotional distress.

16     THE COURT:  Right.

17     MR. MELLEY:  And what I presented the Court with

18 is the Connecticut civil jury judge's compilation of the

19 charge.

20     And at the end of that section where it says,

21 notes there's a reference to the threshold issue for the

22 Court as to whether or not the plaintiff has met the

23 requirement of severe emotional distress and whether it was

24 extreme and outrageous.  And that's as to the distress.

25     In terms of that issue the Court has just ruled

1  that we don't have any evidence.  We have very, very limited

2  reference by the plaintiff that, yeah, he was upset a couple

3  years later and he went for counseling, period.  But there's

4  no method by which to evaluate that.

5          And I would submit, as a matter of law, that such

6  limited testimony, without any corroboration, does not

7  satisfy the standard of what would be severe to give rise to

8  pass that threshold to give the charge.

9          THE COURT:  All right.  The emotional distress

10  that they are looking for is not something typically that

11  occurs years later.  It's emotional distress at the time of

12  the alleged tortious conduct; right?  It would be emotional

13  distress on the evening in question, at least most commonly?

14          MR. MELLEY:  It has to be -- well, there's three

15  requirements that are in the charge.

16          THE COURT:  Right.

17          MR. MELLEY:  Which the Court spelled out.  What is

18  implied is that it's not just that night, it has to be

19  something that continues because every event can have a

20  traumatic effect and cause emotional distress.  But the

21  question of severity comes in -- goes beyond the bounds of

22  decency, atrocious, this is all in this charge, intolerable,

23  outrageous, exclamation point.  And it has to be severe.

24  And there's no evidence that it was severe.  We know this

25  happened.

1          THE COURT:  Right.

2          MR. MELLEY:  But in terms of an effect on him,

3     while he's there he's hurting.  We know that.  He's got the

4     physical complaints.  This is emotional distress.  And the

5     only reference comes around four years later with a very

6     vague comment that comes in and disappears.  And there's no

7     corroboration at all.  And there's nothing further.

8          My point is that as a matter of law that doesn't

9     meet the threshold of an intentional infliction of emotional

10    distress.

11         THE COURT:  Okay.  Mr. Rigat, how do you see it?

12         MR. RIGAT:  I think these facts speak for

13    themselves.  And I think there certainly is a permissible

14    inference by any reasonable adult mind that, not even an

15    adult mind, but any mind, that somebody who takes a bat-like

16    object and delivers three blows to the back of one's head,

17    with such force as to knock someone down to the ground and

18    put them in a fetal position covering their head, that that

19    is severe and outrageous conduct because it wasn't

20    warranted.

21         And then to take that same bat-like object and

22    break his knee shocks the conscience.

23         Now, in Dr. Lena's deposition, which came in as a

24    full exhibit, we heard him testify, Attorney DiCrosta asked

25    him point blank, would you please describe the amount of

pain that that man suffered from that strike.  Ten out of
10.

Now, I don't know any medical doctor, particularly
a surgeon, whose going to come in and tell you pain is 10
out of a 10 point scale.  They just don't do that.

Most of us experience our physicians telling us,
you know, it hurts, I get it, you know, I sympathize, but
you got to work through that kind of pain.  They don't
exaggerate that.  That is extreme pain.

That definitely meets the state standard for
intentional infliction of emotional distress with respect to
the outrageousness of the conduct and the level of pain.

And I can't imagine that this kind of beating that
this man described occurred to him is nothing less than
shocking to anyone's conscience.  And then the icing on the
cake, to be picked up by the collar, and he testified like a
dog, and dragged 62 feet.  And I'm hearing an argument that
as a matter of law that that's not outrageous conduct.

I can't say any more, Judge.  And I'm sorry to
raise my voice.  But I do hope the record reflects I'm not
trying to be disrespectful to you in any way.

THE COURT:  I understand.

MR. RIGAT:  But it baffles the mind.  Thank you.

MR. MELLEY:  Your Honor, there's a distinction
between physical pain and suffering and a claim for

emotional distress.  We heard about pain.  That's not part
of my motion.

I'm not questioning they have an allegation for
physical pain and suffering as a result of this.  I'm
talking about an emotional, an effect on the psyche.  A
disturbance of the well-being of the essence of the person,
not pain.  Not a disruption of life's activities, but
something related to the emotional distress.

If we had a psychologist and/or psychiatrist to
back up that there was a post-traumatic stress condition
that's a whole other ballgame.  But we don't.  All that was
eliminated.

So in terms of the argument as to emotional
distress, and never mind the attempt to get there, but it's
emotional distress.  It's not in this record.

Counsel is alleging conclusions or inferences that
might be drawn.  But as a matter of law the severe emotional
distress should not be inferred.  There should be concrete
evidence.  That's the, that's my point.

THE COURT:  All right.  I'm persuaded by Mr. Rigat
that there is certainly room for a reasonable inference,
looking at the case from the plaintiff's perspective, like
the previous Rule 50 discussion, that an ordinary citizen on
his way home from an evening with friends who is badly
beaten in the street and taken to the hospital and chained

to the bed and hospitalized for several days, that would be

sufficiently, if all that's proved, a sufficiently severe

incident to give rise to extreme emotional response.  So I

think the, for purposes of the prima facie case I think the

elements are there.

So I'll send that claim to the jury like the

others.

MR. MELLEY:  I would like to renew my motion for

judgment as a matter of law based upon the comments I made

earlier, at the conclusion of the plaintiff's evidence.  We

now have the perspective of the officers.  And in terms of

the reasonableness of their response, I think as a matter of

law there's not a basis to infer that they did not act

within their discretion as officers as far as dealing with

the situation that was there.

THE COURT:  Okay.  And anything you wanted to add

on the punitive damages issue?

MR. MELLEY:  Punitive damages um, I, in order to

have a claim for punitive damages there has to be this

evidence of an intent.  And it's not just ordinary

intentional act.  It has to be more.  The callous attitude.

We have an incident that the evidence discloses

from the beginning to the time he's put in the ambulance is

six minutes.  There's no evidence of any interaction

beforehand.  And we have an acknowledgment of an arrest

1    based upon conduct.

2            So it -- and that's not part of this case.  The

3    issue of the arrest, the probable cause for presenting the

4    charges isn't part of it.

5            So you have officers that act based upon a certain

6    set of circumstances.  And in terms of meeting the threshold

7    to say that it's premeditated or intentional, this is all

8    something that happened instantly.

9            And as Officer Allen just testified, we don't have

10   a film, but to go frame by frame and to -- it's a dynamic

11   situation.  Everybody talks about that.  And then it's over.

12   And once it's over it's done.  And I don't find a basis to

13   submit the issue to a jury.

14           THE COURT:  Okay.  Thank you.  Sir?

15           MR. RIGAT:  Yes, sir.  And, well, the testimony

16   from the plaintiff is that as the second kick is coming in I

17   feel a bat-like object hit me in the back of the head.

18   That's Officer Allen.  I immediately drop to the ground.

19   That's when the incident ended, or should have ended, but it

20   didn't end.  Because what we do know is that we have the

21   photographs.  We have the clothing.  We have the blood on

22   the side of the road.  We have the broken kneecap.  We have

23   two, we have three cuts to the head.  So there are two

24   additional blows.  We have a kick to the face.

25           Both officers here acted intentionally.  They were

acting outrageously.  They should be punished for that

conduct for two reasons; to tell them that that's not

acceptable conduct from law enforcement.  To tell their

brother and sister officers that we can't tolerate that.

There's more than enough evidence to send to a

jury on that question.  And it really is important.  And we

need to have the people tell us whether this was intentional

or not and if it's intentional to let us know what the

damages are punitively and allow the community to send its

government agents a clear message so these things don't

occur hopefully in the future.

And, you know, look, life happens, but sending a

deterrent message is critical.  Thank you.

THE COURT:  All right.  I'll deny the Rule 50

motion for the reasons that we talked about before.  I'll

turn to the question of punitive damages.  And I gave it a

lot of thought over the evening.  I have decided that it's

not an issue for the jury and will not be included in the

jury charge and will not be argued to the jury for the

following reasons:

First, based on the evidence submitted, it's

undisputed that both officers, both defendant officers,

responded to problems and potential violations of the law in

a short period of time.

I'll take the claims against the officers one at a

1    time starting with Sergeant Gordon.  It's undisputed that on

2    the evening in question he came upon a man standing in the

3    road in the middle of the night.  This was hardly an

4    emergency, but it was a potentially hazardous situation to

5    which he responded.

6         Depending on whom you believe, he responded

7    either, according to plaintiff's, in a profane, angry and

8    unprofessional manner.  Or, according to his own testimony,

9    to the defense, he responded politely and cooly as a trained

10    officer should.  In either case, his message was

11    unambiguous, pay attention to me and get out of the road.

12         The swearing, as described by the plaintiff, is

13    offensive to everybody, but standing alone there would be no

14    basis for an award for punitive damages.

15         It's undisputed that Sergeant Gordon stopped the

16    car and got out to confront the plaintiff who was still in

17    the travel portion of the roadway.  There would be no basis

18    for an award of punitive damages for that part of the case

19    either.

20         Walking aggressively to confront the plaintiff is

21    hardly a basis for punitive damages.

22         Finally, as the plaintiff describes the incident,

23    Sergeant Gordon kicked him in the chest twice without

24    causing injury, but without provocation or for a good

25    reason.  That conduct, if the plaintiff's account is

believed, may qualify, in the jury's mind, as excessive force. And that's why the case goes to the jury. But it's not the type of willful or wonton or reckless conduct nearly criminal in nature which would support an award of punitive damages against the individual defendant.

It is, at most, impulsive, angry conduct, but I think not sufficiently intentional in its tone, looking at it from the perspective of the plaintiff's evidence.

So I would rule, for purposes of punitive damages on the basis of what Officer Gordon did, not on what happened afterwards, that the situation -- what happened afterwards is that the situation escalated into a more violent struggle, but there's no evidence that he was involved in that part.

I will rule that his conduct would not reach the standard of intentionality and wrongfulness required for punitive damages.

Just a moment. And just to summarize the wrong things charged against him by the plaintiff would be swearing, disputed, but legally not sufficient. Confronting the plaintiff without clearly identifying himself as a police officer. Again, insufficient for punitive damages. And then, three, starting a physical altercation with two kicks which were insufficient to cause injury. I think those don't add up to a punitive claim.

If we turn to Officer Allen, he is in a different position. The evidence is undisputed that he was following Detective Gordon onto the scene. He witnessed an exchange of words between the plaintiff and Detective Gordon. He saw officer, I mean Sergeant Gordon get out of the car to confront the plaintiff. And then he saw a physical altercation break out between the two men.

There's a factual dispute about who started the altercation between Gordon and Outlaw, but Officer Allen was obligated to respond in some fashion to a physical fight involving another officer and a civilian. And he responded by subduing the plaintiff by striking him repeatedly with a nightstick. I don't think there's any dispute about that. He has agreed that that happened.

The reasons why it happened are in dispute. He may well have hit him too hard. That's a judgment for the jury. But I understand the plaintiff's perspective on that.

Officer Allen is a large, physically fit man and he caused considerable injury as documented in the photos and the hospital records. But there's no evidence, either direct or by way of reasonable inference, that his purpose was anything other than to subdue the plaintiff who he perceived as an aggressor in the fight.

They didn't know each other before. There is no preexisting animus. There was no provocation between the

1  two of them.  The only reason that Officer Allen got

2  involved on this factual record is that he saw the

3  alteration and couldn't walk away from it, had to, had to

4  respond.

5          So I would, for purposes of the punitive damages

6  claim, I find there's no basis to infer an intent to cause

7  injury or to, to engage in intentional, well, how shall I

8  put it, I don't think that there was the level of

9  intentionality which would support a punitive claim.

10         I think he may well be found liable for the

11  intentional use of excessive force, but I don't think that

12  there is the sort of animus or cruelty or bad purpose which

13  would support a punitive claim.

14         I have to say anything further?  I think that

15  pretty much covers it.  So from the Court's perspective the

16  excessive force claims under Section 1983, and the other

17  theories, go to the jury for purposes of a compensatory

18  award only.  I don't think the record here would support a

19  punitive award.  Yes?

20         MR. MELLEY:  May I indulge, I mean, may I be

21  indulged by the Court with regards to Rule 50?  I don't want

22  to go backwards, but I'm just reflecting in my head, I know

23  we talked about this at the charging conference, qualified

24  immunity.  I just want to be sure that's part of the

25  perspective of the Rule 50.

          I know the Court's ruled.  I'm not looking to
reargue it.  I just wanted to share that the record reflects
that the basis of the qualified immunity theory is part of
my Rule 50.

          THE COURT:  Right.  My understanding, my plan and
what I think we've agreed on, is that I've not ruled on
qualified immunity at this time, but I will rule on
qualified immunity if it becomes necessary.

          MR. MELLEY:  Thank you.

          THE COURT:  Okay.  But I haven't forgotten it.
You good?

          MR. MELLEY:  I am.

          THE COURT:  All right.

          MR. RIGAT:  Judge, if I may just briefly?  I
understand your ruling and I just want to make it clear for
my record that part of the intentional, excuse me, part of
the request for punitive damages is also the dragging of Mr.
Outlaw, not just the baton strikes to the leg and the head.
It's after that, after he's handcuffed and subdued, you
know, that he was dragged to hurt him.  Thank you.

          THE COURT:  Okay.  Thank you.

          Just in time.  We have final drafts of the jury
charge and verdict form for you.  Why don't I give you to
10:15, collect yourselves and start with summation.  That
sound fair?

1          MR. MELLEY:  May we borrow the clerk?  I just want

2    to be clear with the exhibits before we start the -- I want

3    to be clear everything is in.

4          THE COURT:  Sure.  Yup.

5          MR. MELLEY:  I know that I had to finish

6    scratching out one of the exhibits where the Court ordered

7    an excision.

8          THE COURT:  Oh, yeah.  The one with the scissors?

9          MR. MELLEY:  No, beyond that.  There was another

10   one.

11         THE COURT:  Oh, the black part at the bottom --

12         MR. MELLEY:  Right.

13         THE COURT:  -- with the hearsay.  All right.

14   Sure.

15         So I don't want to kind of roll too late into

16   the -- it would be nice to get the case to them by lunch

17   time because they've got lunch and then they can start their

18   deliberation and all.  So why don't I get out of your hair

19   for 10 minutes, like that.  All right?

20         MR. RIGAT:  So what time, Judge?  I think it

21   works, but what time do you want us back?

22         THE COURT:  10:20.

23         MR. RIGAT:  Thank you.

24         (The Court recessed at 10:05 a.m.)

25

1      C E R T I F I C A T E

2

3          I, Anne Marie Henry, Official Court Reporter for

4      the United States District Court, for the District of

5      Vermont, do hereby certify that the foregoing pages are a

6      true and accurate transcription of my shorthand notes taken

7      in the aforementioned matter to the best of my skill and

8      ability.

9

10     _____

11                        Anne Marie Henry, RPR
                           Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25